Michael J. Farrell - 015056
mfarrell@bfazlaw.com
**BEYERS FARRELL PLLC**
99 East Virginia Ave., Ste. 220
Phoenix, AZ 85004-1195
Tel. (602) 738-3022

David W. Affeld, CA SBN 123922
(*Pro Hac Vice*)
dwa@agzlaw.com
**AFFELD GRIVAKES LLP**
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Tel.:(310) 979-8700

*Attorneys for Plaintiff, Sara Do*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Sara Do, an individual, | **Case No.: 2:22.cv-00190-JJT** |
| Plaintiff, | **Assigned for all Purposes to:** **Honorable John T. Tuchi** |
| vs. | |
| Arizona Board of Regents, an Arizona State Entity; Maricopa County Special Health Care District; Dr. Kimberly Day, an unmarried person, individually and in her official capacity; Dr. Salina Bednarek, individually and in her official capacity, and Joshua Bednarek, wife and husband; Dr. Margaret Morris, individually and in her official capacity, and Phillip Morris, wife and husband; Candace Keck, individually and in her official capacity, and Jonathan Keck, wife and husband, | **FIRST AMENDED COMPLAINT** **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff, Sara Do ("Do" or "Plaintiff"), an individual, alleges against Defendants Arizona Board of Regents ("ASU"), Maricopa County Special Health Care District ("Valleywise," and collectively with ASU "Entity Defendants"), Dr. Kimberly Day ("Day"), Dr. Salina Bednarek ("Bednarek"), Dr. Margaret Morris ("Morris"), and Professor Candace Keck ("Keck," and collectively with Day, Bednarek, and Morris, "Individual Defendants") as follows:

## I.   <u>INTRODUCTION</u>

1.      After putting Sara Do directly in harm's way by mandating that she get a COVID-19 vaccination, with rare but known risks, ASU abandoned her, and ultimately discarded her, when that vaccination caused near-fatal and likely permanent damage to her heart, constructively forcing her out of its nursing program and dashing her hopes of becoming a nurse. This is an action seeking economic and punitive damages and injunctive relief in order to correct the injustice and unfair and illegal treatment Sara Do has suffered at the hands of Defendants—institutions and individuals who were duty-bound and supposed to protect her.

2.      Prior to the devastating reaction to the vaccine, Do was an exceptional student, graduating from ASU *summa cum laude* with a ***4.06 GPA***. Following a few years off to care for her young children, she returned to ASU to pursue a Master's of Science in Nursing Degree ("Master's") in 2020. She again maintained a perfect GPA, until the Summer of 2021, when she was given a failing grade and effectively, and wrongfully, dismissed from the ASU program.

3.      As part of the nursing program, ASU required Do to be vaccinated against COVID-19. This was to minimize the risk of harm to her and to patients during her clinical/experiential classes. ASU was aware when it mandated vaccination that Do, like any other recipient, faced small and known—but non-negligible—risks of severe health

1   complications, including potential cardiac injury.[1]

2       4.      Like many businesses and institutions attempting to straddle a difficult line,

3   ASU issued statements and declarations asserting that getting the vaccine was "voluntary".

4   But for ASU nursing students, getting the vaccine *was anything but voluntary*. Do and her

5   fellow students were expressly told that they would have to be fully-vaccinated in order to

6   complete their required clinicals and the program. Do understood that ASU was mandating

7   her to get the vaccine and she complied with those directives.

8       5.      On December 28, 2020, while sitting in a car with her father, Do received her

9   first and only shot of the Pfizer COVID-19 vaccine. Immediately upon receiving that shot,

10  Do suffered a severe adverse cardiac reaction, resulting in serious, episodic cardiac

11  arrhythmia, often inclusive of tachycardiac ventricular bigeminy. In simpler language, this

12  means that, when her condition is activated, Do experiences an excessively rapid heartbeat;

13  she will have one normal heartbeat followed by an abnormal heartbeat, a terrifying condition

14  that causes Do to feel lightheaded and faint. Due to the abnormal heart rhythm, her body is

15  not effectively perfused with oxygen. Without a risky heart surgery, this is likely a

16  permanent condition. Do was rushed in an ambulance from the vaccination site directly to an

17  acute care hospital, where she was stabilized. Her life would never be the same again.

18      6.      As a hardworking student and single mother dedicated to supporting her

19  family, Do was determined not to let this incident and resulting damage to her heart stop her

20  from realizing her dream of becoming a nurse. She made ASU aware of her heart condition,

21  *which formally recognized Do's disability*. Consistent with longstanding legal requirements,

22  ASU, for a time, agreed to give her reasonable accommodations "[d]ue to a medical

23  condition that student is registered with our office for," including flexible attendance and

24  _____

[1] *See* Savalan Babapoor-Farrokhran et al., *Arrhythmia in COVID-19*, 2(9) SN Compr. Clin. Med. 1430–1435

25  (2020) ("There are well-documented cardiac complications of COVID-19 in patients with and without prior
    cardiovascular disease. The cardiac complications include myocarditis, heart failure, and acute coronary

26  syndrome resulting from coronary artery thrombosis or SARS-CoV-2-related plaque ruptures. There is
    growing evidence showing that arrhythmias are also one of the major complications."); Martina Patone et al.,

27  *Risks of Myocarditis, Pericarditis, and Cardiac Arrhythmias Associated with COVID-19 Vaccination or
    SARS-CoV-2 Infection*, 28(2) Nat. Med. 410-422 (2022); Rimple Jeet Kaur et al., *Cardiovascular Adverse

28  Events Reported from COVID-19 Vaccines: A Study Based on WHO Database*, 14 Int. J. of Gen. Medicine
    3909-3927 (2021).

faculty letters, also noting that "student may need to keep a medical device near her during exams to monitor specific health information." But that would soon change.

7.     During Spring Semester 2021, little by little ASU reneged on its promises of reasonable accommodations—mandated by law—and instead began to force Do out of the program. ASU, acting by and through its faculty and administration, began to create additional barriers and challenges to Do's academic career, apparently in response to her disability, which it did not impose on other students. Do was wrongfully singled out for this treatment.

8.     As a result of her condition, Do is under doctor's orders not to drive, one of many daily tasks that she can no longer perform alone. Despite this, ASU required her to be physically present on the campus despite the pandemic. Wanting to comply, Do attempted to go to campus to complete her requirements. She suffered a cardiac episode while taking an exam on campus, and was again sent to the emergency room.

9.     As a result of that scary episode, Do missed two days of her clinical rotation. Do was told that she could submit written assignments to make up for 24-hours' worth of those missed days. Four-days before these assignments were due—and after Do had completed most of them—ASU told Do that they would no longer accept the work after all. Frustrated, but still committed to her dream of becoming a nurse, she did not complain.

10.    ASU assigned Do to clinical shifts at Valleywise Health Medical Center—a Level I Trauma Center. One of Do's classmates, who also had an absence from the same clinical, was assigned to classroom training for Advanced Cardiac Life Support ("ACLS"). Do was originally assigned to a 3-hour burn victim surgery, in an operating room which is kept at a temperature of over 100 degrees for the patient's safety and well-being. She expressed concern that the high temperature and extended surgical time might aggravate her condition (a disability that ASU had previously recognized), and that she would not have easy access to her medication to control her arrhythmias. She also reaffirmed that despite her concerns, she was willing to do what she was told. In response, the ASU professor on site, Dr. Day (who spent a collective 5-minutes with Do), wrote a nine-page, negative evaluation

asserting that Do had complained about the operating room being too warm. Dr. Day is an employee of both ASU and Valleywise and her knowledge is imputed to each. Dr. Day's evaluation was knowingly and intentionally false and defamatory.

11.    Dr. Day next assigned Do's supervision to another Valleywise staff member, where she observed the surgery of a victim of a gruesome car accident. Do did her best to complete the assignment, but began experiencing arrhythmias due to the horrifying nature of this situation, where the patient had been "de-gloved" in the accident. Because of the extreme seriousness of the injury and the fact that blood and surgical fluids were literally spurting on the floor such that other hospital personnel were throwing towels on the floor to catch them, Do began to experience another heart episode. After twice giving notice to her on-site supervisors, and acting in the best interests of the patient, Do left the operating room and subsequently the facility.

12.    In a false and defamatory written evaluation related to this incident, ASU and Dr. Day falsely alleged that Do: (i) abandoned her clinical assignments without notice or explanation; (ii) stated that she merely wanted the Master's in order to be an administrator; (iii) was disinterested in her assignments; and (iv) did not meet required objectives while making up her clinical hours. ***None of these statements were true***, and ASU, its faculty and personnel are well aware of these falsehoods. Yet, on the basis of this sham evaluation, Do was constructively expelled from the Master's program and given a failing grade for the clinical course, an unwarranted stain on her academic record that will continue to cause considerable harm well into the future. Prior to the 4-hour shift at Valleywise, Do had earned a 100% grade in this class in which she was subsequently failed. Defendants Keck, Bednarek, and Morris also participated in the creation and publication of the false and defamatory evaluation.  To be clear, this is not a situation where a student is complaining about the grading process or that she received a "B" instead of a "B+".  Rather, these Defendants created, ratified, and published a false and defamatory evaluation, including by materially altering the evaluation paperwork to include days for which Do could not be evaluated.

13.     As a direct result of actions taken by ASU, Valleywise, and their agents, Do has suffered (i) extreme emotional distress; (ii) immediate and long-term reputational harm; and (iii) the loss of a salary of between $150,000 and $300,000 per year that she expected to earn with her Master's degrees. She is entitled to significant economic damages, punitive and exemplary damages, and injunctive relief to correct this miscarriage of justice.

## II.    JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action because (i) it has original jurisdiction under 28 U.S.C. § 1331 in that the First, Second, Third, and Sixth Claims arise under the Constitution, laws, or treaties of the United States and (ii) it has supplemental jurisdiction under 28 U.S.C. § 1367 because the remaining Causes of Action in the Complaint are so related to the First, Second, Third, and Sixth Causes of Action that they form part of the same case or controversy under Article III of the United States Constitution.

15.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## III.    PARTIES

16.     Do is an individual and a resident of Phoenix, Arizona. Do was a student at ASU from 2014-2016, during which time she earned her undergraduate degree in Family and Human Development, and in 2020-2021 when she was in the process of earning her Master of Science in Nursing degree.

17.     Defendant Arizona Board of Regents is the jural entity and governing body of Arizona's public university system, which has jurisdiction and control over Arizona State University.

18.     Defendant Maricopa County Special Health Care District is a healthcare organization with multiple facilities throughout Phoenix and the State of Arizona.

19.     Defendant Dr. Kimberly Day is an individual and a resident of Phoenix, Arizona. Dr. Day is employed by and affiliated with both ASU and Valleywise. She acts as a

member of the ASU faculty and as a clinical advisor for Valleywise. Dr. Day is substantially responsible for many of the acts complained about herein.

20.     Defendant Dr. Margaret Morris is an individual and a resident of Phoenix, Arizona. Dr. Morris is employed by ASU and is substantially responsible for many of the acts complained about herein. Defendant Phillip Morris is an individual and a resident of Phoenix, Arizona. At all relevant times, Defendant Phillip Morris and Defendant Dr. Margaret Morris were married, and the actions of Dr. Margaret Morris  were taken in furtherance of their marital community.

21.     Defendant Dr. Salina Bednarek is an individual and a resident of Phoenix, Arizona. Dr. Bednarek is employed by ASU and is substantially responsible for many of the acts complained about herein. Defendant Joshua Bednarek is an individual and a resident of Phoenix, Arizona. At all relevant times, Defendant Joshua Bednarek and Defendant Dr. Salina Bednarek were married, and the actions of Dr. Salina Bednarek  were taken in furtherance of their marital community.

22.     Defendant Professor Candace Keck is an individual and a resident of Phoenix, Arizona. Professor Keck is employed by ASU and is substantially responsible for many of the acts complained about herein. Defendant Jonathan Keck is an individual and a resident of Phoenix, Arizona. At all relevant times, Defendant Jonathan Keck and Defendant Candace Keck were married, and the actions of Candace Keck were taken in furtherance of their marital community.

## IV.     COMPLIANCE WITH ARIZ. REV. STAT. ANN. § 12–821.01

23.     Defendant ASU is a public entity or public school within the meaning of Ariz. Rev. Stat. Ann. § 12-821.01. Pursuant to Ariz. Rev. Stat. Ann. § 12-821.01 and in compliance therewith, notice of Plaintiff's claim, including facts sufficient to understand the basis on which liability is claimed, a specific amount for which the claim can be settled, and facts supporting that amount, was filed by service upon the person or persons authorized to accept service for Defendant ASU as set forth in the Arizona rules of civil procedure on

November 10, 2021, which was within one-hundred eighty days of when each cause of action alleged herein accrued. Pursuant to Ariz. Rev. Stat. Ann. § 12-821.01(E), this claim was deemed denied sixty days after the filing because it was not accepted at any time and Plaintiff was not advised of a denial in writing before the expiration of sixty days after the filing.

24.    Defendant Dr. Kimberly Day is a public employee within the meaning of Ariz. Rev. Stat. Ann. § 12-821.01. Pursuant to Ariz. Rev. Stat. Ann. § 12-821.01 and in compliance therewith, notice of Plaintiff's claim, including facts sufficient to understand the basis on which liability is claimed, a specific amount for which the claim can be settled, and facts supporting that amount, was filed by service upon the person or persons authorized to accept service for Defendant Day as set forth in the Arizona rules of civil procedure on November 30, 2021, which was within one-hundred eighty days of when each cause of action alleged herein accrued.  Pursuant to Ariz. Rev. Stat. Ann. § 12-821.01(E), this claim was deemed denied sixty days after the filing because it was not accepted at any time and Plaintiff was not advised of a denial in writing before the expiration of sixty days after the filing.

25.    Defendant Dr. Margaret Morris is a public employee within the meaning of Ariz. Rev. Stat. Ann. § 12-821.01. Pursuant to Ariz. Rev. Stat. Ann. § 12-821.01 and in compliance therewith, notice of Plaintiff's claim, including facts sufficient to understand the basis on which liability is claimed, a specific amount for which the claim can be settled, and facts supporting that amount, was filed by service upon the person or persons authorized to accept service for Defendant Morris as set forth in the Arizona rules of civil procedure on November 16, 2021, which was within one-hundred eighty days of when each cause of action alleged herein accrued. Pursuant to Ariz. Rev. Stat. Ann. § 12-821.01(E), this claim was deemed denied sixty days after the filing because it was not accepted at any time and Plaintiff was not advised of a denial in writing before the expiration of sixty days after the filing.

26.    Defendant Dr. Salina Bednarek is a public employee within the meaning of

Ariz. Rev. Stat. Ann. § 12-821.01. Pursuant to Ariz. Rev. Stat. Ann. § 12-821.01 and in compliance therewith, notice of Plaintiff's claim, including facts sufficient to understand the basis on which liability is claimed, a specific amount for which the claim can be settled, and facts supporting that amount, was filed by service upon the person or persons authorized to accept service for Defendant Bednarek as set forth in the Arizona rules of civil procedure on November 16, 2021, which was within one-hundred eighty days of when each cause of action alleged herein accrued. Pursuant to Ariz. Rev. Stat. Ann. § 12-821.01(E), this claim was deemed denied sixty days after the filing because it was not accepted at any time and Plaintiff was not advised of a denial in writing before the expiration of sixty days after the filing.

27.     Defendant Dr. Candace Keck is a public employee within the meaning of Ariz. Rev. Stat. Ann. § 12-821.01. Pursuant to Ariz. Rev. Stat. Ann. § 12-821.01 and in compliance therewith, notice of Plaintiff's claim, including facts sufficient to understand the basis on which liability is claimed, a specific amount for which the claim can be settled, and facts supporting that amount, was filed by service upon the person or persons authorized to accept service for Defendant Keck as set forth in the Arizona rules of civil procedure on November 17, 2021, which was within one-hundred eighty days of when each cause of action alleged herein accrued. Pursuant to Ariz. Rev. Stat. Ann. § 12-821.01(E), this claim was deemed denied sixty days after the filing because it was not accepted at any time and Plaintiff was not advised of a denial in writing before the expiration of sixty days after the filing.

28.     Defendant Valleywise, legally known as Maricopa County Special Health Care District, is a public entity within the meaning of Arizona covered by Ariz. Rev. Stat. Ann. § 12-821.01. Pursuant to Ariz. Rev. Stat. Ann. § 12-821.01 and in compliance therewith, notice of Plaintiff's claim, including facts sufficient to understand the basis on which liability is claimed, a specific amount for which the claim can be settled, and facts supporting that amount, was filed by service upon the person or persons authorized to accept service for Defendant Valleywise as set forth in the Arizona rules of civil procedure on November 15,

2021, which was within one-hundred eighty days of when each cause of action alleged herein accrued. Pursuant to Ariz. Rev. Stat. Ann. § 12-821.01(E), this claim was deemed denied sixty days after the filing because it was not accepted at any time and Plaintiff was not advised of a denial in writing before the expiration of sixty days after the filing.

## V.   FACTUAL ALLEGATIONS

29.     As part of her nursing program, ASU required Do to be vaccinated against COVID-19. This was to minimize the risk of harm to her and patients during her clinical/experiential classes. ASU was aware at all relevant times of the small, but meaningful, risk to Do and other students of dangerous side effects of COVID-19 vaccination. ***For ASU nursing students, getting the vaccine was anything but voluntary***. Do and her fellow students were expressly told that they would have to be fully-vaccinated in order to complete their required clinicals and, subsequently, graduate from the program. Do reasonably understood that ASU was mandating her to get the vaccine and she complied with those directives.

30.     On December 28, 2020, while sitting in a car with her father, Do received her first shot of COVID-19 vaccine, and suffered an immediate, severe adverse reaction, including atrial fibrillation, and then ventricular tachycardia (a potentially fatal arrhythmia). As a direct result of the vaccine, Do suffers serious, episodic cardiac arrhythmia, often inclusive of tachycardiac ventricular bigeminy. In short, when her condition is activated, Do has an excessively rapid heartbeat where she experiences one normal heartbeat followed by an abnormal heartbeat; a terrifying condition that has fundamentally altered Do's life.

31.     Ordinary life activities, such as getting ready in the morning, driving a car, or visiting her family have become difficult or impossible. Since receiving the COVID vaccine, she has completely eliminated her consumption of caffeine for fear the elevation to her heart rate will cause an episode. Do cannot even enjoy a simple cup of coffee in the mornings; something that she used to enjoy daily. Do is under strict doctor's orders not to drive, as the sudden onset of her arrhythmias renders it unsafe. Even being a passenger in a vehicle can be

enough to trigger cardiac problems. Do can no longer fly on an airplane, so she cannot easily visit family members out of state. She travels with an EKG monitor at all times, and lives in a state of constant anxiety. Upon awakening, her first task is to check her heart. Simply stated, Do's life has been turned upside down as a result of the damage to her heart.

32.     While she is on heart medication to attempt to control her symptoms, the medication is not always effective. She sees three electrophysiology cardiologists regularly, and they believe her only other option to attempt to control the symptoms is a risky surgery, which would leave permanent scarring on her heart.

33.     Do's long-term aspirations included actively treating patients as a nurse and also advocating on behalf of other nurses. After completing her Master's of Science in Nursing from ASU, Do intended to pursue a second Master's degree in Executive Healthcare Administration with the goal of ultimately becoming a Chief Nursing Officer. During the COVID Pandemic, Do observed ways in which nurses, and their safety and health, were put at risk and often minimized. Along with treating and attending to patients, she also wanted to work with administrators to improve the health, safety, effectiveness, and ultimately happiness, of fellow nurses.

34.     As a hardworking student and single mother determined to support her family, Do did not want to let the COVID-19 shot reaction stand in the way of earning her Master's degree. She made ASU aware of her heart condition, and through its Student Accessibility and Inclusive Learning Services Center, ***ASU formally recognized Do's disability***.

35.     ASU agreed to give her reasonable accommodations, and initially did work with her to accommodate her disability. Accommodations provided included allowing Do to attend classes virtually. During Spring Semester 2021, after her disability developed and worsened, Do continued to excel in her classes, due, in part, to the reasonable accommodations that ASU initially gave her.

36.     As Spring turned to Summer, ASU began to renege on its promises of reasonable accommodations and to single Do out on the basis of her disability. As she became more concerned about her ability to satisfy the course requirements at the level to

which she was accustomed, Do spoke with two ASU professors, including Defendant Dr. Bednarek. During that discussion, in which Do repeated numerous times, without challenge, that ASU had mandated the vaccine, Dr. Bednarek suggested that Do could take a grade of "incomplete" for the course, which would allow her to avoid having to restart the course and, instead, to pick up from that point and finish once her health stabilized.[2] Later, without explanation or justification, Defendants refused to honor that offer and declined to allow Do to take an incomplete.

37.     ASU originally allowed Do flexibility in attending classes and taking exams remotely due to her recognized disability and the ongoing pandemic. During Summer 2021, however, senior staff of the nursing school informed her that she must now perform all requirements of the program in person. As a result of her condition, Do is under doctor's orders not to drive herself and sometimes she is unable to ride safely in a car even as a passenger. Still, wanting to comply with ASU and realize her dream of becoming a nurse, Do attempted to go to campus to complete her requirements.

38.     While taking an exam on the ASU campus the day before her clinical assignment, Do experienced a severe cardiac episode and was forced to go to the hospital. Although she was not formally admitted to the hospital, she was kept there under observation and treated well into the night before she was finally allowed to return home.

39.     As a direct result of this severe, days-long bout of acute arrhythmia, Do missed two bedside clinical shifts. As an accommodation, Professor Keck, another ASU professor, offered Do twenty-four hours' worth of clinical replacement assignments to make up for those missed days. It was not unusual to have clinical replacement assignments either for student absences or when hospitals were unable to accept students in their facilities. When Do was nearly finished with all the clinical replacement assignments, she was told that ASU would no longer accept them. ASU now claims that this change was mandated by the AZ Nursing Board, but the assignments were given to her *after* the alleged change was

---

[2] Do is able to provide quotes from various meetings with ASU and Valleywise personnel because she recorded these meetings. These recordings, made pursuant to Arizona's "one-party consent law", are powerful evidence of Defendants' intentional wrongdoing.

communicated to ASU staff. This is another in a long line of shifting stories and justifications that Defendants have offered for their failure and refusal to follow well-established law.

40.     Frustrated, but still committed to her dream of becoming a nurse, Do did not complain and persisted in her efforts to finish the course. Her next step would be to complete more clinical hours, including bedside clinical hours.

41.     ASU assigned Do to clinical shifts at Defendant Valleywise's facility, Valleywise Health Medical Center, in order to make up for the work she missed. Dr. Day, a professor in Do's Master's program and the charge nurse at Valleywise, was assigned to supervise the clinical.  As an employee for both ASU and Valleywise, Day's knowledge and actions are imputed to each.

42.     On July 23, the night before Do's assigned shift, she was reviewing materials provided by Valleywise in order to ensure strict compliance with hospital protocols. Do became concerned upon reading the "Limitations Applied to All Nursing & Allied Health Student Experiences" document, which stated that students are not permitted in rooms requiring a N95 respirator. In one of Dr. Day's prior emails, she told Do to make sure she brought an N95 mask for each clinical shift, since there is not time to test emergency/trauma patients first to determine their COVID status.

43.     Do emailed Dr. Day and her program director, Dr. Bednarek, at 9:44 p.m., requesting their permission to remain in compliance with Valleywise's protocols. She explicitly noted her concern about potential exposure because she had only received one shot of the COVID vaccination due to her severe cardiac reaction. As such, this places her at a higher risk of contracting COVID than someone who is fully-vaccinated.

44.     At 6:25 a.m. the next morning, prior to beginning her clinical shift, Do asked Dr. Day if she had had a chance to read her email. Dr. Day wears and frequently checks her smart watch, which shows notifications of emails received, and has regularly sent Do emails after 10 p.m. Dr. Day yelled at Do, and asked if she had actually thought Dr. Day would

1   have read an email sent the night before.[3]

2       45.   Despite Dr. Day's reaction, Do remained calm and conveyed her concerns. She

3   also expressed her wish to remain in strict compliance with all rules, because she was

4   concerned the department was trying to lay the groundwork to have her dismissed from the

5   Master's program due to her disability and seeking reasonable accommodations.

6       46.   Dr. Day informed Do that, despite its unequivocal language, the Valleywise

7   rule did not apply to Do personally, said she was exempt from that rule in the operating

8   room, and that if she refused to attend any surgery requiring N95 masks, she would not be

9   able to make up as many clinical hours that day as she needed.

10      47.   Dr. Day then assigned Do to a burn victims surgery, a potential N95 mask

11  required area, which is kept at a temperature of over 100 degrees for patient safety and well-

12  being. Do expressed concern that the high temperature and extended surgical time might

13  aggravate her disability, and that she would not have easy access to her medication to control

14  her arrhythmias should one arise. She also reaffirmed that despite her concerns, she was

15  willing to do what she was told. In response, Dr. Day (who spent a collective 5-minutes with

16  Do), wrote a nine-page, false and defamatory negative evaluation alleging Do had

17  complained about the room being too warm.

18      48.   ASU and Defendants Day and Bednarek also refused to allow Do to complete

19  her clinical hours in less than blocks of twelve-hours shifts, falsely claiming that state law

20  mandated these hours. In fact, clinical shifts for nursing students often lasted less than twelve

21  hours, especially when the ASU professors overseeing the clinical hours had personal

22  conflicts that prevented them from conveniently being present for twelve hours. ***The nursing***

23  ***packet sent to Do and other nursing students before beginning the program plainly states***

24  ***that clinical hour adjustments can be part of the accommodations provided to students***

25  ***with disabilities***.  This is another example of the Defendants taking diametrically-opposed

26  [3] Throughout the mandated grievance process at ASU, the University and its professors and
    administrators routinely communicated with Do over email, at times demanding responses
27  immediately.  This was so even though the Defendants' position was that email was
    inefficient and the highly-paid professors were simply too busy to be expected to read and
28  respond to emails after 9 p.m.

positions when doing so is in their perceived interests. This is the precise opposite of taking into account a student or employee's disability and providing reasonable accommodations.

49.     Do was then reassigned to a different surgery in the trauma unit; another area potentially requiring N95 masks. Do followed the instructions, despite the fact that one of her other classmates was given classroom ACLS training to make up for her previous clinical absence. While other students conducted routine patient checks and tests, and made small talk with patients, Do's cases involved severe accident victims, including one patient who had been degloved—*i.e.*, the skin and muscle on his arm had been completely pulled off, and was spurting blood and surgical fluids in the operating room—and another man who had been crushed by a forklift, was nonresponsive, and brought in as a "John Doe". These assignments were extreme, especially for a nursing student with Do's acknowledged disability, and given her years of education and experience, Dr. Day was well aware that the traumatic experience would increase Do's stress level, heightening the risk of an arrythmia episode.

50.     Do did her best to complete the assignment, but eventually began experiencing arrhythmias due to these horrific scenes. The traumatic clinical shift sent Do into tachycardiac ventricular bigeminy. At 11:01 a.m., Do emailed Dr. Day to let her know that she was not feeling well and specified she was having heart arrhythmia. At 11:07 a.m., she called Dr. Bednarek to try to let her know about the situation, but Dr. Bednarek did not answer. At 11:30 a.m., she emailed Dr. Day again to let her know that she needed to leave due to aggravation of her heart condition and disability.

51.     In addition to these attempts to notify Drs. Day and Bednarek, Do informed the CRNA in the surgery that she was in arrhythmia and needed to take a break and medication. She then left the room, and ultimately did not return for fear of exposing contaminants into the surgery after the patient's operation had begun.  All of Do's actions were taken with the best interests of the patients in mind.

52.     After Do's departure from her clinicals on July 24, 2021, Dr. Day, Dr. Bednarek, Dr. Morris, and Professor Keck submitted an extremely negative, nine-page

performance review. This evaluation contained numerous falsehoods, misleading and defamatory statements, inconsistencies, and failed in any way to take into account that Do had left because she was experiencing a medical emergency in her bout of severe arrythmia.

53.    ASU and its personnel falsely alleged that Do: (i) abandoned her clinical assignments without notice or explanation; (ii) stated she merely wanted the Master's in order to be an administrator; (iii) was disinterested in her assignments; and (iv) did not meet required objectives or competencies while making up her clinical hours. Over a Zoom meeting, with Dr. Bednarek, Dr. Morris, and multiple other members of ASU staff present, Do was told that she had exhibited "gross incompetence as a nursing student." Each and all of these statements are false and defamatory. Not content to just give Do a failing grade, Defendants also wanted to place a permanent stain on her academic record by publishing the false and defamatory evaluation, including by sending it to the Arizona State Nursing Board. Defendants' conduct in this regard is willful, malicious, and outrageous and justifies an award of punitive and exemplary damages.

54.    ASU further altered the standard evaluation form, changing the orientation of the form from portrait to landscape in order to add an additional column for days Do did not perform clinical work. In this extra column, Do was given even more poor evaluations for *nonexistent* work days. Further, the false and defamatory evaluation includes multiple statements from unidentified "witnesses" from Valleywise, whose names and identities have been kept from Do. Without their names, Do is unable to identify who these individuals are. And, given the small number of individuals that she interacted with on that day, it is extremely unlikely that these individuals exist or gave actual information about Do. Rather, Do is informed and believes, and on that basis alleges, that these false "observations" were manufactured by Defendant Day, Defendant Morris, Defendant Bednarek, and Defendant Keck and inserted into the evaluation for the purpose of manufacturing support for removing Do from the program. Defendants had grown tired of accommodating Do's disability, which was directly caused by a vaccine mandated by ASU and Valleywise, and were fabricating a paper trail to justify removing Do from the program.

55.     On the basis of this false and defamatory evaluation, Do was given a failing grade for the clinical course and was constructively removed from the nursing program, effectively ending her dream of becoming a nurse. Worse still, this false and defamatory evaluation, when combined with the failing grade, has permanently damaged Do's name and reputation and will negatively impact her for the rest of her life. Defendants' conduct in all regards was willful, malicious, and intended to harm, and did harm, Do and justify an award of punitive and exemplary damages where so recoverable.

56.     Do unsuccessfully challenged her failing grade through ASU's formal grievance process.

57.     At each stage of that process, Defendants made up a series of inconsistent, pretextual reasons for affirming the failing grade. At no point in that process did ASU recognize the impact that Do's life-altering disability—which resulted from ASU's mandate that she receive a COVID-19 vaccination—had on her ability to complete her clinicals, nor the need for a reasonable accommodation to address this disability.

58.     Do has completed each stage of the formal grievance process (which was expressly limited to challenging that specific grade), and ASU formally upheld the decision to issue her a failing grade and to constructively remove her from the program. Do's claims are thus ripe for adjudication in this forum.

**VI.    CLAIMS**

**FIRST CLAIM**

**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE II**

**(By Plaintiff Against ASU)**

59.     Plaintiff incorporates by reference each of the preceding paragraphs.

60.     Under 42 U.S.C. § 12132, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

61.     Do has a disability within the meaning of the ADA, 42 U.S.C. § 12102. Her cardiac arrythmia is a physical impairment that substantially limits major life activities, including Do's ability to care for herself, her mobility, manual tasks, her ability to work, and her ability to complete her studies. Do's arrythmia significantly impacts her circulatory functions.

62.     With reasonable accommodations, such as those provided to other students in her program, Do would be able to perform all of the requirements of her nursing program.

63.     Under Title II of the ADA, Defendant ASU is a public entity. *See* 42 U.S.C. § 12131(1)(B).

64.     Plaintiff has an ongoing and severe disability on the basis of what appears to be permanent heart damage she sustained after receiving the COVID-19 vaccine as required by ASU.

65.     Defendant ASU has violated Title II of the ADA by failing to provide reasonable accommodations to Plaintiff; altering Plaintiff's schedules and requirements to prevent her from completing her program on the basis of her disability and retaliating against her for seeking accommodations; denying her the benefit of the advanced degree she was in the process of earning; and constructively removing her from the Masters of Nursing program as a result of the disability she suffered as a result of ASU's own vaccination requirements.

66.     ASU was fully aware of Plaintiff's disability, as evidenced by her successful request to the ASU Student Accessibility and Inclusive Learning Services Center for accommodations and through her numerous written and oral communications with her professors and other ASU administrators. With this knowledge, ASU's actions, including those by and through its professors and administrators, against Plaintiff were intentional or taken with deliberate indifference to Plaintiff's federally protected rights.

67.     Pursuant to 42 U.S.C. § 12133, and the remedies, procedures, and rights set forth in 29 U.S.C. § 794a incorporated therein, Plaintiff prays for judgment as set forth below.

**SECOND CLAIM**

**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE II**

**(By Plaintiff Against Valleywise)**

68.     Plaintiff incorporates by reference each of the preceding paragraphs.

69.     Under Title II of the ADA, Valleywise is a public entity. *See* 42 U.S.C. § 12131(1)(B).

70.     Plaintiff has an ongoing and severe disability on the basis of what appears to be permanent heart damage she sustained after receiving the COVID-19 vaccine so that she could conduct clinical work for Defendant Valleywise.

71.     Defendant Valleywise violated Title II of the ADA by failing to operate its clinics and related services on a nondiscriminatory basis; failing to ensure that individuals with disabilities are properly accommodated on site and in clinical work for Defendant Valleywise; and failure to ensure that its agents and supervisors, including Dr. Day, were trained proficiently to supervise, educate, and accommodate individuals with disabilities who were participating in their programs. Valleywise discriminated against Do by giving her difficult and highly-stressful assignments not given to other students, and by issuing her a false and defamatory performance evaluation, resulting in Plaintiff's constructive removal from her nursing program and permanent inability to continue clinicals at Valleywise.

72.     Valleywise, in addition to ASU, was responsible for the supervision and arrangement of Plaintiff's clinical requirements. As a result of disparate treatment due to her disability, Plaintiff was prevented from gaining the same practical experience and degree as her classmates.

73.     With reasonable accommodations, such as those provided to other students in her clinics, Do would be able to perform all of the clinical requirements.

74.     Valleywise was aware of Plaintiff' disability through Dr. Day, an admitted agent of both ASU and Valleywise with direct knowledge of Plaintiff's disability. Despite awareness of the disability, Valleywise refused to place Plaintiff in working environments that were better suited to her condition while still fulfilling her program requirements. Such

alternatives were readily available, and utilized for Plaintiff's non-disabled classmates.

75.     Pursuant to 42 U.S.C. § 12133, and the remedies, procedures, and rights set forth in 29 U.S.C. § 794a incorporated therein, Plaintiff prays for judgment as set forth below.

### THIRD CLAIM

### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE IV

### (By Plaintiff Against Entity Defendants and

### Individual Defendants in their Official Capacities)

76.     Plaintiff incorporates by reference each of the preceding paragraphs.

77.     Under 42 U.S.C. § 12203(b), "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

78.     As a result of Plaintiff's attempt to exercise her rights, as guaranteed under Title II as to ASU and Valleywise, Plaintiff was coerced, interfered with, and intimidated by Defendants and their agents.

79.     As noted above, when Plaintiff requested reasonable accommodations for her known and documented disability, ASU and Valleywise actively placed her on clinical duty in areas unsuitable for Plaintiff when safer alternative assignments were available; negatively impacted her education and reputation by diminishing her disability, concerns, and needs; lied to her about safety protocols to force her onto duty when she knew it was unsafe; made false allegations against her in a pretextual and defamatory performance evaluation; and constructively removed her from her Master's program on a pretextual basis due to their unwillingness to accommodate Plaintiff's disability as she is entitled under Titles II and III of the ADA.

80.     Defendants took these actions intentionally or with deliberate indifference to Plaintiff's federally-protected rights.

81.     Pursuant to the remedies, procedures, and rights set forth in 29 U.S.C. § 794a incorporated therein, Plaintiff prays for judgment as set forth below.

**FOURTH CLAIM**

**VIOLATION OF THE ARIZONANS WITH DISABILITIES ACT**

**A.R.S. § 41-1492.02**

**(By Plaintiff Against ASU)**

82.     Plaintiff incorporates by reference each of the preceding paragraphs.

83.     Under A.R.S. § 41-1492.02 ("AzDA"), "No individual may be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases, leases to others or operates a place of public accommodation."

84.     ASU is a "public accommodation" within the meaning off the AzDA as an "undergraduate or postgraduate private school or other place of education." *See* A.R.S. § 41-1492(11)(j).

85.     ASU is a "person" under the terms of the AzDA. *See* A.R.S. § 49-961.

86.     Plaintiff was discriminated against by Defendant ASU on the basis of her disability, as detailed in her ADA Title II claim. She realleges these facts as the basis of this claim.

87.     Defendant ASU took these actions intentionally or with deliberate indifference to Plaintiff's federally protected rights.

88.     Pursuant to the remedies, procedures, and rights set forth in A.R.S. § 41-1492.08 incorporated therein, Plaintiff prays for judgment as set forth below.

**FIFTH CLAIM**

**VIOLATION OF THE ARIZONANS WITH DISABILITIES ACT**

**A.R.S. § 41-1492.02**

**(By Plaintiff Against Valleywise)**

89.     Plaintiff incorporates by reference each of the preceding paragraphs.

90.     Under A.R.S. § 41-1492.02, "No individual may be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases, leases to others or operates a place of public accommodation."

91.     Valleywise is a "public accommodation" within the meaning of the AzDA Public accommodation includes any "professional office of a health care provider, hospital or other service establishment." A.R.S. § 41-1492(11)(f).

92.     Valleywise is a "person" under the terms of the AzDA. *See* A.R.S. § 49-961.

93.     Plaintiff was discriminated against by Defendant Valleywise on the basis of her disability, as detailed in her ADA Title II claim. She realleges these facts as the basis of this claim.

94.     Defendant Valleywise took these actions intentionally or with deliberate indifference to Plaintiff's federally protected rights.

95.     Pursuant to the remedies, procedures, and rights set forth in A.R.S. § 41-1492.08 incorporated therein, Plaintiff prays for judgment as set forth below.


**SIXTH CLAIM**

**VIOLATION OF REHABILITATION ACT**

**(By Plaintiff Against Entity Defendants and**

**Individual Defendants in their Official Capacities)**

96.     Plaintiff incorporates by reference each of the preceding paragraphs.

97.     Section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 794 ("Section 504") states that "No otherwise qualified individual with a disability in the United States … shall,

solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…"

98.     Defendants ASU and Valleywise each receive federal financial assistance and are consequently subject to Section 504.

99.     Defendants have each violated Section 504 by failing to operate their services, program, and activities on a nondiscriminatory, safe basis; failing to ensure that personnel, staff, and other agents were proficiently trained to handle students/clinical workers with disabilities and to provide such students with appropriate accommodations; and wrongful exclusion of Plaintiff, a disabled individual, from her Master's program on the basis of her disability.

100.    Pursuant to the remedies, procedures, and rights set forth in 29 U.S.C. § 794a, Plaintiff prays for judgment as set forth below.

### SEVENTH CLAIM
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (By Plaintiff Against Entity Defendants and
### Individual Defendants in their Individual and Official Capacities)

101.    Plaintiff incorporates by reference each of the preceding paragraphs.

102.    Defendants' conduct towards Plaintiff was extreme and outrageous. Defendants' failure to accommodate Plaintiff's needs on the basis of her disability, which she only has because of vaccination requirements that Defendants imposed upon her, is atrocious and inexcusable. Defendants actively placed Plaintiff in situations designed to, or reasonably certain to, aggravate her known heart condition, when safe alternatives were available and utilized for her classmates. This is conduct beyond the bounds of decency.

103.    Defendants intended to cause Plaintiff emotional distress by placing her in situations they knew would, or were substantially likely to, trigger her potentially life-threatening heart arrhythmias, as well as by causing her removal from her nursing program.

1  Further, even if Defendants' treatment of Plaintiff would not certainly trigger an arrhythmia

2  episode, it was a near certainty that the stress of being in a situation with a high likelihood of

3  triggering an episode would cause her emotional distress.

4      104.   Plaintiff suffered intense, severe, and pervasive emotional distress as a result of

5  Defendants' actions. Because Defendants acted to exacerbate Plaintiff's disability, Plaintiff

6  experienced potentially-fatal cardiac episodes, was pretextually dismissed from her Master's

7  program, and has been in therapy in order to handle the lingering distress from these

8  incidents.

9      105.   Plaintiff prays for judgment as set forth below.

10

11                          **EIGHTH CLAIM**

12              **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

13                  **(By Plaintiff Against Entity Defendants and**

14       **Individual Defendants in their Individual and Official Capacities)**

15      106.   Plaintiff incorporates by reference each of the preceding paragraphs.

16      107.   In the alternative, Defendants were negligent in giving Plaintiff assignments

17  which exacerbated her known disability.

18      108.   As a result of Defendants' treatment, Plaintiff experienced and continues to

19  experience potentially life-threatening and debilitating anxiety as a result of extreme

20  emotional distress. Plaintiff's cardiac arrhythmias are recurring physical phenomena, which

21  are more than transitory or inconsequential. These amount to substantial bodily harm.

22      109.   Defendants should have realized their conduct involved an unreasonable risk of

23  causing emotional distress. Defendants were aware that Plaintiff's heart condition makes her

24  more susceptible to medical episodes and stress than a non-disabled student, yet still placed

25  her on duty in a Level I Trauma ward and in areas of the hospital where she was at higher

26  risk of contracting COVID-19.

27      110.   Defendants were aware of Plaintiff's disability and the likelihood that

28  strenuous and distressing situations could result in potentially fatal bodily harm as a result of

1    her heart condition.

2        111.    Plaintiff prays for judgment as set forth below.

3

4                              **NINTH CLAIM**

5                              **NEGLIGENCE**

6    **(By Plaintiff Against Defendants ASU, Day in her Individual and Official Capacity,**

7          **and Bednarek in her Individual and Official Capacity)**

8        112.    Plaintiff incorporates by reference each of the preceding paragraphs.

9        113.    Defendants owed the Plaintiff a duty of care by way of their student-teacher

10   relationship. This extends to a duty to protect students from sustaining injury during on-

11   campus activities and while attending classes.

12       114.    Alternatively, Defendants owed Plaintiff a duty of care by voluntarily taking

13   custody of Plaintiff under such circumstances as to deprive her of her normal power of self-

14   protection and failing to exercise reasonable care to prevent unreasonable risk of harm to

15   Plaintiff.

16       115.    Defendants refused Plaintiff's request for reasonable accommodations, such as

17   the ability to attend class and take exams remotely, and to participate in clinical assignments

18   less likely to trigger cardiac arrhythmia. Defendants were aware that these accommodation

19   requests were due to Plaintiff's heart condition, which has rendered her unable to safely

20   travel by car, oftentimes even as a passenger, and which is triggered by stressful and

21   upsetting situations. Defendants' failure to protect Plaintiff was a breach of their duty.

22       116.    As a direct and proximate result of this failure to accommodate, Plaintiff

23   suffered massive cardiac episodes while traveling to and/or from campus to take exams and

24   attend her classes, and in her clinical classes themselves. Plaintiff thus suffered significant

25   economic damages and severe emotional distress.

26       117.    Plaintiff prays for judgment as set forth below.

27

28

## TENTH CLAIM

## DEFAMATION

### (By Plaintiff Against Defendant ASU, and

### Individual Defendants in their Individual and Official Capacities)

118.  Plaintiff incorporates by reference each of the preceding paragraphs.

119.  Following Plaintiff's repeated requests for reasonable accommodations of her disability, Defendants wrote and published a defamatory performance review containing false accounts of Plaintiff's performance within her classes and clinical work.

120.  This performance review was published when it was sent to a third party, including ASU, its professors and administrators, and Valleywise.

121.  The statements contained in the evaluation were false and/or framed in a misleading manner in order to harm Plaintiff's reputation, impeach Plaintiff's integrity, disrepute her academic success, and ridicule her simple requests for accommodation of a serious medical disability.

122.  Plaintiff was injured by the defamatory statements by receiving a failing grade and being constructively removed from her nursing program. Further, the reputational and other damage caused by Defendants' conduct will undoubtedly stay with Plaintiff throughout her life.

123.  Defendants' forgoing acts were intentional, fraudulent, and malicious and oppressive. As a result, they justify an award of punitive and exemplary damages where allowed by law.

124.  Plaintiff prays for judgment as set forth below.

## ELEVENTH CLAIM

## BREACH OF CONTRACT

### (By Plaintiff Against Defendant ASU)

125.  Plaintiff incorporates by reference each of the preceding paragraphs.

126.  In Fall 2020, Plaintiff enrolled, paid for, and began attending ASU. Under the

terms of Plaintiff's enrollment with ASU, she would pay between $9,054-$12,143 for tuition per semester and register for enough class units to constitute continuous enrollment. In exchange, ASU would provide education and guidance towards Plaintiff earning a degree. Plaintiff's enrollment with ASU, payment of tuition and fees, and acceptance of instruction, along with ASU's acceptance of the tuition and fees and agreement to provide instruction constitute a binding contract between the parties.  This contract is memorialized in writing between the parties.

127.    Further, ASU made additional promises in its promotional materials and guides issued to Students. In the Master of Science in Nursing Degree Handbook that ASU provided to Plaintiff, ASU states that it will assign each student a faculty mentor. On the ASU website, the course page for this degree states that "the master's in nursing program offers flexible preceptorships and coursework to provide each student with a learning experience that meets their needs."

128.    While Plaintiff performed fully her obligations under the contract, ASU (i) never assigned her a faculty mentor; (ii) failed to provide reasonable accommodations to Plaintiff after assuring her they would; (iii) acted maliciously in creating barriers to Plaintiff's completion of her Master's degree; and (iv) falsified Plaintiff's performance evaluation in order to justify her constructive removal from the program. This conduct was a breach of the terms of Do's contract with ASU and unreasonably and intentionally deprived Do of the benefit of the bargain.

129.    Because of Defendant's breach, Plaintiff has been denied the right to complete the degree she was on track to earn, as well as the expected annual salary of $150,000-$300,000 which would accompany it.

**TWELFTH CLAIM**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(By Plaintiff Against Defendant ASU)**

130.    Plaintiff incorporates by reference each of the preceding paragraphs.

131.    Every contract in Arizona contains an implied covenant of good faith and fair

dealing, which prevents a party from taking action to unfairly interfere with the right of another to receive the benefits of the contract.

132.    Plaintiff entered into a valid, enforceable contract upon her enrollment at ASU in Fall 2020.

133.    Plaintiff performed all of her required duties under the contract.

134.    ASU unfairly interfered with Plaintiff's right to receive the benefits of the contract when it (i) never assigned her a faculty mentor; (ii) failed to provide reasonable accommodations to Plaintiff after assuring her they would; (iii) acted maliciously in creating barriers to Plaintiff's completion of her Master's degree; and (iv) falsified Plaintiff's performance evaluation in order to justify her constructive removal from the program. ASU intentionally sought to deprive Plaintiff of her rights under the parties' contract.

135.    The actions of ASU were taken in bad faith.

136.    As a direct and proximate result of ASU's conduct, Plaintiff has been denied the right to complete the degree she was on track to earn, as well as the expected annual salary of $150,000-$300,000 which would accompany it.

137.    The bad faith conduct of ASU was a substantial factor in causing this harm.

**THIRTEENTH CLAIM**

**TORTIOUS INTERFERENCE WITH CONTRACT**

**(By Plaintiff Against Defendant ASU, and Defendants Day in her**

**Individual and Official Capacity, and Bednarek in her Individual and Official**

**Capacity)**

138.    Plaintiff incorporates by reference each of the preceding paragraphs.

139.    In Fall 2020, Plaintiff enrolled, paid for, and began attending ASU. Under the terms of Plaintiff's enrollment with ASU, she would pay between $9,054-$12,143 for tuition per semester and register for enough class units to constitute continuous enrollment. In exchange, ASU would provide education and guidance towards Plaintiff earning a degree.

140.    Further, ASU made additional promises in its promotional materials and guides

issued to Students. In the Master of Science in Nursing Degree Handbook that ASU provided to Plaintiff, ASU states that it will assign each student a faculty mentor. On the ASU website, the course page for this degree states that "the master's in nursing program offers flexible preceptorships and coursework to provide each student with a learning experience that meets their needs."

141.    Defendants Day and Bednarek were aware of the existence of Do's contract with ASU.

142.    Defendants Day and Bednarek intentionally interfered with Plaintiff's contractual relationship by intentionally (i) failing to provide reasonable accommodations to Plaintiff after assuring her they would; (ii) acting maliciously in creating barriers to Plaintiff's completion of her Master's degree; and (iii) falsifying Plaintiff's performance evaluation in order to justify her constructive removal from the program.

143.    This improper conduct was a breach of the terms of Do's contract with ASU and unreasonably and intentionally deprived Do of the benefit of the bargain.

144.    Because of Defendants' breach, Plaintiff has been denied the right to complete the degree she was on track to earn, as well as the expected annual salary of $150,000-$300,000 which would accompany it.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial for each cause of action so triable.

VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks relief from this Court in the following respects:

A.    For compensatory damages according to proof, but no less than $15 million;

B.    For punitive damages on account of the Individual Defendants' willful, intentional, malicious, and oppressive conduct taken in their individual capacities, and in an amount to deter this conduct from being repeated;

C.    For injunctive relief, including an order to reinstate Plaintiff to the Master of

1  Science in Nursing Program at Arizona State University, to rescind the false and defamatory

2  evaluation and failing grade, and to provide her with reasonable accommodations;

3          D.      For costs of suit incurred herein;

4          E.      For attorneys' fees on causes of action where fees are available by law, including

5  under the ADA, AzDA, and the Rehabilitation Act;

6          F.      For prejudgment and post-judgment interest as available by law; and

7          G.      For such other and further relief as this Court may deem just and proper.

8  Dated: April 5, 2022.                          **AFFELD GRIVAKES LLP**

9                                                  By */s/ David W. Affeld*
10                                                     David W. Affeld, CA SBN 123922
                                                       (*Pro Hac Vice*)
11                                                     2049 Century Park East, Suite 2460
                                                       Los Angeles, California 90067
12
                                                       Michael J. Farrell
13                                                     **BEYERS FARRELL PLLC**
                                                       99 East Virginia Ave., Suite 220
14                                                     Phoenix, AZ 85004-1195
15
                                                       *Attorneys for Plaintiff, Sara Do*
16

17

18

19

20

21

22

23

24

25

26

27

28