**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sara Do,<br><br>        Plaintiff,<br><br>v.<br><br>Arizona State University, *et al.*,<br><br>        Defendants. | No. CV-22-00190-PHX-JJT<br><br>**ORDER** |

At issue is Defendants Arizona Board of Regents, Kimberly Day, Salina Bednarek and Joshua Bednarek, Margaret Morris and Phillip Morris, and Candace Keck and Johnathan Keck's Motion to Dismiss First Amended Complaint (Doc. 17, MTD), to which Plaintiff Sara Do filed a Response (Doc. 23, Resp.), and moving Defendants filed a Reply (Doc. 25, Reply). The Court heard oral argument on the Motion on July 15, 2022. (Doc. 28; Doc. 31, Tr.).

**I.   BACKGROUND**

In 2020, Plaintiff Sara Do—a *summa cum laude* undergraduate—began pursuing a Master of Science in Nursing degree from Arizona State University ("ASU"), which is governed by Defendant Arizona Board of Regents ("ABOR"). According to Plaintiff's allegations in the First Amended Complaint (Doc. 13, FAC), ASU's nursing school required her to be vaccinated against COVID-19 to be able to complete the required clinicals. Immediately upon receiving the vaccination, Plaintiff suffered a severe adverse

cardiac reaction requiring emergency room care and resulting in damage to her heart. Once her condition stabilized, she told ASU about her heart condition, which includes the risk of arrhythmias, and the school recognized the condition as a disability.

Plaintiff alleges ASU accommodated the disability at first, allowing among other things flexible attendance, but reversed course during the spring and summer 2021 semesters and told Plaintiff she had to meet all program requirements. Plaintiff attempted to comply but struggled, suffering a cardiac episode during an exam that sent her back to the emergency room. She missed two days of a clinical rotation, and she alleges ASU at first told her she could submit written work to make up for the missed days, but again reversed course on that accommodation.

ASU assigned Plaintiff to clinical shifts at Valleywise Health Medical Center, a Level I Trauma Center that is part of Defendant Maricopa County Special Health Care District ("Valleywise"). Among other challenges, Plaintiff observed the surgery of a car accident victim, and the stress of the situation caused her to suffer arrhythmias that required her to leave the operating room after notifying on-site supervisors. Defendant Dr. Kimberly Day, an employee of both ASU and Valleywise, wrote an evaluation that Plaintiff characterizes as false and defamatory. The evaluation stated among other things that Plaintiff abandoned the clinical assignment without notice, was disinterested in her assignments, and did not meet program objectives. Defendants Dr. Margaret Morris, Dr. Salina Bednarek, and Professor Candace Keck also participated in creating and publishing the evaluation.[1] As a result, Plaintiff received a failing grade and was constructively expelled from the nursing program.

Plaintiff unsuccessfully challenged her failing grade through ASU's grievance process, which she alleges ASU expressly limited to a review of the failing grade. Subsequently, after serving notices of her claims on Defendants, Plaintiff filed this lawsuit, raising 13 claims against Defendants: (1) violations of the Americans with Disabilities Act ("ADA"), Title II, 42 U.S.C. § 12132, against ABOR; (2) violations of the ADA, Title II, 42

---

[1] Plaintiff also joins these individual Defendants' spouses to reach the marital communities.

- 2 -

U.S.C. § 12132, against Valleywise; (3) violations of the ADA, Title V, 42 U.S.C. § 12203(b); (4) violations of the Arizonans with Disabilities Act, A.R.S. § 41-1492.02, against ABOR; (5) violations of the Arizonans with Disabilities Act, A.R.S. § 41-1492.02, against Valleywise; (6) violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; (7) intentional infliction of emotional distress; (8) negligent infliction of emotional distress; (9) negligence; (10) defamation; (11) breach of contract; (12) breach of the implied covenant of good faith and fair dealing; and (13) tortious interference with contract.

The moving Defendants (collectively, "University Defendants")—Kimberly Day, Salina Bednarek and Joshua Bednarek, Margaret Morris and Phillip Morris, Candace Keck and Johnathan Keck (collectively, "Individual Defendants"), and ABOR—now move to dismiss all claims against them under Federal Rules of Civil Procedure 12(b)(1) and (b)(6). Defendant Valleywise took no part in the briefing seeking dismissal.

## II. LEGAL STANDARDS

"A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may attack either the allegations of the complaint as insufficient to confer upon the court subject matter jurisdiction, or the existence of subject matter jurisdiction in fact." *Renteria v. United States*, 452 F. Supp. 2d 910, 919 (D. Ariz. 2006) (citing *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979)). "Where the jurisdictional issue is separable from the merits of the case, the [court] may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary." *Thornhill*, 594 F.2d at 733; *see also Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005) ("With a 12(b)(1) motion, a court may weigh the evidence to determine whether it has jurisdiction."). The burden of proof is on the party asserting jurisdiction to show that the court has subject matter jurisdiction. *See Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990).

"[B]ecause it involves a court's power to hear a case," subject matter jurisdiction "can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). Courts "have an independent obligation to determine whether subject-matter jurisdiction

exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513–14 (2006).

Rule 12(b)(6) is designed to "test[] the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A dismissal under Rule 12(b)(6) for failure to state a claim can be based on either (1) the lack of a cognizable legal theory or (2) insufficient facts to support a cognizable legal claim. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When analyzing a complaint for failure to state a claim, the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). Legal conclusions couched as factual allegations are not entitled to the assumption of truth and therefore are insufficient to defeat a motion to dismiss for failure to state a claim. *Iqbal*, 556 U.S. at 680. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that 'recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

### III.   ANALYSIS

#### A.   Dismissal of Certain Claims

In their Motion, University Defendants (including Individual Defendants in their official capacities) argue that Plaintiff's claims against them brought under state law—

1  Counts 4 and 7 through 13—are barred in federal court under the Eleventh Amendment.
2  (MTD at 6 (citing *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 542 (2002); *Coll.*
3  *Sav. Bank v. Fla. Prepaid Secondary Educ. Expense Bd.*, 527 U.S. 666, 676, 680 (1999)).)
4  In her Response (Resp. at 21–22) and at the hearing (Tr. at 6), Plaintiff agreed that without
5  a waiver from University Defendants, she must bring the state law claims in state court.
6  Having no notice of such a waiver, the Court will dismiss Counts 4 and 7 through 13 against
7  University Defendants.

8        University Defendants also argue that Plaintiff's claims against Individual
9  Defendants in their official capacities are duplicative of Plaintiff's claims against ABOR
10 and, as a matter of judicial efficiency, University Defendants request that the Court dismiss
11 the claims against Individual Defendants. (MTD at 17 (citing *Kennedy v. Graham*, 473
12 U.S. 159, 165 (1985); *Vance v. Cnty. of Santa Clara*, 928 F. Supp. 993, 996 (N.D. Cal.
13 1996)).) In her Response, Plaintiff does not oppose that request. Accordingly, the Court
14 will dismiss all claims against Individual Defendants in their official capacities, which
15 include the federal law claims in Counts 3 and 6.

16       Plaintiff also brings certain claims against Individual Defendants in their individual
17 capacities. (FAC Counts 7, 8, 9, 10, 13.) But in the absence of the federal law claims against
18 Individual Defendants, the Court lacks subject matter jurisdiction over the state law claims
19 against these Defendants in their individual capacities. University Defendants thus also
20 request that the Court exercise its discretion to dismiss the remaining claims against
21 Individual Defendants in their individual capacities. (MTD at 18.) Considering the balance
22 of factors, the Court will decline to exercise jurisdiction over Plaintiff's state law claims
23 against Individual Defendants in their individual capacities and therefore dismiss those
24 claims. *See Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997).

25       Finally, University Defendants contend that punitive damages are not available for
26 Plaintiff's remaining claims under the ADA and Rehabilitation Act, and the Court again
27 agrees. *See Barnes v. Gorman*, 536 U.S. 181, 189 (2002); *Alvarado v. Cajun Operating*
28

*Co.*, 588 F.3d 1261, 1269 (9th Cir. 2009). Plaintiff's prayer for punitive damages against University Defendants is thus dismissed.

In sum, for the reasons stated above, the Court will dismiss Counts 4 and 9 through 13 in their entirety and Counts 7 and 8 as raised against University Defendants (but not Valleywise). The Court will also dismiss the remaining claims against Individual Defendants in their official capacities (Counts 3 & 6) and Plaintiff's prayer for punitive damages against University Defendants. With regard to University Defendants, that leaves Counts 1, 3 and 6 against ABOR. Defendant Valleywise did not move to dismiss any claims against it, so Plaintiff's claims against Valleywise—Counts 2, 3, 5, 6, 7 and 8—remain pending.

### B.     Failure to Exhaust Administrative Remedies

For the purposes of this Order, the Court is now left to examine University Defendants' arguments in support of dismissal of Plaintiff's claims under ADA Title II (Count 1), ADA Title V (Count 3), and the Rehabilitation Act (Count 6). To begin with, University Defendants contend that Plaintiff failed to exhaust her administrative remedies as required before bringing her claims against them, basing their contention on Plaintiff's own allegations that she engaged in ASU's grievance process and then did not appeal the unfavorable decision in Arizona Superior Court.

Under Arizona law, when a party fails to appeal a state administrative decision, that decision becomes final, and re-litigation of the underlying legal and factual issues in another court is barred by the doctrine of *res judicata* so long as the administrative process was adequate. *Olson v. Morris*, 188 F.3d 1083, 1086 (9th Cir. 1999) (applying Arizona law). In *Olson*, the Arizona Board of Psychologist Examiners revoked a psychologist's license after he performed an unauthorized exorcism on a child referred to him by Child Protective Services. *Id.* at 1085. The psychologist did not appeal the Board's decision but instead filed an action in federal court raising claims under § 1983, § 1985, and the Religious Freedom Restoration Act. *Id.* The Ninth Circuit Court of Appeals noted that, in Arizona, if a claimant fails to timely appeal an administrative decision made after the

claimant had an adequate opportunity to litigate the issues, the decision is "'conclusively presumed to be just, reasonable and lawful.'" *Id.* at 1086 (quoting *Gilbert v. Bd. of Med. Examiners of the State of Ariz.*, 745 P.2d 617 (Ariz. Ct. App. 1987) (superseded on other grounds by statute)). "This principle applies even to alleged constitutional errors that might have been corrected on proper application to the court which has jurisdiction of the appeal." *Id.* Thus, after reviewing the record as to the adequacy of the administrative process under *United States v. Utah Construction and Mining Co.*, 384 U.S. 394 (1966), the Ninth Circuit concluded that the principles of *res judicata* barred the plaintiff from bringing his claims, which were in effect an attempt to re-litigate the factual and legal issues he could have raised on appeal in state court. *Id.* at 1087.

As University Defendants point out (MTD at 4–5), ABOR is subject to Arizona's Administrative Review Act. *Ernst v. Bd. of Regents*, 579 P.2d 1099, 1101 (Ariz. 1978). Under that Act, an ASU student wishing to challenge an unfavorable administrative decision must appeal to Superior Court. A.R.S. §§ 12-904, 905.

Even if ASU's grade grievance process resulted in an administrative decision subject to the Administrative Review Act, Plaintiff alleges in the FAC that ASU expressly limited the scope of her grievance to challenging the failing grade (FAC ¶ 58), and she argues that the Court can plausibly infer from that allegation that ASU denied her an adequate opportunity to litigate the issues she presents in this case—principally her claim that ASU failed to reasonably accommodate her disability. At the very least, Plaintiff contends, factual issues remain to be resolved as to the scope of the grievance process. Relatedly, because the record of the grievance process is not yet before the Court in this case, Plaintiff argues that any conclusion as to an exhaustion of administrative remedies, and the adequacy of the administrative process, would be premature at this early stage of the lawsuit. Based on *Olson* and its predecessors, the Court agrees with these arguments. 188 F.3d at 1086; *see also Miller v. Cnty. of Santa Cruz*, 39 F.3d 1030, 1033 (9th Cir. 1994).

University Defendants point to a decision this Court made regarding another student's grievance against ASU in *Quade v. Arizona Board of Regents*, No. CV-15-00610-PHX-JJT, 205 WL 10939902, at *3–4 (D. Ariz. Sept. 14, 2015), *aff'd Quade v. Arizona Board of Regents*, 700 F. App'x 623 (9th Cir. 2017). There, this Court concluded at the motion to dismiss stage that the plaintiff had failed to exhaust his administrative remedies after he abandoned the ASU grievance process and did not appeal the unfavorable decision. That case is materially distinguishable from the present one, however, because the Court in that case had the entire administrative record before it, such as it was. Moreover, unlike the instant case, no dispute existed in *Quade* as to the scope of the preclusive effect, that is, whether the basis of the student's grievance was coterminous with the basis of his claims in the lawsuit before this Court, or whether the student had an adequate—even if untaken— opportunity to raise his grievances in ASU's administrative process. In the present case, Plaintiff's allegations raise questions as to the scope of the grievance process, and the Court cannot determine the adequacy of the administrative process without the relevant record. As a result, the Court declines to conclude at this stage of the litigation that Plaintiff failed to exhaust her administrative remedies such that her remaining claims against University Defendants should be dismissed.

### C. Eleventh Amendment Immunity

University Defendants next argue that Plaintiff's claims under Titles II and V of the ADA (Counts 1 & 3) are barred by the Eleventh Amendment. In the FAC, Plaintiff claims that ABOR violated the Title II provision that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. (FAC ¶ 65.) Plaintiff also claims ABOR acted intentionally to violate the Title V provision that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right

granted or protected by this chapter," including her rights under Title II. 42 U.S.C. § 12203(b). (FAC ¶ 77.)

Beginning with Plaintiff's Title II claim (Count 1), Arizona has not waived its sovereign immunity to ADA claims and, under the Eleventh Amendment, a nonconsenting state—a state that has not waived its sovereign immunity—generally cannot be sued by private individuals in federal court. *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). "Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority." *Id.* (internal quotations omitted). Title II of the ADA contains an "unequivocal intent to abrogate state sovereign immunity." *United States v. Georgia*, 546 U.S. 151, 154 (2006).

The parties agree that the question whether Congress abrogated Arizona's sovereign immunity with respect to Plaintiff's Title II claim depends on whether Congress acted within a valid grant of its authority in proscribing the conduct Plaintiff alleges. In this context, Congress may only subject nonconsenting States to suit in federal court when it does so pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment, which "grants Congress the power to enforce the substantive guarantees in § 1 [of the Fourteenth Amendment] by enacting 'appropriate legislation.'" *Garrett*, 531 U.S. at 364–65. Where, as here, Congress passes legislation pursuant to § 5 that "reaches beyond the scope of § 1's actual guarantees," that legislation "must exhibit congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Garrett*, 531 U.S. at 365. That is, § 5 only gives Congress the power to pass "remedial, preventative legislation" that is "adapted to the mischief and wrong which the Fourteenth Amendment was intended to provide against." *City of Boerne v. Flores*, 521 U.S. 507, 532 (1997). To make the congruence and proportionality determination, the Court must first "identify with some precision the scope of the constitutional right at issue," *Garrett*, 531 U.S. at 365, then "examine whether Congress identified a history and pattern of unconstitutional . . . discrimination against the disabled," *id.* at 368, and finally evaluate

1  whether the "rights and remedies created by the ADA against the States" are congruent and
2  proportional to the targeted violation, *id.* at 372–74.

3        Although the Ninth Circuit has not been confronted with a case like the present one
4  requiring an examination whether Congress validly abrogated a State's sovereign
5  immunity with regard to a plaintiff's Title II claim in the context of postsecondary
6  education, four other circuits have decided cases similar to the present one and concluded
7  the Eleventh Amendment was not a bar to the plaintiff's Title II claim. *See Bowers v. Nat'l*
8  *Collegiate Athletic Ass'n*, 475 F.3d 524 (3rd Cir. 2007); *Toledo v. Sanchez*, 454 F.3d 24
9  (1st Cir. 2006); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474
10 (4th Cir. 2005); *Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954 (11th
11 Cir. 2005). University Defendants argue that the analysis those circuit courts provided in
12 those cases is not sufficiently specific, but the Court disagrees.

13       For example, in *Constantine*, the Fourth Circuit examined whether a claim brought
14 by a law student at a public university in Virginia under Title II of the ADA was barred by
15 the Eleventh Amendment. 411 F.3d at 478. There, the student suffered from intractable
16 migraine headache syndrome and, after she suffered a migraine headache during an exam,
17 the university gave her a failing grade and denied her appeal and initial request for re-
18 examination. *Id.* at 478–79. The student was unable to sit for a short-notice re-examination
19 three months later, and the university maintained the failing grade. The student sued the
20 university under Title II, *id.* at 479, and in reversing the district court's dismissal of the
21 complaint, the Fourth Circuit found the claim was not barred by the Eleventh Amendment,
22 *id.* at 490.

23       The Fourth Circuit stated, and this Court agrees, that the constitutional right at issue
24 is the right of the plaintiff—a student at a public postsecondary school—to be free from
25 irrational disability discrimination. *Id.* at 486; *see also Bowers*, 475 F.3d at 554; *Toledo*,
26 454 F.3d at 36; *Ass'n for Disabled Americans*, 405 F.3d at 957.

27
28
> Importantly, the Fourteenth Amendment does not forbid *all* discrimination
> based on disability. Because classifications based on disability are subject to

- 10 -

> minimal scrutiny, States may make distinctions on the basis of disability so long as there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Thus, the Fourteenth Amendment does not require States to makes special accommodations for the disabled, so long as their actions toward such individuals are rational. This rule applies even in the context of public education.

*Constantine*, 411 F.3d at 486 (quoting *Garrett*, 531 U.S. at 367; *Heller v. Doe*, 509 U.S. 312, 320 (1993); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985); *Plyler v. Doe*, 457 U.S. 202, 221–23 (1982)) (internal quotation marks deleted).

With regard to the next step in examining whether Congress acted within its authority in this context, Congress stated that Title II "was necessary to address pervasive [disability] discrimination 'in such critical areas as . . . housing, public accommodations, *education*, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." *Id.* at 487 (quoting 42 U.S.C. § 12101(a)(3)). The *Constantine* court recognized on a general level that "it is settled that Title II was enacted in response to a pattern of unconstitutional disability discrimination by States and nonstate government entities with respect to the provision of public services." *Id.* (citing *Tennessee v. Lane*, 124 S. Ct. 1978, 1992 (2004)). The other three circuit courts to examine this question tailored their analyses to Congress's authority to address discrimination against the disabled in public education specifically, and those circuit courts did not distinguish between public elementary/secondary education and public postsecondary education. *Toledo*, 454 F.3d at 36–37 (noting the Supreme Court's recognition of "the vital importance of all levels of public education in preparing students for work and citizenship as well as the unique harm that occurs when some students are denied that opportunity"); *see also Bowers*, 475 F.3d at 555 & n.35 (noting that Congress enacted Title II "against the backdrop of our regrettable national history in educating students with disabilities"); *Ass'n for Disabled Americans*, 405 F.3d at 957 (noting the history of unconstitutional discrimination in public education and stating "the constitutional right to equality in education, though not fundamental, is vital to the future success of our society"). Like the

four circuit courts to examine this issue, this Court declines to draw a distinction between the history and pattern of disability discrimination in public elementary/secondary education and public post-secondary education—the distinction advocated by University Defendants (MTD at 10; Reply at 9–10; Tr. at 18–19) —in evaluating Congress's authority to address disability discrimination in Title II. *See also Montes v. Desert Cmty. Coll. Dist.*, 2016 WL 10566650, at *2 (C.D. Cal. Jan. 11, 2016).

The final inquiry is "whether the remedial measures contained in Title II represent a congruent and proportional response to this demonstrated history and pattern of unconstitutional disability discrimination," focusing the inquiry on "the remedial measures of Title II only as they apply to the class of cases implicating the right to be free from irrational disability discrimination in public higher education." *Constantine*, 411 F.3d at 487–88 (internal citations omitted). Here, the Court is again persuaded by the analysis provided in *Constantine* and its three sister cases.

> Title II forbids public entities—including State and local governments and their departments, agencies, or instrumentalities, 42 U.S.C. § 12131(1)—from excluding disabled persons from programs, services, or benefits "by reason of" their disabilities. 42 U.S.C. § 12132. In the context of public higher education, Title II requires that disabled students not be excluded from educational programs or activities, or otherwise discriminated against, because of their disabilities . . . . Title II requires state colleges and universities to make reasonable accommodations for disabled students to ensure that they are able to participate in the educational program. These provisions, taken together, target precisely the sort of discrimination that the evidentiary record described and that Congress sought to address.

*Id.* at 488.

Moreover, Congress put significant limits on the scope of Title II.

> First, Title II protects only a "qualified individual with a disability." . . . Second, although Title II forbids discrimination based on a person's disability, States remain free to limit participation in their programs or activities for other, lawful reasons. Third, the requirement that public entities make "reasonable accommodation[s]" to accommodate disabled citizens is limited in important aspects. As the Court noted in *Lane*, "Title II does not require States to employ any and all means to make . . . services accessible

> to persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs. 124 S.Ct. at 1993. Insofar as Title II requires States to make "reasonable" modifications to their educational programs in order to ensure that disabled citizens have access to those programs, this requirement is congruent with the constitutional imperative the State avoid *irrational* discrimination. *See Garrett*, 531 U.S. at 367.

*Id.* at 488–89.

The regulations implementing Title II also provide significant alternatives to the States to avoid liability. For example, "the States retain the right not to 'take any action that [they] can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." *Id.* at 489 (citing 28 C.F.R. § 35.150(a)). This Court agrees with the *Constantine* court in finding that, in the context of this case, the limits provided in Title II and its implementing regulations are sufficient to conclude that Congress's means are congruent and proportional to "ends legitimate under § 5"—that is, targeting irrational disability discrimination in public higher education. *Id.* (internal citation omitted).

In sum, because Congress clearly expressed its intention to abrogate the States' Eleventh Amendment immunity in Title II of the ADA and did so pursuant to a valid exercise of constitutional authority, the Eleventh Amendment does not bar Plaintiff's Title II claim against ABOR. *See id.* at 490. With respect to this issue, the parties agree that, as Plaintiff's Title II claim goes, so goes her Title V claim. *See Demshki v. Monteith*, 255 F.3d 986, 988–89 (9th Cir. 2001). (MTD at 11; Resp. at 15.) Thus, Plaintiff's claim against ABOR under Title V of the ADA (Count 3) is likewise not barred by the Eleventh Amendment.

**IT IS THEREFORE ORDERED** granting in part and denying in part Defendants Arizona Board of Regents, Kimberly Day, Salina Bednarek and Joshua Bednarek, Margaret Morris and Phillip Morris, and Candace Keck and Johnathan Keck's Motion to Dismiss First Amended Complaint (Doc. 17).

**IT IS FURTHER ORDERED** dismissing Counts 4 and 9 through 13 of the First Amended Complaint (Doc. 13) in their entirety, dismissing Counts 7 and 8 and Plaintiff's prayer for punitive damages as raised against University Defendants only, and dismissing Counts 3 and 6 against Individual Defendants in their official capacities only. Counts 1, 3 and 6 remain pending against Defendant Arizona Board of Regents, and Counts 2, 3, 5, 6, 7 and 8 remain pending against Defendant Maricopa County Special Health Care District (Valleywise). Arizona Board of Regents shall answer the remaining claims in the First Amended Complaint within the time limit provided in the applicable rules. The Court will set a Rule 16 Scheduling Conference by separate Order.

Dated this 14th day of September, 2022.

Honorable John J. Tuchi
United States District Judge