Jill J. Chasson (019424)
Andrew T. Fox (034581)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, Arizona  85004
T: (602) 381-5481
jchasson@cblawyers.com
afox@cblawyers.com

*Attorneys for Defendant Maricopa County*
*Special Health Care District*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Sara Do, an individual, | No. CV-22-00190-PHX-JJT |
| Plaintiff, | **DEFENDANT MARICOPA COUNTY SPECIAL HEALTH CARE DISTRICT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Arizona Board of Regents, an Arizona State Entity; et al., | |
| Defendants. | |

1291278.1

The saying "no good deed goes unpunished" explains why Maricopa County Special Health Care District, dba Valleywise Health ("Valleywise"), is a defendant in this action. In July 2021, Valleywise did a favor for Arizona State University's Edson College of Nursing ("Edson") by agreeing to a short-notice request to host Plaintiff Sara Do for a clinical rotation in its operating room to help her satisfy course requirements. Valleywise was not informed that Do had a disability, or of any reason Do could not attend surgeries on burn patients, accident victims, or other patients typically found at a Level I trauma hospital, so she was assigned to observe available procedures. Do ended up leaving her rotation after a few hours, claiming she was experiencing heart arrythmia. Valleywise later learned that the candid statements its staff provided regarding their interactions with Do were included in a course evaluation prepared by Edson faculty.

Based on this brief experience, Do alleges statutory claims against Valleywise for disability discrimination and retaliation and tort claims for infliction of emotional distress. Pursuant to Fed. R. Civ. P. 56, Valleywise moves for summary judgment on all claims alleged against it in Do's First Amended Complaint ("FAC"). This Motion is supported by the Statement of Facts ("SOF") filed herewith and the exhibits attached thereto.

**FACTUAL BACKGROUND**

**I.    Edson Seeks Clinical Placement for Sara Do at Valleywise**

In July 2021, Dr. Salina Bednarek, the Senior Director of Pre-Licensure Nursing Programs at Edson, was in search of a complex care clinical assignment for a student. [SOF ¶¶ 11-12] Plaintiff Sara Do, a student in Edson's Master of Science in Nursing, Entry into Nursing ("MEPN") Program, needed an additional 24.5 clinical hours after failing to complete the clinical component for Nursing Practice for Complex Care ("NUR 478") in earlier shifts at Banner. [*Id.*]

With clinical shifts difficult to find on short notice, especially during the COVID-19 pandemic, Bednarek asked Kimberly Day, an Edson faculty member who worked as an Operating Room ("OR") nurse at Valleywise Medical Center ("Hospital") on Saturdays, if she would precept a clinical rotation for a student in need. [*Id.* ¶ 13] With Day's agreement,

Bednarek contacted Anna Kline, Medical Education Coordinator at Valleywise, on July 13, 2021 about securing a "complex care rotation" for a nursing student to be precepted by Day. [*Id.* ¶ 15] Because the request was outside of the ordinary "Consortium" process, Kline elevated the request to Sherry Stotler, Chief Nursing Officer, and Marc Mongelluzzo, Director of Perioperative Services. [*Id.* ¶ 16] Wanting to help Edson and the then-unnamed student obtain the clinical hours needed, the leaders agreed to a "one-off" exception to go outside the Consortium process as long as Day was on board.[1] [*Id.* ¶¶ 20-21]

Kline and Jamie Knosalla, then the Clinical Practice Educator for the Perioperative Department, had separate phone calls with Day to confirm her willingness to precept the student. [*Id.* ¶¶ 17-19] During these calls, Day mentioned that the student might need shorter shifts and suggested that it may be for a medical reason. [*Id.*] The potential need for shorter shifts did not present an issue for Valleywise because, ultimately, it is the student's responsibility to complete the total number of required clinical hours to satisfy their course requirements. [*Id.* ¶ 23] After receiving Do's name from Edson, Kline emailed Do on July 19, 2021 with her assignment to the Hospital's OR. [*Id.* ¶ 25]

## II.    **Pre-Rotation Communication**

Between July 19-21, 2021, Do emailed with Day and Bednarek about logistical matters, including the number and length of clinical shifts she needed to complete and the daily arrival and departure time. [*Id.* ¶¶ 29-35] In one email, Do referenced "cardiac problems" but did not identify a specific medical condition, indicate that she had a disability, or request accommodations. [*Id.* ¶ 29] Nor did any of Do's emails raise concerns about being assigned to the OR despite Do understanding the types of procedures that occur in the OR, including trauma and emergency cases. [*Id.* ¶¶ 28-34]

On July 23, 2021 at 9:44 PM – less than nine hours before the start of her clinical rotation at the Hospital – Do emailed Day regarding the Nursing Student N95 Policy,

---

[1] Because the student would be assigned to Day, who only worked on Saturdays, Valleywise also had to make an exception to its Weekend OR Policy, which did not allow students in the OR on weekends. That policy was adopted to promote "a better rotation for students" because weekend patient volume fluctuated. Stotler exercised her authority to make an exception to the policy and approved Do to accompany Day. [SOF ¶¶ 5-6, 24]

requesting that she "only participate in planned surgeries or be placed in areas that allow [her] to remain in compliance with [Valleywise's] requirements[.]" [*Id.* ¶ 33] This policy, implemented during the COVID-19 pandemic to reduce demand on PPE supplies and alleviate stress on staff, prohibited nursing students from being present in rooms where an N95 mask was required.[2] [*Id.* ¶¶ 7-8] Do stated in her email that she was unable to get a second dose of the COVID-19 vaccination because she had a "severe cardiac reaction" to the first dose, but she did not identify a specific medical condition, indicate that she had a disability, or request any accommodation. [*Id.* ¶ 34] Other than her two emails with Day, Do did not communicate to anyone else affiliated with Valleywise prior to the start of her clinical rotation. [*Id.* ¶ 37]

Prior to arriving at Valleywise on the morning of July 24, 2021, Do did not tell Day about having any specific medical condition or send Day documentation to indicate that she had a disability or accommodations approved by Edson. [*Id.* ¶ 37] Do simply assumed (erroneously) that Day had been "filled in" by Edson regarding her heart condition. [*Id.* ¶ 39] Do also did not tell Day or anyone else at Valleywise that (i) she had concerns about being exposed to surgery because it might cause or trigger arrhythmia; (ii) stressful environments had the potential to cause issues for her; or (iii) she had any health-related limitations on activities she could perform during a clinical rotation. [*Id.* ¶ 38]

Valleywise also was not informed by Do or Edson that Do had registered with ASU's Student Accessibility and Inclusive Learning Services ("SAILS") office to seek accommodations related to heart arrythmia. [*Id.* ¶¶ 40-41, 43] However, the sole accommodation Do requested (and received) from Edson as it related to clinical rotations was to be assigned daytime shifts. [*Id.* ¶ 42] Do had no approved accommodations excusing her from participating in specific clinical experiences or from being assigned to specific departments in a hospital. [*Id.* ¶ 44] Daytime shifts also were the only restriction identified by Do's medical providers in the Statement of Health Clearance Forms ("Clearance Form")

---

[2] N95 respirators were then required only in rooms where the patient was COVID-19 positive or had unknown COVID-19 status, and during aerosolizing procedures. An N95 was not required in the OR if a patient was confirmed COVID-19 negative. [SOF ¶ 7]

she submitted to Edson. [*Id.* ¶ 45] The Clearance Form requires the provider to indicate "whether the applicant will be able to function as a nursing student" in a clinical experience, which "places students under considerable mental and emotional stress." None of Do's providers identified any stress-related limitations. [*Id.* ¶ 46]

### III.    July 24, 2021 Clinical Rotation

#### A.    Do's Brief Interaction with Day

Do met Day at Valleywise at about 6:30 A.M. for the first (and as it turned out, only) day of her rotation [*Id.* ¶¶ 47, 74] In their initial interaction, Do asked Day whether she'd seen her email from the night before. Unsure which email Do was referring to, Day indicated that she had not. Do felt the tone of Day's response was "brash," "annoyed," and "condescending," causing Do to feel she'd been spoken to like "a defiant toddler." [*Id.* ¶ 48] When Do went to change into scrubs shortly thereafter, she "was in arrhythmia already pretty bad because [Do] felt like [Day] had chastised [her]." [*Id.* ¶ 49]

When Do returned from the locker room, Day notified her that she would attend a burn surgery and cautioned that the OR would be warm. [*Id.* ¶ 50] In response, Do expressed concerns about the temperature of the OR suite. Do's concern was limited to the temperature; she did not indicate any hesitation about participating in surgical procedures generally. [*Id.* ¶ 51] As a result, Day reassigned her to a wound debridement surgery – the only other procedure taking place in the OR at that time. [*Id.* ¶ 52] Thereafter, Do did not see Day again; the two spent a total of approximately five minutes together that day. [*Id.*]

#### B.    Debridement & Orthopedic Procedures

A "very common surgery" at Valleywise, a debridement involves cleaning dead, infected, or damaged tissue from a wound. [*Id.* ¶ 56] Do's time in the debridement was brief – she left within 15 minutes after it started, later returned, and then left again. [*Id.* ¶¶ 61-62] Nurse circulator Gabriela Novakova attempted to engage with Do, but Do declined Novakova's invitation to come bedside for a better view and she asked no questions about the procedure. [*Id.* ¶¶ 57-58] Based on this conduct, and Do's statement that she was there to complete her clinical hours and wanted to be in nursing administration,

Novakova perceived Do as being disinterested in what was taking place. [*Id.* ¶ 60] Two other staff in this procedure had similar impressions of Do. [*Id.* ¶¶ 60, 79]

After a break, Do was next assigned to shadow Reaia Reeves, the nurse circulator in an upcoming orthopedic procedure involving a patient with a serious leg wound. [*Id.* ¶ 63] Like the debridement, Do's time in the OR suite was brief. She left after 10 to 20 minutes and before the surgeon began operating. [*Id.* ¶ 65] Like Novakova, Reaves perceived Do as being disinterested based on her lack of interaction with the medical staff and on Do's comment that she was just "trying to get her hours for the . . . course that she was in." [*Id.* ¶¶ 65, 79] Neither Novakova nor Reaves recall Do saying that she had a medical condition, needed medication, or was in arrhythmia. [*Id.* ¶¶ 61, 67]

**IV.    <u>Aftermath of Do's Departure from Valleywise</u>**

After Do left the orthopedic procedure, she emailed Day twice – first to let her know she was taking a break because of "heart arrythmia" and then to say she was leaving the Hospital. [*Id.* ¶ 68] Do failed to tell anyone else at the Hospital that she was leaving and Day didn't receive Do's emails until hours later, resulting in a search for Do that found only her scrubs in the locker room. [*Id.* ¶¶ 69, 71] Despite feeling she had been in severe arrythmia for several hours that morning, Do did not seek medical attention that day at the Hospital or anywhere else, and data from Do's heart monitors reflect "normal sinus rhythm." [*Id.* ¶¶ 72, 75-76]

Day was responsible for evaluating Do's performance at Valleywise as Do's faculty of record for NUR 478. [*Id.* ¶ 77] Having not observed Do in the OR, Day asked staff who participated in procedures with Do to provide written comments on their experiences. Day did not tell these individuals that she was going to share their comments with Do or include them verbatim in a course evaluation. [*Id.* ¶ 78] The staff each emailed Day with their opinions, observations, and impressions of Do. [*Id.* ¶ 79] In the days after the Valleywise clinical, Edson personnel prepared a written evaluation of Do's performance in NUR 478 and provided it to Do. The evaluation included the written comments sent to Day. [*Id.* ¶ 80]

Following the events of July 24, Edson elected to remove Do from clinicals at

1 Valleywise. Bednarek held a meeting with Stotler and Kline during which she relayed

2 Edson's decision and apologized for the inconvenience to Valleywise. [*Id.* ¶ 74]

3 **V.    Do's Lawsuit**

4      Do asserts claims against Valleywise under: (i) Title II of the Americans with

5 Disabilities Act ("ADA") (Count II); (ii) Section 504 of the Rehabilitation Act of 1973

6 ("Rehabilitation Act") (Count V); and (iii) the Arizonans with Disabilities Act ("AzDA")

7 (Count VI) (collectively, "Discrimination Claims"). Do also asserts a claim under Title V

8 of the ADA ("Anti-Interference Claim") (Count III). Finally, Do brings tort claims against

9 Valleywise for intentional infliction of emotional distress ("IIED") and negligent infliction

10 of emotional distress ("NIED") (collectively, "Tort Claims") (Counts VII and VIII).

11                                    **LEGAL STANDARD**

12      Under Rule 56(a), summary judgment is appropriate when the movant shows that

13 there is no genuine dispute as to any material fact and the movant is entitled to prevail as a

14 matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

15                                        **ARGUMENT**

16 **I.    Valleywise is Entitled to Summary Judgment on Do's Discrimination Claims**[3]

17      "Title II of the ADA prohibits public entities from discriminating on the basis of

18 disability." *Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021). Title II

19 provides that "no qualified individual with a disability shall, by reason of such disability,

20 be excluded from participation in or be denied the benefits of the services, programs, or

21 activities of a public entity[.]" 42 U.S.C. § 12132. To prevail on her discrimination claims,

22 Do must show that: "(1) she is a qualified individual with a disability; (2) she was excluded

23 from participation in or otherwise discriminated against with regard to a public entity's

24 services, programs, or activities, and (3) such exclusion or discrimination was by reason of

25 her disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). For purposes of

27 _____

27 [3] "Because there is no material difference between the legal standards" for evaluating
Do's Discrimination Claims, for simplicity's sake, the analysis that follows will focus on
28 the ADA and omit references to the Rehabilitation Act and AzDA. *Siegel v. Dignity Health*,
No. CV-14-02561-PHX-SPL, 2019 WL 11720205, at *1 (D. Ariz. 2019) (collecting cases).

1  this motion, Valleywise does not dispute that Do has arrythmia or that her condition

2  qualifies as a disability under the ADA. Do's claims still fail for four reasons, each of which

3  is discussed below.

4  **A.    Do's Clinical Rotation was Not a Service, Program, or Activity**

5  The terms "services, programs, and activities" in Title II "presuppose that the public

6  entity provides an output that is generally available, and that the individual seeks to

7  participate in or receive the benefits of such an output." *Zimmerman v. Or. Dep't. of Justice*,

8  170 F.3d 1169, 1174 (9th Cir. 1999), *reh'g en banc denied*, 183 F.3d 1161, *cert. denied*,

9  511 U.S. 1189 (2001). In determining whether something is an output (covered) or an input

10  (not covered), courts look at the core services the public entity provides for the benefit of

11  the general public. For example, a parks department's outputs might include leading nature

12  walks and maintaining playgrounds, but not hiring people "as a means to deliver the

13  services, programs, and activities[.]" *Id.*; *Elwell v. Okla. Ex rel. Bd. of Regents of Univ. of

14  Okla.*, 693 F.3d 1303, 1306 (10th Cir. 2012) ("A university's services . . .  might include

15  courses in Bach, biophysics, or basket weaving . . . but not the professors, piano tuners, or

16  other people needed to make those offerings possible.").

17  Valleywise's core business for the benefit of the public is providing health care

18  services. [SOF ¶¶ 1-2] Do does not claim to have sought (much less been denied) medical

19  care at Valleywise. [*Id.* ¶ 72] This alone is fatal to her claim. *See Houston v. Township of

20  Randolph*, 934 F. Supp.2d 711, 741 (D.N.J. 2012) (dismissing Title II claim because "[t]he

21  business of a volunteer fire department is protecting the community against fires," "Title

22  II guards against discrimination in the provision of that fighting service," and plaintiff

23  "does not allege, and the record does not indicate, that he was denied fire protection.").

24  Even if it were not, her claim still fails.

25  Do's claim is based upon alleged discrimination in connection with her participation

26  in a clinical rotation at the Hospital as part of her nursing education. Such opportunities are

27  available only for students at certain nursing schools and are arranged through the

28  Consortium process. [SOF ¶¶ 3-4] As such, whether analogized to employment or a

volunteer position, and whether considered generally or specifically to Do, a clinical rotation is not an "output" provided by Valleywise to the general public.

*Zimmerman*, *supra*, holds that employment by a public entity is not an "output" and, therefore, not a service, program, or activity covered by Title II. The Ninth Circuit has reached the same conclusion about serving as a volunteer. *See Mirka v. City of Langley*, 16 F. App'x 665 (9th Cir. 2001) (mem.). In *Mirka*, a volunteer at City Hall attempted to bring a discrimination claim under Title II. The court found that her claim "fails at the outset because her unique volunteer position at City Hall was not a service, program, or activity of the City," reasoning that "[t]he services [plaintiff] performed were what we have denominated 'input' rather than 'output' functions." *Id.* at 666 (citing *Zimmerman*). Other courts have come to the same conclusion regarding volunteers. *See, e.g.*, *Tawes v. Frankford Vol. Fire Co.*, No. 03-842-KAJ, 2005 WL 83784, at *6-*7 (D. Del. 2005) (finding volunteer fire department's output is "the service of protecting the community against fires," not "volunteer satisfaction"); *Houston*, 934 F. Supp.2d at 741 (same).

Do's rotation at Valleywise was a "one off" situation. Valleywise made special dispensations for Do by accepting her outside the Consortium process and exempting her from its Weekend OR Policy to help her get the clinical hours she needed. [SOF ¶¶ 20, 24] In other words, it was a "unique [student] position" and not an "output" from Valleywise. *See Mirka*, 16 F. App'x at 666. Do also cannot save her claim by asserting that student clinical rotations generally constitute a Valleywise "program" subject to Title II – the Ninth Circuit rejected a similar argument in *Mirka*. *See* 16 Fed. App'x at 666 (plaintiff cannot "broaden[] the focus to every possible volunteer function within or for the City . . . and then declar[e] that volunteer services, in general, are an activity or program.").

In short, Do's student clinical rotation was not an "output" from Valleywise and, therefore, not a service, program, or activity covered by Title II of the ADA. Accordingly, Do's Discrimination Claims must be dismissed.

## B.   Valleywise Did Not Discriminate Against Do

Even if the Court were to find that Do's clinical rotation was a service, program or

activity offered by Valleywise, Do's Discrimination Claims still fail. There is no evidence Do was subjected to disparate treatment based on her claimed disability, and the undisputed material facts show that Valleywise (i) was not given the kind of notice of a disability that triggers a duty to make reasonable accommodations, and (ii) provided Do with the only modification she specifically requested during her clinical rotation.

### 1. Do Cannot Meet Her Burden as to Disparate Treatment

To prove disparate treatment, Do must demonstrate that similarly situated, non-disabled individuals without Do's disability were treated more favorably. *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004); *Barnett v. Cnty. of Los Angeles*, No. 220CV02530ODWASX, 2020 WL 5350286, at *5 (C.D. Cal. 2020). Do has no evidence that Valleywise treated her differently from other, non-disabled nursing students. She admitted as much in her deposition. [SOF ¶ 98] Without such evidence, Do's claims fail.

### 2. Do Cannot Meet Her Burden as to Reasonable Accommodation

Do must show that Valleywise "failed to make reasonable modifications that would accommodate [her] disability without fundamentally altering the nature of the program or activity, and that the accommodation would have enabled her to meet the program's essential eligibility requirements." *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1206 (9th Cir. 2016) (cleaned up).[4] Importantly, a "defendant's duty to provide a reasonable accommodation is not triggered until the plaintiff makes a specific demand for an accommodation." *Rylee v. Chapman*, 316 F. App'x 901, 906 (11th Cir. 2009).

Mere knowledge of the individual's disability is not enough; the public entity must also be advised of "any limitations experienced by [the plaintiff] as a result of that disability." *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996); *see also Windham v. Harris Cnty., Texas*, 875 F.3d 229, 237 (5th Cir. 2017) ("Because the ADA does not require clairvoyance, the burden falls on the plaintiff to specifically identify the

---

[4] "Title II uses the term 'reasonable modification' rather than the 'reasonable accommodation' term found in Title I, the part of the ADA that applies to employers. The terms create identical standards and may be used interchangeably." *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 860 n.4 (9th Cir. 2022) (cleaned up).

disability and resulting limitations, and to request an accommodation in direct and specific terms.") (cleaned up); *Kelley v. Amazon.com, Inc.*, No. 12-CV-5132-TOR, 2013 WL 6119229, at *6 (E.D. Wash. Nov. 21, 2013), *aff'd*, 652 F. App'x 524 (9th Cir. 2016) (finding claimant must inform their employer of "both the disability *and* the resulting limitations.") (emphasis original); *Wessels v. Moore Excavation, Inc.*, No. 3:14-cv-01329-HZ, 2016 WL 1589894, at *18 (D. Or. 2016) (a defendant is "not required to speculate as to the extent of [plaintiff's] disability or the desire for an accommodation.")

Without information about both the disability and its associated limitations, it is impossible for a public entity to ascertain whether an accommodation is needed at all, much less identify one that would be reasonable under the circumstances for that individual. As the Fifth Circuit has observed in the employment context,

> [A] given disability may limit one employee (and therefore necessitate a reasonable accommodation), [but] it may not limit another. For this reason, **the ADA does not require an employer to assume that an employee with a disability suffers from a limitation**. In fact, better public policy dictates the opposite presumption: that disabled employees are not limited in their abilities to adequately perform their jobs. . . . Accordingly, it is incumbent upon the ADA plaintiff to assert not only a disability, but also any limitation resulting therefrom."

*Taylor*, 93 F.3d at 164 (emphasis added).

The record here is bereft of any evidence that Do (or Edson on her behalf) alerted Valleywise, in direct and specific terms, either that she had a disability or that she needed accommodation. Do did not at any time provide Valleywise with any documents or information related to a heart condition, any accommodations she had in place with Edson, or any accommodations she was seeking from Valleywise. [SOF ¶¶ 27, 37-38]

Unable to point to a direct and specific request, Do may attempt to rely on her vague, passing references to "cardiac problems" and a "cardiac reaction" to the COVID-19 vaccine to meet her burden. [*Id.* ¶¶ 29-30, 33-34] But neither of Do's emails to Day identified a specific medical condition, indicated that she had a disability, or requested accommodations. Again, cases involving employed-related ADA claims are instructive.

"Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA." *Rogers v. CH2M Hill, Inc.*, 18 F. Supp. 2d 1328, 1335 (M.D. Ala. 1998); *see also Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 814, 829 (S.D. Ohio 2004) ("Knowing that an employee has health problems . . . is not the same as knowing that the employee suffers from a disability.").

The same principles apply with respect to the highly general statements Day made in connection with arranging for Do's rotation. Construing the facts most favorably to Do, the most that Day conveyed to Valleywise leadership was that the length of Do's shifts during her rotation might need to be limited for some unspecified/unknown medical reason. [SOF ¶¶ 17-19, 22] Nothing from this conversation put Valleywise on notice that Do had a heart condition or other particular disability, or that she had any health-related needs other than a possible limit on the length of her shift (which Valleywise was prepared to allow).

Do did tell Day after the clinical rotation had begun, and just minutes before the burn procedure, that she was worried about how her "heart was going to handle [the temperature of the OR]." [*Id.* ¶ 51] But even then, Do did not "specifically identify the disability and resulting limitations, [or] request an accommodation in direct and specific terms." *Windham*, 875 F.3d at 237. Unsurprisingly, in similar circumstances, courts have found last-minute, one-off statements insufficient to provide the notice required by the ADA. *See, e.g.*, *Rey v. Univ. of Pittsburgh Sch. of Dental Med.*, 182 F. Supp.3d 282, 297 (W.D. Pa. 2016). There, the student waited until the day of her final examination to notify her professor that "[she] was not able to study at all the night before because [she] had been throwing up, [her] heart rate was elevated, [she] could not concentrate, and [she] was worried about the final in microbiology." *Id.* The court found these statements insufficient as a matter of law. *Id.*; *see also Windham*, 875 F.3d at 237 (finding that plaintiff's "express[ing] vague skepticism about whether he would 'be able to do' the tests" was not a "clear and definite request for accommodations that would trigger the duty to accommodate under the ADA").

1    Finally, even assuming that Do's in-the-moment statement is considered sufficiently
2    specific, Valleywise provided her with the only accommodation she actually requested:
3    Day immediately assigned her to another surgical procedure in which the temperature of
4    the OR suite was not elevated. [SOF ¶ 52] Because Do cannot show that Valleywise either
5    had an obligation to provide her with accommodations or failed to provide one she
6    requested, Valleywise is entitled to summary judgment on her Discrimination Claims.

7    **C.    Do's Claims Fail Because They are Based on Vicarious Liability**

8    As discussed above, Do's Discrimination Claims against Valleywise are based upon
9    specific alleged actions, or lack of action, related to alleged disparate treatment and failure
10   to provide her with reasonable accommodations. Because she fails to point to any "official
11   policy that is discriminatory based on disability," her claims rely exclusively on a theory
12   of vicarious liability. *Barnett v. Clark Cnty. Sch. Dist.*, No. 2:21-cv-00218-APG-VCF,
13   2023 WL 6048796, at *9 (D. Nev. Sep. 14, 2023) ("*Barnett I*"). But as the Supreme Court
14   has told us via *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998),
15   vicarious liability is not available under Title II of the ADA or the Rehabilitation Act.

16   In *Gebser*, the Supreme Court held that a school district could not be vicariously
17   liable under Title IX of the Education Amendments of 1972 ("Title IX") for a teacher's
18   acts. *Id.* at 290. To understand why *Gebser* applies here, it is necessary to recognize the
19   interconnectedness between the ADA, the Rehabilitation Act, Title VI of the Civil Rights
20   Act of 1964 ("Title VI"), and Title IX. When determining whether a particular remedy (*i.e.*,
21   vicarious liability) is available under the ADA, the Court must look to the statute's remedial
22   scheme. That scheme incorporates the Rehabilitation Act, which in turn looks to Title VI,
23   which in turn looks to Title IX. *See* 42 U.S.C. § 12133 (ADA expressly adopts
24   Rehabilitation Act remedies); 29 U.S.C. § 794a(2) (Rehabilitation Act expressly
25   incorporates remedies under Title VI); and *Barnes v. Gorman*, 536 U.S. 181, 185 (2002)
26   ("the [Supreme] Court has interpreted Title IX consistently with Title VI").

27   In other words, the logical chain guiding interpretation of these linked statues leads
28   back to *Gebser* and its rejection of vicarious liability. Consistent with this chain, the Ninth

1   Circuit has found that what was true for Title IX in *Gebser*, is true for Title VI. *United*
2   *States v. County of Maricopa*, 889 F.3d 648, 652 (9th Cir. 2018) ("an entity cannot be held
3   vicariously liable on a *respondeat superior* theory . . . under Title VI").

4       Following this logic further, a District Court within the Ninth Circuit has ruled that,
5   "because there is no vicarious liability under Title IX, the same is true for Title VI, Title II
6   of the ADA, and section 504 of the Rehabilitation Act." *Barnett I*, at *9; *see also Barnett*
7   *v. Clark Cnty. Sch. Dist.*, No. 2:21-cv-00218-APG-VCF, 2023 WL 7919061, at *1 (D. Nev.
8   Nov. 16, 2023) ("*Barnett II*"). Other courts have come to the same conclusion. *See Ingram*
9   *v. Kubik*, 30 F.4th 1241, 1256-59 (11th Cir. 2022); *Jones v. Detroit*, 20 F. 4th 1117, 1119-
10  22 (6th Cir. 2021); *Gradeless v. Kan. State Univ.*, No. 22-1148-JWB, 2023 WL 2536643,
11  at *5-*6 (D. Kan. 2023); *Montgomery v. D.C.*, No. 18-1928 (JDB), 2022 WL 1618741,
12  *14-*17 (D.D.C. 2022). And at least one court has provided an additional basis for this
13  result. In *Hooper v. City of St. Paul*, No. 17-CV-3442 (PJS/DTS), 2019 WL 4015443 (D.
14  Minn. 2019), the court observed that "close examination of the text of [Titles I and II]
15  strongly suggests that Congress did not intend to open the door to vicarious liability" under
16  Title II because, "while Title I of the ADA explicitly contemplates vicarious liability for
17  *employers*, Title II of the ADA does not contemplate vicarious liability for *public entities*."
18  *Id.* at *9-*11

19      At first blush, the Ninth Circuit's decision in *Duvall v. County of Kitsap* would seem
20  to compel a different result. 260 F.3d 1124, 1141 (9th Cir. 2001) ("[w]hen a plaintiff brings
21  a direct suit under . . . Title II . . .  the public entity is liable for the vicarious acts of its
22  employees."). As the court noted in *Barnett I*, however, "*Duvall* does not mention [*Gebser*]
23  or explain why it does not control the question," despite the fact that *Gebser* was decided
24  three years before *Duvall*. *Barnett I* at *8-9. Valleywise urges this Court to follow the lead
25  of the *Barnett* court and find that "under *Gebser,* there is no vicarious liability for money
26  damages under Title IX, so there is no vicarious liability under Title II of the ADA and
27  Section 504 of the Rehabilitation Act either." *Id.*

28

**D.      Do Lacks Standing for Injunctive Relief & Cannot Recover Damages**

To have Article III standing, Do must come forward with evidence showing the following: (1) an injury in fact that is concrete, particularized, and either actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) redressability. *Updike v. Multnomah Cnty.*, 870 F.3d 939, 947 (9th Cir. 2017). "Apart from this, standing for injunctive relief requires that a plaintiff show a 'real and immediate threat of repeated injury.'" *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).

Do cannot cite to any evidence of a 'real and immediate threat of repeated injury.' It has been nearly three years since her clinical rotation at Valleywise. Do has graduated from Edson's MEPN program, passed her licensing examination, and become employed as a nurse. [SOF ¶ 97] Because Do's brief interaction with Valleywise related exclusively to her experience as a nursing student during a clinical rotation, there can be no threat of repeated injury. *See McCullum v. Orlando Regional Hosp. Sys., Inc.*, 768 F.3d 1135, 1145-46 (11th Cir. 2014) (finding plaintiff lacked standing for injunctive relief because he "failed to present evidence showing . . .  a real and immediate threat that [plaintiff] would be hospitalized again"); *Doe One v. CVS Pharmacy, Inc.*, No. 18-CV-01031-EMC, 2024 WL 1707229, at *5 (N.D. Cal. 2024) (same).

Nor can Do recover damages. To recover damages under the ADA or AzDA, Do must demonstrate Valleywise acted with deliberate indifference. "To meet the high bar of deliberate indifference, a plaintiff must first show that the public entity was on notice of the need for an accommodation." *Csutoras v. Paradise High Sch.*, 12 F.4th 960, 969 (9th Cir. 2021) (citing *Duvall*, 260 F.3d at 1139). If a plaintiff satisfies the first element of deliberate indifference, she must also prove that the public entity's failure to act was a result of conduct involving deliberateness rather than mere negligence. *Duvall*, 260 F.3d at 1139 (internal citations omitted).

As discussed above, Do never requested accommodations from Valleywise in direct and specific terms, and Valleywise was not otherwise informed that she had a disability or needed accommodations. Thus, she cannot meet the "high bar" to show deliberate

1   indifference. *See Csutoras*, 12 F.4th at 969-70 (finding no deliberate indifference where

2   plaintiff "never requested any accommodation related to social interactions, bullying, or

3   harassment"); *Smith v. Harris Cnty., Texas*, 956 F.3d 311, 317 (5th Cir. 2020) ("Plaintiffs

4   ordinarily satisfy the knowledge element by showing that they identified their disabilities

5   as well as the resulting limitations to a public entity or its employees and requested an

6   accommodation in direct and specific terms."). Even assuming Do made a sufficiently

7   specific request, that request was limited to not being placed in a warm OR suite, and it

8   was granted. She never made a specific and direct request for any other type of

9   accommodation. [SOF ¶¶ 50, 53] It goes without saying that Valleywise cannot have acted

10  with deliberate indifference to an accommodation request that was never made. *See*

11  *Updike*, 870 F.3d at 951-52.

12       Do also cannot meet her burden on the second element. Do contends that Valleywise

13  acted with deliberate indifference by placing her in environments that were unsafe or

14  otherwise unsuitable for her. [FAC ¶¶ 74, 79] But it was Edson that placed Do in the OR

15  by specifically requesting that she precepted there by Day. Day simply sent Do to observe

16  the surgical cases that were available that morning. Do did not tell Day she had any

17  limitations related to the types of procedures she could observe or make a specific request

18  to be assigned elsewhere the Hospital, nor does Do have any evidence that "safer" (or any)

19  alternative assignments were available at Valleywise the day she was there. Further, even

20  if Do had requested a different assignment, it is undisputed that Day lacked the authority

21  to assign Do *ad hoc* to other departments within the Hospital. [SOF ¶¶ 53-54] As the Ninth

22  Circuit has held, there can be no deliberate indifference when a "complaint may reasonably

23  have been deemed to result from events taking their normal course." *Updike*, 870 F.3d at

24  951-52. That is what happened here.

25       Notwithstanding Do's inability to show deliberate indifference, Do cannot recover

26  damages for the independent reason that she has disclosed no evidence of any damages

27  other than emotional distress damages, which are not recoverable under the ADA or

28  Rehabilitation Act. *See, e.g.*, *Cummings v. Premier Rehab Keller, PLLC*, 142 S.Ct. 1562,

596 U.S. 212 (2022); *Doherty v. Bice*, 18-cv-10898 (NSR), 2023 WL 5103900, at *6 (S.D.N.Y. 2023).

## II.    Do Cannot Establish a Viable Anti-Interference Claim (Count III)

To prevail on her claim under the ADA's anti-interference provision (42 U.S.C. § 12203(b)), Do must show that: (1) she exercised or enjoyed a right protected by the ADA, such as requesting an accommodation; (2) she was subjected to interference, coercion, or threats in relation to the exercise or enjoyment of that right; and (3) she suffered "a distinct and palpable injury" as a result. *Tankersley v. MGM Resorts Int'l*, No. 220CV00995RFBDJA, 2023 WL 6393361, at *7 (D. Nev. 2023); *Golden Gate Trans. Ind. Serv., Inc. v. Cal.*, No. CV 18-08093 SJO (AGRx), 2019 WL 4222452, at *20 (C.D. Cal. 2019). Do must also show a "causal link" between her protected activity and the purported interference. *Golden Gate*, 2019 WL 4222452, at *20.

As a threshold matter, Do lacks standing to pursue this claim. The ADA's anti-interference provision is "redressable only by equitable relief." *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1270 (9th Cir. 2009). Do's request for equitable relief is limited to injunctive relief. [FAC at *Prayer for Relief,* ¶ C] But, for the reasons detailed above, Do lacks standing to seek injunctive relief because she cannot show that she is "reasonably likely to be subjected once again to the conduct alleged as the basis for [her] claim." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864-865 (9th Cir. 2017) (finding plaintiff lacks standing for injunctive relief under ADA anti-interference provision).

Even if the Court finds that Do has standing, however, her interference claim fails for other reasons. First, the claim appears to be duplicative of her discrimination claim. *Compare* FAC ¶¶ 71-74 *with* ¶¶ 76-81. When a plaintiff "claims a violation of the ADA's anti-interference provision based on Plaintiff's disability discrimination cause of action, the anti-inference claim (which is duplicative) fails by virtue of Plaintiff['s] inability to prove disability discrimination[.]" *Golden Gate*, 2019 WL 4222452, at *20.

Do's claim also fails for the independent reason that she cannot "show that [Valleywise's] conduct was **motivated or because of** a discriminatory animus toward [an]

individual[] protected under the ADA." *Id.* (emphasis original); *see also Smith v. Wormuth*, No. 1:20-CV-00419-JRR, 2024 WL 2881334, at *3 (D. Md. 2024) (same). There is no evidence that Day or anyone else at Valleywise was on notice of Do's arrhythmia, any specific limitations arising therefrom, or any accommodation requests. Without such knowledge, it logically follows that any conduct about which Do complains was not motivated by an intent to discriminate.

**III.    Do's Tort Claims Fail as a Matter of Law**

Do alleges that Valleywise intentionally and/or negligently inflicted emotional distress on her and points to the following sources of her alleged distress: (1) her short interaction with Day on the morning of July 24, 2021; (2) her assignment to surgical procedures involving patients with serious injuries; and (3) the statements written by OR personnel that appeared in Edson's evaluation of her performance in the NUR 478 class. Neither of Do's claims can survive summary judgment.

**A.    Do Cannot Establish Any of the Elements of an IIED Claim**

Do's claim for IIED requires her to prove: (1) Valleywise's conduct was "extreme" or "outrageous;" (2) Valleywise intended to cause emotional distress or recklessly disregarded the near certainty that such distress will result from the conduct; and (3) severe emotional distress did occur as a result of Valleywise's conduct. *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 905 P.2d 559, 562-563 (Ariz. Ct. App. 1995). Do fails on every element.

1.    Valleywise's Conduct was Neither Extreme Nor Outrageous

To be outrageous or extreme, conduct must go "beyond all possible bounds of decency, and [] be regarded as atrocious and utterly intolerable in a civilized community." *Id.* "The adjectives 'extreme' and 'outrageous' are not just for show; evidence of callousness or insensitivity will not suffice." *Demetrulias v. Wal-Mart Stores Inc.*, 917 F. Supp. 2d 993, 1012 (D. Ariz. 2013). Whether the alleged acts are sufficiently outrageous is for the court to decide. *Buhagiar v. Wells Fargo NA*, No. CV-19-05761-PHX-JJT, 2022 WL 2833940, at *10 (D. Ariz. 2022).

In many respects, Do's clinical rotation at Valleywise was akin to employment. *See, e.g.*, *O'Haro v. Harrisburg Area Cmty. Coll.*, No. 1:18-cv-02073, 2020 WL 5819768, at *16 (M.D. Pa. Sept. 30, 2020) (applying employment-related legal principles to claims arising out of nursing student's clinical rotation). As recognized in *Mintz*, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." 905 P.2d at 561 (citation omitted).

None of the conduct Do relies upon rises to the level of being extreme or outrageous. First, as Do admits, she spent a grand total of approximately five minutes talking with Day on the morning of July 24, 2021. [SOF ¶ 47][5] Taking Do's allegations as true, as we must, she claims that in that brief time, Day snapped at her, used a brash and condescending tone, seemed annoyed, chastised her, and made her feel like a "defiant toddler." [*Id.* ¶ 48] At worst, this describes "callousness or insensitivity" toward Do – which "will not suffice" to support an IIED claim. *Demetrulias*, 917 F. Supp. 2d at 1012; *see also Henson v. Air Nat. Guard Air Force Rsrv. Command Test Ctr.*, No. CV 06-526-TUC-FRZ (JCG), 2007 WL 2903993 (D. Ariz. 2007) (finding "an abusive five-hour long meeting to discuss [plaintiff's] disability," "repeated threats of the loss of her job," and "disparaging comments about her medications," all following a "request for accommodation," not sufficiently outrageous).

Do's assignment to surgical procedures that she considered gory and traumatic also is insufficient to sustain her claim. She contends that this was extreme or outrageous conduct because Day or others at Valleywise knew she had arrythmia and purposely had her observe surgeries that they knew would aggravate her condition and cause her "debilitating anxiety." [FAC ¶¶ 102-103, 108-109] None of that is true. As discussed

---

[5] Do testified under oath that she had no unpleasant or offensive interactions with anyone else she encountered at the Hospital on the day of her rotation, and that she was not bothered by the tone of Day's pre-rotation emails to her. [SOF ¶¶ 93-94]

1    above, Valleywise had no knowledge of any disabling heart condition or anxiety and no

2    reason to believe Do couldn't accompany Day in her surgical cases.[6]

3        The clinical rotation arranged for Do was specific to the OR. To the extent Do takes

4    issue with being assigned to an OR in the first place, that was not an act by Valleywise – it

5    simply agreed to the request by Edson to host her there. After being notified that she would

6    be in the OR, Do never raised concerns about it to Valleywise despite understanding that

7    her clinical experience might include exposure to trauma and emergency cases. [SOF ¶¶ 27-

8    28, 38] Once on site, Do was assigned to procedures that were on the schedule that day and

9    common for Valleywise. [*Id.* ¶¶ 50, 56, 63] When Do balked at the temperature in the OR

10   suite for the burn procedure, Day sent her to the debridement procedure (the only other

11   case in the OR at that time) in response to her concerns [*Id.* ¶ 52]. The second, orthopedic

12   procedure was likewise the only surgery taking place at that time. All of this was eminently

13   reasonable and consistent with the educational purpose for Do's presence at the Hospital.

14       Finally, the Hospital staff's provision of written feedback about their experience

15   with Do falls far short of being extreme or outrageous. As Do's faculty of record, Day was

16   responsible for evaluating Do's performance. [*Id.* ¶ 77] Having not observed Do in the OR,

17   Day reasonably asked Hospital staff who participated in the debridement and orthopedic

18   procedures to provide written comments on their experience with Do. [*Id.* ¶ 78][7] Each sent

19   Day an email providing an honest, accurate description of their opinions and observations

20   of Do. [*Id.* ¶ 79] Do may disagree with their perceptions of her, but the writing of an

21

22   [6] A "factor in determining outrageousness is defendant's knowledge that plaintiff is
     particularly susceptible to emotional distress." *Mintz*, 905 P.2d at 563. There is no evidence

23   that Day or anyone else at Valleywise had knowledge that Do was particularly susceptible
     to emotional distress, either generally or if assigned to a surgical procedure. [SOF ¶¶ 37-

24   38, 44] Additionally, as an Edson faculty member, Day knew that all Edson students were
     required to have a Clearance Form to attend clinicals. [*Id.* ¶ 35] The Clearance Form

25   required an attestation from a medical professional that the student was fit to be placed
     "under considerable mental and emotional stress." [*Id.* ¶¶ 45-46]

26   [7] Do also identified Valleywise's Nicole Steppig as having provided a written statement
     that caused her distress. But Steppig didn't send a statement to Day. Rather, after speaking

27   with Day a few days after July 24, Steppig wrote a summary of events for internal use.
     That summary was not published to Do or anyone outside of Valleywise; Do learned of it

28   only during this litigation. [SOF ¶ 95]

unflattering evaluation is not "extreme" or "outrageous" conduct. *See Castle v. Eurofresh, Inc.*, No. CV-09-8114-PCT-MHM (DKD), 2010 WL 2035576, at *6 (D. Ariz. 2010) ("threat of termination and derogatory performance evaluations" failed to meet "extremely high burden" for IIED);[8] Restatement (Second) of Torts § 46 ("There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion").

### 2.    Valleywise Lacked the Requisite Intent

Do also must prove that Valleywise intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result from its conduct. *Knox v. Utd. Rentals Highway Tech., Inc.*, No. 07-CV-0297-PHX-DKD, 2009 WL 806625, at *7 (D. Ariz. 2009) (requiring evidence of "actual knowledge" of emotional distress and intent to cause it). She cannot do so.

As detailed above, Day lacked knowledge that Do had a heart condition or was generally susceptible to emotional distress. The mere fact that Day spoke rudely to Do during their five minutes together is not evidence of intent to cause her severe distress. There is also no evidence that Do was assigned to the debridement and orthopedic procedures for any reason other than those were the only procedures available at that time in the OR. The Hospital staff who provided written statements to Day also lacked the requisite intent, as these individuals knew nothing about Do's health condition or mental state and were not told that their written statements would be shared with Do or included

---

[8] Courts in other jurisdictions have come to the same result. *See, e.g.*, *Jenkins v. City of Grenada*, 813 F. Supp. 443, 447 (N.D. Miss. 1993) (finding "unfair criticism of job performance, poor evaluations, and demands that [plaintiff] quit or face the threat of defendant fabricating a case against her to justify termination" failed to rise to "the heightened level of 'extreme and outrageous'"); *DeMeo v. Goodall*, 640 F. Supp. 1115, 1117-118 (D. N.H. 1986) (finding evaluation prepared and published containing "false and defamatory matter" that plaintiff was "an incompetent nurse anesthetist" "fails as a matter of law to meet the definition of outrageous conduct"). And, while there is no evidence that any of the written statements about Do are false, even making false accusations is insufficient to support an IIED claim under Arizona law. *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 747 (9th Cir. 2004) ("Arizona courts have typically found false accusations alone not enough to constitute an intentional infliction of emotional distress.") (collecting cases).

1    verbatim in a course evaluation. [SOF ¶¶ 61, 67, 78] Accordingly, Do has failed to establish

2    the required intent to maintain her claim. *Knox*, 2009 WL 806625, at *7.

3            3.      <u>Valleywise Did Not Cause Do Severe Emotional Distress</u>

4          As for the final element, Do must have suffered "severe" emotional distress ***caused***

5    ***by Valleywise***. For purposes of IIED, "[a] line of demarcation" is drawn between "mere

6    emotional distress" and "severe emotional distress." *Midas Muffler Shop v. Ellison*, 650

7    P.2d 496, 501 (Ariz. Ct. App. 1982). Examples of emotional distress held sufficiently

8    severe include "heart attack, premature birth of a dead baby, severe nervousness rendering

9    the victim unable to perform her job, severe stress and anxiety requiring hospitalization, or

10   stress resulting in permanent impairment of an existing medical condition." *Kretsch v.*

11   *Barton*, No. CV-23-00411-PHX-ROS, 2024 WL 962181, at *8 (D. Ariz. 2024) (citing

12   *Midas*, 650 P.2d at 501); *see also* Restatement § 46 ("The law intervenes only where the

13   distress inflicted is so severe that no reasonable [person] could be expected to endure it.").

14         Do's alleged emotional distress has manifested as crying, shaking, difficulty

15   verbalizing her feelings, and experiencing feelings of not being good enough. [SOF ¶ 89]

16   Courts applying Arizona law have held that similar symptoms are insufficiently severe to

17   recover for IIED.  *See, e.g.*, *Bodett*, 366 F.3d at 747-48 (finding shock, stress, depression,

18   and estrangement from friends and co-workers insufficient under Arizona law); *Cox v.*

19   *Glob. Tool Supply LLC*, 629 F. Supp. 3d 963, 972-73 (D. Ariz. 2022); (finding anxiety,

20   depression, lost trust, crying, and cycles of weight loss/gain insufficient).

21         Even assuming Do's symptoms are sufficiently severe, Do cannot prove the

22   necessary causal link between her distress and Valleywise's conduct. As an initial matter,

23   the statements written by Valleywise staff were provided directly to Day, not to Do. They

24   were shared with Do by <u>Edson</u> personnel, who included them in the course evaluation they

25   prepared. [SOF ¶¶ 79-80] Accordingly, any emotional distress Do claims she experienced

26   from reading those statements days after her rotation ended was not caused by Valleywise.[9]

27    

28          [9] With respect to Thomas, Valleywise cannot be liable for the additional reason that he
     was an independent contractor with District Medical Group, an entity that contracts with
     Valleywise to provide anesthesia services at the Hospital. [SOF ¶ 81]; *Miller v. Ascenda*

Other undisputed facts also prevent Do from establishing that Valleywise caused her severe emotional distress. First, long before the morning she spent at Valleywise, she was diagnosed with generalized anxiety disorder, experienced issues with "apprehension, irritability, worrying, trouble relaxing, and insomnia," as well as "chronic depression and anxiety." [*Id.* ¶¶ 82-84] Second, her mental health treatment records are replete with references to pre-existing and/or concurrent concerns that are marked sources of distress for her. For example:

- She has a history of dysfunctional familial relationships, including with her brother, mother, and father [*Id.* ¶ 85];

- She admits to suffering from an "innate need to gain her mother's approval" which stems back to her childhood but continues to present [*Id.*];

- She has had a number of traumatic experiences, including being diagnosed with thyroid cancer, being a victim of physical abuse by her aunt and an attack by a date, and being a passenger in a childhood car accident [*Id.* ¶ 86];

- She suffers from diffuse fears about driving, mass shootings, and lithium battery plants being built in her community [*Id.* ¶ 87];

- She described having a "trauma bond" with her daughter's father, adding that he "hates her," "constantly calls her names," tells her that "she is a horrible person" and that "***he is the reason she is crying every single day***." [*Id.* ¶ 88 (emphasis added)]; and

- She fears that individuals associated with Edson and ASU whom she has sued in litigation will harm her [*Id.* ¶ 87].

None of this is related to conduct by Valleywise. *Knox*, 2009 WL 806625, at *3, *7 (finding lack of causal connection where plaintiff's treating provider testified that "causes of [plaintiff's] depressive disorder were multifaceted," because plaintiff had pre-existing emotional issues).

Where there are medically complicated questions due to multiple and/or preexisting causes, expert testimony is required to demonstrate the causal link between a defendant's

_____

*USA Inc.*, No. CV-22-02172-PHX-JJT, 2023 WL 4746117, at *5 (D. Ariz. 2023) (finding employer not liable for contractor's conduct).

act and a plaintiff's harm. *Halcomb v. Woods*, 610 F. Supp. 2d 77, 85 (D.D.C. 2009) (expert testimony was required "to ensure that the jury was not left to speculate as to [the] cause or causes" of plaintiff's emotional distress, which was "potentially traceable to at least three different sources"); *Francisco v. U.S. Marshalls Serv.*, No. CA 11-231L, 2014 WL 652147, at *11 (D.R.I. 2014) ("the ordinary case . . . requires expert medical testimony on the existence of a causal relationship between the defendant's wrongful conduct and the plaintiff's claimed emotional distress."). Do's treating provider and expert witness both testified that they were unable to state, to any degree of medical certainty, how much of her emotional distress was caused by Valleywise (as opposed to the other defendants in this case, prior events in her life, her relationship with her family members, etc.). [SOF ¶ 90] While the court need not even reach the issue of causation to dispose of Do's claim, the undisputed facts show that Do cannot establish that necessary element.

### B. Valleywise is Entitled to Summary Judgment on Do's NIED Claim

To prevail on her NIED claim, Do must show that Valleywise acted negligently in creating an unreasonable risk of bodily harm to her, causing emotional distress that resulted in a physical injury or long-term illness. *Kretsch*, 2024 WL 962181, at *8 (citing Rev. Ariz. Jury Instr. (Civ.) Negligence 9 (6th ed. 2018)). Do cannot satisfy this standard.

#### 1. Do Was Never in a Zone of Danger

Arizona law requires that "[t]he plaintiff must have been within the 'zone of danger,' in that the tortfeasor's negligence directly affected the plaintiff by creating an unreasonable risk of bodily harm to the plaintiff." *Hendershott v. Babeu*, No. 1 CA-CV 14-0158, 2015 WL 1395275, at 2 ¶ 13 (Ariz. Ct. App. 2015); *Kretsch*, 2024 WL 962181, at *8 (same). The zone of danger is a concrete physical zone, which houses only those in actual physical peril. Whether a plaintiff is within a zone of danger is an *objective* (not a subjective) inquiry. *See, e.g.*, *K.A.C. v. Benson*, 527 N.W.2d 553, 558 (Minn. 1995); *Hansen v. Sea Ray Boats, Inc.*, 830 P.2d 236, 242 (Utah 1992).

Do's assignment to the debridement and orthopedic procedures did not place her in the zone of danger. Patients in both procedures were confirmed COVID-19 negative. [SOF

¶¶ 55, 64] As such, Do was not actually exposed to the virus. The fact that Do may have subjectively believed otherwise is of no moment. *See, e.g.*, *Benson*, 527 N.W.2d at 558 (finding plaintiff was "not within the zone of danger" when no "actual exposure to HIV" existed); *Weissberger v. Princess Cruise Lines, Ltd.*, No. 2:20-cv-02267-RGK-SK, 2020 WL 3977938, at *2-*4 (C.D. Cal. 2020) (finding plaintiffs' "near miss" with COVID-19 did not put them in zone of danger even though defendant cruise line knew other passengers had symptoms of COVID-19 and failed to employ proper screening protocols for passengers boarding). Nor is there any argument that Day's oral statements or the written statements by Hospital staff put Do in the zone of danger by creating a risk of bodily harm. Courts routinely grant dismissal under these circumstances, and this Court should do so here. *See Lockerby v. Pima Cnty.*, No. 1 CA-CV 15-0277, 2016 WL 1158296, at *2 ¶ 9 (Ariz. Ct. App. 2016) (dismissing NIED claim because plaintiff was not in "zone of danger" where tax assessor incorrectly assed property taxes); *Hendershott*, 2015 WL 1395275, at *2 ¶¶ 13-14 (dismissing plaintiff's claim that "public announcement that they were fired caused them to suffer emotional injuries" because no zone of danger existed).

### 2.    Do Cannot Show But-For Causation

"[T]he rule in Arizona is that when an NIED plaintiff seeks recovery for an emotional injury unaccompanied by a physical injury, the plaintiff must show that the emotional injury eventually resulted in some form of bodily harm, such as a physical injury or a long-term physical illness or mental disturbance." *Dehart v. Johnson & Johnson*, 562 F. Supp. 3d 189, 196-97 (D. Ariz. 2022) (cleaned up). "Transitory physical phenomena" such as weeping and insomnia "are not the type of bodily harm which would sustain a cause of action for emotional distress." *Burns v. Jaquays Mining Corp.,* 752 P.2d 28, 32 (Ariz. Ct. App. 1988).

Do's emotional distress, which manifested as crying, shaking, difficulty verbalizing her feelings, and experiencing feelings of not being good enough, is insufficient to sustain a claim for NIED. Arizona courts have sustained challenges to similar claims. *See, e.g.*, *Burns*, 752 P.2d at 32 ("psychosomatic injuries" such as "headaches, acid indigestion,

1   weeping, muscle spasms, depression and insomnia," were "transitory physical phenomena"
2   and "not the type of bodily harm which would sustain a cause of action for emotional
3   distress"); *Bollin v. Cummings Plumbing, Inc.*, No. 2 CA-CV 2014-0127, 2015 WL
4   5254282, at *4 (Ariz. Ct. App. 2015).

5       Do may claim that her assignment to the two surgical procedures caused her
6   emotional distress that triggered significant cardiac arrythmia, but this contention is belied
7   by objective evidence. On July 24, 2021, Do's heart was being monitored by her Kardia
8   device and a physician-ordered Cardiac Event Monitor. Neither device captured arrythmia.
9   [SOF ¶¶ 75-76] Do did not seek out medical attention for arrythmia on July 24. [*Id.* ¶¶ 72-
10  73] And Do's expert witness is unable to say whether Do experienced arrythmia that day
11  at all, much less that any such arrythmia was caused by mental distress. [*Id.* ¶ 91]

12      Even if this objective data didn't debunk Do's contention (it does), her own
13  testimony forecloses an argument that any arrythmia she experienced that day was caused
14  by viewing surgical patients or procedures. According to Do, soon after her initial
15  interaction with Day – *prior to even being assigned to the burn procedure and reassigned*
16  *to the debridement* – "[she] was in arrhythmia already pretty bad because [she] felt like
17  [Day] had chastised [her]." [SOF ¶ 49] In other words, by Do's own admission, the cause
18  of her arrythmia on July 24 was Day addressing her in a brash and condescending tone,
19  conduct that cannot support a claim for NIED.

20      Finally, Do cannot point to any evidence that she suffered a long-term physical
21  illness *caused by Valleywise* following her clinical rotation. No such evidence exists.
22  Throughout this litigation, Do has doggedly maintained that her cardiac condition was
23  caused by the COVID-19 vaccine she received seven months <u>before</u> her clinical rotation at
24  Valleywise, and she testified that well before that rotation, she was experiencing arrythmia
25  on an almost daily basis, often without an identifiable trigger. [SOF ¶¶ 26, 96] Do has no
26  evidence that any post-rotation arrythmias she suffered were caused by Valleywise (as
27  opposed to the ongoing nature or natural progression of her condition, Edson's conduct, or
28  other life events). [*Id.* ¶ 92] *See Bollin*, 2015 WL 5254282, at *4 (plaintiff failed to show

1    heart palpitations were not merely transitory, temporary, or inconsequential where she

2    failed to present medical evidence "indicating that heart palpitations . . . are caused by

3    emotional distress" and not the result of a pre-existing condition, and were not "manifested

4    only as a result of the emotional distress attributed to [defendant]").

5    **V.      Punitive Damages are Unavailable to Do**

6           Do's prayer for punitive damages against Valleywise must be dismissed. Punitive

7    damages are not available under the Rehabilitation Act, ADA, or AzDA. *Barnes*, 536 U.S.

8    at 189 (Title II of ADA and Rehabilitation Act); *Alvarado*, 588 F.3d at 1269 (ADA

9    retaliation claims); *Wagner v. Maricopa Cnty.*, No. CV 07-00819-PHX-EHC, 2009 WL

10   10673411, at *6 (D. Ariz. 2009) (AzDA). Even if that were not the case, Arizona law

11   forecloses Do's ability to recover punitive damages on any of her claims against

12   Valleywise: as a public entity and a political subdivision of the state, it is immune from

13   punitive damages awards. *See* A.R.S. §§ 12-820(7) (public entity includes "political

14   subdivision of this state") & 12-820.04 ("Neither a public entity nor a public employee . .

15   . is liable for punitive or exemplary damages"); *Coombs v. Maricopa Cnty. Special Health

16   Care Dist.*, 387 P.3d 743, 744 ¶ 2 (Ariz. Ct. App. 2016) (Valleywise is "a special health

17   care district and a political subdivision of the State."); *see also Wood v. Maricopa Cnty.

18   Special Health Care Dist.*, No. CV-16-02215-PHX-SRB, 2016 WL 11652335, at *3 (D.

19   Ariz. 2016) (dismissing punitive damage prayer against Valleywise).

20                                   **CONCLUSION**

21          Valleywise serves as Maricopa County's public safety-net healthcare system,

22   providing healthcare services to some of the most vulnerable and underserved members of

23   the community. In that spirit of service, and while Arizona was still in the grips of the

24   COVID-19 pandemic, Valleywise agreed to help Edson and Do by providing a special

25   opportunity for Do to obtain clinical hours needed for her nursing degree. In return, it has

26   been dragged into this groundless litigation. For the reasons set forth above, the undisputed

27   material facts demonstrate that Valleywise did not discriminate against Do, interfere with

28

her rights under the ADA, or unlawfully inflict emotional distress upon her. Accordingly, summary judgment in favor of Valleywise is warranted on all of Do's claims.

RESPECTFULLY SUBMITTED this 28th day of June, 2024.

**COPPERSMITH BROCKELMAN PLC**

By s/ Jill J. Chasson
  Jill J. Chasson
  Andrew T. Fox

*Attorneys for Defendant Maricopa County Special Health Care District*