Mary R. O'Grady, 011434
Kristin L. Windtberg, 024804
Joshua J. Messer, 035101
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2838
(602) 640-9000
mogrady@omlaw.com
kwindtberg@omlaw.com
jmesser@omlaw.com

Attorneys for Defendant Arizona Board of Regents

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sara Do, an individual, | No. CV-22-00190-PHX-JJT |
| Plaintiff, | **DEFENDANT ABOR'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Arizona Board of Regents, an Arizona State Entity; et al., | |
| Defendants. | |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Arizona Board of Regents ("ASU")[1] moves for summary judgment on all claims asserted against ASU in Plaintiff Sara Do's ("Do") First Amended Complaint (Doc. 13) ("FAC") and Supplemental Complaint (Doc. 100): Claims 1 (ADA Title II), 3 (ADA Title V[2]), and 6 (Rehabilitation Act). The following Memorandum of Points and Authorities and ABOR's Separate Statement of Facts ("SOF") support this Motion.

## I.    Background

In Fall 2020, Do enrolled in ASU's Masters Entry to Nursing Practice program ("MEPN"), a graduate degree program based at ASU's downtown Phoenix campus. (SOF ¶¶ 1, 11.) A key component of the MEPN curriculum is clinical rotations completed in hospitals or other clinical facilities. (*Id.* ¶¶ 1, 4.) These clinical rotations, or "clinicals" are critical for the development of nursing students in that they provide hands-on opportunities for students to demonstrate and attain core clinical competencies so that they may safely practice nursing upon graduation. (*Id.* ¶ 4.) The curriculum is based on students attending full clinical shifts—typically scheduled for 12 hours—including report at the beginning and end of shift. (*Id.* ¶¶ 4-5.) Unfortunately, the COVID-19 pandemic severely limited the availability of clinicals, and in Do's first semester, Edson had no in-person clinicals available for its students. (*Id.* ¶ 10.) This changed by Do's second semester, Spring 2021. (*Id.* ¶ 11.) Do struggled to complete her in-person clinicals, and eventually applied to ASU's Student Accessibility and Inclusive Learning Services ("SAILS") office for accommodations for a heart issue she described as an arrythmia. (*Id.* ¶¶ 17-18.) Both the SAILS office and Edson worked with Do to facilitate her success in the program. (*Id.* ¶ 18.)

---

[1]    Pursuant to A.R.S. § 15-1625, ABOR is the proper party when a litigant complains of conduct of one of Arizona's public universities, including Arizona State University ("ASU"). *See Lazarescu v. ASU*, 230 F.R.D. 596, 601 (D. Ariz. 2005).

[2]    The FAC refers to Do's ADA retaliation claim under 42 U.S.C. § 12203 as a "Title IV" claim. (Doc. 14 at 19.) The case law refers to this provision as Title V, and ABOR refers to it the same way throughout this motion. *See, e.g., Demshki v. Monteith*, 255 F.3d 986, 988 (9th Cir. 2001) (referring to § 12203 as "Title V of the ADA").

Later, in Summer 2021, after Do missed multiple clinicals in NUR 478, Edson faculty went above and beyond to secure make-up clinicals for Do at Valleywise Hospital on short notice before the end of the semester so she could complete her course. (*Id.* ¶¶ 22, 29, 34.) At Do's request, Edson also scheduled the shifts for shorter than the typical 12-hour shifts. But on July 24, 2021, Do abandoned the first of these scheduled make up shifts without ensuring anyone knew she was leaving. (*Id.* ¶¶ 36-42.) Considering this egregious behavior and Do's inability to complete the course requirements in time, Do failed the course. (*Id.* ¶ 43.)

Do then elected to take a leave of absence from the MEPN program for the Fall 2021-Fall 2022 semesters. (*Id.* ¶¶ 48, 50.) While on leave, she initiated this lawsuit alleging that ASU improperly denied accommodations she requested and retaliated against her. (*See* Doc. 13 (FAC)).

Do returned to the MEPN program in Spring 2023. (*Id.* ¶ 50.) Prior to her return, she requested new accommodations from ASU. (*Id.* ¶ 52.) ASU granted many of these, and denied some because they were either unreasonable or would fundamentally alter the MEPN program. (SOF ¶¶54-64.) Do went on to complete the MEPN program. (*Id.* ¶ 73.) After her graduation, she filed her Supplemental Complaint in this case (Doc. 100), alleging additional claims relating to her return to school.

## II.    Legal Argument

### A. Do's claims are moot.

In the FAC, Do seeks both compensatory damages and injunctive relief. (FAC at 29-30.) But Do cannot recover compensatory damages in this case, and the viability of equitable relief ended when Do graduated. As such, Do's claims are moot.

"Mootness is a jurisdictional issue, and federal courts have no jurisdiction to hear a case that is moot." *Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003) (cleaned up). Once "there is no longer a possibility" that a litigant can "obtain relief for his claim, that claim is moot and must be dismissed for lack of jurisdiction." *Id.* "The inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the

1    Constitution under which the exercise of judicial power depends upon the existence of a
2    case or controversy." *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (citation omitted).
3    Here, the possibility that Do can obtain relief for her claims has ended, therefore her claims
4    are moot and summary judgment should be granted to ASU on all claims.

5                    **1.  Do's claims for injunctive relief are moot.**

6    "It is well-settled that once a student graduates, [s]he no longer has a live case or
7    controversy justifying declaratory and injunctive relief against a school's action or
8    policy." *Cole v. Oroville*, 228 F.3d 1092, 1098 (9th Cir. 2000). This is true in the ADA
9    context, where the "great weight of precedent instructs that . . . graduation" renders ADA
10   claims for injunctive relief moot. *Mirabella v. William Penn Charter Sch.*, 2017 WL
11   1062460, *4 (E.D. Pa. Mar. 20, 2017) (gathering cases); *D.M. v. Or. School Activities
12   Ass'n.*, 2023 WL 4557739, *1 (9th Cir. July 17, 2023) (dismissing as moot ADA claim
13   because student's graduation meant the issue was incapable of arising again). Put simply,
14   because Do graduated, "[a] determination by this Court of the legal issues" underlying her
15   requests for equitable relief "is no longer necessary." *DeFunis*, 416 U.S. at 317.

16   Do requests "[i]njunctive relief, including an order to reinstate Plaintiff to the
17   Master of Science in Nursing Program at [ASU], to rescind the false and defamatory
18   evaluation and failing grade, and to provide her with reasonable accommodations." (FAC
19   at 29-30.) As an initial matter, Do was never dismissed from the MEPN program. (SOF ¶
20   46.) Further, she has now graduated. (*Id.* ¶ 73.) She cannot be reinstated or granted any
21   "reasonable accommodations" since she no longer attends ASU.

22   The only remaining equitable relief Do requests is removal of her failing grade
23   from her transcript. But Do has asserted that "she has not sued to reverse a failing grade."
24   (Plf's. Opp. to Motion to Dismiss (Doc. 23) at 17), and the validity of the failing grade is
25   pending in her administrative appeal. (SOF ¶ 47.) Regardless, nothing in the record
26   suggests the failing grade has had a continuing negative impact. Do graduated from the
27   MEPN program after retaking and passing the course, has become a registered nurse, and
28   is working in a job that she says she loves. (*Id.* ¶ 73.) The controversy between the parties

as to Do's equitable relief has "clearly ceased to be definite and concrete." *DeFunis*, 416 U.S. at 317. Do's requests for equitable relief are moot and ASU is entitled to summary judgment as to that relief in connection with all of her claims against ASU.

### 2. Do is not entitled to compensatory damages.

ASU is also entitled to summary judgment on Do's requests for compensatory damages because she has largely failed to disclose any such damages, and the damages she did disclose are unavailable to her in this case. As an initial matter, because the record shows Do was not subject to intentional discrimination by ASU, she is not entitled to compensatory damages as a matter of law. (*See infra* § II(B)(1)(c).)

Further, Do's request for economic damages fails because she has not disclosed any such available damages. In discovery, Do described her damages as "the harm she suffered because of Defendants' failure to accommodate her disability and her resulting emotional distress." (SOF ¶ 74.) She asserted she would "require expert testimony to evaluate various factors including the harm done to her reputation and her earning potential," as well as the extent of her emotional distress. (*Id.*) However, Do did not disclose an expert to provide opinions on the alleged harm to her earning potential or reputation and Do has never disclosed a computation of any damages. (*Id.*) Accordingly, Do is barred from now attempting to prove or recover those damages. Fed. R. Civ. Proc. 37(c)(1) ("If a party fails to provide information . . . the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial.")

In addition, for the claims pled against ASU, emotional distress damages are unavailable to Do. Because the Rehabilitation Act was enacted pursuant to Congress's Spending Clause powers, the Supreme Court has concluded "that emotional distress damages are not recoverable" for Rehabilitation Act claims. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 230 (2022). Emotional distress damages are unavailable for Do's Rehabilitation Act claim.

Do similarly cannot recover emotional distress damages for her ADA Title II claim because "[b]y statute, the remedies for violations of [Title II] and the Rehabilitation Act

are co-extensive with each other." *Ferguson v. City of Phx.*, 157 F.3d 668, 673 (9th Cir. 1998); s*ee also* 42 U.S.C. § 12133 ("the remedies, procedures, and rights" available under Title II are "[t]he remedies, procedures, and rights" set forth in the Rehabilitation Act, as amended). Because emotional distress damages are not available under the Rehabilitation Act, *Cummings*, 596 U.S. at 230, they are also not available under Title II of the ADA. *See Pennington v. Flora Cmty. Unit Sch. Dist., No. 35*, 2023 WL 348320, *2 (S.D. Ill. Jan. 20, 2023); *A.T. v. Oley Valley Sch. Dist.*, 2023 WL 1453143, *3 (E.D. Pa. Feb. 1, 2023) (gathering cases); *see also Hill v. SRS Distrib. Inc.*, 2022 WL 3099649, *5 (D. Ariz. Aug. 4, 2022) (noting it is "unlikely" emotional distress damages "are available under the ADA" after *Cummings*).

Accordingly, Do cannot recover compensatory damages in this case—she has failed to disclose anything other than emotional distress damages, and those damages are unavailable here. At the very least, Do cannot recover emotional distress damages on her claims and ASU is entitled to summary judgment as to that theory of damages.

### 3. Because Do's requested injunctive relief is moot and there are no available compensatory damages, Do's claims should be dismissed as moot.

Do also has no viable claim for equitable relief. This defeats her retaliation claim under Title V of the ADA (Claim 3) outright because "ADA retaliation claims" are "redressable ***only*** by equitable relief," *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1270 (9th Cir. 2009) (emphasis added). Furthermore, because the remaining relief she has identified—emotional distress damages—are not available under her remaining Rehabilitation Act (Claim 6) or Title II of the ADA (Claim 1), there is nothing left for Do to recover under these claims, rendering these claims moot.

In *Doherty v. Bice*, a student sued his university under the ADA after it issued "do not contact" orders against him. 2023 WL 5103900 at *2 (S.D. N.Y. Aug. 9, 2023). He sought both equitable and monetary relief. *Id.* at *4. After the student's enrollment ended, the university moved to dismiss, arguing that the claims for equitable relief were moot and the claims for emotional distress damages could not survive in light of *Cummings*. *Id.* at

*3-4. The court agreed. *Id.* at *6. Because it was "well settled that claims for equitable relief against university actions are moot for students who graduate from their university" and because the student only sought emotional distress damages, which were "not available under the ADA if, as the *Cummings* Court established, they are not available under the Rehabilitation Act," there was nothing left for the court to consider and it dismissed the student's claims. *Id.* at *4-6.

Do's requests for equitable relief are moot. The only damages she has advanced— emotional distress damages—are unavailable to her. Accordingly, there is nothing left for the Court to redress here and Do's claims are moot. *DeFunis*, 416 U.S. at 316 ("federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them") (cleaned up). Summary judgment is warranted on all of Do's claims against ASU.

**B. Even if some aspect of Do's claims remain, her claims fail on the merits.**

Even if the Court finds Do's claims are not entirely mooted, ASU is nevertheless entitled to summary judgment because the undisputed facts demonstrate that Do's claims against ASU fail as a matter of law. The record shows no unlawful conduct by ASU.

**1. ASU did not discriminate against Do under Title II or the Rehabilitation Act.**

Do asserts that, in both 2021 and 2023, ASU failed to adequately accommodate her disability in violation of Title II of the ADA ("Title II") and the Rehabilitation Act. "To establish a claim under the ADA or Rehabilitation Act," a plaintiff:

> must show (1) [she] is a qualified individual with a disability; (2) [she] was denied a reasonable accommodation that [she] needs in order to enjoy meaningful access to the benefits of public services; and (3) the program providing the benefit receives federal financial assistant (for the Rehabilitation Act) or is a public entity (for the ADA claim).

*Csutoras v. Paradise High Sch.*, 12 F.4th 960, 968-69 (9th Cir. 2021) (internal quotation marks omitted); *id.* at 969 n.11 ("Because there is no significant difference in the analysis of rights and obligations created by the ADA and the Rehabilitation Act, we collectively address the claims under both statutes.") (cleaned up).

For purposes of this Motion only, ASU assumes Do is able to satisfy the first element of her claim. ASU does not dispute the third element. Accordingly, this Motion addresses only the second element. To satisfy the second element of a claim under the Rehabilitation Act or Title II, a plaintiff must show that she was "denied a reasonable accommodation that she needs in order to enjoy meaningful access to the benefits of public services." *Id.* The accommodation request must be reasonable, and, where an alternative accommodation is granted, the plaintiff must show "that the alternative accommodations are unreasonable." *Selene v. Legislature of Idaho*, 514 F.Supp.3d 1243, 1256 (D. Idaho 2021) (citing *Zivkovic v. S. Cal. Edison Co.*, 302 F. 3d 1080, 1089 (9th Cir. 2002)); *see also Doe v. Knox Cnty. Bd. of Educ.*, 56 F.4th 1076, 1088 (6th Cir. 2023) ("When a school has provided such aids and services to a disabled student, courts have held that [plaintiffs] must show not just that their *preferred* accommodation was reasonable but also that the *provided* accommodation was unreasonable.").

Additionally, to establish an actionable claim, the request must have been timely. *Zukle v. Regents of Univ. of Cal*, 166 F.3d 1041, 1051 n.16 (9th Cir. 1999) (noting accommodation request made only after school decided to dismiss student "contributes to our finding of unreasonableness."); *see also Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 465 (4th Cir. 2012) (granting summary judgment where plaintiff's "request for an accommodation was untimely"). Moreover, because Title II and Rehabilitation Act focus on ensuring "meaningful access," "[i]t is not enough to simply show the denial of an accommodation. Rather, exclusion occurs when a disabled person cannot participate in the entity's programs *because* she did not receive the desired accommodations." *Karam v. Univ. of Ariz.*, 2022 WL 306976, *5 (D. Ariz. Feb. 2, 2022).

Even when a plaintiff can make this showing, "[t]he Supreme Court has made clear that an educational institution is not required to make fundamental or substantial modifications to its programs or standards." *Zukle*, 166 F.3d at 1046. Instead, "it need only make reasonable ones." *Id.* Accordingly, when a plaintiff proves a prima facia case for failure to accommodate, the burden shifts to the school to show that "the requested

1  accommodation would fundamentally alter the nature of the school's program." *Id.*; 28

2  C.F.R. § 35.130(b)(7). "Deference is appropriately accorded an educational institutions

3  determination that a requested accommodation is unreasonable" or that it would

4  fundamentally alter the program. *Zukle*, 166 F.3d at 1046.

5      Finally, "a private plaintiff seeking money damages" must "clear an additional

6  hurdle: proving a *mens rea* of intentional discrimination." *Csutoras*, 12 F.4th at 969. To

7  meet that standard, a plaintiff must show "[d]eliberate indifference," which is the

8  "knowledge that a harm to a federally protected right is substantially likely, and a failure

9  to act upon that likelihood." *T.B. v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 469 (9th

10  Cir. 2015). This is a "high bar." *Csutoras*, 12 F.4th at 969.

11      Do is unable to meet any of her burdens in this case, whether they relate to her

12  accommodation requests in 2021 (those at issue under the FAC) or in 2023 (those at issue

13  under the Supplemental Complaint). ASU granted the vast majority of Do's requests, and

14  where it did deny her requested accommodations, it did so because those requests were

15  unreasonable and, where possible, ASU offered alternative accommodations.

### a.  ASU did not discriminate against Do in 2021.

17      Do alleges ASU denied five of her requests for accommodations in 2021: (1) ability

18  to attend classes remotely; (2) ability to take an incomplete for NUR 478; (3) ability to

19  complete assignments at an ASU testing center; (4) shorter sessions/broken up clinical

20  hour requirements; and (5) written assignments to replace clinical hour requirements.

21  (SOF ¶ 49.) Do cannot prove a violation of Title II or the Rehabilitation Act in connection

22  with any of these purported requests.

### i.  "Ability to attend class remotely."

24      Do asserts she requested the "[a]bility to attend classes remotely" in 2021. (SOF

25  ¶ 49.) But Do only made this request in relation to classes that she did not attend, and even

26  so, Do has made no showing that her request was reasonable.

27      When Do began the MEPN program, all Edson classes were remote because of

28  safety protocols put in place as a result of the COVID-19 pandemic. (*Id.* ¶ 10.) By the

Spring 2021 semester, lecture courses were being taught in a hybrid format, whereby students had the option to attend in person or virtually. (*Id*. ¶ 16.) Thus, Do had no need to request a remote-learning accommodation for either the Spring or Summer 2021 semesters, because classes were hybrid at the time. Indeed, Do is unable to identify any class that she wanted to attend remotely but was not allowed to do so. (*Id*. ¶ 50.)

To the extent Do made a request to attend her courses remotely, she did so only in regard to the Fall 2021 classes, after learning that Edson would require all students to attend all courses in person starting in the Fall 2021 semester. (*Id*. ¶ 20.) But Fall 2021 is the semester Do began her leave of absence. (*Id.* ¶ 48.) Thus, although she was told in-person attendance would be required that semester (*id.* ¶ 20), Do was not denied "meaningful access" to the MEPN program because she opted to take a leave and did not attend Fall 2021 classes. *Csutoras*, 12 F.4th at 968-69; *Karam*, 2022 WL 306976 at *5. Without a showing that denial of this request deterred Do from meaningful access to the MEPN program, this request cannot give rise to a Title II or Rehabilitation Act claim, and, her claims fail as a matter of law.

### ii.   "Ability to take an incomplete for NUR 478."

Do next asserts she was denied the ability to take an incomplete in NUR 478, the clinical course in which she received a failing grade. (SOF ¶ 49.) But Do's request for an incomplete—made after she initially refused to take an incomplete (*id*. ¶ 29), and only after she failed the course (*id*. ¶ 43)—was not timely and, in any event, was not reasonable under the circumstances.

In July 2021, after missing several clinicals in NUR 478, Edson faculty had a Zoom meeting with Do to discuss potential options moving forward. (*Id*. ¶25.) Edson faculty suggested Do take an incomplete in the course to address her medical concerns and then complete the course later when she was able. (*Id*. ¶ 27.) Do refused, insisting that Edson secure make-up clinicals, on short notice, so she could complete her course requirements. (*Id*. ¶ 29.) Edson faculty did so. (*Id*. ¶¶ 29, 32.) Do nevertheless failed to complete these clinicals—leaving early from the first shift without ensuring anyone was aware she was

leaving. (*Id.* ¶ 40.) She later claimed she left due to arrythmia symptoms, but neither of the heart monitors Do used that day showed any sign her condition had been activated. (*Id.* ¶ 42.) It was only after being informed that she failed NUR 478 that Do requested she be given an incomplete instead. (*Id.* ¶¶ 43, 45.)

Because Do requested an incomplete *after* failing NUR 478, her request was not reasonable and her claims fail as a matter of law because her request was not timely. *Halpern*, 669 F.3d at 465. Where a request comes, "for the first time," after a school has taken action to police its academic standards, it comes too late to give rise to a Title II or Rehabilitation Act claim. *Id.* In addition, the "evaluation made by the institution" that Do had earned a failing grade is entitled to "judicial deference," and it is unreasonable to suggest that, after earning a failing grade, Do should have instead been awarded an incomplete. *Zukle*, 166 F.3d at 1048 and 1051 n.16.

Giving a student an incomplete after they had earned a failing grade would also fundamentally alter Edson's academic standards. As explained in Edson's Masters of Science in Nursing handbook, to be eligible for an incomplete, a student must request the incomplete "at least two weeks prior to the last day of the semester," and have "successfully completed 80% of their coursework (with a C or better) prior to requesting a grade of incomplete." (SOF ¶ 45.) Here, Do did not request the incomplete until after she failed, rendering her ineligible. (*Id.*) Giving Do anything other than a failing grade in this circumstance "would have lowered" Edson's "academic standards." *Zukle* at 1051. ASU "was not required to do" so under the ADA. *Id.* Accordingly, to the extent Do's Title II/Rehabilitation Act claims are premised on not receiving an incomplete in NUR 478, they fail as a matter of law.

### iii. "Ability to complete assignments at an ASU testing center."

Do next points to a purported denial of an "ability to complete assignments at an ASU testing center" as supporting her 2021 Title II/Rehabilitation Act claim. (SOF ¶ 49.) But because it appears that this request was not actually denied, it cannot give rise to a Title II or Rehabilitation Act claim.

In Summer 2021, Do missed an exam due to difficulties in managing childcare. (*Id*. ¶ 21.) She asked if she could take the make-up exam from home; although that request was denied, Do was allowed to complete the make-up exam at an ASU campus other than the downtown Phoenix campus where the MEPN program is based. (*Id*.) When Do later asked to take a subsequent exam at the same location, she was allowed to do so. (*Id*.) As an initial matter, Do's request to utilize a remote testing center is not connected to a disability related accommodation, but rather it related to childcare issues. In addition, there is no instance in 2021 where Do requested to take an exam at a "remote testing center" that was actually denied. But the denial of a request is foundational to Do's claims. *Csutoras*, 12 F.4th at 969. To the extent Do bases her claims on this request, they fail as a matter of law.

### iv.   "**Shorter sessions/broken up clinical hour requirements.**"

Do next asserts she was denied the opportunity to complete her clinicals in "[s]horter sessions" or with "broken up clinical hour requirements" in 2021. (SOF ¶ 48.) Do's claims based on this request fail because this accommodation was granted. On July 9, 2021, during a call to discuss Do's options for completing NUR 478, Do raised for the first time the possibility of completing her clinical coursework in "shorter sessions." (*Id*. ¶ 26.) Following this call, and Do's refusal to take an incomplete in the course, Dr. Bednarek arranged for Do to complete additional clinicals at Valleywise, and in doing so, arranged for Do to complete eight-hour shifts rather than the standard 12-hour shifts. (*Id*. ¶¶ 29, 32, 34) These shorter shifts were scheduled to accommodate Do's request. (*Id*. ¶ 34.) Thus, Do ultimately *was* allowed to complete clinicals in shorter blocks of time, as she requested. Because Do's request for shorter shifts was granted, this claim fails as a matter of law. *Csutoras*, 12 F.4th at 969.

Moreover, even if the eight-hour make-up shifts are viewed as an alternative accommodation, Do nevertheless fails to show "that the alternative accommodation[ ] [is] unreasonable." *Selene*, 514 F.Supp.3d at 1256. To satisfy her burden, Do must show "not just that [her] *preferred* accommodation was reasonable but also that the *provided*

accommodation was unreasonable." *Doe*, 56 F.4th at 1088. ASU took the "extra-ordinary" step of scheduling eight-hour make-up clinicals rather than 12-hour clinicals to help Do complete her course requirements. (SOF ¶ 34.) Do cannot show this was an unreasonable accommodation, and as such Do has not satisfied her initial burden.

Finally, even if Do were to establish that she was denied a reasonable accommodation relating to shift length in 2021, the record demonstrates that further alterations to her clinical schedule beyond the scheduling of the three additional eight-hour shifts would have constituted a fundamental alteration of her educational program.

As discussed, clinicals are an essential element of pre-licensure nursing programs like MEPN. (SOF ¶ 4.) Further alteration of the clinical shift length would have fundamentally altered the NUR 478 course requirements. The Ninth Circuit recognizes that changes to the clinical setting constitute a fundamental alteration of a medical program. Clinical courses are "designed to simulate the practice of medicine," and "releasing a student from a significant number of scheduled hours during the course of a rotation would compromise the [clinical's] curricular purpose, i.e. the simulation of medical practice." *Zukle*, 166 F.3d at 1050. In other words, clinicals are a "vital part" of the MEPN program, and "allowing a student to be excused from this requirement would sacrifice the integrity of its program." *Id.*

ASU reasonably accommodated Do by scheduling her for eight-hour shifts at Valleywise. Accordingly, to the extent her claims are based on her request for "shorter sessions," her accommodation was not denied and her claims fail as a matter of law.

### v.    "Written assignments to replace clinical hour requirements."

The final accommodation request Do identifies in the 2021 time frame is a request that she be allowed to complete "[w]ritten assignments to replace clinical hour requirements." (SOF ¶ 49.) Like Do's other purported requests, this request does not give rise to a claim under Title II or the Rehabilitation Act.

In the Fall 2020, Do, like every MEPN student, was allowed to complete written assignments in lieu of clinical requirements when clinical facilities were not offering in-

person clinical experiences. (SOF ¶¶ 10-11.) This practice was a program-wide effort to make due while the COVID-19 pandemic limited the available number of clinical opportunities. (*Id.*) But given the importance of in-person clinicals to nursing education, Edson was eager to return its students to in-person clinicals when they became available. (*Id.* ¶ 11.) When Edson was able to schedule in-person clinicals for all MEPN students beginning in the Spring 2021 semester it required students to attend those shifts. (*Id.* ¶¶ 11, 17.) Edson was within its rights to make this educational decision. *Zukle*, 166 F.3d at 1049 ("We defer to the Medical School's academic decision . . . and conclude, therefore, that this requested accommodation was not reasonable.").

It was after the MEPN program returned to in-person clinicals that Do submitted her initial SAILS application, requesting that she either be granted "(A) accommodations to be given permission to do virtual clinical assignments to fulfill my clinical hour requirements for graduation . . ., or (B) to be given daytime clinical hours at local, East-Valley hospitals." (SOF ¶ 18.)

At the time, the MEPN program had no daytime shifts available for Do's MEPN cohort for the balance of the semester (*id.*), but Edson let Do know she would be transitioned to daytime clinicals the very next semester when those shifts became available. (*Id.*) As a result, Edson granted Do's request for daytime clinicals, mooting her alternative request for written assignments in lieu of in-person clinicals.

Furthermore, allowing Do to complete written assignments in lieu of her clinical hour requirements when clinical shifts were available would have constituted a fundamental alteration of the MEPN program. As discussed, written assignments were used in lieu of clinical hours as a result of the COVID-19 pandemic while clinicals were unavailable. (*Id.* ¶ 10.) It was an emergency measure to be used only until in-person clinical experiences could be resumed. (*Id.*) But the clinical setting is essential to nursing education. (*Id.* ¶ 4); *Zukle*, 166 F.3d at 1050. To continue to allow students to complete written assignments in lieu of clinical hours when those hours were available would have

1   been a fundamental alteration of the MEPN program. ASU was not required to make such

2   a change for Do. *Zukle*, 166 F.3d at 1046.

3       To summarize, Do's request for written assignments was made in the alternative to

4   daytime clinicals. Do was assigned to daytime clinicals; her request was therefore granted.

5   Moreover, continuing to assign written work in lieu of clinical hours when those hours

6   were available would have constituted a fundamental alteration to the MEPN program.

7   As such, to the extent Do's claims are based on this request, they fail.

8       Indeed, none of Do's 2021 requests for accommodation give rise to a Title II or

9   Rehabilitation Act claim, and ASU is entitled to summary judgment.

10                    **b.  ASU did not discriminate against Do in 2023.**

11      When Do began her return to the MEPN program in 2022, she submitted a list of

12  requests to the SAILS office: (1) exemption from receiving COVID and influenza

13  vaccinations; (2) a request for "open scheduling" of her clinical shifts so that Do could

14  "go to any approved clinical site for any scheduled shift and work however long [she]

15  could tolerate;" (3) exams to be taken at a different campus from her main program

16  campus; (4) no overnight clinical shifts; (5) "flexible attendance" for in-person classes;

17  (6) permission to take breaks as needed during classes and clinicals to take medication;

18  (7) a support companion to accompany her on campus and to her clinical shifts; and (8)

19  placement at East Valley clinical locations if her request for open scheduling was denied.

20  (SOF ¶ 52.) Do also later requested extended testing time. (*Id*. ¶ 65.) There is no dispute

21  that items 1, 4, 5, 6, 7, and Do's request for extended testing time were granted. (*Id*. ¶¶

22  54, 58-59, 65.) As a result, Do has no claim for failure to accommodate based on these

23  requests. *Csutoras*, 12 F.4th at 968. ASU accordingly focuses its arguments on Do's other

24  requests—that she be granted "open scheduling" for clinicals, that she be allowed to take

25  her exams at a different campus, and that she be assigned to East Valley clinical facilities.

26  (SOF ¶ 52.)

27

28

1

          **i.    "Open scheduling."**

2          Do's request that she be allowed to "go to any approved clinical site for any

3   scheduled shift and work however long [she] could tolerate" (what she referred to as "open

4   scheduling") (SOF ¶ 52) does not give rise to a Title II or Rehabilitation Act claim. Do

5   cannot show that, in the absence of this accommodation, she was denied meaningful

6   access to the MEPN program. *Csutoras*, 12 F.4th at 969; *Karam*, 2022 WL 306976* 5.

7   Nor can she show that her request was reasonable, or that ASU's alternative

8   accommodation was unreasonable. *Selene*, 514 F.Supp.3d at 1256. Finally, even if Do

9   were able to demonstrate some facial reasonableness, this request would have resulted in

10   a fundamental alteration of MEPN course requirements and therefore was not required.

11   *Zukle*, 166 F.3d at 1046.

12          Title II and the Rehabilitation Act are concerned with ensuring students have

13   "meaningful access" to educational programs. *Csutoras*, 12 F.4th at 968. Thus, where an

14   accommodation is denied but no prejudice follows, there is no violation of the law. *Zukle*,

15   166 F.3d at 1050. "It is not enough to simply show the denial of an accommodation.

16   Rather," Title II and the Rehabilitation Act require some sort of "exclusion," where a

17   student "cannot participate in the entity's programs *because* she did not receive the desired

18   accommodation." *Karam*, 2022 WL 306976 at *5.

19          Here, no such exclusion occurred. Although Do was not given the specific

20   accommodation she requested, she nevertheless "participated [in] and successfully

21   completed the classes at issue, and was not excluded" from the benefits of the program.

22   *Karam*, 2022 WL 306976 at *5; *see also* SOF ¶ 74 (Do completed her degree program).

23          Even if Do could demonstrate a lack of meaningful access to the MEPN program,

24   her proposed accommodation, "open scheduling," would have fundamentally altered the

25   program, rendering it unreasonable. It is well-established that the "curricular purpose" of

26   clinical coursework is "compromise[d]" when clinical time is reduced because clinical

27   course work is a "vital part" of nursing education. *Zukle*, 166 F.3d at 1050.

28          Here, Do's request for open scheduling was denied because it would have

fundamentally altered MEPN course requirements because it would have exempted Do from some of the key aspects of the nursing curriculum. (SOF ¶¶ 61-63.) The learning outcomes of her courses were designed so that students get real, meaningful experience that includes attendance at full clinicals from "report on" to "report off." (*Id*.) Participation in the full shifts is an essential element of the curriculum. (*Id*.) "[R]eleasing a student from a significant number of scheduled hours during the course of a rotation would compromise the [clinical's] curricular purpose, i.e. the simulation of medical practice." *Zukle*, 166 F.3d at 1050. In other words, clinicals are a "vital part" of the MEPN program, and "allowing a student to be excused from this requirement would sacrifice the integrity of its program." *Id.* Further, Do's coming and going without advance notice, would have been disruptive to both the nurses she was working under and patient care. (SOF ¶ 61.)

Do's requested accommodation ignored each of these concerns, and would not have addressed this gap in her nursing education. She cannot "establish that she would have been able to meet" the course requirements "with the requested accommodation." *Zukle*, 166 F.3d at 1050. As a result, it was not a reasonable request.

Do's requested accommodation was unreasonable for the additional reason that it was unworkable. In Spring 2023, the clinicals for each clinical course were all scheduled for the same dates and times, meaning there were no alternate clinical days available if Do missed one of her own clinicals. (SOF ¶ 62.) To make Do's request to attend "any approved clinical site" work, she would have had to attend clinical sites for clinical courses other than her own course, which meant she could not fulfil the course competencies specific to her courses. (*Id*.) This means that her request would not "have been able to meet" the course "requirements with the requested accommodation." *Zukle*, 166 F.3d at 1050.

Do's claims also fail because she cannot meet her burden of demonstrating that the accommodation offered by ASU instead of open scheduling was unreasonable, *Selene*, 514 F.Supp.3d at 1256. In response to Do's request for open scheduling, ASU offered Do

an alternate accommodation that included the opportunity to take either one 2-hour break or two 1-hour breaks per clinical shift. (SOF ¶ 64.) This would mean that, overall, each of Do's clinical shifts would last two hours less than the typical 12-hour shift. (*Id*.) Additionally, because these breaks would be scheduled to occur mid-shift, they also broke up each clinical shift into shorter blocks of continuous work for Do. (*Id*.)

This accommodation addressed the concerns raised by Do's medical providers whose comments focused on the impact of "significant exertion as well as working very long hours without adequate breaks" and "prolonged period of time of activity," and Do's expressed concern about completing full shifts. (*Id*. ¶¶ 54, 64.) The information provided to the SAILS office indicated that Do's arrhythmia may be triggered if she was required to work a full 12-hour shift. (*Id*.) By granting Do the opportunity to break each 12-hour shift into shorter blocks of time, which also shortened the total time Do would spend onsite, the SAILS office provided an accommodation designed to prevent Do from experiencing her arrythmia and anxiety symptoms in the first instance. (*Id*. ¶ 63.) This alternative accommodation reasonably addressed the identified barriers to access that Do and her medical providers reported, and Do cannot prove otherwise.

Indeed, Do successfully completed her courses in 2023, largely without utilizing her accommodations. (*Id*. ¶ 64.) Do cannot prove she was denied the benefits of the MEPN program by being denied her preferred accommodation. *Karam*, 2022 WL 306976 *5. Nothing in the record demonstrates that the accommodation put in place by Edson was unreasonable.

Put simply, ASU determined Do's request for open scheduling was unworkable and resulted in a fundamental alteration of her educational program. ASU was not required to make the kind of "major adjustments in its nursing program" that Do's requested accommodation would have entailed, *SW Cmty. Coll. v. Davis*, 442 U.S. 397, 413 (1979), particularly given the reasonable accommodations ASU did provide. ASU was within its rights to deny this request and Do's Title II and Rehabilitation Act claims fail to the extent they are based on this request.

### ii.    "Exams to be taken at a different campus from her main program campus."

Do's 2023 request to take exams at a different campus from her main program campus was also denied. (SOF ¶ 65) But, as with Do's other requests, the denial of this request does not give rise to a Title II claim. Do's request was based on her expressed desire to avoid driving to campus for exams. (*Id*. ¶ 65.) But nothing in the record suggests that Do was denied "meaningful access" to the MEPN program by the denial of her request to take tests at a different campus from her main campus. *Csutoras*, 12 F.4th at 968. Do regularly made the trip to her main campus for her classes (SOF ¶ 65), and nothing in the record suggests her exams should have been treated any differently.

"In any event, the evidence shows that [Do] was not prejudiced by" the denial of this request "because she in fact" passed all of her exams. *Zukle*, 166 F.3d at 1050. Again, "[i]t is not enough to simply show the denial of an accommodation," and Do must show that she was excluded from the MEPN program "*because* she did not receive the desired accommodation." *Karam*, 2022 WL 306976 at *5. She cannot do so here. Because Do had "meaningful access" to the MEPN program even in the absence of this accommodation, the denial of that request does not give rise to a Title II or Rehabilitation Act claim. As such, her claims fail as a matter of law.

### iii.    "Placement at East Valley clinical locations if her request for open scheduling was denied."

As with her other requested accommodations, Do's request that she be placed at "East Valley clinical locations" does not give rise to a Title II or Rehabilitation Act claim. As an initial matter, ASU granted Do's request to the extent practicable. By Spring 2023, Edson had switched to a "teams" model where students completed their clinicals with the same group ("team") in the same facility (their "home base"). (SOF ¶ 62.) Do was assigned to the only team in her cohort with capacity for Spring 2023. (*Id*. ¶ 60.) That team was assigned to St. Joeseph's Hospital, which was the closest "home base" for Do's cohort to the East Valley. (*Id*.) Edson did not have any clinical home base facilities in the East

1    Valley for Do's cohort in Spring 2023. (*Id.*) Do's request could not be granted. Further,

2    to the extent Do completed a clinical outside of her "home base" facility, she did so at a

3    location in Gilbert—in other words, and east Valley facility. (*Id.* ¶ 60.)

4        To the extent ASU's efforts can be deemed a denial, it does not follow that it gives

5    rise to Do's claims. Nothing in the record suggests that Do was denied "meaningful

6    access" to the MEPN program as a result of the location of her clinicals. *Csutoras*, 12

7    F.4th at 968; or that she was prejudiced by the denial, and so there is no claim. *Zukle*, 166

8    F.3d at 1050; *Karam*, 2022 WL 306976 at *5. Do "participated [in] and successfully

9    completed the classes at issue, and was not excluded" from the benefits of the program.

10   *Id.*

11       ASU scheduled Do's clinicals as close as it could to Do's home. Nothing in the

12   record suggests that Do's clinical placements prevented her meaningful access to the

13   MEPN program, and further adjustments would have been unreasonable and unworkable.

14   Consequently, Do's claims based on a purported denial of clinical facilities close to her

15   home fail as a matter of law.

16       ASU denied three of Do's 2023 accommodation requests because they were each

17   unreasonable, for the reasons discussed above. In one instance, ASU offered an

18   alternative, reasonable accommodation to Do. "[D]eference is also appropriately accorded

19   to [ABOR's] determination that a requested accommodation not available." *Zukle*, 166

20   F.3d at 1048. Moreover, the denial of these requests did not prevent Do from having

21   "meaningful access" to the MEPN program, as evidenced by her graduation from the

22   program. *Csutoras*, 12 F.4th at 968. Do "participated [in] and successfully completed the

23   classes at issue, and was not excluded" from the benefits of the program. *Karam*, 2022

24   WL 306976 at *5. Summary judgment is warranted on Do's 2023 claims for failure to

25   accommodate under Title II and the Rehabilitation Act.

26           **c.  Regardless, Do is not entitled to compensatory damages for her Title
              II or Rehabilitation Act claims.**

27

28       As explained above, Do's Title II and Rehabilitation Act claims fail as matter of

law on the merits. Even if some aspect of her claims were to survive, however, she is not entitled to any compensatory damages. As explained, "a private plaintiff seeking money damages," Do must "clear an additional hurdle: proving a *mens rea* of intentional discrimination." *Csutoras*, 12 F.4th at 969. She fails to meet that "high bar." *Id.*

Deliberate indifference requires that Do demonstrate that ASU "was on notice of the need for an accommodation" and failed to act with some "element of deliberateness." *Id.; T.B.*, 806 F.3d at 469 (citation omitted). Critically, this element is not satisfied just because a public entity failed to provide an appropriate reasonable accommodation. *T.B.*, 806 F.3d at 470. If a public entity is simply "wrong" in denying an accommodation request, there is no deliberate indifference. *Id.*

*T.B.* is instructive on this point. There, the plaintiff complained that the school had improperly accommodated their g-tube feeding requirements. *Id.* Both the district court and the Ninth Circuit accepted that the school district had improperly accommodated the student. *Id.* However, there was no evidence the school district did so deliberately— instead, the school district had "engaged in detailed discussions about how to provide" the appropriate accommodations and then "offered accommodations based upon its knowledge of" the student's abilities. *Id.* That the school district may have got it "wrong" did not rise to the level of deliberate indifference. *Id.*

The same is true here. In both 2021 and 2023, ASU engaged with Do in detailed discussions to identify her abilities, and then "offered accommodations based upon its knowledge." *Id.*; (SOF ¶¶ 18, 56-58.) ASU offered accommodations that upheld the core requirements of the MEPN program while also making adjustments to assist Do in completing that program. (*Id.* ¶¶ 34, 64.) ASU did not deliberately deny Do reasonable accommodations it was otherwise on notice that she required. (*Id.*)

Finally, even if Do were able to demonstrate she could recover compensatory damages, her request for compensatory damages in this case would nevertheless fail because she has not identified any she may recover. (*See* § II(A)(2), *supra.*) The Court

1  should dismiss Do's claim for monetary relief pursuant to Title II and the Rehabilitation

2  Act. *Doherty*, 2023 WL 5103900 at *6.

3  **III.    Do's ADA Title V retaliation claim also fails as a matter of law.**

4         Do's claim against ASU for retaliation under Title V of the ADA, 42 U.S.C.

5  § 12203 fails as well. As an initial matter, as noted earlier, "ADA retaliation claims are

6  redressable only by equitable relief." *Alvarado*, 588 F.3d at 1270; *see also T.B.*, 806 F.3d

7  at 473 (noting that ADA retaliation claim framework is the same "under Titles I and II").

8  As such, the conduct redressable by Do's retaliation claim is limited to that conduct that

9  can be addressed through equitable relief. But because her claims for equitable relief are

10 moot, so too is her retaliation claim. (*See* § II(A)(1), *supra*.) At most, Do's request that

11 ASU be directed to "rescind the . . . failing grade" she received in NUR 478 in Spring

12 2021 is the only element of relief Do could seek under this claim. Because that relief is

13 specific to conduct alleged in 2021, Do's claim for retaliation arising out of events in 2023

14 fails out of the gate; nonetheless ASU addresses all of Do's retaliation claims.

15        Courts "apply the Title VII burden-shifting framework, as established in

16 *McDonnell Douglass Corp. v. Green*, 411 U.S. 792, 93 . . . (1973), to retaliation claims

17 under the ADA." *T.B.*, 806 F.3d at 744-43. Under that framework, Do must prove, a prima

18 facie case of retaliation, including that she was: (a) "engaged in protected activity"; (b)

19 she "suffered an adverse action"; and (c) "there was a causal link between the two." *Id.*

20 (citation omitted).

21        For purposes of this Motion only, ASU assumes Do was engaged in protected

22 activity in 2021 and 2023 when she requested accommodations and 2023 when she filed

23 her lawsuit, and thus focuses on the remaining two elements of her prima facia case. To

24 satisfy the second element of a prima facie case, a plaintiff must be able to point to an

25 adverse action—an action that would be "reasonably likely to deter" someone from

26 "engaging in protected activity." *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th

27 Cir. 2004) (citation omitted). A plaintiff must then show that there was a causal connection

28 between the adverse action and her protected activity, which "requires proof that the

unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nasser*, 570 U.S. 338, 360 (2013). If a plaintiff is able to make out a prima facie case, the burden shifts to the school to demonstrate "legitimate reasons" for the purported adverse action. *Pardi*, 389 F.3d at 849. The burden then shifts back to Do "to demonstrate a triable issue of fact as to whether such reasons are pretextual." *Id.*

### A. Do was not retaliated against in 2021.

As to Do's 2021 claim, Do cannot establish her prima facie case. Even if she could, ASU had legitimate, non-discriminatory reasons for its conduct. Do alleges that ASU retaliated against her in 2021 when it (a) assigned her to the operating room at Valleywise that Do contends was "high-stress" and in an area of the hospital she claims she was not allowed to be; and (b) issued her a negative performance evaluation and failing grade for NUR 478. (SOF ¶ 76.)

### B. ASU did not retaliate against Do by sending her to Valleywise.

ASU's assignment of Do to Valleywise's operating room for her make-up clinicals does not constitute adverse action under the ADA. Do was assigned to Valleywise for additional clinicals as a way to help Do complete the requirements of her NUR 478 course after she missed multiple clinicals and asked that Edson arrange additional clinicals. (SOF ¶¶ 29, 32.) No adverse action occurred.

Even if Do's assignment to Valleywise could be considered adverse action under the ADA, Do can point to no causal connection between this assignment and Do's prior protected activity of seeking accommodations. That causal link requires a "stringent" showing that the protected activity was the "but-for" cause of the adverse action. *T.B.*, 806 F.3d at 473. Here, Dr. Bednarek has explained that "[n]either Do's heart condition, nor her requests for accommodations played a role in the selection of Valleywise as the location for Do's make-up shifts," (SOF ¶ 32), and Do can point to no evidence to the contrary.

Finally, ASU had legitimate non-discriminatory reasons for assigning Do to Valleywise. Assisting Do in completing her clinical shifts is a legitimate action on ASU's

part. *See Zulkle*, 166 F.3d at 1050 (deferring to "the Medical School's academic decision that the in-hospital portion of a clerkship is a vital part" of the program). To the extent that Do believes the work to which she was assigned was "unsuitable," that has no bearing here because ASU did not have prior knowledge as to the precise work Do would be doing (SOF ¶ 32), and the assignments were made based on the available surgeries (*id.*). Likewise, ASU assigned Do to Valleywise after working with Valleywise to schedule those clinical shifts so there can be no suggestion that ASU believed it was assigning Do somewhere she could not be—indeed, Valleywise approved Do's presence. (*Id.*) As explained by Dr. Bednarek, Valleywise was selected because an operating room was an appropriate setting for fulfilling the course competencies for NUR 478, Dr. Day was willing to supervise Do during the clinical shifts, and there was no indication that Do should be excluded from this type of clinical. (*Id.* ¶ 32.) Do cannot sustain a claim for retaliation based on her assignment to Valleywise.

### C. ASU did not retaliate against Do by issuing a negative performance evaluation or failing grade.

Again, ASU went beyond its standard procedures to identify additional clinical shifts to which Do could be assigned. (*Id.* ¶¶ 29, 32.) Do then performed poorly in that clinical—departing early, without ensuring anyone knew she was leaving the clinical site. (*Id.* ¶ 40.) As a result of that behavior, her conduct while at Valleywise, and because she could not complete the required hours by the end of the course, she received a failing grade. (*Id.* ¶ 43.)

None of this was motivated by a discriminatory intent and Do can prove no causal connection between the course evaluation or her failing grade and her protected activity. The evaluation was based on the observations of Valleywise individuals with no prior knowledge of Do. (*Id.* ¶¶ 37-38.) Four individuals at Valleywise who had no knowledge of Do's disability all observed Do and came to the same conclusion−she was disinterested in being there. (*Id.*) They stated their observations in emails provided to Dr. Day, who incorporated them into the performance evaluation. (*Id.* ¶ 41.) Because these individuals

did not know about any accommodations Do had requested from ASU, that protected activity could not have been a motivating factor, let alone the but-for cause, of their feedback. There is no evidence that ASU's actions in completing the performance evaluation or assigning the failing grade were connected to Do's protected activity under the ADA. *T.B.*, 806 F.3d at 473.

Finally, ASU had legitimate non-discriminatory reasons for issuing the evaluation and failing grade. Valleywise staff who observed Do found her disinterested and unengaged, which they reported to ASU. (SOF ¶¶ 37-38, 41.) That behavior was then reflected in her course evaluation, along with Dr. Day's observations on Do's conduct while at Valleywise. (*Id.* ¶ 41.) Further, Do received a failing grade because she failed to complete her course requirements. (*Id.* ¶ 43.) These are legitimate reasons for the actions Do complains, and they defeat her retaliation claim.

Importantly, "[w]hen judges are asked to review the substance of genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment." *Zukle*, 166 F.3d at 1047 (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)). As such, courts are "not suited to second guess the academic decisions" of professors and defer to them when a student receives a failing grade. *Lan v. Univ. of Texas at San Antonio*, No. SA-22-CV-00769-FB, 2024 WL 2305215, *8 (W.D. Tex. May 21, 2024); *see also, e.g., Williams v. Penn. State Univ.*, No. 4:20-CV-00298, 2023 WL 6626789 (M.D. Pa. Oct. 11, 2023) (holding that university presented non-discriminatory reason for failing grade and complaining student "cannot simply ignore the fact that she was in danger of failing Prawdzik's class").

Finally, to the extent Do alleges she was constructively removed from the MEPN program, this fails to state a claim for retaliation because Do was not dismissed, constructively or otherwise, from the MEPN program. (*Id.* ¶ 46.) After failing NUR 478, Edson staff created a new plan of study for Do so that she could continue her education. (*Id.*) Rather than follow that plan at that time, Do elected to take a leave of absence. (*Id.* ¶ 48.) Do remained enrolled in the program during this leave. (*Id.*) She later returned and

1   completed her degree. (*Id*. ¶ 73.) Nothing in the record suggests she was ever removed

2   from the MEPN program. Do cannot sustain a claim for retaliation based on her

3   performance evaluation or failing grade.

4          Do's 2021 retaliation claims fail as a matter of law.

5          **D. Do was not retaliated against in 2023.**

6          As discussed above, "ADA retaliation claims are redressable only by equitable

7   relief." *Alvarado*, 588 F.3d at 1269; *see also T.B.,* 806 F.3d at 473 (noting that ADA

8   retaliation claim framework is the same "under Titles I and II"). Again, the only

9   potentially remaining equitable relief Do seeks is the removal of her failing grade for a

10  2021 course. Accordingly, even if Do were retaliated against in 2023—which she was

11  not—she seeks no equitable relief to redress that conduct, and her retaliation claim related

12  to 2023 is therefore moot. (*See supra*, Section I.) Nevertheless, ASU addresses that

13  conduct here. To make out her prima facie case, Do must show that "she suffered an

14  adverse action." *T.B.*, 806 F.3d at 473. It is unclear what adverse action Do believes

15  occurred in the 2023 timeframe. Based on the Supplemental Complaint, ASU understands

16  the purported adverse action to be: (1) the alleged denial of accommodations (Doc. 100 ¶

17  4) and (2) requiring Do to comply with her TTP course requirements and complete her

18  final clinical shift in full, as opposed to leaving early (*id.* ¶¶ 69-70). But the former did

19  not happen and the latter was not an adverse action.

20         **E. ASU did not retaliate by denying Do's requests for accommodations.**

21         As explained in detail in Section II above, the majority of Do's 2023

22  accommodation requests were granted, so no adverse action occurred. Even assuming the

23  denial of certain of Do's accommodation requests constitutes adverse action, there is no

24  causal link between those denials and Do's protected activity. Nothing in the record

25  indicates that the denial of any of Do's accommodations "would not have occurred in the

26  absence of the alleged wrongful action or actions of the employer." *Nasser*, 570 U.S. at

27  360; *T.B.*, 806 F.3d at 473.

28

The requests that were denied were requests that the SAILS office determined would have been unworkable, unreasonable, or fundamental alterations of the MEPN program. (SOF ¶¶ 60-63.) That would have been true regardless of whether Do had filed this lawsuit or previously requested accommodations. As such, there is no indication that this lawsuit was "the <u>only</u> reason" for the denial of some of Do's requests. *Kilroy*, 2016 WL 5662042 at *7. Do points to no evidence otherwise.

Finally, Do's retaliation claim related to denial of accommodation fails because even if she could prove a prima facie case, ASU had "legitimate reasons" for its actions. *Pardi*, 389 F.3d at 849. As explained in detail above, Do's accommodation requests were denied because the SAILS office had determined they were unreasonable, unworkable, or would have fundamentally altered the MEPN program. (SOF ¶¶ 60-63.) Do's claim for retaliation based on failure to accommodate fails as a matter of law.

**F.  ASU did not retaliate against Do by enforcing course requirements.**

As to Do's final clinical day, Do asserts that being required to attend a full shift, rather than leaving after four hours, was an adverse action. (Doc. 100 ¶¶ 23-27.) But an adverse action is an action that is "reasonably likely to deter" someone from "engaging in protected activity." *Pardi*, 389 F.3d at 850. In requiring Do to attend her final clinical shift in full, ASU required of Do what it required of all other MEPN students. (SOF ¶ 71.) This was a course requirement for every MEPN student. (*Id.*) The course requirements are designed so that MEPN students can be successful nurses—they are not an action taken to discourage any student, including Do, from "engaging in protected activity." *Pardi*, 389 F.3d at 850.

Similarly, because requiring Do to attend her final clinical shift in full was a basic course requirement that all students, including Do, were informed of and held to (SOF ¶¶ 70-71), there is no indication that retaliatory intent was the "only reason" for requiring Do to attend her final shift in full. *Kilroy*, 2016 WL 5662042 at *7. Do has not established any evidence her protected activity played a role in either the decision to require full attendance at her final clinical. Consequently, her prima facie case fails.

1    Finally, ASU had "legitimate reasons" for its actions. *Pardi*, 389 F.3d at 849. Do

2   was required to attend her final clinical shift in full because every student was expected

3   to attend their final clinical shift in full as that was an essential element of the curriculum.

4   (SOF ¶¶ 70-71.) ASU was exercising its "faculty's professional judgment" on "academic

5   decisions," and ASU's actions are thus entitled to "great respect." *Zukle*, 166 F.3d at 1047

6   (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)). These legitimate,

7   non-discriminatory reasons defeat Do's claim.

8    ASU is entitled to summary judgment on Do's 2023 retaliation claim.

9                                        **CONCLUSION**

10    For these reasons, the Court should grant summary judgment to ASU on all of Do's

11   remaining claims against ASU under the FAC and Supplemental Complaint.

12    DATED this 28th day of June, 2024.

13                              OSBORN MALEDON, P.A.

14

15                              By  s/ Kristin L. Windtberg
                                     Mary R. O'Grady
16                                   Kristin L. Windtberg
                                     Joshua J. Messer
17                                   2929 N. Central Avenue, Suite 2000
                                     Phoenix, Arizona 85012

18                              Attorneys for Defendant Arizona Board of
                                Regents
19

20

21

22

23

24

25

26

27

28