Mary R. O'Grady, 011434
Kristin L. Windtberg, 024804
Joshua J. Messer, 035101
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2838
(602) 640-9000
mogrady@omlaw.com
kwindtberg@omlaw.com
jmesser@omlaw.com

Attorneys for Defendant Arizona Board of Regents

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sara Do, an individual, | No. CV-22-00190-PHX-JJT |
| Plaintiff, | |
| v. | **DEFENDANT ABOR'S SEPARATE STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| Arizona Board of Regents, an Arizona State Entity; et al., | |
| Defendants. | |

**The MEPN program and the importance of in-person clinical rotations**

1. Arizona State University ("ASU") Edson College of Nursing and Health Innovation's ("Edson") Masters Entry to Nursing Practice ("MEPN") program is an intensive pre-licensure graduate nursing program designed for students seeking to pursue their Registered Nursing license and a graduate degree concurrently. (Declaration of Salina Bednarek, attached as **Exhibit 1**, ¶¶ 5-6.) The program is based at ASU's Downtown Phoenix campus. (*Id.*) In accordance with requirements set by the Arizona Board of Nursing ("AZBN"), the MEPN program was designed to include in-person clinical rotations at outside clinical facilities such as hospitals, clinics or public health agencies. (*Id.* ¶ 7.)

2. When Edson created the MEPN program, it was required to obtain approval of the program curriculum from the AZBN. (*Id.* ¶ 8; Declaration of Margi Schultz, Ph.D., attached as **Exhibit 7** ¶ 13.) As part of the curriculum, Edson determined the total number of clinical hours MEPN students would complete for each clinical course to attain core nursing competencies. (Ex. 1 ¶ 8.) When the AZBN approved the MEPN program curriculum, Edson was obligated to ensure that its students satisfied the approved clinical hour requirements and could not modify the curriculum without first receiving approval from the AZBN. (Ex. 1. ¶ 9; Ex. 7 ¶¶ 14-16.)

3. Each clinical rotation consists of several clinical shifts. (Ex. 1 ¶ 10.) The number of clinical shifts scheduled for each clinical course is determined based on the total number of clinical hours required for the course and the length of the clinical shifts at the clinical facility where the students will complete their clinical rotation. (*Id.*)

4. In-person clinical rotations are an essential element of pre-licensure nursing education—through in-person clinical rotations, students can directly interact with and care for patients, collaborate with other members of the healthcare team, learn the flow of various medical care settings, experience the realities of working in the nursing field, and attain core clinical competencies so that they may safely practice nursing upon graduation. (Ex. 1 ¶¶ 11-12; Ex. 7 ¶¶ 8-10.) To ensure students are exposed to the realities of nursing, student clinical shifts are scheduled to overlap with the shifts of staff nurses working in the clinical facility to

which the student is assigned. In the vast majority of clinical settings, nursing shifts are 12-hours in length. (Ex. 1 ¶ 13; Ex. 7 ¶ 12.) Aligning student clinical shifts with the nursing shifts of the clinical facility allows students to see the full range of nursing activity, including important steps such as "report on," when a shift of nurses receives important updates in order to take over care of patients, and "report off," when nurses ensure a new shift is able to safely take over care of patients. (Ex. 1 ¶ 14.) Participation in the "report on/report off" process is an essential element of a clinical course curriculum. (*Id.* ¶ 14.)

5.      It is the norm within nursing programs generally, and the expectation of the MEPN program, that students will attend each clinical shift in full. (Ex. 1 ¶¶ 15; Ex. 7 ¶ 11.)

6.      The Nursing Clinical Coordination Collaborative ("Collaborative") was created in 2001 to facilitate the scheduling for in-person student clinical experiences within Maricopa County. (*Id.* ¶ 21; Ex. 7 ¶18.) The Collaborative manages the scheduling for over 27 nursing education programs and approximately 27 clinical facilities. (Ex. 1 ¶ 21; Ex. 7 ¶¶ 19-20.) Months in advance of a given semester, nursing programs request in-person clinical experiences for their students and clinical facilities input their clinical shift capacities and placement preferences into an on-line database managed by the Collaborative. (Ex. 1 ¶ 22; Ex. 7 ¶¶ 21-22.) The Collaborative facilitates the assignment of clinical shifts to each nursing program. (Ex. 1 ¶ 22.; Ex. 7 ¶ 22.)

7.      Additionally, Edson must identify and secure enough clinical shifts appropriate to each course. (Ex. 1 ¶ 20.) This further narrows the range of available clinical rotations because Edson must tailor its requests to clinical facilities based on the courses its students will be completing in a given semester. (*Id.*)

8.      Given the competitive nature of securing clinical rotations, the limited number of available and course-appropriate rotations, and because student clinical rotations are scheduled months in advance, there are few to no "extra" shifts available in a given semester. (Ex. 1 ¶ 23; Ex. 7 ¶¶ 25-27.) Once clinical placements have been approved, it is very difficult, and at times impossible, to obtain additional clinical placements during a given semester. (Ex. 1 ¶ 23; Ex. 7 ¶¶ 24-25.)

9.      The clinical facilities determine the times, dates, and areas of their facility in which they are willing to host students for clinical rotations. (*Id*. ¶ 19; Ex. 7 ¶ 23-24.) Clinical facilities have the final authority over when and where students can be on site and when the COVID-19 pandemic began and clinical facilities paused scheduling clinicals, Edson had no facilities to send its students to. (*Id*. ¶¶ 24-25; Ex. 7 ¶ 29.)

10.     In March 2020, Arizona Governor Douglas Ducey issued a Declaration of Emergency related to the COVID-19 pandemic. (Ex. 1 ¶ 26; Ex. 7 ¶ 30.) The AZBN issued its own Declaration authorizing educational programs to apply for waivers allowing programs "to substitute simulations, lab hours, and similar non-direct patient contact for required direct patients care clinical/instruction hours." (*Id*.) Edson obtained a waiver from the AZBN allowing Edson to "substitute direct patient care clinical with simulation, labs, or experiential activities when direct care clinical [was] not available." (*Id*. ¶ 29.) Edson also conducted lecture courses virtually rather than in-person. (*Id*.)

**Do's enrollment in the MEPN program and her first semester**

11.     It was under these conditions when, in the Fall 2020 semester, Sara Do enrolled in ASU's Edson MEPN program. (*Id*. ¶ 30.) As the pandemic was beginning to ease, and clinical facilities began offering a severely limited number of in-person clinical opportunities for nursing students. (Ex. 1 ¶ 32; Ex. 7 ¶ 32.) Edson was able to schedule MEPN students for in-person clinical placements in Spring 2021. (Ex. 1 ¶ 32.) Because of the importance of in-person clinical rotations, Edson was eager to return its students to in-person clinicals. (Ex. 1 ¶ 33.)

12.     In December 2020, the COVID-19 vaccine was released. (Ex. 1 ¶ 34; Sara Do Deposition Transcript dated 7/10/23, attached as **Exhibit 9**, at 38:8-23.) Do was concerned about contracting COVID-19 and hoped to receive the vaccine prior to starting her in-person clinical courses. (Ex. 9 at 39:4-7; 39:24-40:1; 43:7-9.) Do emailed Dr. Salina Bednarek to ask whether nursing students were eligible for the vaccine, sharing that getting vaccinated was a "high priority." (Ex. 1 ¶ 34; Ex. 9 at 43:2-6.) She also passed her own research as to whether nursing students would be eligible along to Dr. Bednarek for possible dissemination to other

1    students. (Ex. 1 ¶ 36.)

2    13.    On December 30, 2020, Edson informed its prelicensure nursing students they

3    were eligible for the vaccine but that Edson was <u>not</u> requiring them to receive the COVID-19

4    vaccine. (Ex. 1 ¶ 37.) Dr. Bednarek shared with Do that the clinical facilities were not requiring

5    nursing students to be vaccinated at that time. (Ex. 1 ¶ 35.)

6    14.    Do alleges that she was told she would need to receive the COVID-19 vaccine

7    by Edson personnel but admits that she is unable to recall any specifics about this alleged

8    communication or who may have conveyed this information. (Ex. 9 at 75:10-76:9; 79:18-80:23;

9    81:5-7.) Edson, in fact, did not require its students to receive the COVID-19 vaccine at any time

10   during Do's enrollment. (Ex. 1 ¶ 100.)

11   15.    On December 28, 2020, Do opted to receive the COVID-19 vaccine. (Ex. 9 at

12   48:25-49:3.) After receiving the vaccine, Do asserts she had a negative reaction and sought the

13   aid of on-site EMTs. (Ex. 9 at 52:9-53:1.) Do requested to be transported to the hospital.

14   (12/28/2020 Chandler Fire Dept. Ambulance Record, included in Banner Ocotillo Medical

15   Center Records Excerpt (BOMC000073-BOMC000079, BOMC000132-BOMC000135),

16   attached as **Exhibit 24**, at BOMC00132.) ██████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ████████████    (Ex. 24 at BOMC000079 (12/28/2021 Emergency Dept. Record).) Do alleges

20   she developed arrythmia as a result of receiving the COVID-19 vaccine. (First Amended

21   Complaint ("FAC") ¶ 30; Ex. 9 at 95:16-97:12.) But she admits she suffered from Premature

22   Ventricular Contractions ("PVCs"), a type of arrythmia, prior to her receipt of the vaccine. (Ex.

23   9 at 58:25-60:12; 61:13-15.) Do's medical records confirm she suffered from PVCs for years.

24   (Ex. 9 at 63:17-66:3; 67:1-98:17; 10/26/20 Desert Grove Family Medical Record

25   (DGFM000106-DGFM000108), attached as **Exhibit 28**; 10/28/20 Tri-City Cardiology Record

26   (TCC000034-TCC000037), attached as **Exhibit 29**.)

27                        **Do's request for accommodations**

28   16.    By the Spring 2021 semester, courses were being taught in a hybrid format,

1   whereby students could attend didactic courses in person or virtually. (*Id.* ¶ 31.)

2       17.    Do was scheduled to complete six in-person, overnight clinical shifts at Phoenix

3   Children's Hospital. (Ex. 1 ¶ 38.) Do left several shifts early and missed one entirely, asserting

4   she was not feeling well due to her arrythmia. (*Id.* ¶ 39.) In one of her courses during Spring

5   2021, Do was marked as not displaying "Professional Scholarly Behavior" because she left a

6   clinical shift early without notifying her preceptor. (*Id.* ¶ 40.)

7       18.    In March 2021, Do applied to ASU's Student Accessibility and Inclusive

8   Learning Services ("SAILS") office for accommodations related to her heart condition.

9   (Declaration of Katherine Benedict, attached as **Exhibit 2** ¶ 6; Ex. 9 at 89:11-90:8.) In that

10  application, Do requested that she either be granted "(A) accommodations to be given

11  permission to do virtual clinical assignments to fulfill my clinical hour requirements for

12  graduation . . ., or (B) to be given daytime clinical hours at local, East-Valley hospitals." (Ex. 2

13  ¶ 7.) Do requested no other accommodations at that time (*id.* ¶ 8) and reported no other disability

14  (Ex. 9 at 93:4-12). With her application to the SAILS office, Do submitted a letter from one of

15  her medical providers indicating that it was "advisable that [Do] maintains a consistent sleep

16  schedule and work during day time hours." (Ex. 2 ¶ 9; Ex. 9 at 105:23.) The SAILS office

17  engaged with Do in an interactive process to better understand the barriers to access she was

18  experiencing and to evaluate Do's request for accommodations. (Ex. 2 ¶ 10.)  However, the

19  dates and time for Do's clinical shifts were already set by the clinical facilities where she was

20  completing those shifts, and Edson had no daytime shifts for Do's MEPN cohort. (Ex. 1 ¶ 42;

21  Ex. 2 ¶ 11.) Do was informed that the following semester, Summer 2021, Do's MEPN cohort

22  would transition to daytime clinical rotations and going forward, she would not be scheduled

23  for overnight clinicals. (Ex. 2 ¶¶ 12-13; *see also* Ex. 1 ¶ 41.) Nevertheless, Edson staff worked

24  with Do to develop a plan to assist her in completing her clinical courses that semester. (Ex. 1

25  ¶ 44.)

26      19.    Following Do's early departure from one of her clinical shifts, Do submitted a

27  health clearance letter from one of her medical providers indicating that it was "advisable that

28  she . . . work during daytime hours," but that Do could "otherwise return to her curriculum

1   without physical or mental restrictions." (*Id.* ¶¶ 45-46.)

2   **Summer 2021**

3   20.    In June 2021, SAILS approved Do for "faculty letters," which Do could opt to

4   have sent to her faculty explaining that she was registered with the SAILS office and that she

5   may approach them to discuss potential limitations in class. (Ex. 2 ¶ 16.) Do did not ask the

6   SAILS office to send faculty letters in any of her Summer 2021 courses. (*Id.* ¶¶ 17-18.) Do also

7   requested that she be allowed virtual attendance for her Fall 2021 lecture classes. (*Id.* ¶ 22.)

8   SAILS informed her they could not approve virtual attendance but could grant her a "flexible

9   attendance" accommodation, which would allow Do to work with her faculty regarding

10  attendance as issues arose.  (*Id.* ¶ 23.) SAILS approved the flexible attendance accommodation

11  for Do in June 2021. (*Id.* ¶ 25.)

12  21.    In Summer 2021, Do missed an exam because she "live[d] 40 miles away from

13  the school" and did not have anyone to drive her to school, nor did she "have any one to watch

14  [her] 4 kids." (*Id.* ¶ 19; Declaration of Candace Keck, attached as **Exhibit** 4, ¶ 5.) Do asked if

15  she could take the exam remotely, but Edson was no longer allowing remote exams. (*Id.* ¶ 6.)

16  Professor Keck agreed to allow Do to complete a make-up exam at a later date and time at the

17  ASU Polytechnic campus, as opposed to the downtown Phoenix campus. (*Id.* ¶ 7; Ex. 2 ¶ 19.)

18  Do later asked to take another exam at an alternate testing location. (Ex. 2 ¶ 20.) Do was again

19  allowed to do so as a courtesy. (*Id.* ¶ 20-21.) Do reported significant trouble in identifying how

20  and what to study prior to taking exams during the Summer 2021 semester, "struggling to retain

21  [the] information," and was "terrified to fail" the exam. (6/9/2021 Sara Do email to Prof. Paul

22  More (ABOR002598-ABOR002599), attached as **Exhibit 25**, at ABOR002598.)

23  22.    In Summer 2021, Do was enrolled NUR 478: Complex Care, which required

24  she complete six clinical shifts. (Ex. 1 ¶ 47; Ex. 4 ¶ 4; Ex. 9 at 113:1-3, 114:14-16.) Edson

25  faculty made efforts to place Do at the nearest available clinical site to her home for her NUR

26  478 clinical shifts; she was assigned to Banner Gateway MD Anderson for her clinical shifts,

27  all of which were daytime shifts. (Ex. 1 ¶ 48; Ex. 9 at 114:17-20; 115:4-6.) On July 9 and 10,

28  2021, Do missed two of her scheduled clinical shifts, citing issues relating to her arrythmia, and

1   later missed part of an additional shift on July 16, 2021. (Ex. 1 ¶¶ 49, 56; Ex. 4 ¶¶ 10, 13; Ex. 9

2   at 115:7-12.)

3          23.    At first, Do was given written make-up assignments to account for the time she

4   missed in clinical. (Ex. 1 ¶ 50; Ex. 4 ¶ 11.) In Summer 2021, as the pandemic was easing,

5   representatives of the AZBN told nursing programs they should utilize available clinical

6   opportunities, rather than other alternatives that had been approved at the height of the

7   pandemic. (Ex. 1 ¶¶ 51-52.) As a result, in July 2021, Edson decided to stop accepting written

8   make-up assignments in lieu of in-person clinical hours, and to require missed clinical time to

9   be made up with additional clinical hours. (*Id.* ¶ 53.) This decision was made for all of Edson's

10  prelicensure nursing programs. (*Id.*) Dr. Bednarek conveyed this decision to Edson faculty,

11  including Prof. Candace Keck. (*Id.* ¶¶ 54-55; Ex. 4 ¶ 12.)

12         24.    On July 8, 2021, Ms. Benedict, Do's Accessibility Coordinator, emailed Do to

13  inform her that if she missed any further clinical shifts or hours, she would not be permitted to

14  make up that missed time with written assignments. (Ex. 2 ¶¶ 26-28.)

15         25.    On July 9, 2021, Dr. Bednarek, Edson Associate Dean Dr. Kathy Kenny, and

16  Ms. Benedict met with Do to discuss options to address her clinical absences. (Ex. 1 ¶ 57; Ex.

17  2 ¶ 30.) Dr. Bednarek confirmed that written make-up work was no longer available to MEPN

18  students, including Do, to make up missed clinical hours. (Ex. 1 ¶ 58; 7/9/2021 Video

19  Recording Part 1 (Do_000324 at 21:53-22:36), attached as **Exhibit 21**; 7/9/2021 Video

20  Recording Transcript Part 1 (Valleywise-0556-Valleywise-0593), attached as **Exhibit 18**, at

21  Valleywise-0572:9-Valleywise-0573:4; Ex. 9 at 116:12-16.)

22         26.    During the July 9 video call, Do, for the first time, asked whether it would be

23  possible for her to break up her clinical shifts into shorter segments of time. (Ex. 1 ¶ 59; Ex. 21

24  at 29:54-30:16; Ex. 18 at Valleywise-0579:17-24.) Drs. Bednarek and Kenny explained that

25  they could not reduce the total amount of clinical time Do would complete because they were

26  bound by the AZBN to ensure students completed all of their clinical rotation requirements (Ex.

27  1 ¶ 59; Ex. 21 at 30:35-31:34; Ex. 18 at Valleywise-0580:7-14), and that finding additional

28  clinical rotations was extremely difficult (Ex. 1 ¶ 59; Ex. 21 at 30:35-31:34, 31:52-32:20; Ex.

18 at Valleywise-0580:15-Valleywise-581:15; 7/9/2021; Video Recording Part 2 (Do_000325), attached as **Exhibit 22**, at 29:35-29:49; 7/9/2021 Video Recording Transcript Part 2 (Valleywise-0594-Valleywise-0634), attached as **Exhibit 19**, at Valleywise-0627:19-23.) Dr. Bednarek further explained that breaking up clinical shifts was disruptive to the clinical facility unit where the student was placed. (Ex. 1 ¶ 59; Ex. 21 at 31:53-32:20; Ex. 18 at Valleywise-0581:8-16.)

27.    Drs. Bednarek and Kenny offered Do the option to take an incomplete in NUR 478, which would "stop the clock" so that she could take time to address her health concerns and pick back up when she was able to do so without the need to retake the full course. (Ex. 1 ¶ 60; Ex. 22 at 2:25-3:06; Ex. 19 at Valleywise-0601:5-21.)

28.    Alternatively, Dr. Bednarek offered to attempt to find additional clinical opportunities for Do to make up her missed clinical time. (Ex. 1 ¶ 61; Ex. 21 at 30:35-31:34; Ex. 18 at Valleywise-24:7-25.) Dr. Bednarek reiterated it would be difficult to find these opportunities because of the limited number of clinical facilities available, the limited time remaining in the semester, and because she would need to identify an Edson staff member to supervise Do while on site. (Ex. 1 ¶ 62; Ex. 21 at 30:35-31:34; 32:48-33:10; Ex. 18 at Valleywise-0580:7-25; Valleywise-0582:4-11; Valleywise-0584:15-25.) ASU staff made clear they would help Do find a way to remain in the program and complete her coursework. (Ex. 1 ¶ 63; Ex. 21 at 20:35; Ex. 18 at Valleywise-0571:12-19; Ex. 22 at 24:40-24:59; Ex. 19 at Valleywise-0622:2-6.)

29.    Do declined to take an incomplete and asked for make-up clinical shifts. (Ex. 1 ¶ 64.) Dr. Bednarek began the process of identifying possible additional make-up clinical shifts specific for Do. (*Id.*) This was a process above and beyond the standard process of procuring clinical shifts for students. (*Id.* ¶ 65.) Dr. Bednarek's options were limited due to the competitive nature of obtaining limited clinical shifts for students. (*Id.*)

30.    In the meantime, Prof. Keck, who served as the Course Coordinator for Do's NUR 478 course, provided Do written assignments to make up the missed clinical time. (*Id.* ¶ 66; Ex. 4 ¶¶ 14, 16; Ex. 9 at 116:17-118:3.) Although Prof. Keck had been told that written

make-up work would no longer be permitted, she misunderstood when Edson would implement that requirement. (Ex. 4 ¶ 14.) When she offered Do the written assignments, Prof. Keck believed they would be accepted by Edson to make up for Do's missed clinical hours. (*Id*. ¶ 15.) When Dr. Bednarek learned that Prof. Keck had assigned written make-up work to Do, she notified Do promptly that such alternative assignments would not be accepted, as had been discussed with Do previously. (Ex. 1 ¶ 67.) Around the same time, Prof. Keck also mistakenly assigned a written make-up assignment to another student who missed clinical hours. (*Id*. ¶ 20.) Like Do, that student was not permitted to submit the written assignments in lieu of clinical hours and was required to complete an in-person clinical shift to make up missed clinical time. (*Id*.) This other student was not registered with the SAILS office as having a disability. (*Id*.)

31.     Do admits she understood that alternative clinical assignments would no longer be allowed but "gladly took them" and did not inquire as to whether they would be permitted. (Ex. 1 ¶ 69; Ex. 9 at 119:4-16.)

32.     Eventually, Dr. Bednarek identified an Edson faculty member, Dr. Kimberly Day, as a possible preceptor for make-up clinical shifts for Do's missed NUR 478 clinical shifts. (Ex. 1 ¶ 71.) Dr. Day was concurrently employed in a hospital and therefore could supervise additional clinical shifts needed by Do if the hospital where she worked approved. (*Id*. ¶ 74; Declaration of Kimberly Day, attached as **Exhibit 3**, ¶ 3.) Dr. Bednarek worked with Dr. Day and her employer, Valleywise Hospital ("Valleywise") to schedule make-up clinical opportunities for Do, supervised by Dr. Day during Dr. Day's shifts at Valleywise. (*Id*. ¶ 73; Ex. 3 ¶¶ 4-5, 7.) Because Dr. Bednarek believed a clinical rotation in an operating room was an appropriate setting for fulfilling the course competencies for NUR 478, Dr. Day was an ASU faculty member and could supervise Do during the clinical shifts, and Valleywise was willing to allow Do to complete her hours at their facility, she selected this opportunity for Do's make-up clinical shifts, but she had no prior knowledge of the exact work Do would be doing. (Ex. 1 ¶ 74.) Dr. Bednarek was unaware of any reason Do should be excluded from an operating room; based on the health clearance forms Do submitted, she had no limitations on her ability to participate in clinical rotations, other than needing to work during the day. (*Id*. ¶ 75.) Neither

1    Do's heart condition, nor her requests for accommodations played a role in the selection of

2    Valleywise as the location for Do's make-up shifts. (*Id.* ¶ 76.)

3         33.    Around the same time, Dr. Bednarek scheduled a make-up clinical shift for

4    another student. (*Id.* ¶ 78.) Dr. Bednarek identified Prof. Keck as also holding concurrent

5    employment at a clinical facility and so assigned that student to Prof. Keck. (*Id.* ¶ 78; Ex. 4 ¶¶

6    21-22.) As with Do's make-up clinical rotation, Dr. Bednarek did not have prior knowledge of

7    the exact work that student would be doing. (Ex. 1 ¶ 78.)

8         34.    Do was to make up 24.5 hours of missed clinical time through shifts at

9    Valleywise. (*Id.* ¶ 79.) In response to Do's prior request to work shorter clinical shifts, Dr.

10   Bednarek arranged for Do to complete three, eight-hour shifts, as opposed to attending full 12-

11   hour shifts. (Ex. 1 ¶ 81.) She then informed Do of the opportunity secured, explaining that this

12   arrangement was a "one-time exception" that was an "extra-ordinary change," and would not

13   be permitted in future semesters. (*Id.* ¶¶ 80, 82.)

### The July 24, 2021 Valleywise Clinical Rotation

15        35.    The first of these replacement clinical shifts was scheduled for July 24, 2021.

16   (Ex. 1 ¶ 83; Ex. 3 ¶ 7.) Do emailed Dr. Day before her first shift to ask if she could work longer

17   than eight hours in a given shift. (Ex. 3 ¶ 8.) Dr. Day informed her she could stay for 8, 10, or

18   12 hours, depending on the availability of work and so long as Do provided advance notice of

19   how long she would stay. (*Id.* ¶ 9.) On July 23, Do emailed Dr. Day with concerns about the

20   COVID-19 status of patients. (Ex. 3 ¶ 10.) She asked that she not be required to participate in

21   cases where the COVID-19 status of the patients was unknown. (*Id*). Each of the surgeries Do

22   was assigned to during her shift at Valleywise had been scheduled in advance, meaning there

23   had been time to perform COVID tests on each of the patients, each of whom tested negative.

24   (Ex. 3 ¶ 11; Sherry Ann Stotler Deposition, attached as **Exhibit 15**, at 91:5-15; 103:12-14;

25   155:9-156:20.)

26        36.    Dr. Day met Do at Valleywise on the morning of July 24 and informed Do that

27   she would accompany her to a burn surgery. (Ex. 3 ¶ 13.) Dr. Day had limited options for

28   surgical assignments that day (Ex. 3 ¶ 21), but when Do expressed concerns about whether she

could tolerate the warm temperature in the operating room, Dr. Day made arrangements for Do to attend a different surgery, supervised by Gabriella Novakova, another Valleywise nurse, (Ex. 3 ¶ 14; Ex. 9 at 140:5-11.)

37.     Valleywise staff participating in that surgery, a wound debridement, reported that Do acted disinterested during the surgery, stating she was only interested in management or administrative jobs, not bedside or direct patient care. (Ex. 3 ¶ 21; Janine Carrasco Deposition, attached as **Exhibit 12**, at 18:17-19:7, 20:14-21:6, 21:20-22:3; 7/24/21 Carrasco email to Day (ABOR000555), attached as **Exhibit 30**; Gabriela Novakova Deposition, attached as **Exhibit 13**, at 15:2-24, 17:18-25; 7/24/21 Novakova email to Day (ABOR000560), attached as **Exhibit 31**; Warren Brent Thomas Deposition attached as **Exhibit 16**, at 25:3-27:25; 7/24/21 Thomas email to Day (ABOR000554); attached as **Exhibit 32**.) Do acknowledges she did not ask any questions. (Ex. 9 at 144:22-145:2.) Do left the operating room multiple times during this surgery before it was completed and ultimately did not return. (Ex. 13 at 18:4-19:7; Ex. 16 at 28:5-29:18; Ex. 9 at 147:24-148:2.) As a result, Novakova called Dr. Day to let her know that Do had left and Novakova did not know where she was. (Ex. 3 ¶ 15; Ex. 13 at 18:4-19:21.)

38.     After locating Do, Dr. Day assigned Do to another surgery. (Ex. 3 ¶ 16.)Valleywise staff participating in this orthopedic surgery again reported that Do appeared disinterested and did not engage. (Reaia Reaves Deposition, attached as **Exhibit 14**, at 37:14-45:2; 7/24/21 Reaves email to Day (ABOR000557), attached as **Exhibit 33**.)

39.     Shortly after entering the operating room for this second surgery, before the patient had been cut into, Do left the operating room and did not return. (Ex. 3 ¶ 17; Ex. 14 at 20:7-21:19; Ex. 9 at 155:13-21, 158:21-159:10.) Do admits she did not tell anyone in the room that she would not be returning. (Ex. 9 at 158:21-159:2; 159:25-160:5.)

40.     After leaving the operating room, Do decided to leave the Valleywise facility. (Ex. 9 at 154:13-22.) Before leaving, Do did not speak with Dr. Day or anyone else at Valleywise to let them know that she would be leaving. (*Id*. at 166:12-167:1; Ex. 14 at 33:13-20.) Do did send two emails to Dr. Day before she left the facility but had not received any response to those emails before she left. (Ex. 9 at 166:21-23.) Dr. Day did not see or read the

emails until sometime after Do had left Valleywise. (Ex. 3 ¶ 18.) Do did not call Dr. Day before leaving, despite having her phone number in advance of the first clinical shift. (Ex. 9 at 162:7-8; Ex. 3 ¶ 20.) Do left a voicemail on Dr. Bednarek's work phone but did not speak with Dr. Bednarek. (Ex. 9 at 166:24-167:1.) Dr. Bednarek did not receive the voicemail until the following Monday. (Ex. 1 ¶ 84.)

41.     Do's unexplained departure caused concern among both Edson faculty and Valleywise staff. (Ex. 3 ¶ 17.) The individuals who observed Do during the clinical emailed their concerns and feedback to Dr. Day, taking care to ensure their respective emails accurately represented their observations of Do. (Ex. 3 ¶ 21; Ex. 12 at 24:16-19, 26:14-27:13, 33:11-14; Ex. 30; Ex. 13 at 23:6-16, 25:2-5; 29:13-30:1; Ex. 31; Ex. 16 at 33:5-10, 40:1-4, 48:17-20; Ex. 32; Ex. 14 at 34:16-35:5, 36:13-14, 52:22-24; Ex. 33.) Dr. Day then incorporated those emails into the performance evaluation she completed. (Ex. 3 ¶ 22; Ex. 1 ¶ 88.)

42.     Do later claimed that she left early because of her heart condition. (Ex. 9 at 158:6-159:10.) However, Do's heart monitors showed no activation of her heart condition. (7/24/21 Kardia EKG Reports (Do_010498-Do_010508), attached as **Exhibit 26** (reflecting "███████ ███████"); 7/19/21-8/1/21 Cardiac Event Monitor, included in Valley Heart Rhythm Medical Records (VHR000197-VHR000200), attached **Exhibit 27** at VHR000197 (███████ ███████████████████).)

43.     Edson decided that Do would not return to Valleywise for further clinical shifts. (Ex. 1 ¶ 89.) Because Sara Do abandoned her clinical shift without ensuring Dr. Day or anyone else was aware that she was leaving, had not consistently demonstrated that she could meet the course outcomes for NUR 478, and there was no time to schedule additional clinical shifts for her to complete her course hours, Edson determined that Sara Do would receive a failing grade in the course. (Ex. 1 ¶¶ 90-92.) Neither Sara Do's heart condition nor her prior request for accommodations played a role in the decision to issue the failing grade. (*Id.* ¶ 92.)

44.     On July 28, 2021, Dr. Bednarek, Dr. Margaret Morris, and Professor Keck met with Do to inform her she would receive a failing grade for NUR 478. (Ex 1 ¶ 94; Ex. 4 ¶ 24; 7/28/2021 Video Recording (Do_000326), attached as **Exhibit 23**; 7/28/21 Video Transcript

1   (Valleywise-0635-Valleywise-0665), attached as **Exhibit 20**.)

2       45.    Upon learning that she would not pass NUR 478, Do requested an incomplete

3   for the course. (Ex. 1 ¶ 95; Ex. 9 at 242:17-20; Ex. 23 at 19:50-20:23; Ex. 20 at Valleywise-

4   0655:19-Valleywise-0656:6.) But to be eligible for an incomplete, a student must have made

5   the request "at least two weeks prior to the last day of the semester" and have "successfully

6   completed 80% of their coursework (with a C or better) prior to requesting a grade of

7   incomplete." (Ex. 1 ¶ 96.) Because Do only requested an incomplete after failing the course,

8   she was not eligible for an incomplete. (Ex. 1 ¶ 97.)

9       46.    Edson developed a new plan of study so she could complete the remainder of the

10   MEPN program. (Ex. 1 ¶ 93.) She was never dismissed from the program. (*Id.*; Deposition of

11   Sara Do dated 8/2/23, attached as **Exhibit 10**, at 285:12-14.)

12       47.    Do appealed the failing grade through Edson's grade appeal process. (Ex. 1 ¶ 98;

13   FAC ¶ 56.) Do's failing grade was upheld at every level of that appeal. (Ex. 1 ¶ 98; FAC ¶ 58.)

14   Do later appealed ASU's determination of her academic grievance to Maricopa County

15   Superior Court. (Ex. 1 ¶ 98.) Her appeal remains pending. (*Id.*)

16                                  **Do takes a leave of absence**

17       48.    In September 2021, rather than pursue her new plan of study, Do opted for a

18   leave of absence from the MEPN program. (Suppl. Compl. ¶ 1; Ex. 10 at 285:15-286:4.)

19       49.    Do has identified five accommodations she believed she was improperly denied

20   during the Spring and Summer 2021 semesters: (a) the ability to attend class remotely; (b) the

21   ability to take an incomplete for NUR-478; (c) the ability to complete assignments (exams) at

22   an ASU testing center; (d) shorter sessions/broken up clinical hour requirements; (e) written

23   assignments to replace clinical hour requirements. (Plaintiff Sara Do's Supp. Responses to Def.

24   ABOR's First Set of Special Interrogatories dated 7/6/23, attached as **Exhibit 36** at 6.)

25       50.    Do cannot identify any class that she wanted to attend remotely but was not

26   allowed to do so. (Ex. 9 at 239:17-20; Ex. 10 at 265:5-19.)

27       **Do's return to the MEPN program and her new accommodations requests**

28       51.    In Fall 2022, as her leave was ending, Do began the process of returning to the

1    MEPN program. (Ex. 11 at 10:17-25; 11/1/2022 Email from Sara Do to Nancy Kiernan
2    (ABOR010732-ABOR010733), attached as **Exhibit 34** at ABOR010732.) On November 17,
3    2022, Do submitted a new application to the SAILS office. (Ex. 2 ¶ 32.; Sara Do Deposition
4    Transcript dated 3/16/24, attached as **Exhibit 11**, at 16:19-25.) She identified "heart disease"
5    as her "Primary Disability," and "Chronic Migraines, Anxiety Disorder, and Endocrine
6    System" as "Secondary Disabilities." (Ex. 2 ¶ 33.)

7          52.    Two days later, Ms. Benedict and Do met as part of the interactive process to
8    identify potential barriers to access and discuss potential accommodations. (Ex. 2 ¶¶ 34-35.)
9    Ms. Benedict asked Do to provide information from her healthcare providers. (*Id*. ¶ 35.)
10   Following the meeting, Ms. Benedict directed Do to the steps she could take to obtain
11   exemptions from the COVID-19 and influenza vaccinations, which were required by some of
12   the clinical facilities Do might be assigned to. (*Id*. ¶ 36.) Because many clinical facilities
13   required nursing students to receive the vaccine, Edson asked students to provide either proof
14   of their vaccination status or an exemption letter that could be submitted to the clinical facilities.
15   (Ex. 1 ¶¶ 102-103; Declaration of Alicia Wackerly-Painter, attached as **Exhibit 8**.) In Fall 2022,
16   the SAILS office assisted Edson students with the preparation of COVID-19 vaccination
17   exemption forms that could be submitted to clinical partners who required the vaccine or an
18   exemption, if the students submitted appropriate medical documentation. (Ex. 8 ¶ 7, 10-11.)
19   The ultimate determination of whether a student who did not receive the vaccine could
20   participate in a clinical rotation was at the discretion of the clinical facility. (*Id*. ¶ 12; Ex. 1 ¶
21   104.)

22         53.    On December 13 and 14, 2022, Do emailed documentation from her medical
23   providers to the SAILS office to support her requests for accommodation. (Ex. 8 ¶ 16-17, 19.)
24   In her December 14, 2022 email, Do included a document that set out her accommodation
25   requests for the upcoming semester, which were: (a) exemption from receiving COVID and
26   influenza vaccinations; (b) "[O]pen scheduling" of her clinical shifts so that Do could "go to
27   any approved clinical site for any scheduled shift and work however long [she] could tolerate";
28   (c) exams to be taken at a different campus from her main program campus; (d) no overnight

1    clinical shifts; (e) "[f]lexible attendance" for in-person classes; (f) permission to take breaks as

2    needed during classes and clinicals to take medication; (g) a support companion to accompany

3    her on campus and to her clinical shifts; and (h) placement at East Valley clinical locations if

4    her request for open scheduling was denied. (*Id.*; Ex. 11 at 27:14-29:19.)

5        54.    Do's treating psychologist, Dr. Eddie Taylor, reported that "prolonged periods

6    of time in any given activity may impact the student's anxiety and stress level. Reduced

7    exposure or presence in any uncertain area will be an appropriate accommodation." (Ex. 8 ¶ 2.)

8    He recommended Do be allowed a support companion to accompany her to class and that Do

9    be granted "modified block hours to complete her required clinical training." (*Id.* ¶ 22.) He did

10   not provide further explanation of what "modified block hours" meant. (*Id.*) Do's treating

11   cardiologist, Dr. Jonathan Weiss, reported that related to her PVCs, "[t]here may be limitations

12   with more significant exertion as well as working very long hours without adequate breaks, rest,

13   and allowance for sleep." (*Id.* ¶ 23.) Her primary care physician, Alison Kaplan, reported that

14   related to her multi-focal PVCs, Do was "unable to sustain long term physical exertion due to

15   heart condition." (*Id.* ¶ 24.)

16       55.    On December 15, 2022, ASU provided Do a COVID-19 vaccine exemption

17   letter she could submit to clinical facilities requiring a COVID-19 vaccination. (*Id.* ¶ 18.) Do

18   was not required to obtain any further COVID-19 vaccines and she opted out of the influenza

19   vaccine using a form provided by Edson. (Ex. 11 at 32:11-14; Ex. 1 ¶ 103; *see* Ex. 2 ¶ 36.)

20       56.    The SAILS office reviewed Do's requested accommodations and medical

21   documentation, and asked Do additional questions. (Ex. 8 ¶ 25.) When the SAILS office asked

22   to be permitted to speak with Dr. Taylor, Do authorized Dr. Taylor to discuss the

23   recommendation for a support companion only. (*Id.* ¶¶ 25-26.) The SAILS office was not

24   otherwise authorized by Do to speak with her medical providers. (*Id.* ¶ 27.)

25       57.    The SAILS office further spoke with individuals from Edson to understand the

26   program requirements and fundamental elements of Do's nursing program to assess her

27   requests. (Ex. 8 ¶ 28.) After engaging in the interactive process and analyzing the information

28   Do and Edson provided, the SAILS office responded to Do's remaining accommodation

1    requests on January 6, 2023. (*Id.* ¶ 29; FAC ¶ 13.)

2        58.    The SAILS office approved some of Do's requests and denied others. (Ex. 8 ¶

3    30; FAC ¶ 14.) No accommodations were denied because Do previously requested

4    accommodations or filed her lawsuits. (*Id.* ¶ 31.) Where an accommodation request was denied,

5    the SAILS office had determined it was unreasonable, not possible, or would result in a

6    fundamental alteration of her educational program. (*Id.*)

7        59.    The SAILS office approved Do's request for flexible attendance for her lecture

8    courses, as it had done in 2021. (Ex. 8 ¶ 32; Ex. 11 at 35:11-24.) In response to Do's request for

9    daytime clinical shifts, SAILS explained that Do's MEPN cohort was not scheduled for

10   overnight clinical shifts for the Spring 2023 semester and Do was only scheduled for daytime

11   clinical shifts. (Ex. 8 ¶ 33.) Do was only scheduled for daytime clinical shifts for the remainder

12   of her MEPN program. (Declaration of Victoria Scheer, attached as **Exhibit 6**, ¶ 11; Ex. 11 at

13   34:22-35:10.) The SAILS office approved Do's request for a support companion to accompany

14   her to on-campus and clinical site activities. (Ex. 8 ¶ 34; Ex. 11 at 39:6-10.) The SAILS office

15   approved Do's request to take a short break to take medication as needed. (Ex. 8 ¶ 46; Ex. 11

16   at 36:3-37:25.)

17       60.    As to Do's request for placement at East Valley locations, the facility Do was

18   assigned to, St. Joseph's Medical Center, was the closest available clinical facility to the East

19   Valley that otherwise satisfied MEPN program requirements. (Ex. 8 ¶ 35; Ex. 6 ¶¶ 7-10.) Do

20   completed all of her remaining clinical shifts at St. Joseph's Medical Center, with the exception

21   of one course, which was completed at a facility in Gilbert. (Ex. 6 ¶ 13; Ex. 11 at 72:6-9;

22   Declaration of Bryan Reddick, attached as **Exhibit 5**, ¶¶ 4-5.)

23       61.    Do's request for "open scheduling" for clinical shifts, by which she could attend

24   any clinical site for any scheduled clinical shift, for any length of time at her own discretion,

25   was denied because it would constitute a fundamental alteration of the program. (Ex. 8 ¶ 36;

26   Ex. 1 ¶ 107.) As explained to Do, learning outcomes are designed so that students get real

27   experience that includes attendance at full clinical shifts from "report on" to "report off." Do's

28   request for "open scheduling" would have modified this fundamental element of the MEPN

1  nursing curriculum. (Ex. 8 ¶ 37; Ex. 1 ¶ 107; SOF ¶ 4.) Allowing Do to leave a clinical shift

2  part-way through the shift and without warning would be disruptive to the clinical facilities and

3  patient care. (Ex. 8 ¶ 38; Ex. 1 ¶ 108.)

4      62.    Additionally, Do's request for "open scheduling" was denied because each of

5  the teams completing the same courses as Do were assigned to clinical rotations on the same

6  days and at the same times, just at different hospitals meaning if Do were to miss one of her

7  assigned clinical shifts, she would also miss the clinical shifts of the other teams and would not

8  have any available options to make up the missed shift. (Ex. 8 ¶ 39.; Ex. 6 ¶ 12; Ex. 1 ¶ 109.)

9  Do could not attend clinical shifts for a different cohort because those students were enrolled in

10 different courses, with different learning outcomes. (Ex. 1 ¶ 110.) Moreover, the clinical

11 partners for each clinical rotation had only approved a certain number of student placements for

12 each rotation. (*Id.*)

13     63.    If "open scheduling" were allowed and Do missed a clinical shift, Edson would

14 have had to secure additional clinical shifts along with Edson faculty members to supervise just

15 Do with little to no notice. (*Id.* ¶ 111.) Given the limited availability of clinical placement

16 opportunities, this would not have been a reasonable option. (*Id.*)

17     64.    Instead of "open scheduling," SAILS approved an alternative accommodation

18 by which Do could either take one 2-hour break or two 1-hour breaks in the course of an

19 assigned 12-hour clinical shift, with the time missed in breaks made up through simulation. (Ex.

20 8 ¶ 40.) The breaks were to be scheduled mid-day, mid-shift. (*Id.*; Ex. 11 at 57:7-23.) Based on

21 the information provided by Do and her medical providers, SAILS understood the barrier to

22 access that Do faced was that if she was required to complete a full 12-hour shift, this might

23 trigger Do's arrythmia or her anxiety symptoms. (Ex. 8 ¶¶ 41-42; Ex. 11 at 53:16-54:5.) By

24 granting Do the opportunity to break each 12-hour shift into shorter blocks of time, and to

25 shorten the total time Do spent working on a given shift by two hours, the SAILS office intended

26 to provide an accommodation designed to allow Do to create a schedule to prevent arrhythmia

27 or anxiety symptoms from occurring. (*Id.* ¶ 43.) The SAILS office later explained to Do that

28 she would need to coordinate with the clinical site for a location to take her breaks, but that

1    SAILS was "happy to be a part of any dialogue if needed" to coordinate locating an area in

2    which Do would utilize her breaks. (*Id.* ¶ 44.) Do never utilized her accommodation breaks. (*Id.*

3    ¶ 45; Ex. 11 at 67:13-17; 72:16-18.) In one instance, Do was able to complete a shift after taking

4    a break after feeling unwell. (Ex. 6 ¶ 18.)

5          65.    Do's request to take exams at a different campus from her main campus was

6    denied. (Ex. 8 ¶ 47-48.) There appeared to be minimal barriers to access for Do to travel to the

7    downtown Phoenix campus because Do made this same trip for her lecture courses and her

8    clinical shifts at St. Joseph's Hospital. (Ex. 8 ¶ 49.) SAILS explained that Do could use the

9    inter-campus bus system if she did not want to drive. (Ex. 2 ¶ 24.)

10         66.    In April 2023, Do made an additional request for extra testing time, which was

11   granted but never used. (Ex. 3 ¶ 38; Ex. 8 ¶ 50; Ex. 11 at 63:20, 65:4-8; 65:10-12.)

12         67.    Prior to Summer 2023, SAILS asked Do if she needed to make any changes to

13   her approved accommodations or if she wanted to continue with her current accommodations;

14   Do responded that she wished to "continu[e] everything." (Ex. 3 ¶ 39.)

15                              **Do's final clinical rotation**

16         68.    Do's final clinical shift for the MEPN program was in NUR-519, her "transition

17   to practice" course or "TTP" course. (Ex. 6 ¶ 16.) The TTP course differs from other MEPN

18   clinical courses in that the student accompanies a staff nurse at clinical facility, rather than an

19   Edson staff member. (*Id.*) An Edson faculty member (the faculty of record) is not always on

20   site, so unlike other MEPN clinical shifts, students in TTP were required to record their clinical

21   hours on a log. (Ex. 6 ¶¶ 16, 26; Ex. 11 at 75:6-15.)

22         69.    For her TTP course, Do was required to complete seven full shifts, scheduled

23   from 7:00 a.m. until 7:00 p.m. (Ex. 6 ¶ 17; Ex 11 at 74:7-10; *see also* 42:22-43:1.) Do's final

24   TTP clinical was scheduled for August 5, 2023. (Ex. 6 ¶ 19; Ex. 11 at 75:24-76:1.) The night

25   before her final clinical shift, Do texted her faculty of record, Professor Jessica Serna, to ask

26   whether she could leave her final clinical shift early because she had injured her foot and ankle.

27   (FAC ¶ 24; Ex. 11 at 82:24-83:25; 8/4/2023 text message from Sara Do to Jessica Serna

28   (Do_105023-Do_105024), attached as **Exhibit 35**.) Do admits that her foot and ankle injury is

1    not a disability. (Supp. Compl. at 9, n.9; Ex. 11 at 78:18-79:2.)

2          70.    Do explained that, by her own accounting, she had only four hours and fifteen

3    minutes remaining to satisfy her clinical hours requirement of 84 hours. (Ex. 6 ¶ 21; Ex. 35 at

4    Do_105024.) But for the TTP course, MEPN students were expected and required to complete

5    84 clinical hours, scheduled over seven full 12-hour shifts, including report at the beginning

6    and end of shift. (Ex. 6 ¶¶ 22-23.) This meant that a shift could last longer than 12 hours, as the

7    staff nurses might be involved in patient care past their scheduled end time before they can give

8    report to the next shift of nurses. (*Id.*)

9          71.    Do was aware she needed to complete full shifts: on June 6, 2023, Dr. Scheer

10   informed Do that she would be "required to complete 7 full shifts, at approximately 13-14 hours

11   each, including report at the beginning and end of each shift." (*Id.* ¶ 24-25.) The TTP hours log

12   used by students also makes clear students are to complete "clinical shifts in their entirety" and

13   expressly states: "Do not leave a shift early because you have reached your hours for the

14   rotation." (Ex. 6 ¶ 26.)

15         72.    After conferring with Dr. Scheer, Prof. Serna communicated to Do that the TTP

16   requirement was completion of seven full shifts, including report at the beginning and end of

17   shift. (Ex. 6 ¶ 27-28; Ex. 35 at Do_105203.) By requiring Do to complete a full clinical shift,

18   as opposed to only four hours and fifteen minutes, Edson held Do to the same academic

19   standard as all other MEPN students. (Ex. 6 ¶ 28.)

20         73.    No Edson faculty member told Do she must attend the August 5, 2023 clinical

21   shift. (Ex. 6 ¶ 29.) Had Do determined she could not safely participate in that clinical, she could

22   have arranged with her nurse preceptor to attend a different shift before the end of the semester.

23   (*Id.*) Do made the decision to attend the August 5 clinical shift. (Ex. 11 at 81:1-17.) Do

24   acknowledges that her nurse preceptor had additional scheduled shifts that Do could have

25   attended instead, but she did not want to do so. (*Id.* at 81:1-17.) Do intentionally did not seek

26   medical treatment for her injury because she "didn't want to have any reason why [she] couldn't

27   go to that shift," and did not want a medical provider to tell her that she could not attend the

28   shift. (*Id.* at 80:12-25.) Do attended her final TTP clinical shift in full. (*Id.* at 97:2-6.)

74.    On August 9, 2023, Do graduated from the MEPN program. (Ex. 1 ¶ 113; Ex. 11 at 11:5-10.) Do is now a licensed nurse and is employed. (Ex. 11 at 145:2-5.) Do loves her current job. (Diane Weiss, M.D. Deposition, attached as **Exhibit 17**, at 82:4-18.) Do has requested no accommodations under the ADA in connection with her employment. (Ex. 11 at 149:23-25.)

75.    In this case, Do describes her damages as "the harm she suffered because of Defendants' failure to accommodate her disability and her resulting emotional distress"; she asserts that she would "require expert testimony to evaluate various factors including the harm done to her reputation and her earning potential" but did not disclose any expert to provide opinions on the alleged harm to her earning potential or reputation or computation of damages, and Do has never disclosed any computation of damages. (Plaintiff Sara Do's Responses to Defendant Arizona Board of Regents' First Special Interrogatories, attached as **Exhibit 36**, at 14 (Response to Interrogatory 8).)

76.    Do alleges ABOR retaliated against her in 2021 by sending her to Valleywise and issuing her a negative performance review and failing grade. (Ex. 36 at 16-18 (Response to Interrogatory 6).)

DATED this 28th day of June, 2024.

OSBORN MALEDON, P.A.


By  s/ Kristin L. Windtberg
    Mary R. O'Grady
    Kristin L. Windtberg
    Joshua J. Messer
    2929 N. Central Avenue, Suite 2000
    Phoenix, Arizona 85012

Attorneys for Defendant Arizona Board of Regents