# EXHIBIT 9

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ARIZONA

 3                                          )
 4   Sara Do, an individual,               )
                                           )
 5           Plaintiff,                    )
                                           )
 6   v.                                    )   No.
                                           )   CV-22-00190-PHX-JJT
 7   Arizona Board of Regents, an          )
     Arizona State Entity; et al.,         )
 8                                         )
             Defendants.                   )
 9   _____)

10        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

11             IN AND FOR THE COUNTY OF MARICOPA

12                                         )
     Sara Do, an individual,               )
13                                         )
             Plaintiff,                    )   No. CV2022-009424
14                                         )
     v.                                    )
15                                         )VIDEOTAPED DEPOSITION
     Arizona Board of Regents, an          )   OF SARA DO
16   Arizona State Entity;                 )
     Dr. Kimberly Day, an unmarried        )
17   person; Dr. Salina Bednarek and       )    VOLUME 1
     Joshua Bednarek, wife and             ) (Pages 1 through 248
18   husband; Dr. Margaret Morris          )     Inclusive)
     and Phillip Morris, wife and          )
19   husband; Candace Keck and             )
     Jonathan Keck, wife and               )
20   husband,                              )   Phoenix, Arizona
                                           )
21           Defendants.                   )    July 10, 2023
     _____)

22

23   Prepared by:

24   Meri Coash, RMR, CRR
     Certified Reporter
25   Certification No. 50327
```

**CERTIFIED TRANSCRIPT**

1                          I N D E X

2    WITNESS                                               PAGE

3     SARA DO

4         Examination by Ms. Windtberg                       8

5

6
                           EXHIBITS MARKED
7
     EXHIBITS              DESCRIPTION                     PAGE
8
9     Exhibit 1   2020-21 The Master of Science in          19
                  Nursing Degree Handbook
10                ABOR000160 - 000230

11    Exhibit 2   Application documents to MEPN             28
                  program
12                ABOR000639 - 000665

13    Exhibit 3   Email from Sara Do to Allison             36
                  Reynolds dated 12-16-20
14                ABOR000327

15    Exhibit 4   Email string ending from Sara Do to      41
                  Salina Bednarek dated 12-21-20
16                ABOR000328 - 000329

17    Exhibit 5   Email string ending from Salina          43
                  Bednarek to Sara Do dated 12-22-20
18                ABOR001695 - 0001696

19    Exhibit 6   Email string ending from Salina          46
                  Bednarek to Sara Do and Susan
20                Mahieu-Phillips dated 12-22-20
                  ABOR000332 - 000334

21    Exhibit 7   Medical record from Mohammad Dardari     63
                  DGFM000106 - 000108
22                CONFIDENTIAL

23    Exhibit 8   Medical records from Tri-City            67
                  Cardiology Consultants
24                TCC000034 - 000037
                  CONFIDENTIAL
25

1

Exhibit 9      Medical records from Premier          71
2              Cardiovascular Center
               PCC000002 - 000005
3              CONFIDENTIAL

4   Exhibit 10     Email string ending from Bernadette   85
               Hinojosa to Salina Bednarek dated
5              7-12-21
               ABOR000009
6
    Exhibit 11     SAILS office documents               89
7              ABOR009721 - 009726

8   Exhibit 12     First Amended Complaint              95
               Case No. 2:22.cv-00190-JJT
9
    Exhibit 13     Letter from Ziad El Khoury dated     105
10             2-11-21
               ABOR000237
11
    Exhibit 14     Statement of Health Clearance Form   108
12             ABOR000442 - 000447

13  Exhibit 15     Email string ending from Sara Do to  124
               Kimberly Day, dated 7-23-21, with
14             attachments
               ABOR003138 - 003146
15
    Exhibit 16     Email from Sara Do to Salina         168
16             Bednarek dated 7-24-21
               ABOR000558 - 000559
17
    Exhibit 17     Course Syllabus - NUR 478            172
18             ABOR000150 - 000159

19  Exhibit 18     Email from Sara Do to Cindy Eaton,   177
               dated 7-29-21, with attachments
20             Do_006300 - 006310

21  Exhibit 19     Email string ending from Sara Do to  193
               Salina Bednarek dated 8-4-21
22             Do_006313 - 006316

23  Exhibit 20     Plaintiff Sara Do's responses to     236
               Defendant Arizona Board of Regents'
24             First Set of Special Interrogatories
               Case No. 2:21-cv-00190-JJT
25

1              VIDEOTAPED DEPOSITION OF SARA DO

2   was taken on July 10, 2023, commencing at 9:14 a.m., at

3   the law officer of Osborn Maledon, PA, 2929 North Central

4   Avenue, Phoenix, Arizona, before Meri Coash, a Certified

5   Reporter in the State of Arizona.

6

7

8                          *    *    *

9

10  APPEARANCES:

11        For the Plaintiff:
              AFFELD GRIVAKES, LLP
12            By:  Brian R. England, Esq.
                   Adeline Black, Esq.  (Via Zoom)
13                 2049 Century Park East
                   Suite 2460
14                 Los Angeles, California  90067
                   310-979-8700
15                 bre@agzlaw.com
                   ab@agzlaw.com
16

17        For Defendants Arizona Board of Regents, Day,
          Bednarek, Morris, Keck:
18            OSBORN MALEDON, PA
              By:  Kristin L. Windtberg, Esq.
19                 Mary R. O'Grady, Esq.
                   Joshua J. Messer, Esq.
20                 2929 North Central Avenue
                   20th Floor
21                 Phoenix, Arizona  85012
                   602-640-9000
22                 kwindtberg@omlaw.com
                   mogrady@omlaw.com
23                 jmesser@omlaw.com

24

25

| | | |
|---|---|---|
| 09:54:42 | 1 | Q.   Do you have any specific recollection of what |
| 09:54:44 | 2 | courses you were taking during the spring of 2021? |
| 09:54:47 | 3 | A.   I don't recall without seeing my schedule.  I'm |
| 09:54:49 | 4 | sorry. |
| 09:54:50 | 5 | Q.   If I were to represent to you that you were |
| 09:54:52 | 6 | taking NUR 542, which was an OB course, during the spring |
| 09:54:58 | 7 | of 2021, would that sound correct to you? |
| 09:55:00 | 8 | A.   Yes. |
| 09:55:01 | 9 | Q.   And I believe you also participated in a |
| 09:55:06 | 10 | dedicated education unit at the Phoenix Children's |
| 09:55:09 | 11 | Hospital during that same semester.  Is that right? |
| 09:55:12 | 12 | A.   I believe so. |
| 09:55:13 | 13 | Q.   And I've seen that referred to as the DEU.  Is |
| 09:55:20 | 14 | that familiar to you? |
| 09:55:21 | 15 | A.   Yes, it is. |
| 09:55:21 | 16 | Q.   Did you have the DEU -- was that an optional |
| 09:55:25 | 17 | course? |
| 09:55:25 | 18 | A.   Yes, it was. |
| 09:55:26 | 19 | Q.   And how did you get into that course? |
| 09:55:28 | 20 | A.   I applied for it. |
| 09:55:29 | 21 | Q.   And you were accepted into it? |
| 09:55:31 | 22 | A.   Yes, I was. |
| 09:55:32 | 23 | Q.   And were --  Did the DEU include in-person |
| 09:55:38 | 24 | clinicals? |
| 09:55:39 | 25 | A.   Yes, it did. |

09:55:40   1      Q.   And what about NUR 542, the OB course?  Did it

09:55:44   2   include in-person clinicals?

09:55:46   3      A.   Yes.

09:55:47   4      Q.   Heading into those in-person clinical

09:55:51   5   opportunities then in that spring of 2021, did you have

09:55:55   6   any concerns about contracting COVID-19?

09:55:57   7      A.   Yes, I did.

09:55:58   8      Q.   And at that point in time --  Let me be clear

09:56:03   9   about what point in time I'm talking about:  the start of

09:56:06   10  the spring semester, so January of 2021.  Am I correct

09:56:12   11  that the COVID vaccine had just been released here in

09:56:16   12  Arizona?

09:56:19   13     A.   What was the date?

09:56:20   14     Q.   I'm focusing on the start of your spring

09:56:22   15  semester, so that would have been early January of 2021.

09:56:25   16     A.   And when are you asking for the COVID vaccine

09:56:28   17  rollout?

09:56:30   18     Q.   I'm asking if you recall if it was rolled out

09:56:32   19  shortly before you started your spring semester.

09:56:34   20     A.   Yes, it was.

09:56:36   21     Q.   And it was -- it was rolled out in, I believe,

09:56:39   22  December of 2020, correct?

09:56:41   23     A.   Yes.

09:56:41   24     Q.   Were you hoping to receive the COVID-19 vaccine

09:56:46   25  prior to attending your in-person clinicals?

| | | |
|---|---|---|
| 09:56:49 | 1 | A.   Yes. |
| 09:56:50 | 2 | Q.   And did you take any steps to try to determine |
| 09:56:55 | 3 | whether you would be eligible for receiving that vaccine? |
| 09:56:58 | 4 | A.   Yes. |
| 09:56:59 | 5 | Q.   What did you do? |
| 09:57:01 | 6 | A.   I can't recall specifically what I did. |
| 09:57:04 | 7 | Q.   Can you recall generally what you did? |
| 09:57:08 | 8 | A.   I researched a little bit online and looked |
| 09:57:19 | 9 | through -- I believe it was the Maricopa County health and |
| 09:57:24 | 10 | human services department to see if nursing students would |
| 09:57:30 | 11 | be eligible for the first phase of the rollout. |
| 09:57:36 | 12 | Q.   Did you contact any of the facilities where you |
| 09:57:45 | 13 | would be participating in in-person clinicals for the |
| 09:57:48 | 14 | spring 2021 semester to see if they could provide you any |
| 09:57:54 | 15 | information about the COVID vaccine and your eligibility? |
| 09:57:58 | 16 | A.   I have a vague recollection that I did. |
| 09:58:01 | 17 | Q.   Did you ask anyone at Edson about whether nursing |
| 09:58:09 | 18 | students would be eligible to receive the vaccine? |
| 09:58:12 | 19 | A.   I believe I did. |
| 09:58:13 | 20 | Q.   Do you recall who you asked? |
| 09:58:14 | 21 | A.   Not specifically. |
| 09:58:16 | 22 | Q.   Is it true that during the winter break in |
| 09:58:32 | 23 | 2020 -- so between the fall 2020 semester and the spring |
| 09:58:36 | 24 | 2021 semester -- that you reached out to Dr. Salina |
| 09:58:40 | 25 | Bednarek, who was then the director of prelicensure |

10:01:37  1      A.    Yes, you did.

10:01:38  2      Q.    What did you mean when you said that getting the

10:01:40  3  vaccine was a high priority?

10:01:50  4      A.    I -- it was important to me to protect my --

10:01:54  5  myself, my children, my parents, and my future patients

10:02:03  6  that I would be caring for.

10:02:05  7      Q.    And so you wanted to receive the vaccine prior to

10:02:10  8  going into those clinicals, correct?

10:02:13  9      A.    Yes.

10:02:13  10               MR. ENGLAND:  When you get to a good point,

10:02:27  11  could we take just a quick five-minute break?

10:02:31  12               MS. WINDTBERG:  Sure.  We can do the break

10:02:33  13  right now.  Go off the record.

10:02:33  14               THE VIDEOGRAPHER:  We are off the record.

10:02:35  15  The time on the video monitor is 10:02 a.m.

10:02:39  16               (A recess ensued.)

10:15:40  17               THE VIDEOGRAPHER:  We are on the record.

10:15:45  18  The time on the video monitor is 10:15 a.m.

10:15:49  19               MS. WINDTBERG:  Okay.  Ms. Do, we're going

10:15:52  20  to hand you what's been marked as Exhibit Number 5 to your

10:15:54  21  deposition.  It's marked with Bates Numbers ABOR 1695

10:16:00  22  through ABOR 1696.

         23               THE WITNESS:  Thank you.

         24               (Deposition Exhibit 5 was marked for

10:16:10  25           identification.)

10:21:26  1  contacted to indicate which one of the five local

10:21:29  2  immunization pods I should go to in order to obtain the

10:21:33  3  vaccine."  Did I read that correctly?

10:21:35  4      A.    Yes.

10:21:35  5      Q.    Do you remember what the prescreen tool was?

10:21:42  6      A.    I believe it was through the Maricopa County

10:21:48  7  health and human services department, but I'm not a

10:21:51  8  hundred percent sure that was the correct department.  But

10:21:54  9  I do believe it was through the -- the county to check and

10:21:58  10  see if you were eligible for a vaccine.

10:22:02  11      Q.    Do you recall if, at the time you sent this email

10:22:04  12  on December 22nd of 2020, you had begun the process to try

10:22:10  13  to register to receive the vaccine?

10:22:13  14      A.    I don't remember the dates that I actually filled

10:22:17  15  out anything.

10:22:19  16      Q.    Okay.  You say here in this email, though, that

10:22:21  17  you filled out the prescreen tool, correct?

10:22:24  18      A.    Yes.

10:22:24  19      Q.    Do you have any reason to doubt that you had

10:22:26  20  already filled out the prescreen tool as of the date that

10:22:30  21  you sent this email?

10:22:32  22      A.    Hold on.

10:22:34  23            No.  If I said that I filled it out, then I

10:22:37  24  had already filled it out.

10:22:38  25      Q.    When did you receive the COVID-19 -- your first

| | | |
|---|---|---|
| 10:22:42 | 1 | shot of the COVID-19 vaccine? |
| 10:22:44 | 2 | A.   It was December 28th, 2020, and my appointment |
| 10:22:49 | 3 | time was at 3:16 p.m. |
| 10:22:52 | 4 | Q.   And you answered my next question.  You needed an |
| 10:22:54 | 5 | appointment to get that vaccine, correct? |
| 10:22:56 | 6 | A.   Yes. |
| 10:22:56 | 7 | Q.   Do you recall when you made that appointment? |
| 10:22:59 | 8 | A.   I don't. |
| 10:23:00 | 9 | Q.   Which vaccine did you receive? |
| 10:23:03 | 10 | A.   Pfizer. |
| 10:23:06 | 11 | Q.   And December 28th of 2020 was during your winter |
| 10:23:09 | 12 | break, correct? |
| 10:23:10 | 13 | A.   I don't remember the dates.  I'm sorry. |
| 10:23:12 | 14 | Q.   You're typically on winter break at the end of |
| 10:23:16 | 15 | December leading into the beginning of January, correct? |
| 10:23:19 | 16 | A.   I think so.  So it's probably right.  I have no |
| 10:23:25 | 17 | reason to think otherwise. |
| 10:23:26 | 18 | Q.   Okay.  If you would turn back to Exhibit |
| 10:23:34 | 19 | Number 5, please.  I just want to make sure we're all on |
| 10:23:38 | 20 | the same page. |
| 10:23:39 | 21 | If you look at the second page of Exhibit |
| 10:23:42 | 22 | Number 5, there is an email from December 17th, 2020, from |
| 10:23:47 | 23 | Salina Bednarek that starts "Greetings MEPN Cohort 2 |
| 10:23:53 | 24 | Students."  Do you see that? |
| 10:23:54 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:23:54 | 1 | Q.   And the first line of her email is "I hope this |
| 10:23:56 | 2 | email finds you well and enjoying a much-needed winter |
| 10:24:00 | 3 | break."  Do you see that? |
| 10:24:01 | 4 | A.   Yes. |
| 10:24:02 | 5 | Q.   Does that refresh your recollection at all as to |
| 10:24:04 | 6 | whether it was winter break when you received your COVID |
| 10:24:07 | 7 | vaccine? |
| 10:24:07 | 8 | A.   I think it was.  I'm pretty sure it was. |
| 10:24:15 | 9 | Q.   Do you recall whether you were taking any classes |
| 10:24:22 | 10 | at the time that you received the vaccine? |
| 10:24:23 | 11 | A.   I don't recall that. |
| 10:24:25 | 12 | Q.   You don't recall that you were taking classes, or |
| 10:24:28 | 13 | you don't recall one way or the other? |
| 10:24:30 | 14 | A.   One way or the other.  I really -- I mean, the |
| 10:24:36 | 15 | dates seem to fall into line with a break, but without |
| 10:24:39 | 16 | seeing that in front of me, I couldn't say, like, a |
| 10:24:42 | 17 | hundred percent that it was, but I believe it was. |
| 10:24:44 | 18 | Q.   Where did you get the vaccine? |
| 10:24:47 | 19 | A.   I got the vaccine -- I believe it was at |
| 10:24:49 | 20 | Chandler-Gilbert Community College, in their parking lot. |
| 10:24:53 | 21 | Q.   Was it one of those drive-up vaccine events? |
| 10:24:58 | 22 | A.   Yes. |
| 10:24:58 | 23 | Q.   And were you driving the vehicle? |
| 10:25:01 | 24 | A.   No, my dad was. |
| 10:25:02 | 25 | Q.   The day that you received the vaccine, did your |

10:25:06    1    dad also receive the vaccine?

10:25:07    2        A.   No, he didn't.

10:25:08    3        Q.   And is that because at the time the vaccine was

10:25:11    4    only available for certain individuals such as doctors or

10:25:14    5    nurses or other people who might be in direct contact with

10:25:19    6    patients?

10:25:19    7        A.   That would make sense, but I can't really speak

10:25:22    8    for my dad either.  I think that would make the most

10:25:25    9    sense, though, that that's why he didn't.  But if -- I

10:25:29   10    don't know.

10:25:29   11        Q.   Do you recall how it was that you were able to

10:25:31   12    get the vaccine in December of 2020?

10:25:33   13        A.   I was a nursing student.

10:25:38   14        Q.   And you weren't working at the vaccination event

10:25:42   15    that day, correct?

10:25:43   16        A.   Correct.

10:25:43   17        Q.   Do you recall seeing other Edson College students

10:25:46   18    or possibly faculty members at the vaccination event?

10:25:50   19        A.   Yes.

10:25:51   20        Q.   And you actually spoke with an Edson faculty

10:25:55   21    member at the vaccination event, correct?

10:25:57   22        A.   Yes.

10:25:58   23        Q.   Who was that?

10:25:58   24        A.   I believe that it was Leslie Barnum.

10:26:05   25        Q.   Professor Barnum is someone we just saw in

| | | |
|---|---|---|
| 10:26:10 | 1 | Exhibit Number 6, correct? |
| 10:26:12 | 2 | A.   Yes. |
| 10:26:13 | 3 | Q.   She was associated with the DEU rotation at |
| 10:26:17 | 4 | Phoenix Children's Hospital? |
| 10:26:18 | 5 | A.   Yes, I believe that it was her. |
| 10:26:20 | 6 | Q.   Tell me about what happened when you went to get |
| 10:26:22 | 7 | the vaccine. |
| 10:26:23 | 8 | A.   How far back do you want me to go? |
| 10:26:30 | 9 | Q.   Let's start with when you received the vaccine. |
| 10:26:33 | 10 | A.   Okay.  From the point that they injected me? |
| 10:26:36 | 11 | Q.   Sure. |
| 10:26:36 | 12 | A.   Okay.  So the nursing student injected the |
| 10:26:41 | 13 | vaccine into my right deltoid, and within a minute or two, |
| 10:26:47 | 14 | I felt my heart start racing.  And they had instructed us |
| 10:26:55 | 15 | if we felt any kind of -- anything that felt off, as we |
| 10:27:00 | 16 | pulled forward to the area to wait, to honk our horn and |
| 10:27:05 | 17 | that medical personnel would come over. |
| 10:27:10 | 18 | So I was given the injection, and my dad |
| 10:27:13 | 19 | drove forward and put the car in park.  And I believe I |
| 10:27:20 | 20 | told him something like "Something's wrong with my heart." |
| 10:27:25 | 21 | And I said, "Honk the horn.  Something's happening with my |
| 10:27:29 | 22 | heart." |
| 10:27:35 | 23 | And I don't remember if he honked the horn |
| 10:27:38 | 24 | or if somebody was right there.  I don't remember exactly |
| 10:27:41 | 25 | what happened, but very quickly I had paramedics at my |

| Time | Line | Text |
|---|---|---|
| 10:27:48 | 1 | side while I was in the car.  And -- |
| 10:27:50 | 2 | Q.   You were still in the vehicle? |
| 10:27:52 | 3 | A.   I was still in the vehicle.  I explained to them |
| 10:27:56 | 4 | that my heart felt like it was racing and that it wasn't |
| 10:28:00 | 5 | beating right.  They put a 12-lead EKG on me very quickly, |
| 10:28:07 | 6 | and one of the paramedics said -- excuse me -- "She's in |
| 10:28:13 | 7 | A-fib." |
| 10:28:18 | 8 | Sorry. |
| 10:28:19 | 9 | So at that point, they put me in the back of |
| 10:28:23 | 10 | the ambulance and they continued to have a monitor on me |
| 10:28:29 | 11 | while we drove to the hospital, and I had a monitor |
| 10:28:35 | 12 | sitting on the gurney with me between my legs.  And the -- |
| 10:28:44 | 13 | I don't know if he was a paramedic or what his title was, |
| 10:28:48 | 14 | but he was sitting behind me in the back of the ambulance, |
| 10:28:53 | 15 | and I heard him say -- I'm assuming to the driver or if |
| 10:28:56 | 16 | there was a passenger -- "She's in V-tach."  And I looked |
| 10:29:01 | 17 | at the monitor, and I saw the Vs going across the screen |
| 10:29:05 | 18 | to indicate ventricular tachycardia.  And as soon as I saw |
| 10:29:10 | 19 | it, it went back into a more -- into a nonlethal rhythm. |
| 10:29:15 | 20 | Q.   What do you mean when you say you saw it go back |
| 10:29:27 | 21 | into a nonlethal rhythm? |
| 10:29:29 | 22 | A.   We had just learned about EKG readings in our |
| 10:29:32 | 23 | previous semester.  And it was my understanding that |
| 10:29:36 | 24 | ventricular tachycardia was a lethal rhythm if the patient |
| 10:29:40 | 25 | does not get cardioverted out of that rhythm.  There are |

| | | |
|---|---|---|
| 10:35:14 | 1 | A.   He was a physician -- a physician and would |
| 10:35:22 | 2 | just -- he kept me stocked on all kinds of stuff for |
| 10:35:25 | 3 | emergency purposes. |
| 10:35:26 | 4 | Q.   Was there any concern about your heart that led |
| 10:35:29 | 5 | you to need to have this Kardia device? |
| 10:35:34 | 6 | A.   Not necessarily that I can recall specifically. |
| 10:35:37 | 7 | Q.   There's a lot of qualification there, so I want |
| 10:35:41 | 8 | to make sure I understand. |
| 10:35:42 | 9 | Your ex-husband provided you with a |
| 10:35:47 | 10 | Kardia -- is "device" the right term? |
| 10:35:49 | 11 | A.   Yes. |
| 10:35:49 | 12 | Q.   And you don't recall why you might have had a |
| 10:35:53 | 13 | cardiac monitor that he would have given you? |
| 10:35:55 | 14 | A.   I don't recall the original reason that he ever |
| 10:35:57 | 15 | gave it to me. |
| 10:35:58 | 16 | Q.   Do you recall when he gave it to you? |
| 10:36:00 | 17 | A.   I don't. |
| 10:36:00 | 18 | Q.   Do you recall the last time you used it prior to |
| 10:36:04 | 19 | going to receive your COVID-19 vaccine? |
| 10:36:07 | 20 | A.   I don't. |
| 10:36:07 | 21 | Q.   Is it possible that you used it during the month |
| 10:36:10 | 22 | of December of 2020? |
| 10:36:11 | 23 | A.   I don't recall. |
| 10:36:12 | 24 | Q.   Prior to December 20th -- excuse me. |
| 10:36:33 | 25 | Prior to December 28th of 2020, had you had |

10:36:37  1   any issues with your heart?

10:36:38  2        A.   I had seen a cardiologist previously for -- like

10:36:50  3   when my primary care doctor would refer me out for any

10:36:55  4   reason.

10:36:57  5        Q.   And why did you see a cardiologist prior to

10:37:00  6   December 28th of 2020?

10:37:01  7        A.   I had thyroid cancer when I was 26, and if my

10:37:09  8   thyroid was ever off, if my levels were off, I could get

10:37:14  9   intermittent PVCs.  And I would always go to the doctor

10:37:21  10  just to have them checked, and my doctors would always

10:37:26  11  refer everything out for the most part.  So they would

10:37:31  12  send me to the cardiologist just to have it checked.

10:37:34  13       Q.   And you said "PVCs."  What are PVCs?

10:37:37  14       A.   Premature ventricular contractions.  They may

10:37:43  15  call them complexes now.

10:37:46  16       Q.   Premature ventricular complexes?

10:37:49  17       A.   Yeah.  They kind of go back and forth with them.

10:37:50  18       Q.   What is a premature ventricular complex?

10:37:53  19       A.   It's an -- it's -- it's basically where your --

10:38:02  20  you have like a battery in your heart, and it fires

10:38:06  21  prematurely and it causes your -- your ventricles to

10:38:13  22  squeeze before they're supposed to, and then your heart

10:38:17  23  pauses to catch up with the regular rhythm that it had

10:38:23  24  been in previously.

10:38:26  25       Q.   You said that you had gotten PVCs at some point

10:38:43  1   after you were diagnosed with thyroid cancer, correct?

10:38:52  2       A.   I believe that was when -- I don't know.  I don't

10:38:55  3   know the dates.  I'm sorry.  I'm not trying to be evasive.

10:38:59  4   I just don't know.  But I recall that that's when I had

10:39:03  5   seen a cardiologist.

10:39:05  6       Q.   We were just talking about the PVCs.  At various

10:39:13  7   places in your lawsuit, you refer to having arrhythmia,

        8   correct?

10:39:18  9       A.   Yes.

10:39:18  10      Q.   Is it fair to say that a PVC is a type of

10:39:23  11  arrhythmia?

10:39:24  12      A.   Yes.

10:39:25  13      Q.   And with respect to your condition that you

10:39:28  14  experience, can those two terms be used interchangeably:

10:39:34  15  "PVCs" and "arrhythmia"?

10:39:37  16              MR. ENGLAND:  When you say the "condition,"

10:39:40  17  I'm vague on which time frame you're talking about.  So

10:39:42  18  maybe that would help clarify.

10:39:44  19              MS. WINDTBERG:  Sure.

10:39:45  20  BY MS. WINDTBERG:

10:39:45  21      Q.   So let's -- let's focus on the time frame shortly

10:39:48  22  following December 28th of 2020, over the course of the

10:39:52  23  next several months.

10:39:54  24      A.   What was the question?

10:39:57  25      Q.   You said that a PVC is a type of arrhythmia, and

10:39:59  1   I'm just trying to understand if the terms "PVC" and

10:40:02  2   "arrhythmia" can be used interchangeably to describe the

10:40:05  3   condition that you were experiencing at that time.

10:40:07  4        A.   I'm a little confused on -- like, I get what

10:40:14  5   you're asking, but it's hard for me to answer.  So any

10:40:18  6   kind of abnormality would be an arrhythmia.  Not all

10:40:24  7   arrhythmias are premature ventricular contractions,

10:40:28  8   though.  You can have any number of arrhythmias that would

10:40:32  9   be a different type of arrhythmia.

10:40:34  10       Q.   But I believe you said that PVCs are a type of

10:40:38  11  arrhythmia?

10:40:39  12       A.   Yes.

10:40:39  13       Q.   And you've said that you had PVCs prior to

10:40:54  14  receiving the COVID vaccine, correct?

10:40:56  15       A.   Yes.

10:40:57  16       Q.   And is it true that you've had irregular heart

10:41:06  17  rhythm since you were a child?

10:41:09  18       A.   I don't know what I may have had as a child.

10:41:14  19       Q.   You don't know whether you had an irregular --

          20       A.   Not specifically --

10:41:17  21       Q.   -- heart rhythm as a child?

10:41:18  22       A.   No.  My -- not specifically.  I've never seen any

10:41:21  23  medical records from when I was a child.

10:41:23  24       Q.   Do you know generally whether you had issues with

10:41:25  25  your heart when you were a child?

10:41:27  1      A.   I don't think I ever saw a cardiologist.  I -- my

10:41:31  2  mom said that I would say my chest hurt when I was

10:41:35  3  running, that my heart hurt.

10:41:36  4      Q.   Have you ever told anyone that you had heart

10:41:39  5  issues when you were a child?

10:41:40  6      A.   I don't recall if I have said that.  However,

10:41:46  7  like what I just said to you, my mom has said that my

10:41:53  8  heart -- that I would say my heart hurts.  So it's not

10:41:59  9  impossible that I've said that; I just don't recall ever

10:42:02  10  saying that.

10:42:03  11      Q.   As you sit here today, do you believe that the

10:42:27  12  COVID-19 vaccine caused your PVCs?

10:42:31  13      A.   I believe that the condition that I had -- that I

10:42:36  14  developed after the COVID vaccine was attributed directly

10:42:41  15  to the vaccine.

10:42:41  16      Q.   What is the condition that you contend you

10:42:46  17  developed after the COVID vaccine?

10:42:47  18      A.   The PVCs became out of control, and for the first

10:42:52  19  time in my life, I required heart medication to try and

10:42:56  20  control them.

10:42:57  21      Q.   Okay.  But now I want to go back to the original

10:43:01  22  question I asked, because I don't think you really

10:43:03  23  answered it.

10:43:03  24           Do you believe that the COVID-19 vaccine

10:43:06  25  caused your PVCs?

10:43:09    1              MR. ENGLAND:  Objection.  Vague.

10:43:11    2              You can answer.

10:43:13    3              THE WITNESS:  I'm not sure how to answer

10:43:23    4    that because I had them off and on if I drank too much

10:43:30    5    caffeine or if my thyroid was off previously.  So in

10:43:35    6    general, no.  But the exacerbation, yes.

10:43:41    7    BY MS. WINDTBERG:

10:43:49    8       Q.   You said "In general, no."  In general, no, you

10:43:52    9    don't believe that the COVID-19 vaccine caused your PVCs,

           10    correct?

10:43:58   11              And I'm just trying to clarify what you just

10:44:01   12    said.

10:44:02   13       A.   That's what I said.

10:44:06   14       Q.   In general, you believe that the exacerbation of

10:44:10   15    your PVCs was caused by that vaccine, correct?

10:44:13   16       A.   Yes.

10:44:14   17       Q.   I'm going to show you what we will mark as

10:44:23   18    Exhibit Number 7 to your deposition.  Exhibit Number 7 is

10:44:28   19    marked with Bates Numbers DGFM 106 through DGFM 108.

           20              (Deposition Exhibit 7 was marked for

10:44:49   21              identification.)

10:44:49   22    BY MS. WINDTBERG:

10:44:53   23       Q.   Have you seen Exhibit 7 before?

10:44:55   24       A.   I don't think so.

10:44:56   25       Q.   I'll represent to you that this is a medical

10:44:59  1   record we subpoenaed from one of your providers that you

10:45:03  2   disclosed to us, specifically Desert Grove Family Medical.

10:45:07  3   Is that a medical provider that you see?

10:45:10  4       A.   I've never heard of this specific doctor up here,

10:45:16  5   but Desert Grove is the facility where I do see my

10:45:20  6   providers.

10:45:21  7       Q.   And the provider listed on Exhibit Number 7 is

10:45:24  8   Mohammad Dardari.  Do you see that?

10:45:27  9       A.   Yes.

10:45:27 10       Q.   Is that who you were referring to that you don't

10:45:29 11   recall specifically?

10:45:30 12       A.   Yes.

10:45:30 13       Q.   Do you have any reason to doubt that you saw

10:45:34 14   Dr. Dardari?

10:45:35 15       A.   No.

10:45:35 16       Q.   And this record, Exhibit Number 7, says the

10:45:39 17   patient's name is Sara Do, correct?

10:45:41 18       A.   Yes.

10:45:42 19       Q.   That's you?

10:45:43 20       A.   Yes.

10:45:44 21       Q.   And the appointment date for this record is

10:45:50 22   October 26th of 2020.  Do you see that?

10:45:52 23       A.   Yes.

10:45:52 24       Q.   Now, if you turn to the second page of Exhibit

10:45:58 25   Number 7, DGFM 107, there are various headings.  You can

| | | |
|---|---|---|
| 10:46:09 | 1 | see "Obstetric History," "Family History," "Social |
| 10:46:13 | 2 | History."  Do you see where I'm looking? |
| 10:46:14 | 3 | A.   Yes. |
| 10:46:15 | 4 | Q.   "Surgical History," "Past Medical History," and |
| 10:46:19 | 5 | then it says "HPI."  Do you see that? |
| 10:46:25 | 6 | A.   Yes. |
| 10:46:25 | 7 | Q.   Underneath "HPI" there's a paragraph.  And |
| 10:46:28 | 8 | looking partway through that paragraph, about halfway |
| 10:46:31 | 9 | through -- starts on the sixth line of that paragraph -- |
| 10:46:36 | 10 | it reads, "The patient presents today requesting a |
| 10:46:40 | 11 | referral to Tri-City Cardiology.  Patient has been managed |
| 10:46:44 | 12 | by cardiology for multiple reasons.  She sustained a |
| 10:46:48 | 13 | cardiac arrest a few years ago after Phenergan injection |
| 10:46:52 | 14 | while she was hospitalized.  She also has a history of |
| 10:46:56 | 15 | atrial fibrillation.  The patient states that she has, |
| 10:46:59 | 16 | quote, irregular heart rhythm, end quote, since she was a |
| 10:47:02 | 17 | child.  Lately, the patient has been having multiple |
| 10:47:06 | 18 | premature ventricular contractions and PACs.  The patient |
| 10:47:12 | 19 | is in nursing school and she did an EKG today and fax it |
| 10:47:16 | 20 | to our office; however, it is not scanned in her file yet. |
| 10:47:20 | 21 | The patient states that she did the EKG because she felt |
| 10:47:24 | 22 | some irregularity in her heartbeat with near syncope." |
| 10:47:30 | 23 | Did I read that correctly? |
| 10:47:31 | 24 | A.   Yes. |
| 10:47:32 | 25 | Q.   And so on October 26th of 2020, you went to see |

10:47:37  1  this provider, Desert Grove Family Medical, to receive a

10:47:42  2  referral to Tri-City Cardiology.  Is that accurate?

10:47:45  3      A.   Yes.

10:47:46  4      Q.   And it says here in the record at least that you

10:47:52  5  were feeling some irregular- -- irregularity in your

10:47:55  6  heartbeat.  Do you recall feeling that way in or around

10:47:58  7  October of 2020?

10:47:59  8      A.   I don't recall.

10:48:01  9      Q.   You also report here that you had had an

10:48:07  10  irregular heart rhythm since you were a child, correct?

10:48:11  11      A.   That's what it says.

10:48:11  12      Q.   Do you recall telling any of your doctors that

10:48:15  13  you'd had an irregular heart rhythm since you were a

10:48:18  14  child?

10:48:18  15      A.   No, I don't recall that.

10:48:19  16      Q.   You say here that you were feeling some

10:48:20  17  irregularity -- it says "felt some irregularity in her

10:48:25  18  heartbeat with near syncope."

10:48:28  19          Am I correct that "near syncope" means that

10:48:31  20  you felt you might pass out?

10:48:32  21      A.   Yes.

10:48:33  22      Q.   Do you recall whether you were in fact referred

10:48:36  23  to a cardiologist at Tri-City Cardiology following this

10:48:40  24  visit?

10:48:41  25      A.   I don't.

| | | |
|---|---|---|
| 10:49:02 | 1 | Q.   I'm going to hand you what we'll mark as |
| 10:49:04 | 2 | Exhibit Number 8 to your deposition.  This has been marked |
| 10:49:07 | 3 | with Bates Numbers TCC 34 through TCC 37. |
| | 4 | (Deposition Exhibit 8 was marked for |
| 10:49:25 | 5 | identification.) |
| 10:49:25 | 6 | BY MS. WINDTBERG: |
| 10:49:31 | 7 | Q.   Have you seen Exhibit Number 8 before? |
| 10:49:33 | 8 | A.   No. |
| 10:49:33 | 9 | Q.   I will represent to you that this is another |
| 10:49:37 | 10 | medical record we subpoenaed from your providers.  This |
| 10:49:41 | 11 | one is from Tri-City Cardiology Consultants.  Do you see |
| 10:49:44 | 12 | that at the top? |
| 10:49:45 | 13 | A.   Yes. |
| 10:49:45 | 14 | Q.   Is Tri-City Cardiology Consultants one of your |
| 10:49:49 | 15 | medical providers? |
| 10:49:50 | 16 | A.   They were. |
| 10:49:51 | 17 | Q.   Okay.  And you see at the top here that this is a |
| 10:49:53 | 18 | record relating to Sara Do? |
| 10:49:55 | 19 | A.   Yes. |
| 10:49:55 | 20 | Q.   And the date is October 28th of 2020.  Do you see |
| 10:49:59 | 21 | that? |
| 10:50:00 | 22 | A.   Yes. |
| 10:50:00 | 23 | Q.   Looking at the record, it indicates that you were |
| 10:50:05 | 24 | there seeking consultation for palpitations, correct? |
| 10:50:10 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:50:10 | 1 | Q.   And the record goes on to indicate that you were |
| 10:50:17 | 2 | initially seen by Dr. Linden for palpitations in 2015.  Do |
| 10:50:22 | 3 | you recall a Dr. Linden? |
| 10:50:23 | 4 | A.   Vaguely. |
| 10:50:24 | 5 | Q.   And do you recall seeing a doctor at Tri-City |
| 10:50:28 | 6 | Cardiology Consultants in 2015 for palpitations? |
| 10:50:32 | 7 | A.   Not specifically. |
| 10:50:33 | 8 | Q.   Do you generally recall that? |
| 10:50:35 | 9 | A.   Yes. |
| 10:50:36 | 10 | Q.   This goes on to discuss some further history.  It |
| 10:50:42 | 11 | says, "She was recently seen by Dr. Linden on May 3rd, |
| 10:50:48 | 12 | 2019.  At that time she was still experiencing |
| 10:50:50 | 13 | palpitations, memory issues, balance issues, and reported |
| 10:50:55 | 14 | that she felt as if she was going to pass out."  Do you |
| 10:50:58 | 15 | see that? |
| 10:50:58 | 16 | A.   Yes. |
| 10:50:59 | 17 | Q.   Do you recall in 2019 seeing a doctor at Tri-City |
| 10:51:05 | 18 | Cardiology Consultants in connection with palpitations and |
| 10:51:08 | 19 | feeling as though you were going to pass out? |
| 10:51:11 | 20 | A.   Not specifically. |
| 10:51:12 | 21 | Q.   Looking to the next paragraph there on the first |
| 10:51:15 | 22 | page of Exhibit 8, it reads, "She continues to experience |
| 10:51:21 | 23 | palpitations.  She monitors her heart using Kardia device. |
| 10:51:24 | 24 | I reviewed her Kardia device today which shows PVCs."  We |
| 10:51:28 | 25 | talked about that Kardia device before, correct? |

10:51:31   1        A.    Yes.

10:51:31   2        Q.    That's the one that you said you owned around the

10:51:33   3    time that you got the COVID vaccine?

10:51:36   4        A.    Yes.

10:51:36   5        Q.    And so does this help refresh your recollection

10:51:40   6    as to why you were using that Kardia device around that

10:51:43   7    time?

10:51:43   8        A.    Yes.

10:51:46   9        Q.    You had that monitor to monitor your palpitations

10:51:53  10    and PVCs, correct?

10:51:55  11        A.    When they would arise.

10:51:57  12        Q.    But it was your heart issues with the

10:52:02  13    palpitations that caused you to use that monitor at home,

10:52:06  14    correct?

10:52:07  15        A.    Yes, that's what its sole purpose is for.

10:52:09  16        Q.    And so in October of 2020, you were experiencing

10:52:15  17    PVCs, correct?

10:52:17  18        A.    What was the date you said?

10:52:19  19        Q.    October of 2020.

10:52:20  20        A.    According to this, yes.

10:52:23  21        Q.    That was prior to receiving your COVID-19 vaccine

10:52:28  22    in December of 2020, correct?

10:52:30  23        A.    Correct.

10:52:32  24        Q.    If you turn to the last page of Exhibit Number 8,

10:52:37  25    you see at the top of the page it says "Recommendations"?

10:52:41    1      A.    Yes.

10:52:41    2      Q.    And there are some numbered paragraphs.  Do you

10:52:43    3   see those?

10:52:44    4      A.    Yes.

10:52:45    5      Q.    If you look at paragraph number 4, it says, "We

10:52:47    6   will also order Holter monitor ordered to evaluate PVCs

10:52:51    7   over 24 hours to assess daily frequency and percent."

10:52:56    8   What is a Holter monitor?

10:52:58    9      A.    It's just a certain type of heart monitor.

10:53:01   10      Q.    Is it different than the Kardia?

10:53:03   11      A.    Yes.

10:53:03   12      Q.    Do you have both a Holter monitor and a Kardia

10:53:07   13   monitor?

10:53:07   14      A.    The Holter monitor is given and attached by the

10:53:11   15   physician, so they own that.  That's not something that I

10:53:13   16   own.

10:53:14   17      Q.    But do you use both types of monitors?

10:53:19   18      A.    If the doctor orders the Holter or any kind of

10:53:24   19   event monitor, then I would have used it for whatever time

10:53:30   20   frame they would prescribe it.  It could be 24 hours, or

10:53:34   21   it could be 30 days.

10:53:35   22      Q.    And after that time period, would you then return

10:53:38   23   the Holter monitor --

10:53:39   24      A.    Yes.

10:53:39   25      Q.    -- to the physician?

| | | |
|---|---|---|
| 10:53:41 | 1 | I'm going to show you what we will mark as |
| 10:53:57 | 2 | Exhibit Number 9 to your deposition.  It is marked with |
| 10:54:01 | 3 | Bates Numbers PCC 2 through PCC 5. |
| | 4 | (Deposition Exhibit 9 was marked for |
| 10:54:22 | 5 | identification.) |
| 10:54:22 | 6 | BY MS. WINDTBERG: |
| 10:54:22 | 7 | Q.   Have you ever seen Exhibit Number 9 before? |
| 10:54:24 | 8 | A.   No. |
| 10:54:24 | 9 | Q.   This is a medical record from Premier |
| 10:54:31 | 10 | Cardiovascular Center.  Do you see that? |
| 10:54:33 | 11 | A.   Yes. |
| 10:54:33 | 12 | Q.   Is Premier Cardiovascular Center one of your |
| 10:54:38 | 13 | medical providers? |
| 10:54:39 | 14 | A.   They were. |
| 10:54:39 | 15 | Q.   Are they no longer one of your providers? |
| 10:54:43 | 16 | A.   I don't consider them to be a provider for me |
| 10:54:46 | 17 | anymore. |
| 10:54:46 | 18 | Q.   Do you recall when you stopped seeing doctors at |
| 10:54:48 | 19 | Premier Cardiovascular Center? |
| 10:54:52 | 20 | A.   I don't recall when my last appointment was with |
| 10:54:54 | 21 | them. |
| 10:54:54 | 22 | Q.   Why did you stop going to them? |
| 10:54:59 | 23 | A.   I found a provider that I preferred. |
| 10:55:05 | 24 | Q.   Who is that? |
| 10:55:06 | 25 | A.   Dr. Weiss. |

10:55:12  1      Q.   And why do you prefer Dr. Weiss?

10:55:17  2      A.   He seems very, very intelligent, very

10:55:26  3  knowledgeable of my condition.  And my ex-husband would go

10:55:34  4  with me to the appointments, and as a physician himself,

10:55:38  5  he also had a preference for Dr. Weiss.

10:55:41  6      Q.   I understand that you say he's intelligent and

10:55:46  7  knowledgeable of your condition, but there's a -- is there

10:55:49  8  a reason that you prefer him over Dr. El Khoury from

10:55:53  9  Premier Cardiovascular Center?

10:55:56  10     A.   I feel like he's probably more current with

10:56:13  11  evidence-based practices and seems -- like, his -- his

10:56:25  12  experience with dealing with ablations, he -- I just

10:56:34  13  preferred him for a lot of reasons.

10:56:35  14     Q.   What about his experience with ablations did you

10:56:40  15  prefer?

10:56:40  16     A.   He does robotic surgeries for ablations.  And

10:56:46  17  when looking him up online, his entire background is very

10:56:51  18  impressive when it comes to that, and I just felt most

10:56:54  19  comfortable with him.

10:56:55  20     Q.   Do you recall when you started seeing Dr. Weiss?

10:56:59  21     A.   I don't.

10:56:59  22     Q.   Do you recall whether you were still in classes

10:57:04  23  in connection with the MEPN program when you started

10:57:07  24  seeing Dr. Weiss?

10:57:08  25     A.   Yes, I think so.  I've been -- I didn't start

10:57:16  1   seeing him until after the COVID vaccine.  So I've been in

10:57:20  2   classes pretty consistently since then with the exception

10:57:24  3   of a little time frame.

10:57:26  4       Q.   Well, let me focus on Exhibit Number 9 for a

10:57:31  5   minute here.  This is a December 30th of 2020 record from

10:57:36  6   Premier Cardiovascular Center relating to you, correct?

10:57:40  7       A.   Yes.

10:57:40  8       Q.   And under "History of Present Illness," it

10:57:47  9   indicates "Ms. Do is presenting for evaluation of

10:57:52 10   palpitations."  Do you see that?

10:57:54 11       A.   Yes.

10:57:54 12       Q.   It goes on a little bit later to say ". . . she

10:57:58 13   felt severe sustained palpitations two days ago, a few

10:58:02 14   minutes after she had the COVID-19 vaccine."  Do you see

10:58:05 15   that?

10:58:05 16       A.   Yes.

10:58:06 17       Q.   "She was taken by ambulance to the hospital and

10:58:08 18   her heart rate was in the 130s at the time.  She used her

10:58:13 19   Kardia device that reported possible atrial fibrillation."

10:58:17 20   Did I read that correctly?

10:58:18 21       A.   Yes.

10:58:19 22       Q.   Do you recall, looking at this exhibit, whether

10:58:22 23   you were using your Kardia device at the time you received

10:58:25 24   the COVID-19 vaccine on December 28th of 2020?

10:58:29 25       A.   Yes.  I did use it prior to the emergency

10:58:34  1  personnel coming over.

10:58:36  2      Q.   So you had it with you when you went to receive

10:58:41  3  the vaccine?

10:58:41  4      A.   I always have it with me.

10:58:43  5      Q.   Why do you always have it with you?

10:58:48  6      A.   I just do.  It's -- I just do.  I don't have a

10:58:55  7  specific reason.  It's very small.  I carry some medical

10:59:01  8  stuff with me to help other people if I needed to at all

10:59:06  9  times in my backpack.

10:59:07  10     Q.   Exhibit Number 9 goes on to read, "She was

10:59:12  11 treated in the ER and her ECGs repeated without evidence

10:59:16  12 of atrial fibrillation."  Do you see that?

10:59:20  13     A.   Yes.

10:59:21  14     Q.   "The labs were normal and she was discharged home

10:59:24  15 after a few hours.  No recurrences.  No history of heart

10:59:28  16 disease."  Did I read that correctly?

10:59:30  17     A.   Yes.

10:59:30  18     Q.   And so at least according to this record from

10:59:33  19 Premier Cardiovascular Center, there was no evidence of

10:59:38  20 atrial fibrillation when you were at the hospital,

          21 correct?

10:59:41  22     A.   Correct.

10:59:41  23     Q.   Now, this says here, "No history of heart

10:59:46  24 disease."  Did you not talk to Dr. El Khoury about the

10:59:50  25 prior issues you've experienced with your heart?

| | | |
|---|---|---|
| 10:59:52 | 1 | A.    I don't recall what we talked about. |
| 10:59:54 | 2 | Q.    You were there to seek a consultation about the |
| 11:00:06 | 3 | palpitations you had been feeling at least since two days |
| 11:00:13 | 4 | prior, correct? |
| 11:00:14 | 5 | A.    Correct. |
| 11:00:14 | 6 | Q.    And you didn't think it was important to talk to |
| 11:00:17 | 7 | him about any prior palpitations or PVCs you had |
| 11:00:23 | 8 | experienced? |
| 11:00:23 | 9 | A.    I don't recall what I felt at that appointment. |
| 11:00:25 | 10 | Q.    You've alleged in this case that you were |
| 11:00:34 | 11 | required to get the COVID-19 vaccine as part of your |
| 11:00:37 | 12 | nursing program, correct? |
| 11:00:40 | 13 | A.    I felt it was required, yes. |
| 11:00:41 | 14 | Q.    What do you mean when you say "I felt it was |
| 11:00:44 | 15 | required"? |
| 11:00:44 | 16 | A.    Based on verbal comments from various staff |
| 11:00:51 | 17 | members, I felt that we had to get it. |
| 11:00:59 | 18 | Q.    Let me start with who those people were. |
| 11:01:04 | 19 |        Who do you contend told you you were |
| 11:01:07 | 20 | required to get the vaccine as part of your nursing |
| 11:01:10 | 21 | program? |
| 11:01:11 | 22 | A.    It was talked about generally.  So I wouldn't |
| 11:01:13 | 23 | feel comfortable giving a specific name because I can't |
| 11:01:17 | 24 | recall specifically who said it.  It was just generally |
| 11:01:19 | 25 | spoken of. |

| | | |
|---|---|---|
| 11:01:20 | 1 | Q.   What do you mean "it was generally spoken of"? |
| 11:01:23 | 2 | A.   Since we were in the middle of COVID at the time, |
| 11:01:25 | 3 | it was just a topic we frequently discussed, and it was |
| 11:01:31 | 4 | just something that we all knew as students -- we had been |
| 11:01:34 | 5 | told, "As soon as you can get the vaccine, you need to get |
| 11:01:37 | 6 | it." |
| 11:01:37 | 7 | Q.   But you don't recall specifically who told you |
| 11:01:40 | 8 | that? |
| 11:01:40 | 9 | A.   No. |
| 11:01:41 | 10 | Q.   Do you remember what time frame those discussions |
| 11:01:45 | 11 | began? |
| 11:01:46 | 12 | A.   No. |
| 11:01:47 | 13 | Q.   And I want to piece this out just a little bit to |
| 11:01:53 | 14 | make sure that I really understand who we're talking |
| 11:01:56 | 15 | about.  So I'm going to differentiate between people who |
| 11:01:59 | 16 | work for the Edson College as opposed to people who work |
| 11:02:02 | 17 | more generally for ASU.  Okay? |
| 11:02:05 | 18 | A.   Okay. |
| 11:02:05 | 19 | Q.   So focusing first on people who work for ASU but |
| 11:02:09 | 20 | not the Edson College.  Do you contend that anyone from |
| 11:02:12 | 21 | ASU was requiring students to receive the COVID-19 |
| 11:02:15 | 22 | vaccine -- |
| | 23 | A.   I cannot -- |
| 11:02:16 | 24 | Q.   -- in December of 2020? |
| 11:02:17 | 25 | A.   Sorry.  I can't specifically remember. |

11:02:19    1        Q.   Well, do you have any general recollection of

11:02:23    2    whether the university was in fact requiring vaccines of

11:02:27    3    its students?

11:02:27    4        A.   I don't believe that I saw anything to that

11:02:31    5    effect or heard anything from a general employee.

11:02:33    6        Q.   And so is your contention focused on individuals

11:02:39    7    from the Edson College who you believe told you you were

11:02:42    8    required to get the vaccine --

11:02:44    9        A.   Yes.

11:02:44   10        Q.   -- in December of 2020?

11:02:46   11        A.   Yes.

11:02:47   12        Q.   Do you recall whether the people that you don't

11:02:55   13    remember who said that the vaccine was required -- did

11:02:59   14    they say it was required of all nursing students within

11:03:02   15    the Edson College?

11:03:03   16        A.   That's --  Can you say that again?  Sorry.

11:03:09   17        Q.   Yeah.  So I want to understand if your

11:03:12   18    understanding at the time was that all Edson College

11:03:15   19    nursing students would be required to receive the COVID-19

11:03:18   20    vaccine.

11:03:18   21        A.   That was my understanding.  If we were going to

11:03:22   22    do clinicals, we had to get it.

11:03:24   23        Q.   Now I want to come back to the time frame.  When

11:03:33   24    is it that you allege that Edson College representatives

11:03:36   25    told you that you needed to get the COVID-19 vaccine?

11:03:40  1    A.   It was, I believe, before I got my vaccine.  They

11:03:44  2  may have continued after I got my vaccine as well, but I

11:03:48  3  know it was definitely before.

11:03:52  4    Q.   Okay.  And I want to press that because you said,

11:03:56  5  "I believe it was before," and then you said, "I know it

11:03:59  6  was definitely before."  So is there anything that you can

11:04:02  7  point to to put a time frame on when you were told you

11:04:05  8  need to receive the vaccine?

11:04:07  9    A.   There's nothing specific that I can refer to that

11:04:10 10  would help me pinpoint it, but that was one of the reasons

11:04:13 11  why I was looking into it so heavily.

11:04:17 12    Q.   Was it during the fall 2020 semester?

11:04:21 13    A.   That would make the most sense, yes.

11:04:29 14    Q.   Do you recall whether -- was this in a

11:04:34 15  conversation that you were told you needed to receive the

11:04:38 16  vaccine?

11:04:38 17    A.   I honestly can't -- I mean, it had to have been

11:04:42 18  in a conversation.  I don't recall where the conversation

11:04:44 19  was because it was just something we frequently discussed.

11:04:49 20    Q.   When you say "we frequently discussed," who are

11:04:51 21  you referring to?

11:04:52 22    A.   Professors and classmates.  COVID was always a

11:04:57 23  conversation that we discussed, probably every time we

11:05:01 24  were together.

11:05:01 25    Q.   And do you specifically recall hearing from a

11:05:04   1  professor that you needed to receive the COVID vaccine?

11:05:08   2      A.   Yes, but I can't recall which one it was.  We had

11:05:12   3  a lot of professors, and we had a lot of different

11:05:15   4  employees that we worked with that were nursing

11:05:17   5  employees -- school employees.

11:05:19   6      Q.   So you're certain that a professor told you, but

11:05:22   7  you don't remember specifically any professor?

11:05:24   8      A.   Correct.

11:05:25   9      Q.   Do you recall whether this conversation was

11:05:26  10  before or after winter break of 2020?

11:05:28  11      A.   It had to have been before.

11:05:32  12      Q.   Why do you say "it had to have been"?

11:05:34  13      A.   Because as we talked about, it appears that I got

11:05:38  14  my vaccine during the break.  And they may have discussed

11:05:42  15  it after, but my -- one of my motivators for the vaccine

11:05:49  16  was the conversations that we had prior to getting the

11:05:53  17  vaccine.

11:05:53  18      Q.   Prior to December 28th of 2020, did you receive

11:06:01  19  anything in writing from the Edson College indicating that

11:06:05  20  you were required to receive the COVID-19 vaccine?

11:06:08  21      A.   I can't recall specifically receiving anything in

11:06:11  22  writing.

11:06:11  23      Q.   And so your belief that the vaccine was required

11:06:20  24  is based off of your recollection that someone verbally

11:06:23  25  told you you needed to receive it?

11:06:25  1      A.   Yes.

11:06:26  2      Q.   Do you recall more details about the actual

11:06:40  3  conversation where this purported requirement was conveyed

11:06:45  4  to you?

11:06:46  5      A.   Not specifically.

11:06:47  6      Q.   What do you generally recall you were told about

11:06:50  7  needing to get the COVID vaccine?

11:06:52  8      A.   That we as students needed to get the vaccine as

11:06:56  9  soon as it was available to us because, going forward,

11:07:00 10  there was a very high possibility that clinical locations

11:07:05 11  would require any nursing student to be vaccinated and, if

11:07:11 12  we didn't have a vaccine, then it was possible that we

11:07:14 13  wouldn't graduate if we couldn't do our clinicals.

11:07:18 14      Q.   But did anybody tell you that ASU or Edson

11:07:23 15  College itself was requiring the vaccine?

11:07:25 16      A.   I don't recall.

11:07:29 17      Q.   You don't recall that you were told that?

11:07:31 18      A.   Correct.

11:07:32 19      Q.   So as you sit here today, you can't say that

11:07:35 20  anyone from Edson College specifically told you that the

11:07:38 21  college was requiring you to receive the COVID-19 vaccine

11:07:41 22  in December of 2020, correct?

11:07:44 23      A.   That's correct.

11:07:44 24      Q.   In the conversations around the high possibility

11:07:54 25  that the clinical location would require a vaccine, I

11:07:58  1   think you said -- the focus, it sounds to me, was on the

11:08:04  2   fact that a clinical facility might require the vaccine.

11:08:07  3   Is that accurate?

11:08:08  4       A.   That was my understanding.

11:08:09  5       Q.   Did anybody tell you that any particular clinical

11:08:14  6   facility was requiring the vaccine in December of 2020?

11:08:17  7       A.   Not that I can recall.

11:08:18  8       Q.   And the vaccine wasn't even out for use at the

11:08:21  9   beginning of December of 2020, correct?

11:08:23  10      A.   Correct.

11:08:24  11      Q.   And you believe that someone told you you might

11:08:29  12  not graduate if you didn't have the vaccine because you

11:08:31  13  wouldn't be able to complete your clinicals?

11:08:35  14      A.   Correct.

11:08:43  15      Q.   Focusing on the time period after December 28th

11:08:47  16  of 2020, did anybody from Edson College tell you that you

11:08:51  17  were required to receive the COVID-19 vaccine as a

11:08:54  18  requirement of the Edson College?

11:08:56  19      A.   It was required in our documents that we had to

11:09:12  20  upload to remain in compliance.  And I'm trying to think

11:09:20  21  if that was -- we have two different systems, and without

11:09:24  22  seeing it, I'm sorry, I can't tell you with certainty if

11:09:28  23  that was -- which system it was through, if it was for ASU

11:09:31  24  or if it was for the clinical sites.

11:09:34  25      Q.   What time frame are you talking about when you

11:09:37    1   say "it was required in our documents to remain

11:09:40    2   compliant"?

11:09:41    3       A.   I don't know.  I'm sorry.

11:09:42    4       Q.   Well, is that something you had to submit when

11:09:47    5   you were returning to your classes after your leave of

11:09:50    6   absence?

11:09:51    7       A.   After I was out for a year?

11:09:55    8       Q.   Correct.

11:09:56    9       A.   I believe so.

11:09:58   10       Q.   Do you recall whether you needed to upload that

11:10:01   11   information prior to taking that leave of absence?

11:10:04   12       A.   I don't recall.

11:10:06   13       Q.   Now, you say it was required in the documents.

11:10:12   14   Did something say you were required to be vaccinated

11:10:16   15   against the COVID-19 virus?

11:10:20   16       A.   I can't recall exactly what the program says, but

11:10:24   17   it's got big bright red letters if you're not in

11:10:29   18   compliance to indicate that you're not in compliance with

11:10:32   19   a requirement set forth by that program that the college

11:10:39   20   uses.

11:10:39   21       Q.   What do you mean when you say "program"?  Are you

11:10:42   22   talking about a computer program?

11:10:43   23       A.   So they use -- it's like a third-party company to

11:10:47   24   ensure that students are in compliance with requirements

11:10:51   25   for vaccinations and stuff and documents like fingerprint

11:10:55   1   clearance cards.  And this particular -- there's two

11:11:00   2   programs.  One is My Clinical Exchange, and I can't think

11:11:05   3   of the name of the other one off the top of my head.

11:11:08   4       Q.   And is My Clinical Exchange the program that's

11:11:12   5   used to interface with the specific clinical facilities

11:11:15   6   that you go to?

11:11:17   7       A.   That's for all the clinicals.  So that is where

11:11:20   8   they handle all of the compliance.  And I'm sorry, I don't

11:11:26   9   even know why I'm spacing out on the other program.

11:11:29  10       Q.   The other program is the one that's used for ASU

11:11:33  11   and the Edson College?  Did I understand that correctly?

11:11:36  12       A.   So I think so.  But behind the scenes, I'm not

11:11:41  13   really sure who uses what for what specific purposes.  So

11:11:46  14   I don't know for sure who uses what information.  I just

11:11:51  15   know that we're told we have to upload and keep current

11:11:54  16   the requirements in both programs.

11:11:57  17       Q.   Isn't it true, though, with respect to the COVID

11:12:00  18   vaccine, you can select either "I am vaccinated" and

11:12:05  19   provide proof of your vaccination or you can decline to be

11:12:09  20   vaccinated and indicate that or you can indicate that you

11:12:12  21   received an exemption from the vaccination and you can

11:12:15  22   provide that as well?

11:12:17  23            MR. ENGLAND:  Objection.  Vague as to time

11:12:18  24   and to which program.

11:12:21  25            THE WITNESS:  I don't remember without

11:12:22  1  seeing it.  I'm sorry.

11:12:23  2  BY MS. WINDTBERG:

11:12:23  3      Q.  Have you received a document from the Student

11:12:30  4  Accessibility and Inclusive Learning Services office to

11:12:31  5  provide you an exemption from getting the COVID-19

11:12:34  6  vaccine?

11:12:35  7      A.  I believe that I did after providing them with

11:12:41  8  information from my medical providers, but I'm not a

11:12:45  9  hundred percent because I haven't seen that, so -- I think

11:12:47  10  so, though.

11:12:48  11      Q.  Has ASU required you to get a second or third or

11:12:52  12  fourth shot of the COVID-19 vaccine?

11:12:54  13      A.  On the program, it did expect for me to upload

11:13:03  14  boosters and -- a second vaccine and then boosters.

11:13:09  15      Q.  That wasn't my question.

11:13:10  16          Has the university required you to in fact

11:13:13  17  receive any additional shots of the COVID-19 vaccine?

11:13:16  18      A.  Not directly.

11:13:18  19      Q.  What do you mean by "not directly"?

11:13:21  20      A.  So, like, when I said that I wasn't sure behind

11:13:24  21  the scenes what was being used by which entity, whether it

11:13:27  22  was ASU or the clinical sites, I'm not sure if that was a

11:13:33  23  requirement from ASU or not.

11:13:36  24      Q.  Have you received more than one shot of the

11:13:38  25  COVID-19 vaccine?

| | | |
|---|---|---|
| 11:13:39 | 1 | A.    No. |
| 11:13:40 | 2 | Q.    And so you've not in fact been required to get |
| 11:13:42 | 3 | more than one shot of the vaccine, correct? |
| 11:13:44 | 4 | A.    Correct. |
| 11:13:45 | 5 | Q.    And you have a difference of opinion about |
| 11:13:49 | 6 | whether you were required to get the first shot.  But |
| 11:13:52 | 7 | focusing on the requirement to get the vaccine, Edson |
| 11:14:01 | 8 | College and ASU have provided you a process by which you |
| 11:14:05 | 9 | can become exempted from receiving the COVID vaccine, |
| | 10 | correct?  Or any -- |
| 11:14:10 | 11 | A.    Yes. |
| 11:14:10 | 12 | Q.    -- further shots of that vaccine? |
| 11:14:13 | 13 | A.    Yes. |
| 11:14:14 | 14 | Q.    And did not require -- require you to in fact get |
| 11:14:18 | 15 | any shots? |
| 11:14:18 | 16 | A.    Correct. |
| 11:14:20 | 17 | Q.    I'll hand you what we will mark as Exhibit |
| 11:14:33 | 18 | Number 10 to your deposition.  It is marked with Bates |
| 11:14:40 | 19 | Number ADOR 9. |
| | 20 |            (Deposition Exhibit 10 was marked for |
| 11:15:03 | 21 |            identification.) |
| 11:15:03 | 22 | BY MS. WINDTBERG: |
| 11:15:04 | 23 | Q.    Do you recognize Exhibit Number 10? |
| 11:15:08 | 24 | A.    Do you mind if I read it real quick -- |
| | 25 | Q.    Not at all. |

| | | |
|---|---|---|
| 11:15:10 | 1 | A.    -- because I don't just by glancing at it. |
| 11:15:40 | 2 |            Okay.  I read it. |
| 11:15:41 | 3 | Q.    Do you recognize Exhibit Number 10? |
| 11:15:43 | 4 | A.    Not specifically. |
| 11:15:47 | 5 | Q.    Do you generally recognize it? |
| 11:15:54 | 6 |            MR. ENGLAND:  Let me just object that |
| 11:16:00 | 7 | there's two emails.  The first one she's not on, so I'm |
| 11:16:04 | 8 | assuming you're asking her if she received the middle |
| 11:16:06 | 9 | email. |
| 11:16:07 | 10 |            MS. WINDTBERG:  I was going to get to that. |
| | 11 |            MR. ENGLAND:  Okay.  Sorry. |
| 11:16:08 | 12 |            MS. WINDTBERG:  I'm just generally asking. |
| 11:16:13 | 13 | She said she didn't specifically remember seeing this. |
| 11:16:13 | 14 | That was a characterization.  I wanted to understand if |
| 11:16:16 | 15 | she generally remembers receiving this. |
| 11:16:19 | 16 |            THE WITNESS:  I'm not denying that I |
| 11:16:22 | 17 | received it, but I don't remember it.  I get so many |
| 11:16:25 | 18 | emails and some --  I just don't specifically remember |
| 11:16:28 | 19 | this one.  Sorry. |
| 11:16:31 | 20 | BY MS. WINDTBERG: |
| 11:16:32 | 21 | Q.    But you don't have any reason to think you did |
| 11:16:34 | 22 | not receive -- |
| | 23 | A.    No -- |
| 11:16:35 | 24 | Q.    -- this email? |
| 11:16:35 | 25 | A.    -- I don't. |

| | | |
|---|---|---|
| 11:16:36 | 1 | Q.   And this is a December 30th, 2020, email, and |
| 11:16:40 | 2 | it's addressed to Edson College prelicensure program |
| 11:16:44 | 3 | students.  Do you see that? |
| 11:16:45 | 4 | A.   Yes. |
| 11:16:46 | 5 | Q.   And the MEPN program is a prelicensure program, |
| 11:16:48 | 6 | correct? |
| 11:16:49 | 7 | A.   Yes. |
| 11:16:49 | 8 | Q.   If you look at the last full paragraph at the |
| 11:16:53 | 9 | bottom of the page in that bottom email, it says, "At this |
| 11:16:57 | 10 | time, it is not required that Edson College PreLicensure |
| 11:17:01 | 11 | students obtain the vaccine as part of" a clinical -- "of |
| 11:17:07 | 12 | clinical compliance."  Did I read that correctly? |
| 11:17:11 | 13 | A.   Yes. |
| 11:17:11 | 14 | Q.   And so as of December 30th, Edson College was |
| 11:17:15 | 15 | telling the prelicensure students that they were not |
| 11:17:18 | 16 | required to obtain the vaccine per clinical compliance, |
| 11:17:22 | 17 | correct? |
| 11:17:22 | 18 | MR. ENGLAND:  Objection.  Assumes facts. |
| 11:17:24 | 19 | You can answer. |
| 11:17:25 | 20 | THE WITNESS:  Yes. |
| 11:17:26 | 21 | BY MS. WINDTBERG: |
| 11:17:39 | 22 | Q.   Are you familiar with ASU's Student Accessibility |
| 11:17:46 | 23 | and Inclusive Learning Services office? |
| 11:17:46 | 24 | A.   Yes. |
| 11:17:46 | 25 | Q.   That office is often referred to as the SAILS |

| | | |
|---|---|---|
| 11:17:50 | 1 | office, correct? |
| 11:17:51 | 2 | A.   Yes. |
| 11:17:51 | 3 | Q.   And so if I refer to the Student Accessibility |
| 11:17:54 | 4 | and Inclusive Learning Services office as "SAILS," you'll |
| 11:17:57 | 5 | know what I mean? |
| 11:17:58 | 6 | A.   Yes. |
| 11:17:58 | 7 | Q.   What is your understanding of the function of the |
| 11:18:01 | 8 | SAILS office? |
| 11:18:01 | 9 | A.   My understanding is that it's essentially the |
| 11:18:04 | 10 | disability department of the university and they handle |
| 11:18:09 | 11 | accommodations for students who might need extra help from |
| 11:18:14 | 12 | a disability or condition. |
| 11:18:16 | 13 | Q.   You're currently registered with SAILS, correct? |
| 11:18:20 | 14 | A.   Yes. |
| 11:18:20 | 15 | Q.   When did you first register with SAILS? |
| 11:18:23 | 16 | A.   I don't have the date.  I'm sorry. |
| 11:18:24 | 17 | Q.   Do you roughly remember what semester it was? |
| 11:18:27 | 18 | A.   I don't. |
| 11:18:28 | 19 | MR. ENGLAND:  Kristin, I don't mean to |
| 11:18:40 | 20 | interrupt.  I thought you were staying on the same topic. |
| 11:18:45 | 21 | If you're switching, can we take a short five-minute |
| 11:18:47 | 22 | break?  We've been -- |
| 11:18:47 | 23 | MS. WINDTBERG:  Sure. |
| | 24 | MR. ENGLAND:  -- going another hour. |
| 11:18:48 | 25 | MS. WINDTBERG:  Sure. |

| | | |
|---|---|---|
| 11:18:48 | 1 | THE VIDEOGRAPHER:  We are off the record. |
| 11:18:49 | 2 | Time on the video monitor is 11:18 a.m.  This ends |
| 11:18:56 | 3 | Media 1. |
| 11:18:57 | 4 | (A recess ensued.) |
| 11:38:27 | 5 | THE VIDEOGRAPHER:  We are on the record. |
| 11:38:28 | 6 | The time on the video monitor is 11:38 a.m.  This begins |
| 11:38:32 | 7 | Media 2. |
| | 8 | (Deposition Exhibit 11 was marked for |
| 11:38:33 | 9 | identification.) |
| 11:38:33 | 10 | BY MS. WINDTBERG: |
| 11:38:34 | 11 | Q.    Okay.  Ms. Do, I'm going to give you what we have |
| 11:38:37 | 12 | marked as Exhibit Number 11 to your deposition.  It's |
| 11:38:41 | 13 | branded with Bates Numbers ADOR 9721 through ADOR 9726. |
| 11:38:57 | 14 | Shortly before we took our break, I asked if |
| 11:39:00 | 15 | you recalled when you registered with the SAILS office and |
| 11:39:03 | 16 | you said you didn't know. |
| 11:39:04 | 17 | Do you recognize Exhibit Number 11? |
| 11:39:15 | 18 | A.    No. |
| 11:39:15 | 19 | Q.    Do you recall, when you registered with the SAILS |
| 11:39:17 | 20 | office, how you registered with them? |
| 11:39:18 | 21 | A.    It was through their website. |
| 11:39:20 | 22 | Q.    And you input information into their website to |
| 11:39:24 | 23 | complete that registration? |
| 11:39:25 | 24 | A.    Yes. |
| 11:39:25 | 25 | Q.    If you look at the information that's included in |

| | | |
|---|---|---|
| 11:39:27 | 1 | Exhibit Number 11, does it look like the type of |
| 11:39:32 | 2 | information you input into that SAILS application? |
| 11:39:35 | 3 | A.   Yes. |
| 11:39:35 | 4 | Q.   I will represent to you that this is a printout |
| 11:39:40 | 5 | from the SAILS system of your application.  That sounds |
| 11:39:44 | 6 | right to you looking at the material -- |
| | 7 | A.   Yes. |
| 11:39:47 | 8 | Q.   -- in this document? |
| 11:39:48 | 9 | And so if you look at the first page of |
| 11:39:50 | 10 | Exhibit Number 11, it shows that you had an appointment |
| 11:39:56 | 11 | scheduled for March 15th of 2021.  Do you see that under |
| 11:40:00 | 12 | lists of appointments entered? |
| 11:40:02 | 13 | A.   Yes. |
| 11:40:03 | 14 | Q.   And if you flip to the second page of Exhibit 11, |
| 11:40:10 | 15 | you'll see there are some black boxes.  One says "File |
| 11:40:15 | 16 | Title."  One says "Date Uploaded."  One says "Size," then |
| 11:40:18 | 17 | "Download" and "Delete."  Do you see that? |
| 11:40:21 | 18 | A.   Yes. |
| 11:40:21 | 19 | Q.   And right under that box that says "File Title," |
| 11:40:25 | 20 | you see where it says "Physician note indicated -- |
| 11:40:28 | 21 | indicating needed accommodations"? |
| 11:40:31 | 22 | A.   Yes. |
| 11:40:31 | 23 | Q.   And then next to that there is a date of upload |
| 11:40:34 | 24 | of March 1st of 2021.  Do you see that? |
| 11:40:37 | 25 | A.   Yes. |

11:40:37   1      Q.    Does March 1st of 2021 sound like it's around the

11:40:43   2   right time that you would have registered with the SAILS

11:40:46   3   office?

11:40:46   4      A.    Most likely.

11:40:47   5      Q.    And that would have been during the spring of

11:40:50   6   2021 semester, correct?

11:40:54   7      A.    I believe so.

11:40:54   8      Q.    What was the medical condition that you had in

11:41:00   9   March of 2021 that prompted you to register with the SAILS

11:41:04  10   office?

11:41:04  11      A.    Do you mind if I look through this?

11:41:17  12      Q.    I do not.

11:41:18  13      A.    Okay.   Thanks.

11:42:28  14            Okay.   Do you mind reading your question

11:42:31  15   again --

          16      Q.    Sure.

11:42:31  17      A.    -- please?

11:42:32  18      Q.    Let me ask it differently.

11:42:33  19            Why did you register with the SAILS office?

11:42:35  20      A.    To hopefully get a little bit of assistance with

11:42:42  21   some struggles that I had so I could make it through the

11:42:47  22   program.

11:42:47  23      Q.    What were the struggles you were having?

11:42:51  24      A.    Well, my arrhythmia.

11:43:03  25      Q.    Anything else?

| | | |
|---|---|---|
| 11:43:04 | 1 | A.    I don't believe so. |
| 11:43:20 | 2 | Q.    So at the time you registered with SAILS, you |
| 11:43:26 | 3 | reported that you had arrhythmia, correct? |
| 11:43:29 | 4 | A.    Yes. |
| 11:43:29 | 5 | Q.    And if you look at the page that is marked |
| 11:43:36 | 6 | ABOR 9724 in Exhibit Number 11, you see at the top of the |
| 11:43:44 | 7 | page it says "Additional Information"? |
| 11:43:47 | 8 | A.    Yes. |
| 11:43:47 | 9 | Q.    And it says "Primary Disability:  Heart Disease." |
| 11:43:51 | 10 | A.    Yes. |
| 11:43:51 | 11 | Q.    Is that information you would have input into the |
| 11:43:55 | 12 | system? |
| 11:43:55 | 13 | A.    Through their drop-down arrow, yes. |
| 11:43:58 | 14 | Q.    So you selected "Heart Disease" from an option of |
| 11:44:01 | 15 | a variety of different types of conditions? |
| 11:44:04 | 16 | A.    Yes. |
| 11:44:04 | 17 | Q.    And then there are no other disabilities listed, |
| 11:44:07 | 18 | correct? |
| 11:44:07 | 19 | A.    Correct. |
| 11:44:09 | 20 | Q.    In March of 2021 when you registered with SAILS, |
| 11:44:15 | 21 | what were the symptoms that you were experiencing? |
| 11:44:17 | 22 | A.    Arrhythmia. |
| 11:44:21 | 23 | Q.    And I think you said this before, but that's an |
| 11:44:29 | 24 | irregular heartbeat? |
| 11:44:30 | 25 | A.    Yes. |

11:44:30   1      Q.   Any other symptoms?

11:44:31   2      A.   Are you --  I'm sorry.  Do you mind repeating

11:44:39   3   your original question?

11:44:40   4      Q.   Yeah.  I asked, in March of 2021 when you

11:44:43   5   registered with SAILS, what symptoms you were

11:44:46   6   experiencing.

11:44:46   7      A.   I had the arrhythmia and anxiety.

11:44:52   8      Q.   You were experiencing anxiety in March of 2021?

11:44:56   9      A.   Yes.

11:44:56   10      Q.   But you didn't report that on your SAILS

11:45:01   11   application, correct?

11:45:02   12      A.   Correct.

11:45:02   13      Q.   When you say that you were experiencing

11:45:05   14   arrhythmia, can you describe for us what that felt like?

11:45:09   15      A.   Are you asking -- like, can you tell me what

11:45:17   16   you're asking?  Like, how does it feel regarding --

11:45:19   17      Q.   I just want to understand what you were

11:45:21   18   experiencing at the time when you first registered with

11:45:23   19   the SAILS office.  You've said arrhythmia is an irregular

11:45:29   20   heartbeat, but what was that experience like for you?

11:45:31   21      A.   Are you asking physically or emotionally?

11:45:34   22      Q.   Let's start with physically.

11:45:36   23      A.   Okay.  It feels like -- I get light-headed.  I

11:45:45   24   feel panicked.  It feels like there's a really heavy

11:45:58   25   fluttering sensation in my chest.  I can get chest pain

11:46:05   1  depending on how long it's been sustained.  I can have,

11:46:15   2  like, numbness or temperature changes in my extremities,

11:46:20   3  specifically, like, my hands and feet.  I can get really

11:46:28   4  nauseated and -- like, overall -- like, my stomach will

11:46:38   5  start to feel really upset from the fluttering.

11:46:42   6      Q.   Anything else?

11:46:44   7      A.   No, I don't think so.

           8      Q.   I just want --

11:46:47   9      A.   That covers it.

11:46:48  10      Q.   -- to make sure.  So that I'm clear, I was asking

11:46:51  11  about the symptoms you were experiencing back in March of

11:46:55  12  2021.  Is that what you were describing for me?

11:46:58  13      A.   Yes.

11:46:58  14      Q.   You said you also have -- you were focused on the

11:47:03  15  emotional experience.  What is the emotional experience

11:47:06  16  for you when you're experiencing arrhythmia?

11:47:09  17      A.   Terror, fear, embarrassment, weakness.  I don't

11:47:40  18  know.  I guess stuff like that.

11:47:43  19      Q.   When you're experiencing the arrhythmia, what is

11:47:47  20  it that you're afraid of?

11:47:49  21      A.   Dying, failure, letting people down.  That's

11:48:12  22  about it.

11:48:12  23      Q.   I just want to make sure that I have a general

11:48:22  24  understanding of your heart condition.  And I know that

11:48:26  25  there are lots of different terms that can be used for it,

11:48:30  1  so bear with me.  I'm not a medical professional.

11:48:35  2            But you've alleged in your lawsuits that you

11:48:38  3  suffer from episodic cardiac arrhythmia, often inclusive

11:48:43  4  of tachycardic ventricular bigeminy.  Is that accurate?

11:48:50  5     A.   Yes.

11:48:51  6     Q.   For those of us who are not medical

11:48:54  7  professionals, can you explain what that means?

11:48:55  8     A.   Yeah.  So episodic just means that it can happen

11:48:59  9  whenever.  There could be precursors to it or not.  And,

11:49:07  10  like, sustained ventricular tachycardia -- or premature

11:49:14  11  ventricular contraction -- sorry.  Do you have that

11:49:17  12  written down somewhere so I can just look at it and

11:49:19  13  explain every step of it?  Or am I allowed to write it

11:49:23  14  down the way it's written just so I can explain it

11:49:26  15  exactly?

11:49:28  16     Q.   Yeah.  Let me -- let me give you what we'll mark

11:49:44  17  as Exhibit Number 12 to your deposition.  Exhibit

11:49:50  18  Number 12 is not Bates-numbered.

          19            (Deposition Exhibit 12 was marked for

          20            identification.)

          21  BY MS. WINDTBERG:

11:50:09  22     Q.   Do recognize Exhibit 12?

11:50:10  23     A.   Yes.

11:50:11  24     Q.   What is it?

11:50:12  25     A.   It's a court document.

11:50:20  1      Q.   This is the First Amended Complaint that was

11:50:24  2  filed in the United States District Court for the District

11:50:27  3  of Arizona on your behalf, correct?

11:50:28  4      A.   Yes.

11:50:29  5      Q.   Initiating the federal lawsuit that you've

11:50:32  6  brought against the defendants?

11:50:33  7      A.   Yes.

11:50:33  8      Q.   If you would turn to page 10 of Exhibit Number 12

11:50:41  9  and look at paragraph number 30.  Partway -- Let's see.

11:50:49  10  The second sentence of that paragraph says, "As a direct

11:50:54  11  result of the vaccine, Do suffers serious episodic cardiac

11:51:01  12  arrhythmia, often inclusive of tachycardic ventricular

11:51:06  13  bigeminy."  Is that helpful in you answering my question

11:51:09  14  about what that means?

11:51:10  15      A.   Yes.  So bigeminy is where you have one normal

11:51:22  16  heartbeat followed by an abnormal heartbeat.  And if it's

11:51:28  17  sustained, it means it continues to go on.  Nonsustained

11:51:34  18  or unsustained is where it just happens maybe a couple of

11:51:37  19  times and then stops.

11:51:42  20           So the episodic just means, like I said, it

11:51:44  21  happens whenever.  The arrhythmia is the premature

11:51:50  22  ventricular contractions.  And then the tachycardiac

11:51:57  23  ventricular bigeminy -- the word "premature" should have

11:52:01  24  been in there, I believe, but its overall meaning is

11:52:07  25  essentially the same.  There is a ventricular arrhythmia.

11:52:09   1    It originates in the ventricles of my heart.  And

11:52:16   2    tachycardia is when your heart rate goes into an

11:52:19   3    abnormally fast speed, which is medically considered a

11:52:24   4    hundred beats or faster.

11:52:26   5        Q.   So I'm going to try to rephrase, and you can tell

11:52:36   6    me if you agree or disagree with what I'm saying.

11:52:39   7             But what I'm understanding you to be saying

11:52:41   8    is that you will periodically have an irregular heartbeat

11:52:48   9    that consists of a pattern where you have a regular beat,

11:52:51  10    then an abnormal beat, and that sometimes that is very

11:52:56  11    rapid and it comes from the ventricles in your heart.

11:52:59  12        A.   Yes.

11:52:59  13        Q.   At the time you submitted your SAILS application

11:53:07  14    to the SAILS office, how was your arrhythmia impacting you

11:53:13  15    at school?

11:53:13  16        A.   We're back to this Exhibit 11, right?  Kind of?

11:53:23  17        Q.   Well, I'm just asking about the time that you --

11:53:25  18    at the time you registered with SAILS, how was your

11:53:30  19    arrhythmia impacting you at school?

11:53:32  20        A.   So at this time, I was doing overnight clinicals

11:53:52  21    and having a disruption of sleep was causing them to be

11:53:56  22    worse -- my arrhythmia.  And my doctor had told me that I

11:54:03  23    should stick to a normal sleep pattern, which included

11:54:09  24    doing daytime clinicals.

11:54:17  25             Have I answered that or not really?

| | | |
|---|---|---|
| 11:54:19 | 1 | Q.    Not exactly the question that I asked. |
| | 2 | A.    Okay. |
| 11:54:20 | 3 | Q.    What I want to understand is how was your medical |
| 11:54:23 | 4 | condition impacting your ability to perform in the MEPN |
| 11:54:27 | 5 | program? |
| 11:54:29 | 6 | A.    Well, in the MEPN program, we were required to do |
| 11:54:31 | 7 | the clinicals, and my medical condition was affecting that |
| 11:54:39 | 8 | because if I was in arrhythmia, I wasn't really in a place |
| 11:54:50 | 9 | where it was a good idea to be taking care of patients or |
| 11:54:56 | 10 | attending clinicals. |
| 11:54:59 | 11 | Q.    What do you mean when you say you weren't in a |
| 11:55:02 | 12 | place that it was a good idea for you to be taking care of |
| 11:55:05 | 13 | patients? |
| 11:55:06 | 14 | A.    Physically.  If I'm in arrhythmia and I'm feeling |
| 11:55:13 | 15 | light-headed, taking care of another person who's relying |
| 11:55:19 | 16 | on me for my strength and ability to do what I need to do |
| 11:55:24 | 17 | for them isn't a good idea. |
| 11:55:28 | 18 | Q.    Was it unsafe for you to be providing that care |
| 11:55:35 | 19 | to other people when you were in arrhythmia? |
| 11:55:37 | 20 | MR. ENGLAND:  Objection.  Vague. |
| 11:55:38 | 21 | You can answer. |
| 11:55:39 | 22 | THE WITNESS:  That would depend on how |
| 11:55:43 | 23 | severe my arrhythmia would be at any given time.  I would |
| 11:55:49 | 24 | never ever knowingly put a patient at risk just so I could |
| 11:55:57 | 25 | finish a clinical.  If I felt unsafe, I would recognize |

| | | |
|---|---|---|
| 12:04:15 | 1 | Number 13 to your deposition. |
| | 2 | (Deposition Exhibit 13 was marked for |
| 12:04:28 | 3 | identification.) |
| 12:04:28 | 4 | BY MS. WINDTBERG: |
| 12:04:28 | 5 | Q.   Exhibit 13 is marked with Bates Numbers ABOR 237. |
| 12:04:35 | 6 | Does this look like the doctor's note you |
| 12:04:37 | 7 | would have submitted in support of your request to have |
| 12:04:39 | 8 | daytime clinical shifts -- |
| 12:04:40 | 9 | A.   Yes. |
| 12:04:41 | 10 | Q.   -- in March of 2021? |
| 12:04:43 | 11 | A.   Yes. |
| 12:04:43 | 12 | Q.   And this letter is dated February 11th of 2021, |
| | 13 | correct? |
| 12:04:47 | 14 | A.   Yes. |
| 12:04:47 | 15 | Q.   It's signed by Dr. El Khoury? |
| 12:04:51 | 16 | A.   Yes. |
| 12:04:55 | 17 | Q.   It indicates that it is advisable that you |
| 12:04:58 | 18 | maintain a consistent sleep schedule and work during |
| 12:05:01 | 19 | daytime hours, correct? |
| 12:05:02 | 20 | A.   Yes. |
| 12:05:03 | 21 | Q.   It does not ask for any other accommodations or |
| 12:05:05 | 22 | modifications to your program at that time, correct? |
| 12:05:08 | 23 | A.   Correct. |
| 12:05:17 | 24 | MS. WINDTBERG:   Let's go ahead and take a |
| 12:05:19 | 25 | break.  Lunch is here. |

13:06:54   1        Q.   And then if you turn to the next page of

13:06:56   2   Exhibit 14, this is a Statement of Health Clearance Form

13:07:00   3   from another one of your providers, correct?

13:07:02   4        A.   Yes.

13:07:02   5        Q.   And that's Dr. Lau.  Is that correct?

13:07:06   6        A.   Yes.

13:07:06   7        Q.   And Dr. Lau indicates on this form that you need

13:07:09   8   to be in daytime clinical hours so that you can have

13:07:13   9   regular sleep and work.  Do you see that?

13:07:15  10        A.   Yes.

13:07:17  11        Q.   And it appears to me that she attaches the same

13:07:21  12   letter -- I'm sorry, not the same letter -- but the letter

13:07:23  13   from Dr. El Khoury that you submitted with your SAILS

13:07:26  14   application back in March of 2021.  Do you see that?

13:07:31  15        A.   Yes.

13:07:32  16        Q.   Again, there's nothing indicating that you have

13:07:34  17   any other limitations on your ability to participate in

13:07:37  18   the MEPN program by Dr. Lau, correct?

13:07:40  19        A.   On this document, correct.

13:07:41  20        Q.   We've been talking about the spring of 2021.  I

13:07:50  21   want to transition into the summer of 2021.  You took

13:07:53  22   courses during the summer in 2021, correct?

13:07:57  23        A.   Yes.

13:07:57  24        Q.   And by June of 2021, was your heart condition

13:08:08  25   worsening?

| | | |
|---|---|---|
| 13:08:09 | 1 | A.   Yes. |
| 13:08:09 | 2 | Q.   How so? |
| 13:08:11 | 3 | A.   I was having more frequent attacks of arrhythmia. |
| 13:08:18 | 4 | They were lasting longer.  Just symptomatically-wise it |
| 13:08:25 | 5 | was worse. |
| 13:08:26 | 6 | Q.   How frequently would you say you were having |
| 13:08:29 | 7 | attacks of your arrhythmia? |
| 13:08:31 | 8 | A.   I don't have dates or times indicated, but I know |
| 13:08:37 | 9 | that it got so severe there were days that I was in bed |
| 13:08:40 | 10 | without being able to get out for three days at a time. |
| 13:08:44 | 11 | Q.   As a result of that, were you missing classes? |
| 13:08:47 | 12 | A.   I don't recall if I ever missed a class.  I |
| 13:08:52 | 13 | didn't ever not turn in work, though.  I know that. |
| 13:08:56 | 14 | Q.   Would it be fair to say that in June of 2021, |
| 13:09:01 | 15 | your condition was such that you were nearly incapacitated |
| 13:09:05 | 16 | by it? |
| 13:09:05 | 17 | MR. ENGLAND:  Objection.  Vague.  Calls for |
| 13:09:07 | 18 | a legal conclusion. |
| 13:09:09 | 19 | You can answer, Sara. |
| 13:09:10 | 20 | THE WITNESS:  It certainly felt that way. |
| 13:09:12 | 21 | BY MS. WINDTBERG: |
| 13:09:15 | 22 | Q.   And were you sharing how you were feeling with |
| 13:09:17 | 23 | your various instructors of your courses? |
| 13:09:20 | 24 | A.   I don't recall how -- the extent that I may have |
| 13:09:23 | 25 | shared anything with them. |

13:09:24   1      Q.   You took NUR 478 the first time during the summer

13:09:37   2   of 2021, correct?

           3      A.   Yes.

13:09:42   4      Q.   And who was your course coordinator when you took

13:09:44   5   it in the summer of 2021?

13:09:48   6      A.   I can't recall.  I know that my faculty of record

13:09:54   7   was Professor Candace -- not Candace Keck -- it was

13:09:58   8   Katelin Keown, and that's who I interacted with most of

13:10:03   9   the time.  But I believe she had somebody over her that

13:10:06  10   was over the entire class, and I'm not sure who that

13:10:09  11   person was.

13:10:14  12      Q.   What is your understanding of the objectives of

13:10:18  13   the nursing practice complex care course, NUR 478?

13:10:23  14      A.   That is the clinical portion of complex care,

13:10:29  15   which at the time was being referred to as critical care

13:10:32  16   clinicals.

13:10:35  17      Q.   And what are the objectives of that clinical

13:10:38  18   course?

13:10:38  19      A.   We're supposed to get some clinical hours in and

13:10:43  20   have that experience for clinicals for that particular

13:10:47  21   class.  There is a separate didactic course for complex

13:10:52  22   care, critical care.

13:10:54  23      Q.   And what is your understanding of what complex

13:10:57  24   care means?

13:10:58  25      A.   It's adult care, so it's nonpediatric.  And there

13:11:06    1    are a variety of departments in a hospital that would --

13:11:14    2    that would cover the requirements for what a complex care

13:11:19    3    case would look like.

13:11:20    4        Q.    And what is your understanding of what a complex

13:11:27    5    case would be?

13:11:28    6        A.    It could be really anything that would require a

13:11:35    7    higher acuity of care for a patient that is hospitalized

13:11:42    8    for some reason.

13:11:46    9        Q.    You said that this was the clinical portion of

13:11:49    10   the complex care course.  Do you recall how many clinical

13:11:56    11   hours you were required to complete as part of NUR 478

13:12:00    12   during the summer of 2021?

13:12:02    13       A.    I do not.

13:12:02    14       Q.    Do you recall how many days you were scheduled to

13:12:07    15   be in clinical shifts during that course?

13:12:10    16       A.    It was six.

13:12:16    17       Q.    And where were you scheduled to complete your

13:12:21    18   clinical courses?

13:12:22    19       A.    Originally, I was scheduled at Banner Gateway in

13:12:27    20   Mesa.

13:12:27    21       Q.    And why do you say originally?

13:12:32    22       A.    That was just the original class that I had, and

13:12:39    23   that was before I was put anywhere else for any makeup

13:12:45    24   clinicals.

13:12:45    25       Q.    For the actual class, apart from makeup

13:12:48   1   clinicals, did you complete all of the clinical hours you

13:12:52   2   completed at Banner Gateway?

13:12:53   3       A.    Prior to needing to make any up?  Yes.

13:12:57   4       Q.    And were the clinical shifts that you completed

13:13:00   5   at Banner Gateway daytime shifts?

13:13:03   6       A.    Yes.

13:13:04   7       Q.    Now, during the course of NUR 478, you missed

13:13:14   8   some of your clinical shifts, correct?

13:13:15   9       A.    Yes.

13:13:16  10       Q.    And you missed shifts on July 9th and 10th of

13:13:23  11   2021.  Does that ring a bell?

13:13:25  12       A.    Yes.

13:13:25  13       Q.    As a result of missing those -- those two days of

13:13:30  14   clinical shifts, you needed to make up certain hours and

13:13:33  15   competencies, correct?

13:13:34  16       A.    Correct.

13:13:35  17       Q.    And am I also correct that it was around this

13:13:38  18   same time that you were informed that you would no longer

13:13:42  19   be able to make up missed clinical hours with alternative

13:13:45  20   written assignments?

13:13:47  21              MR. ENGLAND:  Objection.  Vague.

13:13:48  22              You can answer.

13:13:50  23              THE WITNESS:  I'm not sure of the dates.

13:13:53  24   BY MS. WINDTBERG:

13:13:54  25       Q.    At some point, though, during the summer of 2021,

| | | |
|---|---|---|
| 13:13:56 | 1 | were you told that you would no longer be allowed to make |
| 13:13:59 | 2 | up missed clinical hours with alternative written |
| 13:14:02 | 3 | assignments? |
| 13:14:02 | 4 | A.   Yes. |
| 13:14:03 | 5 | Q.   And do you recall receiving an email from |
| 13:14:10 | 6 | Katherine Benedict explaining that going forward, if you |
| 13:14:15 | 7 | missed any further clinical hours, you would need to make |
| 13:14:17 | 8 | up those clinical hours in person? |
| 13:14:19 | 9 | A.   It sounds familiar.  Do you have -- do you have a |
| 13:14:24 | 10 | printout maybe? |
| 13:14:26 | 11 | Q.   It so happens I do. |
| 13:14:28 | 12 | A.   Okay.  Great.  Thank you. |
| 13:14:29 | 13 | Q.   Eventually. |
| 13:15:08 | 14 | I'll come back to that in a minute. |
| 13:15:12 | 15 | Do you recall having a meeting around the |
| 13:15:15 | 16 | time you missed the two clinical days on July 9th and 10th |
| 13:15:20 | 17 | of 2021 with Ms. Benedict and Dr. Bednarek about how you |
| 13:15:26 | 18 | would move forward in NUR 478 after having missed those |
| 13:15:32 | 19 | courses -- or those clinicals?  Excuse me. |
| 13:15:34 | 20 | A.   I remember meeting with Dr. Bednarek.  We had so |
| 13:15:38 | 21 | many different meetings, though, I can't recall |
| 13:15:40 | 22 | specifically if Katherine was there or not, but she |
| 13:15:42 | 23 | probably was.  She was there for a couple of them. |
| 13:15:48 | 24 | Q.   Okay.  And do you recall if you made a video |
| 13:15:51 | 25 | recording of that meeting on your cell phone? |

13:15:54   1      A.    That particular one, I'm not sure if I did or not

13:16:02   2   because, like I said, there were multiple meetings.

13:16:06   3      Q.    You recorded several meetings that you had with

13:16:08   4   Edson staff members, though, on your cell phone, correct?

13:16:12   5      A.    Correct.

13:16:12   6      Q.    And you produced those video recordings in the

13:16:15   7   context of your lawsuits, correct?

13:16:19   8      A.    Yes.

13:16:19   9      Q.    And so if we wanted to know what was said during

13:16:22   10   one of those conversations, we could review that video?

13:16:25   11      A.    Yes.

13:16:25   12      Q.    Now, during -- during your meeting with

13:16:36   13   Dr. Bednarek on July 9th, did you also discuss the idea

13:16:40   14   that on a forward-looking basis you would not be able to

13:16:44   15   make up missed clinical hours with written assignments?

13:16:48   16      A.    Yes.

13:16:49   17      Q.    Following that meeting, did Professor Keck assign

13:16:55   18   you some written assignments to make up missed clinical

13:16:58   19   hours?

13:16:58   20      A.    Yes.

13:16:59   21      Q.    And do you recall when you received those

13:17:01   22   assignments from Professor Keck?

13:17:03   23      A.    I don't know the date.  I'm sorry.

13:17:05   24      Q.    And just to go back because I think you said you

13:17:08   25   couldn't recall, does it refresh your recollection if I

13:17:11  1  were to tell you that Professor Keck was your course

13:17:14  2  coordinator for NUR 478?

13:17:16  3      A.   Yes.

13:17:17  4      Q.   And so I think you said that Kate Keown was your

13:17:24  5  faculty of record and then there was also a course

13:17:26  6  coordinator, correct?

13:17:28  7      A.   Yes.

13:17:28  8      Q.   And that would have been Candace Keck?

13:17:30  9      A.   Yes.

13:17:32 10      Q.   When you got the written assignments from

13:17:35 11  Professor Keck, did you reach out to her to ask anything

13:17:39 12  about, you know, whether those would be allowed having

13:17:42 13  been just recently told by both Dr. Bednarek and

13:17:46 14  Ms. Benedict that you wouldn't be allowed to do any

13:17:48 15  alternative written assignments?

13:17:50 16      A.   I can't recall if I specifically asked her that

13:17:53 17  question or not.  We had a lot of emails.

13:17:57 18      Q.   Did you complete the written assignments that

13:18:04 19  Professor Keck provided to you?

13:18:06 20      A.   I completed the majority of them.  I wasn't

13:18:09 21  100 percent finished with them, though.

13:18:11 22      Q.   But you don't recall whether or not you asked her

13:18:16 23  if those would count to make up your missed clinical

13:18:20 24  hours?

13:18:21 25      A.   I don't know if I specifically asked her if they

13:18:23  1  would count.  I presumed that they would because she

13:18:27  2  offered them to me, and she said they were for making up

13:18:30  3  those clinical hours.

13:18:31  4      Q.   Having had a discussion with Dr. Bednarek about

13:18:34  5  the inability to make up missed clinical hours with

13:18:38  6  written assignments, did you reach out to Dr. Bednarek

13:18:41  7  after you received those assignments to see if they would

13:18:44  8  count towards your missed hours?

13:18:46  9      A.   I did not because I presumed that they had talked

13:18:49  10  behind the scenes and that the boss knew what the employee

13:18:53  11  was doing when she offered them to me, and I didn't want

13:18:59  12  it to seem like I was questioning anybody's authority.  So

13:19:02  13  at the point that she offered me those assignments, I

13:19:05  14  gladly took them and I figured they had probably already

13:19:09  15  talked and come to a different conclusion than what I was

13:19:12  16  told previously.

13:19:12  17      Q.   Why did you figure that they had already talked?

13:19:15  18      A.   I assumed that most bosses and employees are on

13:19:21  19  the same page about things that they are doing and that

13:19:28  20  they're assigning to a student or a subordinate, and I

13:19:34  21  just presumed that they would know what each other is

13:19:37  22  doing.

13:19:38  23      Q.   And so it was based off of your assumption that

13:19:41  24  Dr. Bednarek would know what Professor Keck had assigned

13:19:44  25  to you?

13:48:46    1      A.   Her tone.  She snipped at me.  She said that she

13:48:49    2   would go find me a different assignment.  She wasn't -- I

13:48:52    3   felt like she wasn't professional about it.  She was --

13:48:56    4   she just feeled -- it was -- it just felt like it was

13:49:01    5   filled with contempt.

13:49:03    6      Q.   You said you told her you were worried about the

13:49:06    7   surgery and how your heart would handle it.  What did you

13:49:09    8   tell her about your heart at that time?

13:49:12    9      A.   I don't remember exactly what I told her.

13:49:14   10      Q.   Do you remember anything about what you told her?

13:49:20   11      A.   I don't specifically.  I was under the impression

13:49:25   12   that she had already been filled in.

13:49:28   13      Q.   Why were you under that impression?

13:49:30   14      A.   I don't know.  I guess my own presumption that

13:49:36   15   they communicated.

13:49:39   16      Q.   Nobody told you that they shared with Dr. Day

13:49:41   17   that you had a heart condition, correct?

13:49:43   18      A.   Not that I can recall.

13:49:44   19      Q.   And so you didn't tell her any specifics about

13:49:52   20   your arrhythmia or PVCs at that point, did you?

13:49:56   21      A.   I don't recall if I did or not.  I don't know if

13:49:59   22   I told her I had already taken medication.  I just -- I

13:50:04   23   can't recall that specific.

13:50:05   24      Q.   Did you talk to Dr. Day about concerns you were

13:50:14   25   having with regard to your grandpa?

13:50:17    1        A.    I may have mentioned it.    I don't know.

13:50:24    2        Q.    Was your grandfather ill at the time of this

13:50:27    3    clinical?

13:50:28    4        A.    Yes.

13:50:29    5        Q.    When you told Dr. Day that you had concerns about

13:50:38    6    being put into the burn surgery, she found you a different

13:50:45    7    surgery to attend, correct?

13:50:47    8        A.    Yes.

13:50:47    9        Q.    So you didn't participate in that burn surgery.

13:50:51   10    Is that right?

13:50:51   11        A.    That's correct.

13:50:52   12        Q.    And do you recall what the alternate surgery

13:50:59   13    was --

           14        A.    Yes.

13:50:59   15        Q.    -- that you were scheduled for --

13:51:00   16        A.    Yes.

13:51:00   17        Q.    -- or sent to?

13:51:01   18        A.    Yes.

13:51:02   19        Q.    What was it?

13:51:05   20        A.    It was a patient who -- he had -- he had been

13:51:13   21    driving and his window was down and he got into a motor

13:51:18   22    vehicle accident while his arm was out the window and his

13:51:25   23    car flipped over and it degloved him.    So it took the skin

13:51:30   24    off from his palm all the way up to his shoulder area and

13:51:39   25    you could see through the bones.    So if he held his hand

13:51:42  1  up, you could see across the room, like.  So he -- he was

13:51:51  2  in surgery because he needed to have a cleanout done, and

13:52:02  3  they were going to pack his arm with antibiotic pellets.

13:52:12  4  Yeah.

13:52:12  5      Q.   And you attended that surgery with a different

13:52:17  6  nurse besides Dr. Day.  It was someone else who worked for

13:52:21  7  Valleywise, correct?

13:52:22  8      A.   Yes.

13:52:23  9      Q.   Do you recall who that was?

13:52:24  10     A.   No.

13:52:25  11     Q.   Was that surgery already under way when you went

13:52:31  12  to attend the surgery?

13:52:32  13     A.   No.  The patient -- I first interacted -- I first

13:52:37  14  saw him in the pre-op area, and he was speaking with

13:52:45  15  Valleywise staff members about the surgery.  And I was

13:52:50  16  basically standing back listening to what they were

13:52:53  17  talking about.

13:52:53  18     Q.   And then did he transition from there into the

13:52:58  19  operating room?

13:52:58  20     A.   Yes.

13:52:59  21     Q.   And you went with him into the operating room?

13:53:02  22     A.   I don't know if I walked -- I can't remember if I

13:53:04  23  walked with him, alongside him, but I believe we did.

13:53:07  24     Q.   Let's start with the preoperative time frame.

13:53:14  25  How many people were present when you were there in the

13:53:18  1  area with that patient?

13:53:19  2      A.   Well, there was the patient and there was a nurse

13:53:24  3  in front of him who was taking some notes on a computer.

13:53:29  4  And then I remember -- I think it was an anesthesiologist

13:53:34  5  that came to talk with him about what to expect and ask if

13:53:38  6  he had any questions.  I think -- I don't remember if the

13:53:46  7  surgeon came by or not to speak with him.  But it

13:53:51  8  wasn't -- there wasn't a lot of people in the room.

13:53:53  9      Q.   And do you recall anything else about what

13:53:57  10  happened in the preoperative time frame?

13:53:59  11      A.   No.

13:54:01  12      Q.   And so after you all transition into the

13:54:04  13  operating room, what happens?

13:54:06  14      A.   They intubated the patient and began the surgery.

13:54:21  15      Q.   Then what?

13:54:22  16      A.   They performed the surgery on him.  They -- there

13:54:29  17  was a nurse -- everybody had masks on and everybody had on

13:54:36  18  surgical scrubs, so I didn't see name tags or anything of

13:54:40  19  anybody.  But there was a tall blonde nurse that told me

13:54:44  20  to go sit.  There was a stool in the corner next to the

13:54:48  21  door, and she told me to go sit there and watch the

13:54:53  22  surgery.

13:54:59  23          The surgeon was progressing with the

13:55:02  24  surgery.  And when they were doing the cleanout, they were

13:55:10  25  using high-pressured saline.  And they told me that I

13:55:15  1  needed to move to the opposite side of the room or I could

13:55:20  2  get splashed with the fluids, the blood and the fluids

13:55:25  3  that was coming out of his arm.  And there was another

13:55:34  4  older nurse in there.  I don't know her name, but she was

13:55:37  5  older.  And she was throwing towels on the floor because

13:55:43  6  the blood and the -- all the stuff was dripping on the

13:55:49  7  floor under the patient.  And so when they told me that I

13:55:56  8  needed to move, I went over into the opposite corner --

13:56:02  9  like from where I was, I just kept walking, like, forward.

13:56:06  10  And that's where this blonde nurse was, and she said that

13:56:11  11  I could sit down right there instead, and so I did.

13:56:16  12      Q.   And during the surgery, apart from when you were

13:56:23  13  physically moving in the room, what were you doing?

13:56:25  14      A.   I was watching the surgery, and I was looking

13:56:31  15  around the room.  That was my first time ever being in an

13:56:37  16  operating room aside from being a patient, and so I had

13:56:40  17  never seen it and there was a lot of really interesting

13:56:44  18  things to see, the organization of the room.  It was

13:56:52  19  just -- it was just -- I don't know.  It was -- it was

13:56:55  20  interesting, neat.  I don't know.  I just looked around to

13:57:00  21  see all the new sights that I had never seen before.

13:57:06  22      Q.   Were you asking any questions of the providers

13:57:08  23  who were in there?  So I think you said there were a few

13:57:11  24  nurses and the surgeon.  Did you ask them any questions

13:57:13  25  about the procedure or anything else?

13:57:15   1      A.   No.  I don't -- I don't remember asking any

13:57:18   2   questions about the procedure.  They were all being --

13:57:23   3   they were talking amongst one another, and the surgeon

13:57:29   4   chastised another -- I think it was a surgical tech -- for

13:57:34   5   using the wrong name for a body part.  And I was afraid to

13:57:38   6   say anything because I didn't want that to happen to me,

13:57:42   7   so I just listened to what was being said.

13:57:47   8      Q.   I just want to make sure I understand.

13:57:50   9           In the operating room, who all was present?

13:57:53  10   So you had mentioned a tall blonde nurse, an older nurse,

13:57:56  11   the surgeon, now a surgical tech.  Were there any other

13:58:00  12   people in the operating room?

13:58:01  13      A.   There was either an anesthesiologist or a nurse

13:58:04  14   anesthetist.  I'm not sure what was being used.

13:58:07  15      Q.   Anyone else?

13:58:09  16      A.   Not that I can recall.

13:58:10  17      Q.   Stepping back out for a minute in the

13:58:14  18   preoperative time frame, what were you doing during that

13:58:17  19   time frame?

13:58:18  20      A.   I was standing in front of the patient.  So he

13:58:22  21   was laying on a gurney, and I was basically at the foot of

13:58:27  22   his bed with a couple of feet in between us, probably at

13:58:31  23   least three feet between us, so that I could give enough

13:58:35  24   room for any staff members that needed to talk to him.

13:58:39  25   And so I was just standing there listening to what they

13:58:41    1    were saying.

13:58:42    2        Q.   Did you speak with the patient at all?

13:58:45    3        A.   No, I don't recall speaking with him.

13:58:47    4        Q.   Did you speak with any of the nurses or other

13:58:53    5    people -- other providers who were there in the

13:58:55    6    preoperative space?

13:58:57    7        A.   There was a nurse who I was standing next to for

13:59:00    8    a little bit, and I think she was the one that was taking

13:59:04    9    notes about the patient.  And I think she had told me

13:59:10   10    something about the patient, like what she was doing with

13:59:12   11    charting, but that was really our only interaction.

13:59:17   12        Q.   Did you ask her any questions?

13:59:19   13        A.   Not that I can recall.

13:59:21   14        Q.   And so going back to while you were in the

13:59:28   15    operating room, you had moved -- you had sat in the chair

13:59:34   16    where they told you to sit and then they told you you

13:59:36   17    should move.  You moved to the other side of the room.

13:59:39   18    What happened after that?

13:59:40   19        A.   I was in arrhythmia really bad at this time, so

13:59:49   20    there are some parts of my recollection that are -- that

13:59:54   21    feel kind of hazy because I just -- I was trying to hide

14:00:01   22    it and push through it, but it was getting worse.

14:00:10   23             So I'm probably not answering your question,

14:00:17   24    am I?

14:00:18   25        Q.   No, you are.  I'm just trying to understand what

14:00:20    1  happens next.

14:00:20    2       A.   I -- I know that I stepped out of the room a

14:00:28    3  couple different times, which I didn't think twice about

14:00:39    4  doing.  I did ask, "Is it okay if I step out?"  And the

14:00:44    5  tall blonde nurse said, "Yeah, that's fine.  Go ahead."

14:00:49    6            I remember saying that I had a heart problem

14:00:51    7  and I was having some issues.

14:00:52    8       Q.   Who did you say that to?

14:00:58    9       A.   The tall blonde.  She had an accent.  I don't

14:01:01   10  know what her name was or -- she was from a different

14:01:03   11  country; that's all I remember.  She had shared that with

14:01:07   12  me, but I can't even remember what country it was now.

14:01:09   13       Q.   And you told her that you were having heart

14:01:14   14  problems?

14:01:15   15       A.   Yes.

14:01:15   16       Q.   And that you were having issues?

14:01:17   17       A.   Yes.

14:01:17   18       Q.   Did you tell her specifically what those issues

14:01:20   19  were?

14:01:20   20       A.   I can't remember how detailed I got with her.

14:01:23   21       Q.   Did she ask you any follow-up questions when you

14:01:26   22  mentioned that you were having heart problems?

14:01:28   23       A.   I can't recall specifically if she did.

14:01:30   24       Q.   And you said you stepped out a couple different

14:01:33   25  times.  How many times did you step out of the operating

14:01:35  1  room during that surgery?

14:01:36  2      A.   At least two that I know of, maybe three.

14:01:41  3      Q.   What did you do when you left the operating room?

14:01:47  4      A.   I went into the restroom and splashed some water

14:01:56  5  on my face.  And I remember taking more medication,

14:02:04  6  getting a drink of water.

14:02:12  7      Q.   Anything else?

14:02:13  8      A.   Not that I can specifically remember.

14:02:20  9           There was -- there was people, like, walking

14:02:21 10  in and out of that surgery room, so I didn't really think

14:02:27 11  twice about, you know, the safety of going in and out

14:02:30 12  because other people were doing it.

14:02:32 13      Q.   You said that you took more medication.  Had you

14:02:36 14  previously taken medication?

14:02:37 15      A.   Yes.  I had taken my morning dose before I got

14:02:40 16  there.

14:02:40 17      Q.   And when you say "morning dose," were you taking

14:02:44 18  your heart medication on a daily basis at that point?

14:02:48 19      A.   I would have to see records because I know for a

14:02:56 20  while I was taking it as needed.  But I know that I took

14:03:00 21  it that morning for sure because -- I think I was taking

14:03:06 22  it regularly then.  I'm pretty sure I was.

14:03:10 23      Q.   What medication was that?

14:03:11 24      A.   It was metoprolol.

14:03:14 25      Q.   So you -- you took more while you had stepped out

| | | |
|---|---|---|
| 14:20:26 | 1 | but I think that it was her -- and she told me to grab a |
| 14:20:33 | 2 | lead vest, to put it on.  And so there was a lead vest |
| 14:20:38 | 3 | that I had picked up off of a chair and I put it on.  And |
| 14:20:48 | 4 | by this time, my heart was -- it was really bad and I was |
| 14:20:52 | 5 | feeling really -- just overall really bad.  And the |
| 14:21:01 | 6 | patient had not yet been cut into yet.  And I told her |
| 14:21:08 | 7 | that I needed to go and take some more of my medication |
| 14:21:12 | 8 | because I was having some heart issues.  I think I did say |
| 14:21:18 | 9 | that I was in arrhythmia at that time, and I asked if I |
| 14:21:24 | 10 | could step out and go take some medication.  And she said, |
| 14:21:27 | 11 | "Yeah, that's totally fine.  You know, go ahead and do |
| 14:21:31 | 12 | what you need to do." |
| 14:21:33 | 13 | And I left, went back into the locker room, |
| 14:21:39 | 14 | and I took some more medication, went into the bathroom, |
| 14:21:46 | 15 | put some water on my face, and was still not feeling well, |
| 14:21:52 | 16 | and I'm running through my mind what do I need to do.  I |
| 14:21:57 | 17 | knew that I had to get those clinical hours in that day, |
| 14:22:01 | 18 | but it was getting worse.  And I think it was probably at |
| 14:22:11 | 19 | that time that I was out of the room for I don't know how |
| 14:22:16 | 20 | long.  10, 15 minutes or so, I'm guessing.  And I think it |
| 14:22:27 | 21 | was at that time that I made the decision not to go back |
| 14:22:29 | 22 | into the room. |
| 14:22:30 | 23 | I walked back over to the surgery room and |
| 14:22:34 | 24 | the patient -- the surgery had already started.  And this |
| 14:22:38 | 25 | particular patient was not being packed with antibiotic |

14:22:42   1   pellets.  He was not having a cleanout of a wound

14:22:51   2   performed like the previous patient.  And I felt like it

14:22:58   3   might cause him harm if I opened the door to walk back in

14:23:06   4   this surgery.  I didn't see people going in and out of the

14:23:09   5   room like I did the first one.  And out in the hallway,

14:23:15   6   they had a lot of boxes for, like, inventory, and it

14:23:20   7   wasn't very clean.  And I just was concerned that by

14:23:25   8   opening the door, it could cause, like, a rush of air to

14:23:29   9   go into the room and with the patient having already been

14:23:34  10   cut into, I didn't want it to cause an infection, so I

14:23:40  11   didn't open the door back to tell them that I was leaving,

14:23:48  12   and that was why.

14:23:49  13       Q.   How long would you say you were in the operating

14:23:57  14   room before you stepped out?

14:23:58  15       A.   For the second surgery?

14:24:00  16       Q.   Correct.

14:24:01  17       A.   My -- my best educated guess would be 20 minutes

14:24:13  18   or so, give or take.  I really don't know.  But it

14:24:18  19   wasn't -- it wasn't terribly long.  Like I said, the

14:24:23  20   patient had been put in traction already, but he had not

14:24:27  21   been cut into yet.

14:24:28  22       Q.   Was the patient awake?

14:24:30  23       A.   No, he was not.

14:24:33  24       Q.   And what were you doing during the time that you

14:24:38  25   were in the operating room?

14:24:39    1    A.   I was standing -- this operating room was smaller

14:24:43    2  than the first one, and it was very cramped.  It wasn't

14:24:47    3  small, but it was smaller.  And where the patient's table

14:24:53    4  was in comparison to the door, there wasn't a lot of

14:24:57    5  movable space.  And things were moving very quickly in

14:25:02    6  there, so I tried to just stay out of everybody's way.  I

14:25:08    7  can't imagine it's easy having a student anywhere where

14:25:12    8  you're trying to perform trauma surgery, so I didn't want

14:25:15    9  to get in the way and cause any kind of disruption, so I

14:25:19   10  just kind of stayed back a little bit and just watched.

14:25:23   11    Q.   Were you engaging with the providers that were in

14:25:27   12  the room?

14:25:27   13    A.   There was one provider there that -- I don't know

14:25:31   14  what his name was; I don't know what he did.  I'm guessing

14:25:37   15  that he was an anesthesiologist.  He -- he did talk with

14:25:42   16  me about some stuff that he was doing.  I wasn't really

14:25:53   17  carrying on like a whole conversation with him.  I felt

14:25:56   18  like I was just listening more than anything to what he

14:25:59   19  was saying to me.

14:26:00   20    Q.   Did you ask any questions of him?

14:26:03   21    A.   Not that I can recall.

14:26:04   22    Q.   Did you ask any questions of anybody else?

14:26:07   23    A.   Not that I can recall.

14:26:08   24    Q.   Can you tell me who you remember -- how many

14:26:13   25  people, what types of people were in the room?

14:26:15   1      A.   Not as much as I could with the other one.  It

14:26:21   2   seemed like there was more people in the room, but it may

14:26:24   3   have just been more cramped.  Yeah, I don't -- I don't

14:26:32   4   know.  This particular patient was having the x-ray

14:26:37   5   procedure done, so I don't know if there were, like,

14:26:43   6   radiology techs in there.  I'm just not sure.

14:26:46   7      Q.   Well, we know -- you said you went into the

14:26:48   8   surgery with the nurse who Dr. Day had passed you off

14:26:53   9   with, correct?  So there was that nurse.

14:26:54   10     A.   Yes.

14:26:54   11     Q.   There was this gentleman you spoke with who might

14:26:57   12  have been an anesthesiologist.  Was there a surgeon in the

14:27:00   13  room?

14:27:00   14     A.   I don't recall if there was or not.

14:27:03   15     Q.   Okay.  Who else was in the room?

14:27:05   16     A.   There were just nurses there, but I don't -- I

14:27:10   17  don't -- it's hard for me to identify any -- it's

14:27:13   18  impossible because I just -- I didn't know anybody and

14:27:18   19  everybody had on a mask and a cap, and I didn't see name

14:27:25   20  tags.

14:27:25   21     Q.   When you stepped out to take your break, you said

14:27:32   22  that you were feeling pretty bad at that point.  Again,

14:27:40   23  what was it that you were feeling?

14:27:42   24     A.   I was feeling the near-syncope, the very heavy

14:27:51   25  fluttering in my chest.  I had chest pain.  I remember my

| | | |
|---|---|---|
| 14:27:58 | 1 | hands and feet were very cold and -- they weren't, like, |
| 14:28:02 | 2 | numb, but they just didn't feel -- they feel like if |
| 14:28:05 | 3 | you've been outside for a long time and it's cold and you |
| 14:28:08 | 4 | just don't have as much control or feeling in your hands |
| 14:28:11 | 5 | and feet.  I felt -- I was very afraid.  I -- |
| 14:28:28 | 6 | Q.   Why were you afraid? |
| 14:28:30 | 7 | A.   All those reasons from earlier.  I was afraid |
| 14:28:36 | 8 | of -- I was afraid of passing out and then causing a |
| 14:28:44 | 9 | second patient in the room when the attention should be |
| 14:28:47 | 10 | focused on the patient on the bed.  I was afraid of |
| 14:28:55 | 11 | failing.  I was afraid of what was going on with my heart. |
| 14:29:07 | 12 | Q.   Did you feel like at that -- at that time you |
| 14:29:09 | 13 | needed medical attention? |
| 14:29:10 | 14 | A.   Probably so. |
| 14:29:20 | 15 | Q.   You can't say for sure? |
| 14:29:25 | 16 | A.   It was severe enough to where I should have, but |
| 14:29:33 | 17 | again, I didn't want to cause problems for anybody.  And I |
| 14:29:42 | 18 | already knew, you know, that I had gone to the emergency |
| 14:29:45 | 19 | room at a different clinical, and I didn't want to do it |
| 14:29:48 | 20 | again. |
| 14:29:48 | 21 | Q.   And you said that you stepped out of the room and |
| 14:30:00 | 22 | you were gone for, you thought, 10 or 15 minutes.  When |
| 14:30:04 | 23 | you left the operating room, did you tell anyone where you |
| 14:30:09 | 24 | were going? |
| 14:30:09 | 25 | A.   In that second surgery, I asked if I could go to |

14:30:13   1   the locker room and take some more medication, so I told

14:30:17   2   her I was going to the locker room.

14:30:18   3        Q.   And you said that you were going to take more

14:30:20   4   medication.  Did you tell her what it was for?

14:30:25   5        A.   I told her that I -- I believe that I told her I

14:30:28   6   had arrhythmia, that I had heart arrhythmia and I needed

14:30:32   7   to take some more of my medicine.

14:30:34   8        Q.   And when you stepped out for that break, did you

14:30:37   9   ever go back into that operating room?

14:30:38   10        A.   No.

14:30:39   11        Q.   You said that you knew that the surgery had

14:30:43   12   already started.  How did you know that the surgery had

14:30:45   13   already started?

14:30:46   14        A.   I -- it's been a long time since I was in that

14:30:52   15   room on that day, and I can't recall if there was a window

14:30:58   16   into that room.  I can't tell you a hundred percent how I

14:31:05   17   knew.  But I -- I felt -- like, looking back now, I just

14:31:12   18   feel like I knew that the surgery had started and that it

14:31:16   19   wouldn't be safe for the patient if I opened that door or

14:31:19   20   that it could potentially not be safe for them and I

14:31:22   21   didn't want to put them at risk.

14:31:24   22        Q.   When you told the individual that you were going

14:31:29   23   to the locker room, did they say, "Don't come back in"?

14:31:32   24        A.   No.

14:31:32   25        Q.   And so when you left, the understand- -- what you

14:31:41    1    had conveyed was that you would be in the locker room, but

14:31:44    2    it wasn't clear if you would be coming back.  Is that

14:31:47    3    fair?

14:31:47    4        A.    I didn't address whether I was coming back

14:31:50    5    because I hadn't intended on just leaving at that time.  I

14:31:54    6    intended to go take some medication and put some water on

14:31:58    7    my face.  There are some moves that you can do with a

14:32:06    8    heart condition, like where you bear down and it's

14:32:08    9    supposed to help your heart slow down if it's going too

14:32:12    10   fast.  So I did that a couple of times hoping that

14:32:14    11   something would help kick me back into a regular rhythm,

14:32:19    12   and it just wasn't working.

14:32:23    13       Q.    How long were you out of the operating room

14:32:25    14   before you decided that you needed to go home?

14:32:28    15       A.    It was however long -- let's see.  I don't know.

14:32:37    16   I think I was out for, like, 15 minutes, like at the most

14:32:44    17   maybe.  It was so long ago.  Honestly, when I'm in

14:32:48    18   arrhythmia, things are very foggy.  So I can't tell you a

14:32:52    19   hundred percent sure how long I was out, but looking back

14:32:55    20   now, maybe 15 minutes.

14:32:57    21       Q.    And when you left the lock- -- or when you left

14:33:04    22   the operating room to go to the locker room, did you see

14:33:08    23   anybody else in the hallway, in the locker room --

14:33:11    24       A.    No.

14:33:11    25       Q.    -- in the spaces that you pass through to get

14:34:50  1  to tell her I was taking a break because I was in

14:34:52  2  arrhythmia and I took some medication.  And then I called

14:35:00  3  Dr. Bednarek on her work -- her work phone number and it

14:35:07  4  went to voice mail.  It was the weekend.  I thought she

14:35:10  5  may have had her phone forwarded to voice mail -- or to

14:35:15  6  her cell phone or something.

14:35:17  7      Q.   Did you try calling Dr. Day?

14:35:22  8      A.   No.

14:35:23  9      Q.   Why not?

14:35:24  10     A.   I didn't believe that I had her phone number.  I

14:35:30  11  hadn't recalled ever getting her phone number from her.

14:35:33  12     Q.   Do you now recall whether you had been given

14:35:40  13  Dr. Day's phone number?

14:35:41  14     A.   I don't believe that I was ever given her phone

14:35:43  15  number.  I think at one point when I was looking through

14:35:46  16  old emails I saw that it may have been in a signature on

14:35:50  17  one of her emails, but it didn't dawn on me to look back

14:35:55  18  through previous emails to check and see if I could find a

14:35:58  19  signature that had a phone number in it.

14:36:00  20     Q.   Did you do anything to look for Dr. Day's phone

14:36:05  21  number before you sent her the email?

14:36:07  22     A.   No.

14:36:08  23     Q.   So you stepped out and you thought it would be

14:36:14  24  best to send her an email to let her know you were

14:36:16  25  stepping out of the OR?

14:39:49  1  badly?

14:39:49  2      A.    I don't know if I called him or if I walked out

14:39:52  3  there.  But I did walk out there at some point and sat in

14:39:54  4  my car and talked with him.

14:39:56  5      Q.    When was that?

14:39:56  6      A.    It was before I left.  We pulled out of the

14:39:59  7  parking lot right as soon as I sent the second email that

14:40:04  8  said I was leaving to Dr. Day.

14:40:16  9      Q.    And you don't recall where you went from there?

14:40:18  10      A.    I don't recall.  If you didn't see any medical

14:40:23  11  records, it's quite possible I just went home.

14:40:26  12      Q.    And I just want to make sure that I'm

14:40:31  13  understanding.  Before you left the Valleywise facility,

14:40:34  14  you did not tell anyone at Valleywise that you were in

14:40:38  15  fact leaving that facility, correct?

14:40:41  16      A.    That's correct.  Well, except for Dr. Day, and I

14:40:43  17  did email her before --

14:40:44  18      Q.    You didn't speak with her before you left,

19  correct?

14:40:46  20      A.    That's correct.

14:40:46  21      Q.    And you didn't get a response to either of your

14:40:49  22  emails from her before you left, correct?

14:40:51  23      A.    That's correct.

14:40:51  24      Q.    And I think you said you didn't actually get

14:40:56  25  ahold of Dr. Bednarek either.  Is that right?

14:40:58   1        A.   When I called her, she did not answer.

14:41:00   2        Q.   Do you know if Valleywise has an emergency room

14:41:06   3   at their facility?

14:41:07   4        A.   I would assume they do.

14:41:09   5        Q.   Did you consider at all trying to go to the

14:41:13   6   emergency room at Valleywise?

14:41:15   7        A.   No.  I don't think I did.

14:41:16   8        Q.   Why not?

14:41:17   9        A.   Usually if you go to the emergency room on a

14:41:22  10   clinical shift, you have to fill out an incident report.

14:41:26  11   And Dr. Day would have had to have filled that out for me

14:41:30  12   as my faculty of record, and I didn't want to upset her

14:41:34  13   more than I felt like she was already upset with me.

14:41:36  14        Q.   But you've told us also that you were in distress

14:41:42  15   with your heart, correct?

14:41:43  16        A.   I felt I was, yes.

14:41:44  17        Q.   And in your mind, you were more concerned about

14:41:48  18   having an incident report filled out than addressing your

14:41:51  19   heart concerns?

14:41:53  20             MR. ENGLAND:  Objection.  Argumentative.

14:41:55  21             You can answer.

14:41:57  22             THE WITNESS:  My doctors have told me that I

14:41:59  23   need to take medication and I need to lay down.  And when

14:42:05  24   seeking treatment at the hospital, that's essentially what

14:42:08  25   happens.  I get IV fluid, take more medication, and lay

16:54:17  1  | BY MS. WINDTBERG:

16:54:17  2  |      Q.   In the fall of 2020, you had not yet requested

16:54:20  3  | any accommodations from ASU or Edson College, correct?

16:54:26  4  |      A.   That's correct.

16:54:27  5  |      Q.   And in the spring semester of 2021, you

16:54:30  6  | registered with SAILS in March, correct?

16:54:32  7  |      A.   Yes.

16:54:33  8  |      Q.   Between March 1st when you registered with the

16:54:39  9  | SAILS department and the end of that spring 2021 semester,

16:54:42  10 | were you ever denied the opportunity to attend classes

16:54:45  11 | remotely?

16:54:46  12 |      A.   I can't remember.

16:54:47  13 |      Q.   In the summer of 2021, were you denied the

16:54:55  14 | opportunity to attend classes remotely?

16:54:58  15 |      A.   I can't remember dates, honestly.  I wish I

16:55:03  16 | could.

16:55:03  17 |      Q.   Do you recall any specific class that you wanted

16:55:07  18 | to attend remotely that you were denied the opportunity to

16:55:09  19 | attend remotely?

16:55:11  20 |      A.   Not specifically.

16:55:19  21 |      Q.   After the summer of 2021, you took the leave of

16:55:22  22 | absence from your learning, correct?  For a period of

16:55:28  23 | time?

16:55:28  24 |      A.   I was out of the program for that amount of time.

16:55:37  25 |      Q.   You did not return for the fall 2021 semester.

16:58:17    1    BY MS. WINDTBERG:

16:58:20    2        Q.    How would having an incomplete in the class help

16:58:24    3    you address your arrythmia?

16:58:25    4                    MR. ENGLAND:    Same objection.

16:58:27    5                    You can answer, Sara.

16:58:29    6                    THE WITNESS:    It would have given me time to

16:58:34    7    try and get a control -- a better control of the

16:58:36    8    arrhythmia, whether it was through medication changes or

16:58:41    9    titration of doses, and it would have alleviated a lot of

16:58:45    10    stress that further got put on me when they said I would

16:58:48    11    have to redo the entire class in its entirety.

16:58:52    12    BY MS. WINDTBERG:

16:58:52    13        Q.    Prior to attending the clinical at Valleywise,

16:58:56    14    you had been offered the ability to take an incomplete in

16:58:59    15    the NUR 478 course, correct?

16:59:02    16        A.    Yes.

16:59:02    17        Q.    And it was only after that you were informed that

16:59:04    18    you had failed the class that you asked to receive the

16:59:07    19    incomplete.    Is that correct?

16:59:09    20        A.    Yes.

16:59:09    21        Q.    Exhibit Number 20, Item Number 3 on your list is

16:59:19    22    the "Ability to complete assignments at an ASU testing

16:59:23    23    center."

16:59:24    24                    How would completing assignments at an ASU

16:59:27    25    testing center have accommodated your disability?

1  STATE OF ARIZONA      )

2  COUNTY OF MARICOPA    )

3            BE IT KNOWN that the foregoing proceedings

4  were taken before me; that the witness before testifying

5  was duly sworn by me to testify to the whole truth; that

6  the foregoing pages are a full, true, and accurate record

7  of the proceedings all done to the best of my skill and

8  ability; that the proceedings were taken down by me in

9  shorthand and thereafter reduced to print under my

10 direction.

11           I CERTIFY that I am in no way related to any

12 of the parties hereto nor am I in any way interested in

13 the outcome hereof.

14           [ ] Review and signature was requested.

15           [ ] Review and signature was waived.

16           [X] Review and signature was not requested.

17           I CERTIFY that I have complied with the

18 ethical obligations set forth in ACJA 7-206(F)(3) and

19 ACJA 7-206 (J)(1)(g)(1) and (2).  Dated at Phoenix,

20 Arizona, this 23rd day of July, 2021.

21

22 _____

23              Meri Coash, RMR, CRR

24              Certified Reporter

25              Arizona CR No. 50327

1           I CERTIFY that Coash & Coash, Inc., has

2    complied with the ethical obligations set forth in

3    ACJA 7-206 (J)(1)(g)(1) through (6).

4

5

6

7

8

9

10

11

12    _____

13              COASH & COASH, INC.

14         Registered Reporting Firm

15         Arizona RRF No. R1036

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 10

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF ARIZONA

 3                                        )
 4   Sara Do, an individual,             )
                                          )
 5           Plaintiff,                   )
                                          )
 6   v.                                   )   No.
                                          )   CV-22-00190-PHX-JJT
 7   Arizona Board of Regents, an         )
     Arizona State Entity; et al.,        )
 8                                        )
             Defendants.                  )
 9   _____)

10        IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

11            IN AND FOR THE COUNTY OF MARICOPA

12                                        )
     Sara Do, an individual,             )
13                                        )
             Plaintiff,                   )   No. CV2022-009424
14                                        )
     v.                                   )
15                                        )       VIDEOTAPED
     Arizona Board of Regents, an         )     DEPOSITION OF
16   Arizona State Entity;                )        SARA DO
     Dr. Kimberly Day, an unmarried       )
17   person; Dr. Salina Bednarek and      )      VOLUME 2
     Joshua Bednarek, wife and            )  (Pages 249 Through
18   husband; Dr. Margaret Morris         )    438, Inclusive)
     and Phillip Morris, wife and         )
19   husband; Candace Keck and            )
     Jonathan Keck, wife and              )
20   husband,                             )   Phoenix, Arizona
                                          )
21           Defendants.                  )   August 2, 2023
     _____)

22

23   Prepared by:

24   Meri Coash, RMR, CRR
     Certified Reporter
25   Certification No. 50327
```

**CERTIFIED TRANSCRIPT**

```
 1                         I N D E X

 2   WITNESS                                          PAGE

 3        Examination By Ms. Windtberg                 255

 4        Examination By Ms. Chasson                   343

 5

 6

 7                    EXHIBITS MARKED

     EXHIBITS              DESCRIPTION               PAGE
 8
     Exhibit 21   Unofficial Transcript               262
 9                ABOR004108 - 004109

10   Exhibit 22   Complaint CV2022-009424             299

11   Exhibit 23   Desert Grove medical records        324
                  DGFM000130 - 000133
12                CONFIDENTIAL

13   Exhibit 24   Compliance Requirements form        344
                  Valleywise-0001
14
     Exhibit 25   Email from Sara Do to Thong Do dated 348
15                10-30-21, with attachments
                  Do_008353 - 008378
16                CONFIDENTIAL

17   Exhibit 26   Email string ending from Sara Do to 354
                  Salina Bednarek dated 6-26-21
18                ABOR002774 - 002777

19   Exhibit 27   Email from Salina Bednarek to Sara  360
                  Do dated 7-20-21
20                ABOR003113

21   Exhibit 28   Plaintiff Sara Do's Responses to    404
                  Defendant Valleywise Health's First
22                Set of Interrogatories
                  Case No.: 2:21-cv-00190-JJT
23
     Exhibit 29   Text messages                       426
24
     Exhibit 30   Text messages                       426
25
```

1                    PREVIOUSLY MARKED EXHIBITS

2                 Exhibit 20    Page 259
                  Exhibit 12    Page 272
3                 Exhibit 15    Page 362
                  Exhibit 16    Page 393
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:22-cv-00190-JJT    Document 125-8    Filed 06/28/24    Page 94 of 412

Sara Do vs. Arizona Board of Regents                    CV-22-00190-PHX-JJT
Sara Do                      August 2, 2023                           252

1              VIDEOTAPED DEPOSITION OF SARA DO

2   was taken on August 2, 2023, resumed at 9:05 a.m., at the

3   law office of Osborn Maledon, PA, 2929 North Central

4   Avenue, Phoenix, Arizona, before Meri Coash, a Certified

5   Reporter in the State of Arizona.

6                          *    *    *

7   APPEARANCES:

8        For the Plaintiff:
             AFFELD GRIVAKES, LLP
9            By:  Brian R. England, Esq.
                  2049 Century Park East
10                Suite 2460
                  Los Angeles, California  90067
11                310-979-8700
                  bre@agzlaw.com
12
             and
13
             BEYERS FARRELL, PLLC
14           By:  Michael Farrell, Esq.
                  99 East Virginia Avenue
15                Suite 220
                  Phoenix, Arizona  85004
16                602-738-3022
                  mfarrell@bfazlaw.com
17

18       For Defendants Arizona Board of Regents, Day,
         Bednarek, Morris, Keck:
19           OSBORN MALEDON, PA
             By:  Kristin L. Windtberg, Esq.
20                Mary R. O'Grady, Esq. (Via Zoom)
                  Joshua J. Messer, Esq.
21                2929 North Central Avenue
                  20th Floor
22                Phoenix, Arizona  85012
                  602-640-9000
23                kwindtberg@omlaw.com
                  mogrady@omlaw.com
24                jmesser@omlaw.com

25

```
 1   APPEARANCES (CONTINUED)

 2        For Defendant Maricopa County Special Health Care
          District:
 3            COPPERSMITH BROCKELMAN, PLC
              By:  Jill J. Chasson, Esq.
 4                 Andrew T. Fox, Esq.
                   2800 North Central Avenue
 5                 Suite 1900
                   Phoenix, Arizona  85004
 6                 602-224-0999
                   jchasson@cblawyers.com
 7                 afox@cblawyers.com

 8
          Also present:  Kwan Piensook, Esq.; Daniel Rohan,
 9        videographer

10        Also present via Zoom:  Johanna Hammel, Amanda
          Gibson, Trisha Farrell.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 09:20:54 | 1 | memory of who or what, so -- it's probably not a good |
| 09:21:02 | 2 | answer.  I'm sorry.  I wish I could be more accurate with |
| 09:21:07 | 3 | it, but it's been a long time and I've had a lot of |
| 09:21:12 | 4 | classes since then. |
| 09:21:13 | 5 | Q.  But you can't identify a specific course during |
| 09:21:15 | 6 | the spring of 2020 -- 2021 semester where you were denied |
| 09:21:20 | 7 | the ability to attend remotely? |
| 09:21:23 | 8 | A.  I cannot remember specifically requesting a |
| 09:21:27 | 9 | specific class to take remotely that was denied. |
| 09:21:31 | 10 | Q.  What about in the summer of 2021, did you ask |
| 09:21:35 | 11 | anyone at ASU to be allowed to attend any of your courses |
| 09:21:39 | 12 | remotely during the summer of 2021 that you contend was |
| 09:21:43 | 13 | denied? |
| 09:21:44 | 14 | A.  I feel like that's the same answer as the |
| 09:21:51 | 15 | previous one. |
| 09:21:51 | 16 | Q.  That you can't identify any specific courses |
| 09:21:54 | 17 | where you were denied the ability to attend remotely |
| 09:21:57 | 18 | during that semester? |
| 09:21:58 | 19 | A.  Correct. |
| 09:21:59 | 20 | Q.  Looking at Exhibit Number 20, on this list of |
| 09:22:06 | 21 | accommodations that you say you requested, Number 2 is |
| 09:22:10 | 22 | "Ability to take an incomplete for NUR-478," and then it |
| 09:22:15 | 23 | says offered and changed.  Do you see that? |
| 09:22:17 | 24 | A.  Yes. |
| 09:22:18 | 25 | Q.  And we talked a little bit about this item last |

| | | |
|---|---|---|
| 09:51:54 | 1 | Whether it was emailing professors to check and |
| 09:51:57 | 2 | double-check their instructions on an assignment or really |
| 09:52:01 | 3 | anything that to me could have a different interpretation. |
| 09:52:13 | 4 | And then even doing that, they came back and said that I |
| 09:52:17 | 5 | appeared to be confused about everything and that I didn't |
| 09:52:21 | 6 | have it in me to be in this program.  And it just felt, |
| 09:52:27 | 7 | like I said in my last deposition, like it was the mean |
| 09:52:31 | 8 | girls from high school and you had to watch out for them |
| 09:52:33 | 9 | because they were -- they were plotting something at all |
| 09:52:37 | 10 | times. |
| 09:52:37 | 11 | BY MS. WINDTBERG: |
| 09:52:37 | 12 | Q.   Did anyone from the Edson program tell you that |
| 09:52:39 | 13 | you were being removed or kicked out of the MEPN program? |
| 09:52:43 | 14 | A.   No. |
| 09:52:45 | 15 | Q.   And in the fall of 2021, you took a leave of |
| 09:52:52 | 16 | absence due to your health concerns, correct? |
| 09:52:56 | 17 | A.   Yes. |
| 09:52:56 | 18 | Q.   And that leave of absence continued into the |
| 09:52:59 | 19 | spring 2022 semester.  Is that right? |
| 09:53:03 | 20 | A.   Yes. |
| 09:53:03 | 21 | Q.   And then again into the fall of 2023 semester, |
| 09:53:10 | 22 | correct? |
| 09:53:10 | 23 | MR. ENGLAND:  No, fall of 2022.  Sorry. |
| 09:53:13 | 24 | MS. WINDTBERG:  Yes.  Sorry. |
| | 25 | /// |

09:53:15    1  | BY MS. WINDTBERG:

09:53:15    2  |     Q.   Continued into the fall of 2022 semester.  Is

09:53:18    3  | that correct?

09:53:18    4  |     A.   Yes.

09:53:19    5  |     Q.   If you would turn to page 20 of Exhibit 12, which

09:53:32    6  | I believe you have there in front of you.

09:53:38    7  |          See towards the top of the page where it

09:53:40    8  | says "Third Claim"?

09:53:41    9  |     A.   What page, I'm sorry?

09:53:43   10  |     Q.   Page 20.

09:53:55   11  |     A.   Okay.  Your last question, can we kind of revisit

09:54:03   12  | that one again or are we past that?

09:54:05   13  |     Q.   Go ahead.

09:54:06   14  |     A.   Okay.  So you were asking about the -- like, you

09:54:11   15  | said that I -- I don't remember verbatim -- but that I

09:54:15   16  | took those semesters off for health reasons.  To me, it

09:54:20   17  | was multifaceted.  It wasn't just as straightforward as my

09:54:25   18  | health.  My health was very obviously deteriorating.  I

09:54:31   19  | feel also, though, that the school was not welcoming me.

09:54:38   20  | Their words were not matching their actions.  And I very

09:54:43   21  | much felt like they didn't want me there anymore and

09:54:48   22  | that's why they were making things so difficult for me.

09:54:52   23  | And the stress that was involved with all of that and that

09:54:55   24  | heightened awareness that I told you about, that I felt

09:54:58   25  | like I became obsessed with just constantly looking for

1    STATE OF ARIZONA      )

2    COUNTY OF MARICOPA    )

3              BE IT KNOWN that the foregoing proceedings

4    were taken before me; that the witness before testifying

5    was duly sworn by me to testify to the whole truth; that

6    the foregoing pages are a full, true, and accurate record

7    of the proceedings all done to the best of my skill and

8    ability; that the proceedings were taken down by me in

9    shorthand and thereafter reduced to print under my

10   direction.

11             I CERTIFY that I am in no way related to any

12   of the parties hereto nor am I in any way interested in

13   the outcome hereof.

14             [ ] Review and signature was requested.

15             [ ] Review and signature was waived.

16             [X] Review and signature was not requested.

17             I CERTIFY that I have complied with the

18   ethical obligations set forth in ACJA 7-206(F)(3) and

19   ACJA 7-206 (J)(1)(g)(1) and (2).  Dated at Phoenix,

20   Arizona, this 14th day of August, 2023.

21

22   _____

23             Meri Coash, RMR, CRR

24             Certified Reporter

25             Arizona CR No. 50327

1          I CERTIFY that Coash & Coash, Inc., has

2    complied with the ethical obligations set forth in

3    ACJA 7-206 (J)(1)(g)(1) through (6).

4

5

6

7    _____

8              COASH & COASH, INC.

9           Registered Reporting Firm

10           Arizona RRF No. R1036

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 11

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ARIZONA

 3                                        )
 4    Sara Do, an individual,            )
                                          )
 5           Plaintiff,                   )
                                          )
 6    v.                                  )   No.
                                          )   CV-22-00190-PHX-JJT
 7    Arizona Board of Regents, an        )
      Arizona State Entity; et al.,       )
 8                                        )
             Defendants.                  )
 9    _____)

10

11

                VIDEOTAPED DEPOSITION OF SARA DO
12

13

14

                       Phoenix, Arizona
15
                      March 16, 2024
16

17

18

19

20

21

22

23    Prepared by:

24    Meri Coash, RMR, CRR
      Certified Reporter
25    Certification No. 50327
```

**CERTIFIED TRANSCRIPT**

```
 1                        I N D E X

   WITNESS                                              PAGE
 2
    SARA DO
 3
        Examination by Ms. Windtberg                       7
 4

 5

 6

 7

 8                    EXHIBITS MARKED

 9   EXHIBITS              DESCRIPTION              PAGE

10   Exhibit 38    Supplemental Complaint dated        11
                   12-21-23
11
     Exhibit 39    Email string dated 11-1-22,         13
12                 Subject:  Next steps:  Spring 2023
                   ABOR010732 - 10733
13
     Exhibit 40    Application for:  Sara "Sara" Do    17
14                 ABOR014590 - 14594
                   Confidential
15
     Exhibit 41    Email string, Subject:  Follow up   21
16                 from our meeting, with attachment
                   ABOR010770 - 10771
17
     Exhibit 42    Email dated 12-13-22, Subject:      24
18                 Sara Do - M.D. and PhD Signed
                   Accommodations Form (Including
19                 Covid Vaccine Medical Exemption),
                   with attachments
20                 ABOR010892 - 10905

21   Exhibit 43    Email dated 12-14-22, Subject:      27
                   Letter from my Cardiologist re:
22                 Covid Vaccine (New Documentation),
                   with attachments
23                 ABOR010954 - 10968

24   Exhibit 44    Email string, Subject:             30
                   Accommodations update request
25                 ABOR011401 - 11409
```

 1   Exhibit 45      Arizona State University Official      40
                     Transcript
 2                   ABOR014726 - 14731

 3   Exhibit 46      Email string, Subject:                 64
                     Accommodations for Summer Semester
 4                   Do_009175 - 9188

 5   Exhibit 47      NUR 478 - Nursing Practice Complex      67
                     Care - Clinical Performance
 6                   Evaluation
                     ABOR013279 - 013313
 7
     Exhibit 48      Text messages                          83
 8                   Do_105023 - 105024

 9   Exhibit 49      Text messages                          87
                     Do_105025
10
     Exhibit 50      NUR 519 Nursing Practice:  Clinical    89
11                   Immersion Clinical Replacement
                     Hours LOG
12                   Do_010522

13   Exhibit 51      NUR 519 - Nursing Practice Complex      97
                     Care - Clinical Performance
14                   Evaluation
                     ABOR014453 - 14475
15
     Exhibit 52      Email string dated 7-13-23,           141
16                   Subject:  Break Today
                     ABOR014262
17
     Exhibit 53      Letter dated 2-7-24                    145
18                   Do_011672

19

20

21

22

23

24

25

```
 1              VIDEOTAPED DEPOSITION OF SARA DO

 2   was taken on March 16, 2024, commencing at 10:03 a.m., at

 3   the law offices of Osborn Maledon, PA, 2929 North Central

 4   Avenue, Suite 2000, Phoenix, Arizona, before Meri Coash, a

 5   Certified Reporter in the State of Arizona.

 6

 7

 8                         *    *    *

 9

10   APPEARANCES:

11        For the Plaintiff:
               AFFELD ENGLAND & JOHNSON LLP
12             By:  Brian R. England, Esq.
                    2049 Century Park East
13                  Suite 2460
                    Los Angeles, California  90067
14                  310-979-8700
                    bre@aejlaw.com
15

16        For Defendants Arizona Board of Regents, Day,
          Bednarek, Morris, Keck:
17             OSBORN MALEDON, PA
               By:  Kristin L. Windtberg, Esq.
18                  Mary R. O'Grady, Esq. (via videoconference)
                    Joshua J. Messer, Esq.
19                  2929 North Central Avenue
                    20th Floor
20                  Phoenix, Arizona  85012
                    602-640-9000
21                  kwindtberg@omlaw.com
                    mogrady@omlaw.com
22                  jmesser@omlaw.com

23

24

25
```

10:09:05   1        Q.   And upon returning to the MEPN program, you

10:09:08   2   completed courses over the course of the spring and summer

10:09:11   3   of 2023.  Is that right?

10:09:14   4        A.   Yes.

10:09:14   5        Q.   And you've since graduated from the MEPN program?

10:09:17   6        A.   Yes.

10:09:18   7        Q.   When did you graduate?

10:09:19   8        A.   I think it was August 9th.

10:09:23   9        Q.   Of 2023?

10:09:25  10        A.   2023.  Sorry.

10:09:27  11        Q.   Now, you've filed a Supplemental Complaint

10:09:31  12   against the Arizona Board of Regents in the district court

10:09:35  13   action, correct?

10:09:37  14        A.   Yes.

10:09:37  15        Q.   And that Supplemental Complaint sets forth your

10:09:42  16   allegations against ASU related to the events that

10:09:45  17   occurred after you returned to the MEPN program in 2023,

          18   correct?

10:09:49  19        A.   Yes.

10:09:50  20        Q.   I'm going to show you what we will mark as

10:09:54  21   Exhibit Number 38.

          22             (Deposition Exhibit 38 was marked for

          23             identification.)

          24   BY MS. WINDTBERG:

10:10:13  25        Q.   Do you recognize what's been marked as Exhibit

| | | |
|---|---|---|
| 10:14:58 | 1 | have you returning to the MEPN program in the spring of |
| 10:15:01 | 2 | 2023? |
| 10:15:01 | 3 | A.   Yes. |
| 10:15:01 | 4 | Q.   If you look back into the email from Ms. Kiernan |
| 10:15:06 | 5 | on this Exhibit Number 39, the second sentence of her |
| 10:15:14 | 6 | email says, "Once you confirm your intent to enroll, you |
| 10:15:18 | 7 | should immediately begin the intake process with the |
| 10:15:24 | 8 | Student Accessibility and Inclusive Learning Services |
| 10:15:26 | 9 | (SAILS) team."  Do you see that? |
| 10:15:28 | 10 | A.   Yes. |
| 10:15:28 | 11 | Q.   Did you --  She then gives you a link to begin |
| 10:15:34 | 12 | that process to fill out what she refers to as a new |
| 10:15:36 | 13 | registration form, correct? |
| 10:15:38 | 14 | A.   Yes. |
| 10:15:39 | 15 | Q.   Okay.  And she then goes on to tell you that once |
| 10:15:43 | 16 | you begin the process with SAILS, you'll need to provide |
| 10:15:46 | 17 | supporting documentation, correct? |
| 10:15:50 | 18 | A.   Yes. |
| 10:15:50 | 19 | Q.   Okay.  Did you submit a new registration form or |
| 10:15:56 | 20 | application to the SAILS office prior to returning to the |
| 10:16:01 | 21 | MEPN program in the spring of 2023? |
| 10:16:03 | 22 | A.   I believe I did. |
| 10:16:04 | 23 | Q.   And did you do that through the SAILS online |
| 10:16:07 | 24 | portal? |
| 10:16:08 | 25 | A.   I believe so. |

10:29:23   1       Q.   Okay.  Your email here says, "I was able to

10:29:26   2   complete the form today."  Do you see that?

10:29:27   3       A.   Yes.

10:29:27   4       Q.   So if the form was completed the day the email

10:29:30   5   was sent, would you have been able to send it prior to

10:29:32   6   this date?

10:29:33   7       A.   I don't believe so, but just I --  I'm under oath

10:29:38   8   right now, so I can't for sure say "yes" or "no."  So I

10:29:42   9   don't --  I believe this was probably the first set of

10:29:47  10   documentation that I sent, but I -- I don't know a hundred

10:29:54  11   percent because --  That's what it looks like, though.

10:29:56  12       Q.   Sure.  I appreciate that.

10:29:59  13            After December 13th of 2022, did you send

10:30:04  14   additional medical documentation to Ms. Wackerly-Painter

10:30:07  15   to support your requests for accommodation?

10:30:10  16       A.   I don't remember.

10:30:11  17       Q.   All right.  Let me show you what we're going to

10:30:14  18   mark as Exhibit Number 43.

10:30:17  19            MS. WINDTBERG:  And for the record,

10:30:19  20   Exhibit -- excuse me -- 43 is marked ABOR010954 through

10:30:28  21   ABOR010968.

          22            (Deposition Exhibit 43 was marked for

10:30:42  23            identification.)

10:30:42  24   BY MS. WINDTBERG:

10:30:48  25       Q.   Ms. Do, do you recognize Exhibit Number 43?

10:30:51 1   A. It's an email and forms filled out, Arizona State

10:31:19 2 University forms, and a letter in there included also from

10:31:26 3 one of my providers.

10:31:30 4   Q. And -- and the email is dated December 14th of

10:31:33 5 2022, correct?

10:31:34 6   A. Yes.

10:31:34 7   Q. And the email is from you to Alicia

10:31:38 8 Wackerly-Painter.  Is that right?

10:31:40 9   A. Yes.

10:31:40 10   Q. And it appears from the email -- please correct

10:31:42 11 me if I'm wrong -- that the attachments to the -- to the

10:31:47 12 email are the same as the attachments that we saw in

10:31:50 13 Exhibit Number 42 but with the addition of a letter from

10:31:55 14 your cardiologist to support your, quote, inability to

10:32:00 15 obtain any more vaccinations due to my cardiac reaction,

10:32:04 16 end quote, correct?

10:32:05 17   A. Yes.

10:32:05 18   Q. And if you would turn to the page that has been

10:32:20 19 marked ABOR010964, please.  Do you have in front of you a

10:32:38 20 document titled "Accommodations I've requested from ASU

10:32:43 21 that I feel would allow me to finish the MSN program

10:32:48 22 successfully"?

10:32:49 23   A. Yes.

10:32:49 24   Q. Do you recognize this document?

10:32:51 25   A. Yes.

10:32:51  1      Q.   Is this document that we're looking at a document

10:32:55  2   that you prepared?

10:32:56  3      A.   I believe so.

10:33:00  4      Q.   If you would keep that in front of you but then

10:33:05  5   also please get Exhibit Number 38, which was the

10:33:09  6   Supplemental Complaint.

10:33:16  7           In Exhibit Number 38, if you would turn to

10:33:19  8   paragraph 11, please.  Are you there?

10:33:31  9      A.   Yes.

10:33:31  10     Q.   Paragraph 11 in the first sentence says, "On

10:33:36  11  December 14, 2022, Do provided a list of accommodation

10:33:39  12  requests and documentation related to her accommodation

10:33:44  13  needs."

10:33:44  14          Did I read that correctly?

10:33:45  15     A.   Yes.

10:33:46  16     Q.   Is the list of accommodation requests that we

10:33:53  17  have in Exhibit Number 43 the list that was being

10:33:56  18  referenced in paragraph 11 of the Supplemental Complaint?

10:33:59  19     A.   Yes.

10:34:00  20     Q.   Thank you.  You can set the complaint aside so

10:34:05  21  it's not in your way.  Actually, I'm sorry.  I want to do

10:34:08  22  one more thing with that before we move on.

10:34:10  23          If you look at paragraph number 13 of your

10:34:14  24  Supplemental Complaint.

10:34:16  25               MR. ENGLAND:  This one.

10:37:27  1    like the -- the specific accommodations requests are in

10:37:31  2    numbered paragraphs, correct?

10:37:32  3        A.   Yes.

10:37:32  4        Q.   Okay.  I'd like to start with numbered

10:37:35  5    paragraph 1.  And here you were asking for an exemption

10:37:38  6    not to receive another COVID and influenza vaccine,

10:37:43  7    correct?

10:37:44  8        A.   Yes.

10:37:44  9        Q.   And was that request granted by ASU?

10:37:47  10       A.   Yes.

10:37:48  11       Q.   And you weren't required to obtain either a flu

10:37:51  12   or a COVID vaccine in order to attend your classes or

10:37:55  13   clinical shifts in 2023, correct?

10:37:58  14       A.   Correct.

10:37:58  15       Q.   If you look, then, to Item Number 4 on Exhibit

10:38:09  16   Number 43 -- excuse me -- you were asking to have your --

10:38:13  17   to be allowed to take your exams at the ASU Polytechnic

10:38:18  18   campus testing center, correct?

10:38:21  19       A.   I'm sorry.  Which one is that?  What number?

          20            MR. ENGLAND:   Number 3.

          21   BY MS. WINDTBERG:

10:38:23  22       Q.   Number 3.

          23       A.   Okay.

10:38:24  24       Q.   To make sure we're on the same page, in Item

          25   Number 3 --

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | A.    Yes.                                                |
| 10:38:25 | 2  | Q.    -- you were asking to be allowed to take your      |
| 10:38:27 | 3  | exams at the ASU Polytechnic campus testing center,      |
| 10:38:31 | 4  | correct?                                                 |
| 10:38:31 | 5  | A.    Yes.                                                |
| 10:38:32 | 6  | Q.    And that request was not granted, correct?         |
| 10:38:36 | 7  | A.    Can I look back at what she responded with?        |
| 10:38:39 | 8  | Q.    Of course.                                         |
| 10:38:40 | 9  | A.    Okay.  Thank you.                                   |
| 10:38:43 | 10 |          THE WITNESS:  Which number was that?            |
| 10:38:45 | 11 |          MR. ENGLAND:  44.                               |
| 10:39:02 | 12 |          THE WITNESS:  That's correct.                   |
| 10:39:02 | 13 | BY MS. WINDTBERG:                                         |
| 10:39:05 | 14 | Q.    And you are looking at Exhibit Number 44.  Can     |
| 10:39:08 | 15 | you tell me what page you're on in Exhibit Number 44,    |
| 10:39:11 | 16 | please?                                                  |
| 10:39:11 | 17 | A.    ABOR011402.                                        |
| 10:39:15 | 18 | Q.    And it appears to me that in Exhibit Number 44,    |
| 10:39:20 | 19 | each of your accommodation requests is written in bold   |
| 10:39:25 | 20 | type with the same paragraph number as is included on    |
| 10:39:30 | 21 | Exhibit Number 43, correct?                              |
| 10:39:31 | 22 | A.    Correct.                                           |
| 10:39:31 | 23 | Q.    Okay.  So you're looking at Item Number 3 on       |
| 10:39:36 | 24 | ABOR 1142 of Exhibit Number 44?                          |
| 10:39:42 | 25 | A.    Yes.  In comparison to the Number 3 on             |

10:39:45    1    ABOR010964.

10:39:47    2        Q.    Thank you.

10:39:49    3        A.    You're welcome.

10:39:49    4        Q.    And in denying this request, ASU indicated that

10:39:57    5    the university does not determine accommodations on the

10:40:00    6    basis of an individual's place of residence, correct?

10:40:03    7        A.    For Number 3?

10:40:09    8        Q.    Yes.

10:40:10    9        A.    That's correct.  It does say that in there, yes.

10:40:18   10        Q.    And the first sentence of the response says,

10:40:22   11    "This request for accommodations to reduce the time it

10:40:26   12    takes you to commute between your home and program

10:40:28   13    activity locations is not a reasonable accommodation in

10:40:32   14    light of your disability needs," correct?

10:40:34   15        A.    Yes, that's what it says.

10:40:35   16        Q.    And then it goes on to say that "If you have

10:40:38   17    additional information for us to consider concerning this

10:40:40   18    request, we will be happy to review any other information

10:40:43   19    specific to the nature of this request at any time,"

           20    correct?

10:40:46   21        A.    Yes, it says that.

10:40:47   22        Q.    Looking back at Exhibit Number 43, your request

10:40:55   23    for accommodations, if you would turn to Item Number 4.

10:41:03   24    Here you're requesting that you have no overnight clinical

10:41:07   25    requirements in order to maintain a regular sleep

10:41:10  1  schedule, correct?

10:41:11  2      A.   Correct.

10:41:11  3      Q.   And Arizona State University did not require you

10:41:15  4  to participate in any overnight clinicals during either

10:41:18  5  the spring or summer 2023 semesters, correct?

10:41:22  6      A.   They didn't have any scheduled, so no student was

10:41:25  7  going to have to do any overnight clinicals.

10:41:28  8      Q.   And so you did not have to do any overnight

10:41:31  9  clinicals, correct?

10:41:32  10     A.   Correct.

10:41:32  11     Q.   Looking at Item Number 5, here you're requesting

10:41:37  12  flexible attendance for your in-person classes, correct?

10:41:42  13     A.   Yes.

10:41:42  14     Q.   And Arizona State University granted that

10:41:44  15  request, didn't it?

10:41:46  16     A.   Do you mind if I read her response?

10:41:49  17     Q.   Not at all.

10:41:49  18     A.   Okay.  Thanks.

10:43:16  19          Okay.  Sorry.  Do you mind asking your

10:43:19  20  question again?

10:43:20  21     Q.   Your request for flexible attendance in

10:43:24  22  connection with your in-person classes was granted,

10:43:25  23  correct?

10:43:26  24     A.   For the lecture sessions only, yes.

          25     Q.   Okay.

10:43:30  1      A.    It didn't apply to clinical or simulation

10:43:35  2  experiential classes.

10:43:36  3      Q.    Okay.  On Exhibit Number 43, if you would look at

10:43:47  4  Item Number 6.  Here you're requesting to be permitted to

10:43:52  5  take breaks as needed during clinicals and classes to take

10:43:55  6  medication, correct?

10:43:57  7      A.    Yes.

10:43:57  8      Q.    And ASU granted this request, correct?

10:44:03  9      A.    Do you mind if I read through her response more

10:44:07 10  detailed?  Sorry.

10:44:08 11      Q.    I don't.  My -- my question is just did they

10:44:10 12  grant that request?  But I'm -- I'm happy to have you read

10:44:12 13  through whatever you need to to answer that.

10:44:15 14      A.    Thank you.

10:45:40 15            Okay.  What was your question again?

10:45:43 16      Q.    That Arizona State University granted your

10:45:45 17  request that you be allowed to take breaks to take your

10:45:48 18  medication when needed.

10:45:51 19      A.    It was somewhat conditional.  It wasn't just as

10:45:55 20  needed as I had requested.  So it was --  There were some

10:45:59 21  caveats in there.

10:46:00 22      Q.    And what were those caveats?

10:46:02 23      A.    Well, specifically, like, for medication

10:46:07 24  management, I was allowed a 5- to, I think, 10-minute

10:46:11 25  break -- I don't know; maybe it was 5 minutes --

| | | |
|---|---|---|
| 10:46:15 | 1 | throughout the course of up to a 14-hour shift.  I was |
| 10:46:20 | 2 | allowed one of those breaks for medication management. |
| 10:46:26 | 3 | And then they had given me the option of either having two |
| 10:46:34 | 4 | separate one-hour breaks or one two-hour break that I |
| 10:46:42 | 5 | would have to preschedule before each shift, and it had to |
| 10:46:47 | 6 | occur midday, mid-shift, and I had to stay on-site at the |
| 10:46:53 | 7 | hospital, and I would have to make that time up later on |
| 10:47:01 | 8 | through simulation experiences. |
| 10:47:03 | 9 | Q.  Okay.  Thank you.  And we're going to turn to |
| 10:47:06 | 10 | that piece in a minute, but right now, I just wanted to |
| 10:47:09 | 11 | focus on Item Number 6 of your request for accommodation, |
| 10:47:12 | 12 | which was a request that you be allowed breaks to take |
| 10:47:15 | 13 | medication. |
| 10:47:18 | 14 | Were you ever denied the opportunity to take |
| 10:47:20 | 15 | a break to take medication during any of your clinical |
| 10:47:23 | 16 | shifts? |
| 10:47:24 | 17 | A.  My nurse preceptor is who I would interact with |
| 10:47:32 | 18 | one-on-one there, and none of my nurse preceptors ever |
| 10:47:36 | 19 | denied me the need to take medication.  And the nurse |
| 10:47:43 | 20 | preceptors were whoever I was working with each shift at |
| 10:47:47 | 21 | the hospital. |
| 10:47:48 | 22 | Q.  And so during any of your clinical shifts in |
| 10:47:51 | 23 | either the spring or summer 2023 semesters, if you felt |
| 10:47:57 | 24 | you needed to take medication, you were allowed to do so? |
| 10:48:00 | 25 | A.  Yes.  I don't recall a time where I couldn't. |

| | | |
|---|---|---|
| 10:48:03 | 1 | Q.   On Exhibit Number 43, if you'd look at Item |
| 10:48:10 | 2 | Number 7, please.  In Item Number 7, you're requesting |
| 10:48:15 | 3 | that you be allowed to have a support companion in |
| 10:48:20 | 4 | attendance with you to on-campus obligations, correct? |
| 10:48:24 | 5 | A.   Yes. |
| 10:48:25 | 6 | Q.   And here you mentioned having your support |
| 10:48:30 | 7 | companion attend on-campus obligations, but you later also |
| 10:48:34 | 8 | request -- requested that the support companion also |
| 10:48:37 | 9 | accompany you to clinical rotations, correct? |
| 10:48:40 | 10 | A.   Yes.  It was any on-campus -- like, I considered |
| 10:48:42 | 11 | the hospital to be a campus -- that I would be at for |
| 10:48:45 | 12 | performing obligations for the MEPN program.  So anything |
| 10:48:48 | 13 | that I was required to be on site at a facility for any |
| 10:48:50 | 14 | reason as a result of requirements for my program, that's |
| 10:48:55 | 15 | what I'm referring to when I say "on campus." |
| 10:48:57 | 16 | Q.   And who was your support companion? |
| 10:49:00 | 17 | A.   Relationship or name? |
| 10:49:04 | 18 | Q.   Let's start with name. |
| 10:49:05 | 19 | A.   Thong Do. |
| 10:49:06 | 20 | Q.   And -- and what was Mr. --  Thong Do is a |
| 10:49:10 | 21 | licensed physician, correct? |
| 10:49:11 | 22 | A.   Yes, he is.  He's a medical doctor. |
| 10:49:13 | 23 | Q.   He's Dr. Do? |
| 10:49:14 | 24 | A.   Yes. |
| 10:49:14 | 25 | Q.   And what is Dr. Do's relationship to you? |

10:49:17   1        A.   I have known him for over 20 years, and he's my

10:49:20   2   former husband.

10:49:21   3        Q.   And did --

10:49:23   4        A.   And he's also my medical power of attorney.

10:49:26   5        Q.   Thank you.

10:49:27   6             Did Arizona State University grant your

10:49:29   7   request to have Dr. Do as a support companion accompany

10:49:34   8   you -- accompany you to both your on-campus and clinical

10:49:38   9   obligations?

10:49:39   10       A.   Yes.

10:49:40   11       Q.   And were you ever denied the opportunity to have

10:49:42   12   your support companion with you at any MEPN course

10:49:45   13   obligation?

10:49:46   14             MR. ENGLAND:   Objection.   Vague.

10:49:51   15             THE WITNESS:   My memory is hazy regarding

10:50:03   16   the specifics of it, but I know that at one point, there

10:50:06   17   was, like, a little bit of an issue with some on-campus

10:50:10   18   presence and a professor, but we -- I talked with them and

10:50:16   19   I told them that he -- that I have accommodations, and we

10:50:22   20   settled it --

           21   BY MS. WINDTBERG:

           22       Q.   And was --

10:50:24   23       A.   -- just through discussion.

10:50:26   24       Q.   Excuse me.

10:50:26   25             And so was Dr. Do permitted to stay in that

10:50:30    1    instance?

10:50:31    2         A.   Yes.

10:50:32    3         Q.   If you'd look back to Exhibit Number 43, Item

10:50:44    4    Number 2.  Here you are requesting "Modification to

10:50:48    5    clinical shift blocks of time (originally scheduled in

10:50:53    6    14-hour blocks with one 30-minute break).  Requesting

10:50:57    7    'open scheduling' for clinicals where I can go to any

10:51:00    8    approved clinical site for any scheduled shift and work

10:51:05    9    however long I can tolerate without being required to

10:51:07   10    'only' do shifts in 14-hour blocks of time," correct?

10:51:10   11         A.   Correct.

10:51:11   12         Q.   For the spring 2023 semester only, you had one

10:51:18   13    clinical course, correct?

10:51:28   14         A.   Spring?  I would have to see my schedule.  I'm

10:51:31   15    sure if you're saying it, that's right.  I just don't --

10:51:35   16    Everything blends together.

10:51:36   17         Q.   I understand.

10:51:37   18              I want to make sure that -- that we are on

10:51:39   19    the same page, so I'm going to give you what we will mark

10:51:42   20    as Exhibit 45.  And Exhibit 45 is marked ABOR014726

10:51:53   21    through ABOR014731.

           22              (Deposition Exhibit 45 was marked for

10:52:09   23              identification.)

10:52:09   24    BY MS. WINDTBERG:

10:52:14   25         Q.   Ms. Do, is Exhibit Number 45 your transcript from

| | | |
|---|---|---|
| 10:52:17 | 1 | Arizona State University? |
| 10:52:18 | 2 | A.   Yes, it is. |
| 10:52:20 | 3 | Q.   If you would turn to the third page of that |
| 10:52:24 | 4 | exhibit, which is marked ABOR014728 -- |
| 10:52:32 | 5 | A.   Okay. |
| 10:52:32 | 6 | Q.   -- you'll see on the left-hand side of the page, |
| 10:52:37 | 7 | a little more than halfway down, it says "Beginning of |
| 10:52:40 | 8 | Graduate Record." |
| 10:52:41 | 9 | A.   Yes. |
| 10:52:41 | 10 | Q.   Do you see that? |
| 10:52:42 | 11 | A.   Uh-huh. |
| 10:52:43 | 12 | Q.   And then if you look across the page at about the |
| 10:52:47 | 13 | same height, you will see "2023 Spring."  Do you see that |
| 10:52:51 | 14 | there? |
| 10:52:51 | 15 | A.   Yes. |
| 10:52:51 | 16 | Q.   Looking at your courses for the spring 2023 |
| 10:52:55 | 17 | semester, you only had one clinical course that semester, |
| 10:53:10 | 18 | correct? |
| 10:53:10 | 19 | A.   Yes. |
| 10:53:11 | 20 | Q.   That was the NUR 478 -- |
| 10:53:12 | 21 | A.   Yes. |
| 10:53:12 | 22 | Q.   -- complex care course? |
| 10:53:14 | 23 | A.   Yes. |
| 10:53:15 | 24 | Q.   And am I correct that you were assigned to |
| 10:53:19 | 25 | complete your clinical shifts for NUR 478 in the spring |

| | | |
|---|---|---|
| 10:53:25 | 1 | 2023 semester at St. Joseph's Hospital? |
| 10:53:28 | 2 | A.   Yes. |
| 10:53:32 | 3 | Q.   And the shifts for those clinical -- that |
| 10:53:36 | 4 | clinical rotation were scheduled by the hospital to begin |
| 10:53:40 | 5 | at 7 a.m. and end at 7 p.m., correct? |
| 10:53:42 | 6 | MR. ENGLAND:  Objection.  Assumes facts. |
| 10:53:44 | 7 | You can answer. |
| 10:53:44 | 8 | THE WITNESS:  That is their employee |
| 10:53:48 | 9 | scheduling.  And so it's --  That's the exact time that |
| 10:53:57 | 10 | they're supposed to be ideally doing shift turnover |
| 10:54:02 | 11 | from -- taking over from the nighttime nurse and |
| 10:54:04 | 12 | transferring to the daytime nurse and then at night doing |
| 10:54:08 | 13 | the same thing at 7:00.  So the oncoming nurse will get |
| 10:54:12 | 14 | there, you know, typically a little bit early to try to |
| 10:54:15 | 15 | take over so that the other nurse -- you know, to keep |
| 10:54:19 | 16 | that schedule.  But it doesn't usually work that way. |
| 10:54:22 | 17 | BY MS. WINDTBERG: |
| 10:54:22 | 18 | Q.   And so just -- I just want to make sure that |
| 10:54:24 | 19 | we're on the same page.  And I think I understand what |
| 10:54:26 | 20 | you're talking about, but I just want to go piece by |
| 10:54:28 | 21 | piece. |
| 10:54:28 | 22 | So for the daytime shifts at |
| 10:54:34 | 23 | St. Joseph's Hospital, for the nurses -- the registered |
| 10:54:36 | 24 | nurses who worked there, their daytime shift was scheduled |
| 10:54:39 | 25 | to begin at 7 a.m. and end at 7 p.m., correct? |

| | | |
|---|---|---|
| 10:54:43 | 1 | A.    That's their schedule, yes. |
| 10:54:44 | 2 | Q.    And as a nursing student who was going to perform |
| 10:54:48 | 3 | clinical rotations at St. Joseph's Hospital during the |
| 10:54:51 | 4 | daytime shift, you would have mirrored that same daytime |
| 10:54:55 | 5 | shift schedule, correct? |
| 10:54:56 | 6 | A.    No. |
| 10:54:56 | 7 | Q.    Why not? |
| 10:54:57 | 8 | A.    We were expected to be there early so we could |
| 10:55:00 | 9 | meet with our class and kind of do a little morning huddle |
| 10:55:03 | 10 | with our classmates and our faculty of record.  And then |
| 10:55:13 | 11 | after the shift, we would typically meet again before we |
| 10:55:19 | 12 | were allowed to leave. |
| 10:55:20 | 13 | Q.    And how far in advance of the 7 a.m. start time |
| 10:55:25 | 14 | were you asked to arrive for the shift? |
| 10:55:27 | 15 | A.    I don't remember what time we were asked to |
| 10:55:29 | 16 | arrive.  It just would vary depending on the faculty of |
| 10:55:34 | 17 | record and if there was anything we needed to discuss. |
| 10:55:40 | 18 | Q.    And so again, I want to focus -- I'm just talking |
| 10:55:44 | 19 | right now about NUR 478 in the spring of 2023 semester. |
| | 20 | A.    Uh-huh. |
| 10:55:50 | 21 | Q.    Did anyone give you specific instructions about |
| 10:55:52 | 22 | what time you should arrive for your clinical shifts at |
| 10:55:56 | 23 | St. Joseph's Hospital for that course? |
| 10:55:57 | 24 | A.    Our faculty of record would ask us to be there at |
| 10:56:01 | 25 | whatever time she wanted us to show up. |

11:09:26   1          But again, we're talking about at the time

11:09:29   2   where you were requesting these accommodations before you

11:09:32   3   returned to classes, so before you were getting up to go

11:09:34   4   to your clinicals.  In December of 2022, when you asked

11:09:38   5   for the open scheduling, I'm trying to understand what

11:09:41   6   specific concerns you were trying to address with that

11:09:44   7   request for accommodation.

11:09:46   8      A.   So I knew that there was a possibility they could

11:09:49   9   put me anywhere in the Valley, so when I requested that

11:09:56   10   accommodation, it was in case I needed it.  Because if the

11:10:02   11   accommodation's not approved and set in place, then it's a

11:10:06   12   lot harder to get a last-minute accommodation.  So I felt

11:10:12   13   like if I could put these down and they could grant, you

11:10:19   14   know, whatever they could, that maybe that would be enough

11:10:22   15   to help get me through the program.

11:10:24   16      Q.   And just to make sure that I'm understanding I

11:10:31   17   think what you're saying -- but I just want to make

11:10:33   18   sure -- so you requested the accommodation listed as Item

11:10:38   19   Number 2 on Exhibit 43, the request for open scheduling,

11:10:42   20   because you were concerned that you might not be able to

11:10:45   21   complete full clinical shifts that might last, as you say,

11:10:48   22   up to 14 hours -- correct? -- due to your disability?

11:10:52   23      A.   Yes.

11:10:52   24      Q.   And which disability or disabilities were you

11:10:55   25   focused on?

| | | |
|---|---|---|
| 11:10:56 | 1 | A.    That's primarily my heart condition.  And then |
| 11:11:06 | 2 | anxiety disorder comes in with that because the two -- |
| 11:11:09 | 3 | when they're working in tandem, one makes the other one |
| 11:11:15 | 4 | worse, and then that sets off the other one to be worse, |
| 11:11:19 | 5 | and it's just -- it's not good. |
| 11:11:23 | 6 | MS. WINDTBERG:  We've been going about an |
| 11:11:24 | 7 | hour.  I'm happy to keep going.  I know you said you |
| 11:11:28 | 8 | didn't want to take many breaks, but I'm also happy to |
| 11:11:30 | 9 | take a break.  So it seems like a good -- |
| 11:11:30 | 10 | MR. ENGLAND:  You okay to take 20 more |
| 11:11:32 | 11 | minutes and then take a break? |
| 11:11:35 | 12 | THE WITNESS:  Yeah. |
| | 13 | MR. ENGLAND:  Or do you need a break now? |
| 11:11:35 | 14 | THE WITNESS:  No, I don't need a break. |
| 11:11:37 | 15 | BY MS. WINDTBERG: |
| 11:11:37 | 16 | Q.    Okay.  So your request for open scheduling |
| 11:11:39 | 17 | ultimately was not granted, correct? |
| 11:11:41 | 18 | A.    Correct. |
| 11:11:42 | 19 | Q.    And one of the reasons that it wasn't granted was |
| 11:11:49 | 20 | because during the spring 2023 semester, all of the teams |
| 11:11:53 | 21 | in your cohort were scheduled to participate in their |
| 11:11:56 | 22 | clinical shifts on the same days, correct? |
| 11:11:59 | 23 | A.    Is that written somewhere?  Like, was that on |
| 11:12:02 | 24 | Number 2 over here or something?  I just wanted to kind of |
| 11:12:06 | 25 | go back and look at that. |

| | | |
|---|---|---|
| 11:12:07 | 1 | Q.   If you look at Exhibit 44, under Number 2, |
| 11:12:11 | 2 | referring to your request for open scheduling, the first |
| 11:12:16 | 3 | paragraph and the second sentence starts, "As it relates |
| 11:12:19 | 4 | to this upcoming clinical rotation, specifically your |
| 11:12:22 | 5 | current placement and current clinical location, while |
| 11:12:26 | 6 | your cohort is split into a few teams placed at various |
| 11:12:30 | 7 | facilities, each of those teams' clinical rotations are |
| 11:12:33 | 8 | scheduled for the same dates and times."  Do you see that? |
| 11:12:37 | 9 | A.   I do see that. |
| 11:12:38 | 10 | Q.   And -- and you were told that all of the teams |
| 11:12:40 | 11 | would be participating in their clinicals on the same |
| 11:12:43 | 12 | dates and time during the spring 2023 semester, correct? |
| 11:12:49 | 13 | A.   So I saw --  I mean, yes, that's what they -- |
| 11:12:53 | 14 | that's what they said.  I saw a schedule, though, later on |
| 11:12:56 | 15 | that showed something to the contrary. |
| 11:12:58 | 16 | Q.   And -- and what are you referring to? |
| 11:13:01 | 17 | A.   There were some teams that were scheduled for the |
| 11:13:03 | 18 | same days at various locations but others that were -- |
| 11:13:10 | 19 | that did not have the same dates.  So -- so my entire |
| 11:13:14 | 20 | cohort of 50 students did not all have the same schedule. |
| 11:13:19 | 21 | Q.   Which teams did you see something that suggested |
| 11:13:23 | 22 | they had different dates for their clinical shifts in the |
| 11:13:26 | 23 | spring of 2023? |
| 11:13:27 | 24 | A.   I was told that I could not see that schedule, |
| 11:13:31 | 25 | and I don't remember now how I was able to get a copy of |

| | | |
|---|---|---|
| 11:13:35 | 1 | it, but I did.  And that's how I saw it. |
| 11:13:40 | 2 | As far as teams, we weren't -- actually, we |
| 11:13:43 | 3 | were -- we were given names, but I don't remember who |
| 11:13:45 | 4 | was --  Well, I don't even remember what my team name was. |
| 11:13:49 | 5 | Q.  So you had a copy of a schedule of clinical |
| 11:13:52 | 6 | shifts for the spring 2023 semester for a team other than |
| 11:13:57 | 7 | yours? |
| 11:13:58 | 8 | A.  It was for everybody. |
| 11:14:00 | 9 | Q.  Did you produce that in this case? |
| 11:14:01 | 10 | A.  I believe I did. |
| 11:14:02 | 11 | Q.  And you believe that schedule shows that teams |
| 11:14:05 | 12 | other than yours participated in clinical shifts on days |
| 11:14:10 | 13 | that were different from the ones you participated in? |
| 11:14:12 | 14 | A.  That's correct. |
| 11:14:13 | 15 | Q.  And you said you weren't supposed to have it but |
| 11:14:17 | 16 | you got a copy of it? |
| 11:14:18 | 17 | A.  Yes.  I was -- I asked for it originally, and I |
| 11:14:22 | 18 | believe that I --  Professor Keck and Dr. Bednarek are two |
| 11:14:28 | 19 | people that I believe I asked for that schedule to come |
| 11:14:34 | 20 | up -- or I asked if I could have a copy of it just so I |
| 11:14:37 | 21 | could see.  And I was told that that's not something that |
| 11:14:40 | 22 | they would turn over to a student.  And I believe that I |
| 11:14:47 | 23 | saw it uploaded to one of -- to my portal, that one of the |
| 11:14:55 | 24 | professors had uploaded it. |
| 11:14:57 | 25 | Q.  Do you recall when you saw that? |

11:14:59   1      A.   No.

11:15:00   2      Q.   Was it after the semester had begun?

11:15:03   3      A.   It had to have been, I believe, because I don't

11:15:14   4   think that they had the schedule set in stone before the

11:15:17   5   semester started.  I could be wrong, but I think it was

11:15:21   6   after, yeah.

11:15:21   7      Q.   You mentioned this earlier, but in response to

11:15:26   8   your request for open scheduling, you were granted a

11:15:32   9   different accommodation through which you could take

11:15:34  10   scheduled breaks, correct?

11:15:36  11      A.   Correct.

11:15:36  12      Q.   And I believe you said you were offered the

11:15:39  13   option of either one two-hour break or two one-hour breaks

11:15:45  14   that would be scheduled mid-shift, midday, correct?

11:15:49  15      A.   Correct.

11:15:50  16      Q.   And you were to schedule those breaks in advance

11:15:52  17   of your clinical shift.  Is that right?

11:15:54  18      A.   Yes.  I had to schedule those breaks before the

11:15:57  19   clinical shift began.  That's what I was told.

11:16:00  20      Q.   And then if you took those breaks, either a

11:16:04  21   two-hour break or two one-hour breaks, you would make up

11:16:07  22   that missed time in simulation, correct?

11:16:09  23      A.   Yes.

11:16:10  24      Q.   So what you were granted was an option where

11:16:16  25   if -- I'm just going to give a hypothetical -- if you

| | | |
|---|---|---|
| 11:41:39 | 1 | Q.    Okay.  I think we have gone through all but the |
| 11:41:44 | 2 | final request that's on your list.  So if you would look |
| 11:41:46 | 3 | at Item Number 8, please.  There you are asking that if |
| 11:41:51 | 4 | flexible or open scheduling for clinicals is denied, that |
| 11:41:54 | 5 | you'd be placed at East Valley clinical locations, |
| | 6 | correct? |
| 11:41:58 | 7 | A.    Yes. |
| 11:41:58 | 8 | Q.    In response to this request, you were told that |
| 11:42:06 | 9 | you had been placed at the closest clinical site to the |
| 11:42:10 | 10 | East Valley, correct? |
| 11:42:12 | 11 | A.    Yes. |
| 11:42:12 | 12 | Q.    Do you know if that was true? |
| 11:42:19 | 13 | A.    Once I looked at that schedule that I -- that I |
| 11:42:25 | 14 | got access to, that was actually true, and it was 30 miles |
| 11:42:30 | 15 | away from my home. |
| 11:42:31 | 16 | Q.    So we have gone through all of the Items 1 |
| 11:42:41 | 17 | through 8 on Exhibit Number 43 in your request of |
| 11:42:46 | 18 | accommodations.  At a later time, you also asked that you |
| 11:42:51 | 19 | be given additional time for your exams, correct? |
| 11:42:55 | 20 | A.    Yes. |
| 11:42:55 | 21 | Q.    And ASU granted you that additional time, |
| | 22 | correct? |
| 11:43:01 | 23 | A.    Where -- where is that? |
| 11:43:03 | 24 | Q.    I'm asking you.  You said that you had -- had |
| 11:43:06 | 25 | requested that additional time.  Were you granted the |

| | | |
|---|---|---|
| 11:44:40 | 1 | Q.   But I think it answers the question. |
| 11:44:42 | 2 | But let me know when you're ready, please. |
| 11:44:44 | 3 | A.   Okay.  Thank you. |
| 11:44:51 | 4 | Okay.  Yes, they approved -- according to |
| 11:44:53 | 5 | this email that Katherine Benedict wrote on June 2nd, |
| 11:44:58 | 6 | 2023, that they have updated my file with approval for 1.5 |
| 11:45:02 | 7 | times extended testing times for my exams moving forward. |
| 11:45:06 | 8 | Q.   Okay.  Thank you. |
| 11:45:08 | 9 | A.   You're welcome. |
| 11:45:09 | 10 | Q.   Did you ever utilize the additional testing time? |
| 11:45:12 | 11 | A.   I don't think I did. |
| 11:45:15 | 12 | Q.   Okay.  You can set that aside. |
| 11:45:25 | 13 | I want to talk more generally now about |
| 11:45:28 | 14 | specifically the spring 2023 semester.  During that |
| 11:45:33 | 15 | semester, we've already talked about the fact that you |
| 11:45:36 | 16 | were enrolled in NUR 478, correct? |
| 11:45:40 | 17 | A.   Yes. |
| 11:45:40 | 18 | Q.   And you also had some didactic and experiential |
| 11:45:46 | 19 | courses, correct? |
| 11:45:50 | 20 | A.   In the spring of 2023? |
| 11:45:52 | 21 | Q.   Yes. |
| 11:45:53 | 22 | A.   Yeah, I had -- I had didactic and then --  I |
| 11:45:59 | 23 | don't know what the experiential would have been for that |
| 11:46:03 | 24 | semester.  Like simulations. |
| 11:46:05 | 25 | Q.   Did you have simulations during that semester? |

| | | |
|---|---|---|
| 11:47:49 | 1 | how many students we had in the classroom, so he would |
| 11:47:52 | 2 | always be very close by but not necessarily in the |
| 11:47:55 | 3 | classroom with me but, like, within steps.  Just maybe |
| 11:47:59 | 4 | outside the building instead of inside. |
| 11:48:01 | 5 | Q.   Okay.  And for purposes of your NUR 478 |
| 11:48:05 | 6 | clinical course during the spring 2023 semester, did |
| 11:48:10 | 7 | Dr. Do attend each of your clinical shifts with you at |
| 11:48:14 | 8 | St. Joseph's Hospital? |
| 11:48:14 | 9 | A.   He did.  And he stayed on-site from the moment we |
| 11:48:17 | 10 | arrived to the moment we left together. |
| 11:48:19 | 11 | Q.   If I asked you this before, I apologize. |
| 11:48:23 | 12 | A.   That's okay. |
| 11:48:23 | 13 | Q.   I don't think I did. |
| 11:48:24 | 14 | In connection with the spring 2023 NUR 478 |
| 11:48:28 | 15 | clinicals, did you use any of the breaks that Arizona |
| 11:48:33 | 16 | State University had offered you as an accommodation? |
| 11:48:35 | 17 | A.   I did not. |
| 11:48:37 | 18 | Q.   I am going to hand you what we will mark as |
| 11:48:50 | 19 | Exhibit 47. |
| 11:48:52 | 20 | MS. WINDTBERG:  And for the record, |
| 11:48:53 | 21 | Exhibit 47 is marked ABOR013279 through ABOR013313. |
| | 22 | (Deposition Exhibit 47 was marked for |
| 11:49:25 | 23 | identification.) |
| 11:49:25 | 24 | BY MS. WINDTBERG: |
| 11:49:26 | 25 | Q.   Do you recognize Exhibit Number 47? |

11:54:56  1     A.   Again, it was, like, the same from the other

11:54:59  2  semester.  He wouldn't be in the classroom with me, but he

11:55:02  3  would be, like, in a chair right outside the door.

11:55:04  4     Q.   On campus?

11:55:05  5     A.   Yes.

11:55:06  6     Q.   Okay.  I want to talk about NUR 516, the mental

11:55:11  7  health clinical course.  Where were your clinical shifts

11:55:15  8  for that course scheduled?

11:55:17  9     A.   Copper Springs East in Gilbert.

11:55:24 10     Q.   Okay.  And did Dr. Do accompany you to your

11:55:26 11  clinical shifts for that course?

11:55:27 12     A.   Yes.  Every one.

11:55:29 13     Q.   Did you attend all of your clinical shifts for

11:55:33 14  that course?

11:55:33 15     A.   Yes, I did.

11:55:34 16     Q.   And in connection with NUR 516, did you use any

11:55:38 17  of your accommodation breaks?

11:55:40 18     A.   No, I did not.

11:55:42 19     Q.   Okay.  Switching gears again, now I want to talk

11:55:50 20  about NUR 519 now, the transition to practice --

11:55:54 21     A.   Okay.

11:55:54 22     Q.   -- course.

11:55:54 23          What is the transition to practice course?

11:55:57 24     A.   It's our last set of clinicals that we do to

11:56:02 25  prepare us for nursing.

11:56:06  1        Q.    I've heard NUR 519 referred to as "TTP."  Have

11:56:13  2    you heard that?

11:56:14  3        A.    I have.  Transition to practice.

11:56:16  4        Q.    So if I refer to NUR 519 as "TTP," will you

11:56:20  5    understand what I mean?

11:56:21  6        A.    Yes.

11:56:22  7        Q.    Okay.  Just hoping that speeds us up a little bit

11:56:25  8    for us.

11:56:26  9              Where were your TTP clinicals scheduled?

11:56:28  10       A.    At St. Joseph's Hospital in Phoenix.

11:56:30  11       Q.    And was the scheduling of those clinical shifts

11:56:34  12   different from the scheduling of the clinical shifts for

11:56:37  13   your prior clinical courses?

11:56:40  14       A.    In terms of -- do you mind clarifying in terms

11:56:48  15   of -- yeah.

11:56:48  16       Q.    So for your TTP course, were you responsible to

11:56:52  17   schedule the clinical shifts with your nurse preceptor and

11:56:55  18   your faculty of record from ASU?

11:56:58  19       A.    Yes, I was.

11:56:59  20       Q.    And so the clinical shift dates weren't preset

11:57:02  21   when you started that course, correct?

11:57:04  22       A.    That's correct.  So the way that I would handle

11:57:07  23   those, I worked in conjunction with my nurse preceptor,

11:57:13  24   and so she would give me her schedule for when she would

11:57:18  25   be working on her shifts, and then from there, I could

11:57:23   1   select which shifts I wanted to work.  And then I had to

11:57:29   2   get those shifts approved through the university.  And

11:57:34   3   then if they approved the shifts that I wanted to work

11:57:37   4   with my preceptor, then my schedule was set for that.

11:57:41   5        Q.    Thank you.

11:57:42   6        A.    You're welcome.

11:57:43   7        Q.    How many shifts were required for the TTP course?

11:57:48   8        A.    I think it was seven.

11:57:51   9        Q.    And were those day shifts?

11:57:55  10        A.    They were.

11:57:56  11        Q.    Am I understanding correctly that your preceptor

11:58:04  12   was a nurse who worked for St. Joseph's Hospital?

11:58:11  13        A.    That's correct.

11:58:11  14        Q.    And what was your preceptor's name?

11:58:13  15        A.    Oh, my gosh, I don't remember.  Do you have it in

11:58:24  16   there?  I would immediately recognize it if you said it.

11:58:27  17        Q.    Is Janice Cook --

11:58:29  18        A.    Yes.

11:58:29  19        Q.    -- her name?

11:58:31  20        A.    That's her.

11:58:34  21        Q.    Okay.  And in addition to a preceptor, you also

11:58:36  22   had a faculty of record, correct?

11:58:38  23        A.    Yes.

11:58:38  24        Q.    Who was your faculty of record for the TTP

11:58:41  25   course?

11:58:41  1      A.   I -- I think her last name was Serna.  And I

11:58:44  2   think her first name was maybe Jessica.

11:58:49  3      Q.   Okay.  And Professor Serna was a faculty member

11:58:51  4   at the Edson College.  Is that right?

11:58:53  5      A.   That's correct.

11:58:54  6      Q.   Did Professor Serna accompany you to all of your

11:58:59  7   clinical shifts at St. Joseph's for the TTP course?

11:59:02  8      A.   So the tran- -- the TTP is different from all

11:59:07  9   other clinicals.  The -- the faculty of record does not

11:59:11  10  have to attend every shift.  They typically will make an

11:59:17  11  appearance in the beginning, maybe midway through, and

11:59:20  12  then at the end.

11:59:21  13     Q.   Of each shift?

11:59:22  14     A.   Not of each shift.  Of the whole entire program,

11:59:26  15  so all seven.

11:59:28  16     Q.   Do you recall how many times Professor Serna, as

11:59:32  17  you put it, made an appearance at your clinical shifts in

11:59:36  18  connection with this course?

11:59:37  19     A.   I believe it was three times, but she required

11:59:39  20  that I text her when I arrive on-site and every day when I

11:59:42  21  would leave the hospital.  So we were making contact at

11:59:49  22  every shift.  It just wasn't in person except for three

11:59:53  23  times, three out of the seven.

11:59:58  24     Q.   Okay.  Your last clinical shift for the TTP

12:00:01  25  course was scheduled for August 5th of 2023, correct?

12:00:05  1    A.    That sounds right.

12:00:06  2    Q.    And in advance of that last shift, you injured

12:00:13  3  your foot and ankle, I believe it was.  Is that correct?

12:00:18  4    A.    My foot, ankle, and then up my shin area.

12:00:22  5    Q.    What happened?

12:00:23  6    A.    I fell.  I tripped over a metal basket at home

12:00:27  7  and -- yeah.

12:00:28  8    Q.    And what happened to your foot, ankle, and shin?

12:00:32  9    A.    I had a really bad contusion that went -- I don't

12:00:38  10  even know.  It was 8 to 12 inches long.  I was having

12:00:46  11  trouble walking.  It was a lot of pain, so -- yeah.

12:00:53  12    Q.    Did you seek any medical attention for your

12:00:57  13  injury?

12:00:57  14    A.    I did through Thong.

12:01:04  15    Q.    What do you mean by that?

12:01:05  16    A.    Well, he's a licensed medical doctor practicing

12:01:12  17  med-peds, so he does internal medicine, family practice,

12:01:16  18  and pediatrics.  So I basically had him look at my -- look

12:01:22  19  at my leg, evaluate me.  I didn't believe that it was

12:01:24  20  broken.  Neither did he.

12:01:27  21           And then I was also just a couple of

12:01:30  22  clinicals away --  No, that was my last clinical that day

12:01:36  23  to graduating as a master's-trained nurse, so I also took

12:01:39  24  into consideration my own training and education and what

12:01:41  25  I knew in conjunction with what I saw and what I felt, and

| | | |
|---|---|---|
| 12:01:46 | 1 | so I didn't seek other outside medical treatment for it. |
| 12:01:53 | 2 | He told me what his opinion was that he thought that I |
| 12:01:56 | 3 | should do and that aligned with my own thoughts of what I |
| 12:01:59 | 4 | needed to do.  He told me what to look out for as far |
| 12:02:04 | 5 | as -- you know, if it gets worse; if there's any kind of |
| 12:02:06 | 6 | numbness, tingling; you know, if I were to have a reduced |
| 12:02:13 | 7 | pedal pulse in my foot that could indicate a clot, all of |
| 12:02:18 | 8 | which, you know, like I said, aligned with my own |
| 12:02:22 | 9 | education and what I felt as well. |
| 12:02:23 | 10 | Q.   And you said he told you his opinion of what you |
| 12:02:25 | 11 | should do.  What did he tell you he thought you should do? |
| 12:02:28 | 12 | A.   So there's an acronym called RICE.  It's rest, |
| 12:02:33 | 13 | ice it, compress, and elevate.  So if you sprain your |
| 12:02:42 | 14 | ankle or you have any kind of injury, that's always kind |
| 12:02:45 | 15 | of a good rule of thumb to follow assuming that the foot's |
| 12:02:49 | 16 | not -- or the -- whatever area of the body isn't turning |
| 12:02:53 | 17 | cold, which -- you know, or discolored, which could |
| 12:02:55 | 18 | indicate, you know, problems with blood flow and stuff |
| 12:03:00 | 19 | like that. |
| 12:03:01 | 20 | Q.   In this lawsuit, you've alleged that you needed |
| 12:03:06 | 21 | to wear an orthopedic boot. |
| 12:03:09 | 22 | A.   Uh-huh. |
| 12:03:10 | 23 | Q.   What is an orthopedic boot? |
| 12:03:11 | 24 | A.   So it's a -- it is basically a very hard plastic |
| 12:03:22 | 25 | walking boot that provides the C for the compression in |

12:03:30  1   the RICE acronym.  It provides protection from bumping the

12:03:36  2   contu- -- the contusion to anything else, which helps to

12:03:40  3   protect the area that's injured.  If there is a sprain, it

12:03:45  4   helps to immobilize it.  So . . .

12:03:50  5       Q.   And did Dr. Do recommend that you wear an

12:03:54  6   orthopedic boot?

12:03:54  7       A.   Yes.  And I actually had one from a previous fall

12:03:57  8   when I fell over a baby gate that an orthopedic doctor

12:04:02  9   gave to me when I injured myself when I fell previously,

12:04:07  10  so he suggested using that one.  The orthopedic boots that

12:04:12  11  a orthopedic doctor prescribes are far different than,

12:04:16  12  like, the ones you can buy on Amazon, for example.

12:04:19  13  They're much more high medical grade.  They immobilize

12:04:24  14  significantly better than the ones that you can just buy

12:04:28  15  at a drugstore or Amazon.

12:04:29  16      Q.   Okay.  And so you used the one you already had?

12:04:31  17      A.   Yes.  From the orthopedic doctor.

12:04:35  18      Q.   And just so that I can confirm, you're not

12:04:39  19  asserting in this lawsuit that the injury that you

12:04:42  20  suffered to your foot, ankle, and leg was a disability,

12:04:44  21  correct?

12:04:45  22      A.   No.

12:04:45  23      Q.   No, you're not asserting that it's a disability?

12:04:48  24      A.   I'm asserting that it was not a dis- --  The foot

12:04:51  25  itself was not --  You know, wearing a big boot like that,

| | | |
|---|---|---|
| 12:04:56 | 1 | it does cause issues with my disability, but the foot |
| 12:05:00 | 2 | injury itself was not a disability. |
| 12:05:03 | 3 | Q.   What issues does the boot cause with your |
| 12:05:07 | 4 | disability? |
| 12:05:08 | 5 | A.   So the boot in and of itself is pretty heavy. |
| 12:05:14 | 6 | It's clunky.  It's very cumbersome.  The hospital rooms at |
| 12:05:21 | 7 | St. Joseph Hospital are pretty small, and the area that I |
| 12:05:26 | 8 | was assigned to was the mother and baby unit.  So in any |
| 12:05:31 | 9 | given room, we have a patient along with their bed.  You |
| 12:05:37 | 10 | have an Isolette that their newborn is sitting in -- or |
| 12:05:41 | 11 | laying in.  There's a recliner, an IV pole.  Typically, |
| 12:05:48 | 12 | they have a partner there, a helper with them, you know, |
| 12:05:51 | 13 | their -- their spouse or a parent, whoever.  Oftentimes |
| 12:05:55 | 14 | multiple people.  So maneuvering around all of that when |
| 12:05:58 | 15 | you have a boot that goes up to your knee is -- it takes a |
| 12:06:03 | 16 | lot of extra effort.  It --  And when you have a heart |
| 12:06:09 | 17 | that's already kind of overworked the way it is and an |
| 12:06:14 | 18 | arrhythmia, moving around, walking around, having to turn |
| 12:06:17 | 19 | sideways and scoot by so you're not walking in a normal |
| 12:06:21 | 20 | fashion, you know, scooting by things, it just adds an |
| 12:06:26 | 21 | extra cardiac burden because you're having to move in ways |
| 12:06:29 | 22 | that you wouldn't normally move. |
| 12:06:30 | 23 | Q.   The injuries that you suffered to your foot, |
| 12:06:38 | 24 | ankle, and leg was two days before your last clinical |
| 12:06:41 | 25 | shift, correct? |

| | | |
|---|---|---|
| 12:06:42 | 1 | A.   That sounds right.  I think it was the night |
| 12:06:46 | 2 | before -- the night before.  So it was -- it was late at |
| 12:06:49 | 3 | night, and I think it was the night before -- two nights |
| 12:06:57 | 4 | before, I think it was. |
| 12:06:57 | 5 | Q.   So if your last clinical shift was August 5th, it |
| 12:07:01 | 6 | would have been the night of August 3rd? |
| 12:07:03 | 7 | A.   I think so. |
| 12:07:04 | 8 | Q.   So the night before your last clinical shift, on |
| 12:07:09 | 9 | August 4th, did you reach out to Professor Serna about |
| 12:07:13 | 10 | your injury? |
| 12:07:13 | 11 | A.   I think I did, you know. |
| 12:07:19 | 12 | And I kind of want to go back just for a |
| 12:07:23 | 13 | second regarding, like, the -- when you asked me if I |
| 12:07:25 | 14 | sought medical care for it.  One of the other reasons that |
| 12:07:29 | 15 | I didn't was because, like, I didn't want for a provider |
| 12:07:33 | 16 | to tell me like, "You really -- you really shouldn't be up |
| 12:07:37 | 17 | on your foot walking around doing a full shift at a |
| 12:07:41 | 18 | hospital."  I mean, it -- it was -- it was -- it was |
| 12:07:49 | 19 | really bruised.  It looked bad.  And I just was concerned |
| 12:07:57 | 20 | that if a provider were to tell me, you know, "You really |
| 12:08:01 | 21 | need to stay off of it for a week or whatever" -- I didn't |
| 12:08:05 | 22 | want to have any reason why I couldn't go to that shift, |
| 12:08:08 | 23 | and I would just have rather remained doing whatever I |
| 12:08:13 | 24 | felt like I needed to do instead of having a provider say, |
| 12:08:16 | 25 | "You can't go; you need to stay off of it." |

12:08:19   1        Q.   And so it was your decision that you wanted to go
12:08:21   2   to that final shift?
12:08:22   3        A.   I did want to go to that final shift because I
12:08:25   4   knew that that was going to be a deal-breaker if I didn't.
12:08:27   5        Q.   What do you mean?
12:08:28   6        A.   I wouldn't have graduated if I didn't finish all
12:08:31   7   my clinicals.
12:08:32   8        Q.   Could you have scheduled another clinical shift
12:08:35   9   at a later time to complete that clinical course?
12:08:37  10        A.   I think --  According to Janice's schedule, I
12:08:41  11   think that she had another day or maybe two that she was
12:08:44  12   scheduled for that I could have done, but I didn't want to
12:08:52  13   go up to the very last day in case I had an issue with my
12:08:56  14   heart.
12:08:56  15        Q.   And so you decided to do what you could to go to
12:09:00  16   the August 5th, 2023, clinical shift?
12:09:02  17        A.   Yes.
12:09:03  18        Q.   Turning back to your communication with Professor
12:09:11  19   Serna, you said you think you reached out to her about the
12:09:13  20   injury the night before, correct?
12:09:16  21        A.   I'm pretty sure I did.  I mean, I know I did for
12:09:19  22   sure.  I just don't know if it was the night before.  I
12:09:22  23   think it was.
12:09:22  24        Q.   When you reached out to her, did you do that by
12:09:25  25   text message?

12:09:26   1      A.   Probably, I -- yeah.  I mean, gosh, it's been so

12:09:36   2   long.  I think I probably did, but it may have been

12:09:38   3   through email.

12:09:38   4      Q.   Do you remember sending her an email?

12:09:42   5      A.   I don't remember specifically which method of

12:09:45   6   communication I -- I used to convey that message to her.

12:09:47   7      Q.   Let me ask --

12:09:50   8      A.   I mean, you can see I write a lot of emails, so

12:09:53   9   it's hard to keep them straight.

12:09:55  10      Q.   Let me ask a couple of questions that might help

12:09:57  11   us.

12:09:58  12      A.   Okay.

12:09:58  13      Q.   Do you recall speaking to Professor Serna either

12:10:01  14   in person or over the phone?

12:10:02  15      A.   I don't remember speaking to her over the phone.

12:10:11  16   It doesn't mean I didn't, but I don't remember doing that.

12:10:14  17      Q.   Do you remember if you reached out to Profess- --

12:10:16  18   Professor Serna in more than one way?  So, for example,

12:10:20  19   with an email and a text message?

12:10:22  20      A.   I don't remember that.

12:10:23  21      Q.   Is it possible that the only way you communicated

12:10:30  22   with Professor Serna about your injury was through text?

12:10:33  23      A.   It is possible.

12:10:34  24      Q.   Let's take a look at an exhibit and see if that

12:10:42  25   helps at all.  We are at Exhibit Number 48, and we'll hand

| | | |
|---|---|---|
| 12:10:49 | 1 | you what we will mark as Exhibit Number 48.  It's been |
| 12:10:52 | 2 | branded Do_105023 through Do_105024. |
| | 3 | THE WITNESS:  Thank you. |
| 12:11:19 | 4 | Sorry.  I'm just trying to keep them in |
| 12:11:21 | 5 | order in case she wants me to pull them back out.  Thank |
| 12:11:26 | 6 | you. |
| | 7 | (Deposition Exhibit 48 was marked for |
| 12:11:35 | 8 | identification.) |
| 12:11:35 | 9 | BY MS. WINDTBERG: |
| 12:11:35 | 10 | Q.   Do you recognize Exhibit Number 48? |
| 12:11:37 | 11 | A.   Yes. |
| 12:11:37 | 12 | Q.   What is Exhibit Number 48? |
| 12:11:38 | 13 | A.   It's a printout of some text messages with |
| 12:11:43 | 14 | Professor Serna. |
| 12:11:44 | 15 | Q.   Are those text messages that you sent |
| 12:11:48 | 16 | Professor Serna? |
| 12:11:48 | 17 | A.   That we shared back and forth.  But yes, mine are |
| 12:11:51 | 18 | on here that I sent to her. |
| 12:11:53 | 19 | Q.   And if you look at the top of the first page of |
| 12:11:59 | 20 | Exhibit 48, do you see the date of August 4th, 2023? |
| 12:12:02 | 21 | A.   Yes. |
| 12:12:03 | 22 | Q.   And am I correct that the text that appears in |
| 12:12:09 | 23 | green is yours and the text that appears in lighter color |
| 12:12:14 | 24 | is from Professor Serna? |
| 12:12:16 | 25 | A.   Yes. |

12:43:45  1 | exception.

12:43:45  2 |     Q.   Did you attend your final clinical shift on

12:43:50  3 | August 5th of 2023?

12:43:51  4 |     A.   Yes, I did.

12:43:52  5 |     Q.   Did you stay for the full shift?

12:43:55  6 |     A.   Yes, I did.

12:43:56  7 |     Q.   I'm going to hand you what we will mark as

12:44:09  8 | Exhibit 51.  Exhibit 51 is Bates-numbered ABOR014453

12:44:15  9 | through ABOR014475.

        10 |           (Deposition Exhibit 51 was marked for

        11 |           identification.)

        12 | BY MS. WINDTBERG:

12:44:38 13 |     Q.   Do you recognize Exhibit Number 51?

12:44:40 14 |     A.   It's my clinical performance evaluation.

12:44:43 15 |     Q.   For your transition practices course?

12:44:48 16 |     A.   Sorry.  For 59 -- NUR 519.  So yes, that would

12:44:50 17 | have been transition to practice.

12:44:51 18 |     Q.   And if you look at the page that is marked

12:45:00 19 | ABOR014473, please.

12:45:02 20 |     A.   Okay.

12:45:02 21 |     Q.   Is that your signature on that page?

12:45:05 22 |     A.   Yes.

12:45:06 23 |     Q.   And just to make sure that this is the same as

12:45:10 24 | the last performance evaluation you looked at, there are

12:45:13 25 | columns that allow for student feedback and faculty

13:50:18    1    to travel to meet with patients in person?

13:50:20    2        A.    It's possible but not probable.

13:50:26    3        Q.    Okay.

13:50:29    4        A.    Because they have a case manager already, but I'm

13:50:33    5    a registered nurse case manager, so their case manager

13:50:36    6    goes out and meets with them.  And so if a case manager

13:50:40    7    has, like, more of a medical question that they don't know

13:50:43    8    the answer to, they come to me.  And for the higher-acuity

13:50:50    9    prior authorizations that need to be approved, those also

13:50:53   10    would go to me.  And for the lower ones -- like, say a

13:50:58   11    patient needs some home health care, you know, maybe they

13:51:01   12    have a wound or something that's not healing correctly,

13:51:06   13    maybe they're diabetic or whatever and they need home

13:51:10   14    health care -- their -- their case manager can handle that

13:51:13   15    for them because it's a lower acuity.  But once it gets

13:51:17   16    into, like, bariatric patients or patients who are on a

13:51:22   17    ventilator who might be doing, like, dialysis, those with

13:51:26   18    the higher acuity would come to a registered nurse case

13:51:30   19    manager, not just a regular case manager who doesn't have

13:51:32   20    the nursing or medical background.

13:51:36   21        Q.    What is your typical work schedule?

13:51:39   22        A.    Monday through Friday, 8:00 to 5:00.

13:51:43   23        Q.    In connection with this job, have you requested

13:51:46   24    any accommodations under the ADA?

13:51:49   25        A.    No.

14:20:44  1        A.   Yeah.

14:20:44  2        Q.   Okay.  Are you currently driving?

14:20:47  3        A.   Sometimes I'll drive, like, to Walmart.  It's,

14:20:50  4    like, three miles away from my house.  But I don't

14:20:53  5    typically drive further than that.  Yeah.  I know my

14:20:58  6    limitations, so I don't typically drive further than that.

14:21:02  7    I mean, if I had to, if I -- if my heart felt okay, then

14:21:06  8    I -- I would, but not generally.

14:21:11  9               MS. WINDTBERG:  Subject to further

14:21:12  10   questions, based on what others ask, that's all I have for

14:21:16  11   you now.

14:21:17  12              THE WITNESS:  Okay.

14:21:17  13              MS. CHASSON:  I don't have any questions.

14:21:19  14              MR. ENGLAND:  Nothing from me.

14:21:21  15              MS. WINDTBERG:  Okay.  Thank you very much.

14:21:22  16              THE WITNESS:  Thank you.

14:21:24  17              THE VIDEOGRAPHER:  We are off the record.

14:21:26  18   Time on the monitor is 2:21 p.m.  This ends Volume 1,

14:21:35  19   Media Number 3, of the deposition of Sara Do.

          20              (The deposition was concluded at 2:21 p.m.)

          21

          22               _____

          23                         SARA DO

          24

          25

```
 1   STATE OF ARIZONA      )

 2   COUNTY OF MARICOPA    )

 3              BE IT KNOWN the foregoing deposition was

 4   taken by me pursuant to stipulation of counsel; that I was

 5   then and there a Certified Reporter of the State of

 6   Arizona, and by virtue thereof authorized to administer an

 7   oath; that the witness before testifying was duly sworn by

 8   me to testify to the whole truth; notice was provided that

 9   the transcript was available for signature by the

10   deponent; that the questions propounded by counsel and the

11   answers of the witness thereto were taken down by me in

12   shorthand and thereafter transcribed into typewriting

13   under my direction; that the foregoing pages are a full,

14   true, and accurate transcript of all proceedings and

15   testimony had and adduced upon the taking of said

16   deposition, all to the best of my skill and ability.

17          I FURTHER CERTIFY that I am in no way related to

18   nor employed by any parties hereto nor am I in any way

19   interested in the outcome hereof.

20          DATED at Phoenix, Arizona, this 31st day of March,

21   2024.

22

23          Meri Coash, RMR, CRR
            Certified Reporter #50327

24

25
```

# EXHIBIT 12

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF ARIZONA

 3                                      )
 4   Sara Do, an individual,           )
                                        )
 5            Plaintiff,                )
                                        )
 6   v.                                 )   No.
                                        )   CV-22-00190-PHX-JJT
 7   Arizona Board of Regents, an       )
     Arizona State Entity; et al.,      )
 8                                      )
              Defendants.               )
 9   _____)

10       IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

11            IN AND FOR THE COUNTY OF MARICOPA

12                                      )
     Sara Do, an individual,           )
13                                      )
              Plaintiff,                )   No. CV2022-009424
14                                      )
     v.                                 )
15                                      )      VIDEOTAPED
     Arizona Board of Regents, an       )    DEPOSITION OF
16   Arizona State Entity;              )   JANINE CARRASCO
     Dr. Kimberly Day, an unmarried     )
17   person; Dr. Salina Bednarek and    )
     Joshua Bednarek, wife and          )
18   husband; Dr. Margaret Morris       )
     and Phillip Morris, wife and       )   Phoenix, Arizona
19   husband; Candace Keck and          )
     Jonathan Keck, wife and            )   August 3, 2023
20   husband,                           )
                                        )
21            Defendants.               )
     _____)
22

23   Prepared by:

24   Meri Coash, RMR, CRR
     Certified Reporter
25   Certification No. 50327
```

**CERTIFIED TRANSCRIPT**

```
 1                    I N D E X
     WITNESS                                              PAGE
 2
 3        Examination by Mr. Messer                         6
 4        Examination by Mr. England                       38
 5        Further Examination by Mr. Messer                60
 6        Further Examination by Mr. England               61
 7
 8
 9
10
11               EXHIBITS MARKED
12   EXHIBITS             DESCRIPTION                     PAGE
13   Exhibit 31    Email from Carrasco to Day,             24
                   7-24-21, Subject:  "Nursing
14                 Student"
                   ABOR000555
15
     Exhibit 32    Photo of folded paper scrubs            35
16                 ABOR000556
17
18
19
20
21
22
23
24
25
```

```
 1              VIDEOTAPED DEPOSITION OF JANINE CARRASCO

 2   was taken on August 3, 2023, commencing at 9:05 a.m., at

 3   the law offices of Osborn Maledon, PA, 2929 North Central

 4   Avenue, Phoenix, Arizona, before Meri Coash, a Certified

 5   Reporter in the State of Arizona.

 6

 7

 8                           *    *    *

 9

10   APPEARANCES:

11        For the Plaintiff:
              AFFELD GRIVAKES, LLP
12            By:  Brian R. England, Esq.
                   2049 Century Park East
13                 Suite 2460
                   Los Angeles, California  90067
14                 310-979-8700
                   bre@agzlaw.com
15

16

17        For Defendants Arizona Board of Regents, Day,
              Bednarek, Morris, Keck:
18                OSBORN MALEDON, PA
              By:  Kristin L. Windtberg, Esq.
19                 Mary R. O'Grady, Esq. (Via Zoom)
                   Joshua J. Messer, Esq.
20                 2929 North Central Avenue
                   20th Floor
21                 Phoenix, Arizona  85012
                   602-640-9000
22                 kwindtberg@omlaw.com
                   mogrady@omlaw.com
23                 jmesser@omlaw.com

24

25
```

```
 1   APPEARANCES (CONTINUED):

 2        For Defendant Maricopa County Special Health Care
          District:
 3            COPPERSMITH BROCKELMAN PLC
              By:  Jill J. Chasson, Esq.
 4                 Andrew T. Fox, Esq.
                   2800 North Central Avenue
 5                 Suite 1900
                   Phoenix, Arizona  85004
 6                 602-224-0999
                   jchasson@cblawyers.com
 7                 afox@cblawyers.com

 8
          Also present:  Kwan Piensook, Esq.;
 9        Daniel Rohan, videographer

10        Also present via Zoom:  Sara Do, Johanna Hammel

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

09:21:07  1  I'm normally on call.  I thought it was odd that we had a

09:21:10  2  nursing student on a weekend.  Normally, we don't have --

09:21:13  3  if we have any students in the OR on the weekends, they're

09:21:16  4  generally medical students who are doing their surgical

09:21:20  5  rotation.  So I just thought it was very odd that we had a

09:21:24  6  nursing student in the OR on a weekend.

09:21:26  7      Q.   Did you know why you had a nursing student in the

09:21:33  8  weekend in the O- -- nursing student in the OR on a

09:21:37  9  weekend?

09:21:38  10      A.   Well, at that time I just assumed that

09:21:40  11  arrangements were made for her to be there.

09:21:43  12      Q.   You said "at that time."  Is there -- did you get

09:21:51  13  a different understanding later?

09:21:52  14      A.   No.

09:21:55  15      Q.   Lawyer question.

         16      A.   I know.

09:22:03  17      Q.   So you said you did recall her.  What do you

09:22:06  18  recall about that nursing student?

09:22:07  19      A.   Well, I recall I was already scrubbed when she --

09:22:13  20  when I -- when she came to the room.  And I remember that

09:22:20  21  she sat down in a chair.  And because I don't like to talk

09:22:24  22  to people, I scooted my chair over to engage her in

09:22:28  23  conversation and basically just asked her what kind of

09:22:34  24  nursing did she want to pursue.  And I was kind of

09:22:41  25  expecting, you know, a general --  You know, what most

09:22:49    1   nursing students say to me is "I want to do general

09:22:51    2   surgery," "I want to do psych," or "I really like labor

09:22:54    3   and delivery," or --  And her response to me was -- I

09:22:58    4   can't remember specifically whether it was management or

09:23:02    5   administration, but it was one of those two.  And which I

09:23:12    6   also found very odd because neither of those are

09:23:18    7   patient-centered.

09:23:19    8        Q.   When you were having this conversation with that

09:23:32    9   nursing student, I recognize that she told you she wanted

09:23:35   10   to do management or administration, did she also say that

09:23:38   11   she didn't want to do patient care?

09:23:42   12        A.   No.  Because I didn't feel like she wanted to

09:23:44   13   really engage any longer, so I just -- I was sitting on a

09:23:47   14   stool, and frequently I'll roll myself across the room

09:23:50   15   instead of getting up, and I just basically rolled myself

09:23:54   16   away back to my sterile area.

09:23:56   17        Q.   After she -- Excuse me.  After she told you that

09:23:59   18   she wanted to do administration is when you --

09:24:02   19        A.   Well, because I just got the sense that she just

09:24:06   20   really didn't want to talk.

09:24:07   21        Q.   What gave you that sense?

09:24:10   22        A.   I don't know.

09:24:13   23        Q.   It was just the vibe that you got?

09:24:14   24        A.   Yeah, the vibe that I got.

09:24:16   25        Q.   Had the surgery started when the nursing student

Sara Do vs. Arizona Board of Regents                          CV-22-00190-PHX-JJT
Janine Carrasco                    August 3, 2023                              20

09:24:24    1    came in?

09:24:24    2        A.   Had the surgery started?

09:24:27    3                MS. CHASSON:  Object to form.

09:24:30    4                THE WITNESS:  The -- are you talking about

09:24:31    5    the actual -- the actual procedure or are you referring

09:24:35    6    to --  I believe when she came in, they were still

09:24:37    7    intubating the patient.  They were doing all of the

09:24:40    8    precursor to the surgery:  the intubation, the making sure

09:24:46    9    they're preoxygenate- -- oxynigate -- I can't get that

09:24:50   10    word out -- make sure they have lots of good oxygen in

09:24:54   11    their lungs.  So that's what was going on when she entered

09:24:59   12    the room, when she came into the room.

09:25:01   13    BY MR. MESSER:

09:25:06   14        Q.   Do you recall how she behaved once the surgery

09:25:10   15    got under way?

09:25:13   16                MR. ENGLAND:  Objection.

09:25:14   17                THE WITNESS:  How she behaved?  Well, I just

09:25:16   18    remember she was very disinterested in participating in

09:25:23   19    the goings-on in the room.

09:25:25   20    BY MR. MESSER:

09:25:25   21        Q.   What makes you say that?

09:25:26   22        A.   Because she really didn't get up from the stool.

09:25:30   23    Gabi, the nurse that I -- in my room --  The nurse is --

09:25:33   24    when a patient's being intubated, the nurse is right there

09:25:38   25    at the patient's bedside to help the anesthesiologist

| | | |
|---|---|---|
| 09:25:41 | 1 | should they have any problems with the intubation, or just |
| 09:25:46 | 2 | in general help with the intubation.  And I remember Gabi |
| 09:25:49 | 3 | standing at the patient's bedside and inviting her over |
| 09:25:53 | 4 | with a wave.  You know, "Come on over."  And she just |
| 09:25:58 | 5 | didn't want -- didn't get up and didn't want to be at the |
| 09:26:02 | 6 | patient's bedside. |
| 09:26:03 | 7 | Q.  Did anyone -- did you say anything to the nursing |
| 09:26:12 | 8 | student once the surgery got started? |
| 09:26:15 | 9 | A.  No. |
| 09:26:15 | 10 | Q.  Do you recall if anybody did? |
| 09:26:16 | 11 | A.  Well, I remember that the nurse anesthetist in |
| 09:26:22 | 12 | the room attempted to engage in conversation with her. |
| 09:26:27 | 13 | And if she had conversation with Gabi, I don't recall |
| 09:26:30 | 14 | that.  And I can't say what they said because they were -- |
| 09:26:33 | 15 | I couldn't hear what they were saying, if they were |
| 09:26:36 | 16 | speaking. |
| 09:26:36 | 17 | Q.  So you said the nurse anesthetist -- that's a |
| 09:26:42 | 18 | hard word, nurse anesthetist -- |
| 09:26:44 | 19 | A.  Yes. |
| 09:26:44 | 20 | Q.  -- tried to engage with her.  What do you mean by |
| 09:26:48 | 21 | tried to engage? |
| 09:26:50 | 22 | A.  It was -- I just -- I can't remember their |
| 09:26:54 | 23 | conversation specifically, but he was attempting to make |
| 09:26:58 | 24 | her feel welcome in the room. |
| 09:27:00 | 25 | Q.  Do you remember how she responded? |

09:27:02    1      A.    In general, my recollection is that she did not

09:27:12    2   want to be within -- she didn't want to participate in the

09:27:16    3   patient care.

09:27:17    4      Q.    Did she say that she didn't want to participate

09:27:31    5   in the patient care?

09:27:32    6      A.    Specifically, I don't recall her saying that.

09:27:36    7      Q.    Do you recall her saying anything?

09:27:37    8      A.    Other than what she said to me, no.

09:27:42    9      Q.    Was the nursing student there for the whole

09:27:58   10   surgery?

09:27:59   11      A.    She might have been.  I recall she -- I recall

09:28:06   12   that she left the room at least once, perhaps more.  I

09:28:13   13   can't remember.  It's been a long time.

09:28:15   14      Q.    Do you remember if she said anything to anyone

09:28:24   15   before leaving the room?

09:28:25   16      A.    No.

09:28:26   17      Q.    No, you don't recall, or no, she didn't say

09:28:32   18   anything?

09:28:32   19      A.    She didn't say anything that I was in -- within

09:28:37   20   earshot that I heard.

09:28:38   21      Q.    Do you recall what kind of surgery this was?

09:28:58   22      A.    Before yesterday or the day before yesterday when

09:29:06   23   I was able -- when I met with Jill, I couldn't tell you

09:29:09   24   what the surgery was because it was two years ago.  But

09:29:15   25   upon looking at --

09:30:54    1        Q.    Do you remember any other details about the

09:31:15    2    surgery?

09:31:16    3        A.    No.

09:31:17    4        Q.    We touched on this briefly, but I want to circle

09:31:25    5    back to it.  Did the nursing student at one point leave

09:31:28    6    the room and not come back?

09:31:29    7        A.    I don't recall that.

09:31:34    8        Q.    Prior to the nursing student coming into the OR,

09:31:45    9    had anyone talked to you about that nursing student?

09:31:49   10        A.    No.

09:31:49   11        Q.    I'm going to show you what's going to be marked

09:32:05   12    as Exhibit 31.

           13                (Deposition Exhibit 31 was marked for

09:32:21   14            identification.)

09:32:21   15    BY MR. MESSER:

09:32:32   16        Q.    All right.  So Exhibit 31 is an email from you to

09:32:38   17    a Kimberly Day, and it has Bates number -- which is the

09:32:41   18    number down in the bottom right -- ABOR000555.

09:32:51   19        A.    Uh-huh.

09:32:51   20        Q.    Do you know who Kimberly Day is?

09:32:53   21        A.    Yes.

09:32:54   22        Q.    Who is Kimberly Day?

09:32:56   23        A.    Kimberly Day at that time was a nurse who worked

09:32:59   24    weekends for us.  I know that she was a professor at

09:33:04   25    Arizona State University in the nursing program.

09:33:06   1        Q.    Do you know whether Kim Day was the charge nurse

09:33:16   2   on the day of the surgery that we've been talking about?

09:33:18   3        A.    Yes.  She was the charge nurse.

09:33:20   4        Q.    And what does that mean, being the charge nurse?

09:33:22   5        A.    Oh, the charge nurse gets to carry around an

09:33:28   6   annoying phone that rings constantly, and they get to be

09:33:32   7   in the middle of physician arguments.  Basically, they're

09:33:37   8   there to coordinate the day as new -- new surgeries are

09:33:42   9   added on.  Some surgeries have already been posted for

09:33:46  10   that day, and some surgeries were added on.  And basically

09:33:51  11   she -- she's the person that coordinates and --

09:33:56  12   coordinates the day.

09:33:57  13        Q.    The annoying phone that rings constantly, is that

09:34:03  14   a personal phone or --

09:34:04  15        A.    No.

09:34:04  16        Q.    Is that a phone that the hospital provides?

09:34:07  17        A.    It's an Ascom phone.  It's a phone that the

09:34:11  18   hospital provides.

09:34:12  19        Q.    What is Ascom?

09:34:13  20        A.    It's the name of the phone, so that's what we

09:34:16  21   call them.  Ascoms.  Ascom phones.  Mostly, they're very

09:34:21  22   annoying.

09:34:23  23        Q.    And prior to the surgery that we've been talking

09:34:31  24   about, did you speak with Kim Day on the day of the

09:34:35  25   surgery?

| | | |
|---|---|---|
| 09:34:36 | 1 | A.   Well, I mean, you know, there's the "Good |
| 09:34:41 | 2 | morning" generalities.  And beyond that, she told us all |
| 09:34:48 | 3 | which room she wanted us to be in, and -- and that was |
| 09:34:54 | 4 | pretty much the conversation in the morning. |
| 09:34:55 | 5 | Q.   Did she discuss having a nursing student with |
| 09:34:59 | 6 | her? |
| 09:34:59 | 7 | A.   With -- she did mention to me at some point in |
| 09:35:05 | 8 | passing that there would -- that Gabi would have a nursing |
| 09:35:08 | 9 | student. |
| 09:35:09 | 10 | Q.   When she mentioned that, did she say anything |
| 09:35:17 | 11 | else about the nursing student? |
| 09:35:18 | 12 | A.   No.  She just said she would have a nursing |
| 09:35:21 | 13 | student. |
| 09:35:21 | 14 | Q.   All right.  So I do want to ask you a few |
| 09:35:38 | 15 | questions about this email. |
| 09:35:39 | 16 | A.   Sure. |
| 09:35:39 | 17 | Q.   Did you have a chance to read through it? |
| 09:35:41 | 18 | A.   Uh-huh. |
| 09:35:42 | 19 | Q.   Okay.  First question, do you remember why you |
| 09:35:44 | 20 | sent this email? |
| 09:35:45 | 21 | A.   Because Kim asked us if we would please send an |
| 09:35:51 | 22 | email so that it was -- so that others had observed what |
| 09:35:58 | 23 | she observed or that -- what we had observed so that it |
| 09:36:03 | 24 | wasn't just the student's word against her word. |
| 09:36:10 | 25 | Q.   When you said "us," who did you mean? |

09:36:12  1    A.    "Us"?

09:36:13  2    Q.    Yes.

09:36:14  3    A.    Those of us that were in the room:  myself, Gabi

09:36:17  4  the nurse, and I don't know -- I can't remember his name,

09:36:21  5  the nurse anesthetist.

09:36:22  6    Q.    And you said that Kim Day asked you to -- asked

09:36:35  7  you to send her this email.

09:36:37  8    A.    Uh-huh.

09:36:37  9    Q.    Are these thoughts that you had told to her,

09:36:40  10  like, verbally before she asked you to send the email?

09:36:43  11    A.    No.

09:36:44  12    Q.    Did she tell you what to say in the email?

09:36:46  13    A.    No.

09:36:46  14    Q.    Did she say why she wanted you to send this email

09:36:51  15  to her?

09:36:52  16    A.    I don't recall her words specifically aside from

09:37:01  17  she wanted to be able to show that others had -- others

09:37:07  18  were -- I don't know what the word is.  Observed, perhaps.

09:37:19  19  I don't know --

09:37:29  20    Q.    Was it that --  Kim wasn't in the operating room

09:37:32  21  with the nursing student, so was she trying to get an

09:37:35  22  understanding of what the nursing student had done in the

09:37:37  23  room, the OR?

09:37:38  24    A.    No.

09:37:41  25          MR. ENGLAND:  Foundation, calls for

| | | |
|---|---|---|
| 09:45:29 | 1 | A.   No. |
| 09:45:30 | 2 | Q.   Okay. |
| 09:45:31 | 3 | A.   As I said before, it's not my job.  She's not my |
| 09:45:35 | 4 | responsibility. |
| 09:45:36 | 5 | Q.   When you found the scrubs, did you tell anybody? |
| 09:45:42 | 6 | A.   No.  No.  Because I think when I saw the scrubs, |
| 09:45:51 | 7 | somebody else had already said that they found the scrubs, |
| 09:45:59 | 8 | but I can't tell you who that somebody else is or was. |
| 09:46:02 | 9 | Q.   You anticipated my next question. |
| 09:46:09 | 10 | A.   Long ago; far, far away. |
| 09:46:11 | 11 | Q.   Before we get too far afield on this, does this |
| 09:46:24 | 12 | email accurately recount your experience with that nursing |
| 09:46:28 | 13 | student? |
| 09:46:28 | 14 | A.   Yes. |
| 09:46:31 | 15 | Q.   Is there anything that you remember in your |
| 09:46:37 | 16 | interactions with the nursing student that we haven't |
| 09:46:39 | 17 | talked about today or is not included in your email? |
| 09:46:43 | 18 | A.   Could you repeat that?  Sorry.  I'm sorry.  Could |
| 09:46:48 | 19 | you repeat your question? |
| 09:46:50 | 20 | Q.   Of course.  Is there anything you remember about |
| 09:46:52 | 21 | your interactions with the nursing student that either we |
| 09:46:55 | 22 | haven't talked about today or isn't included in your |
| 09:46:58 | 23 | email? |
| 09:46:59 | 24 | A.   No. |
| 09:46:59 | 25 | Q.   Okay.  And does the email refresh your |

1  STATE OF ARIZONA     )

2  COUNTY OF MARICOPA   )

3           BE IT KNOWN that the foregoing proceedings

4  were taken before me; that the witness before testifying

5  was duly sworn by me to testify to the whole truth; that

6  the foregoing pages are a full, true, and accurate record

7  of the proceedings all done to the best of my skill and

8  ability; that the proceedings were taken down by me in

9  shorthand and thereafter reduced to print under my

10 direction.

11          I CERTIFY that I am in no way related to any

12 of the parties hereto nor am I in any way interested in

13 the outcome hereof.

14          [ ] Review and signature was requested.

15          [ ] Review and signature was waived.

16          [X] Review and signature was not requested.

17          I CERTIFY that I have complied with the

18 ethical obligations set forth in ACJA 7-206(F)(3) and

19 ACJA 7-206 (J)(1)(g)(1) and (2).  Dated at Phoenix,

20 Arizona, this 15th day of August, 2023.

21

22          _____ *Meri Coash*

23                 Meri Coash, RMR, CRR

24                 Certified Reporter

25                 Arizona CR No. 50327

1           I CERTIFY that Coash & Coash, Inc., has

2    complied with the ethical obligations set forth in

3    ACJA 7-206 (J)(1)(g)(1) through (6).

4

5

6    _____

7              COASH & COASH, INC.

8         Registered Reporting Firm

9          Arizona RRF No. R1036

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 13

Sara Do vs. Arizona Board of Regents                          CV-22-00190-PHX-JJT
Gabriela Novakova                    August 3, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ARIZONA

 3                                        )
 4    Sara Do, an individual,            )
                                          )
 5             Plaintiff,                 )
                                          )
 6    v.                                  )   No.
                                          )   CV-22-00190-PHX-JJT
 7    Arizona Board of Regents, an       )
      Arizona State Entity; et al.,      )
 8                                        )
               Defendants.                )
 9    _____)

10         IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

11              IN AND FOR THE COUNTY OF MARICOPA

12                                        )
      Sara Do, an individual,            )
13                                        )
               Plaintiff,                 )   No. CV2022-009424
14                                        )
      v.                                  )
15                                        )     VIDEOTAPED
      Arizona Board of Regents, an       )   DEPOSITION OF
16    Arizona State Entity;              )   GABRIELA NOVAKOVA
      Dr. Kimberly Day, an unmarried     )
17    person; Dr. Salina Bednarek and    )
      Joshua Bednarek, wife and          )
18    husband; Dr. Margaret Morris       )
      and Phillip Morris, wife and       )   Phoenix, Arizona
19    husband; Candace Keck and          )
      Jonathan Keck, wife and            )   August 3, 2023
20    husband,                           )
                                          )
21             Defendants.                )
      _____)

22

23    Prepared by:

24    Meri Coash, RMR, CRR
      Certified Reporter           CERTIFIED
25    Certification No. 50327       TRANSCRIPT
```

```
 1                     I N D E X
     WITNESS                                          PAGE
 2
      GABRIELA NOVAKOVA
 3
            Examination  by Mr. Messer                   6
 4
            Examination by Mr. England                  39
 5
            Examination by Mr. Fox                      73
 6
            Further Examination by Mr. Messer           73
 7

 8

 9

10

11
                     EXHIBITS MARKED
12
     EXHIBITS                 DESCRIPTION             PAGE
13
     Exhibit 33      Email from Novakova to Day,        23
14                   7-25-21, Subject:  FW:  From Gabi -
                     plastic OR case
15                   ABOR000560

16   Exhibit 34      Master Daily Schedule              34
                     Valleywise-0211
17

18

19

20

21

22

23

24

25
```

Case 2:22-cv-00190-JJT   Document 125-8   Filed 06/28/24   Page 167 of 412

Sara Do vs. Arizona Board of Regents                                    CV-22-00190-PHX-JJT
Gabriela Novakova                    August 3, 2023                                          3

```
 1           VIDEOTAPED DEPOSITION OF GABRIELA NOVAKOVA

 2   was taken on August 3, 2023, commencing at 2 p.m., at the

 3   law offices of Osborn Maledon, PA, 2929 North Central

 4   Avenue, Phoenix, Arizona, before Meri Coash, a Certified

 5   Reporter in the State of Arizona.

 6

 7

 8                           *    *    *

 9

10   APPEARANCES:

11        For the Plaintiff:
               AFFELD GRIVAKES, LLP
12          By:  Brian R. England, Esq.
                 2049 Century Park East
13               Suite 2460
                 Los Angeles, California  90067
14               310-979-8700
                 bre@agzlaw.com
15

16

        For Defendants Arizona Board of Regents, Day,
17        Bednarek, Morris, Keck:
               OSBORN MALEDON, PA
18          By:  Joshua J. Messer, Esq.
                 Kristin L. Windtberg, Esq.
19               2929 North Central Avenue
                 20th Floor
20               Phoenix, Arizona  85012
                 602-640-9000
21               jmesser@omlaw.com
                 kwindtberg@omlaw.com
22

23

24

25
```

```
 1   APPEARANCES (CONTINUED):

 2         For Defendant Maricopa County Special Health Care
           District:
 3             COPPERSMITH BROCKELMAN PLC
           By:   Andrew T. Fox, Esq.
 4                 2800 North Central Avenue
                   Suite 1900
 5                 Phoenix, Arizona  85004
                   602-224-0999
 6                 afox@cblawyers.com

 7
           Also present:  Kwan Piensook, Esq.;
 8         Daniel Rohan, videographer

 9         Also present via Zoom:  Sara Do, Johanna Hammel,
           Amanda Gibson
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 14:13:44 | 1 | A.   Yes. |
| 14:13:49 | 2 | Q.   I would like to ask now about a specific nursing |
| 14:14:08 | 3 | student.  Do you remember a nursing student named Sara Do? |
| 14:14:11 | 4 | A.   Yes. |
| 14:14:11 | 5 | Q.   What do you remember about that nursing student? |
| 14:14:22 | 6 | MR. FOX:  Objection.  Vague. |
| 14:14:23 | 7 | You can answer. |
| 14:14:23 | 8 | THE WITNESS:  I don't remember much only |
| 14:14:27 | 9 | because she was what feels something like maybe |
| 14:14:28 | 10 | 15 minutes.  I just remember she was not interested in |
| 14:14:30 | 11 | anything.  That's mainly what stood out. |
| 14:14:36 | 12 | BY MR. MESSER: |
| 14:14:37 | 13 | Q.   What makes you say she wasn't interested in |
| 14:14:39 | 14 | anything? |
| 14:14:39 | 15 | A.   Body language and her verbal -- verbal say-so. |
| 14:14:45 | 16 | Q.   And what do you remember her saying that |
| 14:14:51 | 17 | indicated to you that she wasn't interested in anything? |
| 14:14:53 | 18 | A.   She said she doesn't want to do nursing or be a |
| 14:14:57 | 19 | nurse.  She wants to be in management.  She just has to |
| 14:15:02 | 20 | get clinical hours or, you know, get through the school. |
| 14:15:11 | 21 | Not saying that word to word, but that's what I remember. |
| 14:15:17 | 22 | Q.   Did she say to you that she didn't want to do |
| 14:15:33 | 23 | patient care? |
| 14:15:33 | 24 | A.   Yes. |
| 14:15:34 | 25 | Q.   Do you remember anything else that she said to |

14:15:42   1   you?

14:15:43   2       A.   Not in particular.

14:15:47   3       Q.   Do you remember why Sara Do was in the OR with

14:15:55   4   you that day?

14:15:57   5       A.   Why?

14:15:57   6       Q.   Yes.

14:15:59   7       A.   She was assigned to me by her instructor for the

14:16:03   8   case.

14:16:04   9       Q.   Do you remember who the instructor was?

14:16:07  10       A.   Kim Day.

14:16:10  11       Q.   And was Kim Day also serving as charge nurse on

14:16:15  12   this day?

14:16:16  13       A.   Yes.

14:16:17  14       Q.   Do you remember what Kim Day said to you when she

14:16:32  15   assigned Sara Do to you?

14:16:34  16       A.   Not exactly.  No.

14:16:36  17       Q.   Do you remember generally?

14:16:39  18       A.   Something to the effect like "I'll just put her

14:16:45  19   with you for this case."  "I'm putting Sara with you for

14:16:49  20   the case."

14:16:50  21       Q.   Did she tell you anything about Sara Do when

14:16:57  22   she --

14:16:58  23       A.   No.  I should say, like, I don't know.  I'm not

14:17:03  24   sure about that question.  I mean, nothing that I can

14:17:08  25   remember.

| | | |
|---|---|---|
| 14:17:08 | 1 | Q.   I can phrase it another way.  Did she say |
| 14:17:12 | 2 | anything to you other than "I'm assigning Sara Do to you |
| 14:17:16 | 3 | for this case"? |
| 14:17:20 | 4 | A.   No, except she just said that she can't be with |
| 14:17:27 | 5 | her because she was in a case that was too hot for a |
| 14:17:32 | 6 | student to be in. |
| 14:17:33 | 7 | Q.   Was it unusual for Kim to assign students to you |
| 14:18:00 | 8 | in the OR? |
| 14:18:01 | 9 | MR. FOX:  Objection.  Vague. |
| 14:18:05 | 10 | You can answer. |
| 14:18:05 | 11 | THE WITNESS:  I don't understand the |
| 14:18:06 | 12 | question. |
| 14:18:06 | 13 | BY MR. MESSER: |
| 14:18:07 | 14 | Q.   Sure.  Was there anything out of the ordinary in |
| 14:18:12 | 15 | your interaction with Kim Day when she was assigning Sara |
| 14:18:15 | 16 | Do to you for the OR? |
| 14:18:17 | 17 | A.   No. |
| 14:18:17 | 18 | Q.   We talked a little bit about what Sara Do said to |
| 14:18:31 | 19 | you in the OR.  Do you remember anything about how she |
| 14:18:34 | 20 | acted when she was in the OR? |
| 14:18:38 | 21 | A.   She looked disinterested in anything. |
| 14:18:42 | 22 | Q.   And you mentioned part of that was her body |
| 14:18:50 | 23 | language.  Can you describe that a little bit more? |
| 14:18:52 | 24 | A.   She would turn away from, you know, the patient, |
| 14:18:59 | 25 | the staff. |

| | | |
|---|---|---|
| 14:18:59 | 1 | Q.  Anything else? |
| 14:19:07 | 2 | A.  I'm trying to think.  It's been a long time.  I |
| 14:19:20 | 3 | can't recall anything else. |
| 14:19:21 | 4 | Q.  Okay.  Do you know whether Sara Do was in the |
| 14:19:28 | 5 | operating room for that entire surgery that you were in? |
| 14:19:31 | 6 | A.  In my surgery I was in? |
| 14:19:33 | 7 | Q.  Yes. |
| 14:19:34 | 8 | A.  No, she was not. |
| 14:19:43 | 9 | Q.  So did she leave the OR before the surgery was |
| 14:19:46 | 10 | done? |
| 14:19:46 | 11 | A.  Yes. |
| 14:19:46 | 12 | Q.  Do you remember how far into the surgery she -- |
| 14:19:55 | 13 | or how much time had elapsed in that surgery before she |
| 14:19:58 | 14 | left? |
| 14:19:58 | 15 | A.  I can't remember exactly.  It just seemed like |
| 14:20:06 | 16 | very short.  It seemed it was like 10, 15 minutes when she |
| 14:20:10 | 17 | left.  Very shortly.  Wasn't there at all. |
| 14:20:13 | 18 | Q.  Did she -- this time that she left 10 or |
| 14:20:23 | 19 | 15 minutes after things had started, did she come back to |
| 14:20:25 | 20 | the OR? |
| 14:20:26 | 21 | A.  Yes. |
| 14:20:27 | 22 | Q.  Do you remember about how long she was out of the |
| 14:20:31 | 23 | OR? |
| 14:20:32 | 24 | A.  I can't, but not long. |
| 14:20:37 | 25 | Q.  Did Sara Do leave the OR again after she came |

14:20:47   1    back?

14:20:47   2        A.    Yes.

14:20:48   3        Q.    Do you remember about how long after she returned

14:20:51   4    she left again?

14:20:54   5        A.    I can't.  Five minutes.  Not long after.

14:21:01   6        Q.    And did she come back this time?

14:21:03   7        A.    No.

14:21:03   8        Q.    What did you do when she didn't come back to the

14:21:10   9    OR?

14:21:10  10        A.    Well, what did I do?  I just -- I -- at some

14:21:20  11    point when I had a second, I just called her instructor,

14:21:24  12    just saying the student left the room and just I don't

14:21:27  13    know where she is, so she wasn't coming back.  And I --

14:21:31  14    yeah.  That's all I know.  I mean, that's, I guess, all I

14:21:35  15    can think of.

14:21:35  16        Q.    Her instructor was Kim Day, correct?

14:21:50  17        A.    Yes.

14:21:50  18        Q.    Did you call Kim Day's personal phone to let her

14:21:53  19    know that Sara Do had left?

14:21:55  20        A.    The Ascom or the hospital phone, little phones we

14:22:00  21    all have.

14:22:01  22        Q.    What was the word?

14:22:04  23        A.    Ascom.

14:22:08  24        Q.    As I understand it, that's a phone that Kim Day

14:22:11  25    as charge nurse would have?

| | | |
|---|---|---|
| 14:27:24 | 1 | THE COURT REPORTER: Yes -- No. 33. |
| | 2 | MR. MESSER: Oh, 33. All right. |
| | 3 | (Deposition Exhibit 33 was marked for |
| 14:27:25 | 4 | identification.) |
| 14:27:25 | 5 | BY MR. MESSER: |
| 14:27:33 | 6 | Q. Okay. The court reporter just handed you what is |
| 14:27:38 | 7 | Exhibit 33. It's an email that's Bates-stamped in the |
| 14:27:41 | 8 | bottom right corner ABOR000560. Ms. Novakova, do you |
| 14:27:48 | 9 | recognize what this is? |
| 14:27:49 | 10 | A. Yes. |
| 14:27:49 | 11 | Q. What is it? |
| 14:27:51 | 12 | A. A letter I wrote -- wrote to -- a letter I wrote. |
| 14:27:56 | 13 | Q. Who did you send it to? |
| 14:27:59 | 14 | A. To the instructor. |
| 14:28:01 | 15 | Q. And that's Kim Day? |
| 14:28:02 | 16 | A. Yes. |
| 14:28:03 | 17 | Q. And so on the top -- the top From line says |
| 14:28:08 | 18 | "Gabriella Novakova." And is that your email address? |
| 14:28:12 | 19 | A. The work email address, yes. |
| 14:28:14 | 20 | Q. And the top email is actually you forwarding the |
| 14:28:23 | 21 | main body of the email, correct? |
| 14:28:29 | 22 | A. One more time? |
| 14:28:31 | 23 | Q. You -- It looks to me -- and you can correct me |
| 14:28:34 | 24 | if I am wrong -- you originally typed out an email to Kim |
| | 25 | Day. |

| | | |
|---|---|---|
| 14:29:48 | 1 | BY MR. MESSER: |
| 14:29:56 | 2 | Q.   Did Kim Day tell you what to say in this email? |
| 14:30:00 | 3 | A.   No. |
| 14:30:01 | 4 | Q.   Did anyone tell you what to say in this email? |
| 14:30:11 | 5 | A.   No. |
| 14:30:12 | 6 | Q.   Do you remember about how long after you last saw |
| 14:30:37 | 7 | Sara Do you wrote this email? |
| 14:30:39 | 8 | A.   I don't even know if it was the same day.  Either |
| 14:30:48 | 9 | later that day --  It must have been later that shift.  I |
| 14:31:03 | 10 | could probably look.  Yeah. |
| | 11 | (Clarification requested by the court |
| | 12 | reporter.) |
| | 13 | THE WITNESS:  I said I could probably look |
| 14:31:04 | 14 | the date I sent it, yeah.  It was later that day. |
| | 15 | BY MR. MESSER: |
| 14:31:05 | 16 | Q.   And are you looking at the -- |
| | 17 | A.   Yeah. |
| 14:31:07 | 18 | Q.   -- Saturday, July 24th, 2021, at 12:12 p.m.? |
| 14:31:11 | 19 | A.   Uh-huh.  Yes. |
| 14:31:11 | 20 | Q.   We've done a lot of talking about the email, so |
| 14:31:17 | 21 | now I'm going to ask you some questions about what it |
| 14:31:20 | 22 | says.  If you go to the very end of the second line, into |
| 14:31:28 | 23 | the third, you wrote, ". . . in my whole career I have |
| 14:31:32 | 24 | never met a student like Sara."  Do you see that? |
| 14:31:35 | 25 | A.   Let me find it.  Yes. |

| | | |
|---|---|---|
| 14:36:18 | 1 | crying or something.  Or she just looked, like, different. |
| 14:36:24 | 2 | So I don't know.  I don't know.  Again, I haven't talked |
| 14:36:29 | 3 | to her about it. |
| 14:36:30 | 4 | Q.   Did she say anything to you when she came back? |
| 14:36:33 | 5 | A.   She just came back, and I remember asking -- I |
| 14:36:41 | 6 | mean, I looked at her, and she -- I think she said she |
| 14:36:44 | 7 | didn't feel good or something.  But I can't remember |
| 14:36:47 | 8 | exactly what it was. |
| 14:36:49 | 9 | Q.   And then when -- the second time she left the |
| 14:36:51 | 10 | room, did she say anything before she left? |
| 14:36:53 | 11 | A.   I don't -- I can't remember.  All I know is we |
| 14:36:57 | 12 | had this little -- where she said she didn't feel good. |
| 14:37:00 | 13 | Q.   Does this email accurately reflect your |
| 14:37:22 | 14 | experience with Sara Do in the operating room that day? |
| 14:37:25 | 15 | MR. FOX:  Objection.  Vague. |
| 14:37:33 | 16 | Go ahead. |
| 14:37:33 | 17 | THE WITNESS:  I don't know.  I'm not sure |
| 14:37:34 | 18 | what --  I mean, I don't know if you want to ask -- I |
| 14:37:36 | 19 | don't know what you mean by that.  I mean, this was my -- |
| 14:37:41 | 20 | the brief experience and the first of the impressions that |
| 14:37:43 | 21 | I had of Sara. |
| 14:37:45 | 22 | BY MR. MESSER: |
| 14:37:45 | 23 | Q.   Sure.  I can be a little more blunt. |
| 14:37:47 | 24 | A.   Yeah. |
| 14:37:47 | 25 | Q.   Did you write anything untrue in this email? |

| | | |
|---|---|---|
| 14:37:49 | 1 | A.   No. |
| 14:37:49 | 2 | Q.   Is there anything else that you remember about |
| 14:37:57 | 3 | Sara Do that we haven't talked about today or isn't in |
| 14:38:00 | 4 | this email? |
| 14:38:01 | 5 | MR. FOX:  Objection.  Vague. |
| 14:38:05 | 6 | THE WITNESS:  Like specifics?  I mean, I |
| 14:38:10 | 7 | don't recall anything -- anything -- anything else.  She |
| 14:38:17 | 8 | spent very little time with me, so . . . |
| 14:38:23 | 9 | BY MR. MESSER: |
| 14:38:24 | 10 | Q.   Did you ever invite Sara Do to the PACU? |
| 14:38:30 | 11 | A.   To PACU? |
| 14:38:34 | 12 | Q.   Yes. |
| 14:38:35 | 13 | A.   I don't remember.  She wasn't with me the whole |
| 14:38:38 | 14 | case, so -- so she would only go there if she went with |
| 14:38:44 | 15 | the patient, but I can't remember. |
| 14:38:46 | 16 | Q.   Are you aware that after Sara Do left the surgery |
| 14:38:58 | 17 | she was in with you, she attended another surgery? |
| 14:39:01 | 18 | A.   No. |
| 14:39:02 | 19 | Q.   Are you aware that she later left the Valleywise |
| 14:39:05 | 20 | hospital altogether? |
| 14:39:07 | 21 | MR. FOX:  Objection.  Vague as to time. |
| 14:39:09 | 22 | MR. ENGLAND:  Join. |
| 14:39:10 | 23 | BY MR. MESSER: |
| 14:39:11 | 24 | Q.   From that second surgery, are you aware that Sara |
| 14:39:13 | 25 | Do left Valleywise altogether? |

```
 1   STATE OF ARIZONA      )

 2   COUNTY OF MARICOPA    )

 3              BE IT KNOWN that the foregoing proceedings

 4   were taken before me; that the witness before testifying

 5   was duly sworn by me to testify to the whole truth; that

 6   the foregoing pages are a full, true, and accurate record

 7   of the proceedings all done to the best of my skill and

 8   ability; that the proceedings were taken down by me in

 9   shorthand and thereafter reduced to print under my

10   direction.

11              I CERTIFY that I am in no way related to any

12   of the parties hereto nor am I in any way interested in

13   the outcome hereof.

14              [ ] Review and signature was requested.

15              [ ] Review and signature was waived.

16              [X] Review and signature was not requested.

17              I CERTIFY that I have complied with the

18   ethical obligations set forth in ACJA 7-206(F)(3) and

19   ACJA 7-206 (J)(1)(g)(1) and (2).  Dated at Phoenix,

20   Arizona, this 15th day of August, 2023.

21

22   _____

23              Meri Coash, RMR, CRR

24              Certified Reporter

25              Arizona CR No. 50327
```

```
 1              I CERTIFY that Coash & Coash, Inc., has

 2   complied with the ethical obligations set forth in

 3   ACJA 7-206 (J)(1)(g)(1) through (6).

 4

 5

 6

 7   _____

 8              COASH & COASH, INC.

 9            Registered Reporting Firm

10            Arizona RRF No. R1036

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 14

```
 1              UNITED STATES DISTRICT COURT

 2                        for the

 3                 DISTRICT OF ARIZONA
                                         )
 4   Sara Do, an individual,             )
                                         )
 5           Plaintiff,                   )
                                         )
 6   v.                                   )   No.
                                         )   CV-22-00190-PHX-JJT
 7   Arizona Board of Regents, an        )
     Arizona State Entity; et al.,       )
 8                                       )
             Defendants.                  )
 9   _____)

10       IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

11            IN AND FOR THE COUNTY OF MARICOPA

12                                       )
     Sara Do, an individual,             )
13                                       )
             Plaintiff,                   )   No. CV2022-009424
14                                       )
     v.                                   )
15                                       )   VIDEO-RECORDED
     Arizona Board of Regents, an        )    DEPOSITION OF
16   Arizona state entity;              )     REAIA REAVES
     Dr. Kimberly Day, an unmarried      )
17   person; Dr. Salina Bednarek and     )
     Joshua Bednarek, wife and           )
18   husband; Dr. Margaret Morris        )
     and Phillip Morris, wife and        )   Phoenix, Arizona
19   husband; Candace Keck and           )
     Jonathan Keck, wife and             )   October 17, 2023
20   husband,                            )
                                         )
21           Defendants.                  )
     _____)

22

23   Prepared by:

24   Meri Coash, RMR, CRR
     Certified Reporter
25   Certification No. 50327
```

**CERTIFIED TRANSCRIPT**

Sara Do vs. Arizona Board of Regents                          CV-22-00190-PHX-JJT
Reaia Reaves                        October 17, 2023                            2

```
 1                        I N D E X
    WITNESS                                          PAGE
 2
      REAIA REAVES
 3
           Examination by Ms. Windtberg               6
 4
           Examination by Ms. Black                  53
 5
           Examination by Mr. Fox                    66
 6
           Further Examination by Ms. Black          73
 7

 8

 9

10

11

12                    EXHIBITS MARKED

    EXHIBITS               DESCRIPTION                PAGE
13
    Exhibit 36      Email dated 7-24-21, Subject:     34
14                  Clinical Student Concern
                    ABOR000557
15
    Exhibit 37      Master Daily Schedule dated 7-24-21  68
16                  Valleywise-0211

17

18

19

20

21

22

23

24

25
```

```
1          VIDEO-RECORDED DEPOSITION OF REAIA REAVES

2   was taken on October 17, 2023, commencing at 4:39 p.m., at

3   1008 Lexington Drive, Eden Prairie, Minnesota, before

4   Meri Coash, a Certified Reporter in the State of Arizona

5   (via videoconference).

6                             *   *   *   *

7   APPEARANCES (All Via Videoconference):

8        For the Plaintiff:
             AFFELD GRIVAKES, LLP
9            By:  Adeline Black, Esq.
                  Brian R. England, Esq.
10                2049 Century Park East
                  Suite 2460
11                Los Angeles, California  90067
                  310-979-8700
12                ab@agzlaw.com
                  bre@agzlaw.com
13


14       For Defendants Arizona Board of Regents, Day,
         Bednarek, Morris, Keck:
15           OSBORN MALEDON, PA
             By:  Kristin L. Windtberg, Esq.
16                2929 North Central Avenue
                  20th Floor
17                Phoenix, Arizona  85012
                  602-640-9000
18                kwindtberg@omlaw.com

19

         For Defendant Maricopa County Special Health Care
20       District:
             COPPERSMITH BROCKELMAN PLC
21           By:  Andrew T. Fox, Esq.
                  Jill J. Chasson, Esq.
22                2800 North Central Avenue
                  Suite 1900
23                Phoenix, Arizona  85004
                  602-224-0999
24                afox@cblawyers.com
                  jchasson@cblawyers.com
25
```

```
 1   APPEARANCES (CONTINUED):
              Also Present (All Via Videoconference):
 2            Sara Trower, Esq.; Kwan Piensook, Esq.;
              Johanna Hammel; Sara Do; Daniel Rohan,
 3            videographer

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

17:00:17   1      Q.   And do you recall what that student's name was?

17:00:23   2      A.   I don't recall her name.

17:00:24   3      Q.   If I told you that her name was Sara Do, would

17:00:27   4   that sound familiar to you at all?

17:00:30   5      A.   I mean, again, I don't really remember her name

17:00:33   6   exactly.  Yeah.  Sorry about that.

17:00:37   7      Q.   No need to apologize.

17:00:40   8           So you said you did remember there was a

17:00:46   9   student who was there on the weekend.  What do you recall

17:00:49  10   about that student?

17:00:50  11      A.   I believe --  So Kimberly Day, she was the one

17:00:53  12   who would bring us students typically.  And I just know

17:00:56  13   because I've worked with her on the weekends.  And so I do

17:01:01  14   recall her bringing a student one weekend who came into

17:01:05  15   the operating room with me to, you know, just shadow.  And

17:01:09  16   I gave her the same instructions as everybody else, you

17:01:11  17   know, "If you're not feeling well, let me know because I

17:01:14  18   can either have you sit down or you can go outside of the

17:01:18  19   room."  And during this time, I believe it was kind of

17:01:22  20   like the height of the COVID epidemic or pandemic -- I

17:01:27  21   don't know really what you would call it -- but I know we

17:01:30  22   had, like, you know, personal protective equipment

17:01:33  23   outside.  This is a time when anybody coming into or out

17:01:36  24   of the operating room had to stay in for 20 minutes after

17:01:39  25   intubation because it's an aerosolizing procedure.  You

17:01:43  1  had to stay in 20 minutes after because that's also -- or

17:01:47  2  after extubation because that's an aerosolizing procedure.

17:01:53  3  So there were a lot of, like, things that were extra I had

17:01:55  4  to explain during that time, because technically -- with

17:01:58  5  COVID because it was, like, there was a lot of unknowns

17:02:02  6  about it.  We weren't able to just go in and out of the

17:02:05  7  room as freely as we used to be in certain instances.

17:02:13  8          But yes, I do remember that Kimberly had a

17:02:20  9  student who came in one weekend.  I gave her all of the

17:02:22  10  instructions, you know, "If you need to leave, let me

17:02:25  11  know."  She did let me know that she needed to leave.  She

17:02:28  12  said, "I have to go to the restroom."  And then I just

17:02:31  13  remember that she kind of never came back.  And I didn't

17:02:34  14  receive any follow-up, so when I did see Kimberly after

17:02:38  15  that surgical case, I did kind of find her and let her

17:02:42  16  know, "Hey, I haven't seen your student.  I don't know if

17:02:45  17  she came and spoke with you.  But, you know, like, I

17:02:49  18  haven't seen her anywhere, so you might want to look for

17:02:52  19  her or give her a call."

17:02:53  20     Q.   I'm going to go back -- back through some of that

17:03:00  21  in a little more detail.  I appreciate that.

17:03:03  22          Do you --  Well, let me start very basic.

17:03:12  23          Do you recall the specific day that this

17:03:16  24  student was in the OR shadowing you?

17:03:18  25     A.   I don't recall the specific day.

17:18:58   1   her would be basically explaining what was going on

17:19:02   2   through the surgery.  And I don't recall what the surgery

17:19:08   3   actually was, so sorry, I can't give you more information

17:19:13   4   on that.

17:19:14   5       Q.   You said, though, that at -- at some point she

17:19:17   6   told you she needed to go to the restroom.  Is that

17:19:19   7   correct?

17:19:19   8       A.   Yes.  Yes.  She asked me if it would be okay to

17:19:22   9   go to the restroom.  I said, "Yeah, that's no problem.

17:19:26   10   You can go.  You know, if you get lost, find somebody in

17:19:29   11   the hallways.  They could point you back in the direction

17:19:32   12   of the OR."

17:19:33   13       Q.   When she asked to go to the restroom, did she

17:19:37   14   tell you that she wasn't feeling well?

17:19:40   15       A.   I don't think she -- I don't recall her

17:19:42   16   mentioning that she wasn't feeling well.  And I assumed

17:19:46   17   that she would be coming back to the operating room.

17:19:49   18       Q.   When -- when she left for the restroom, did she

17:19:55   19   tell you that she was leaving the facility?

17:19:57   20       A.   She did not.

17:20:01   21       Q.   How long do you think you were in the operating

17:20:06   22   room with the student before she asked to go to the

17:20:09   23   restroom and then left?

17:20:11   24       A.   Maybe 15 or 20 minutes.  I don't recall it being

17:20:15   25   a very long time.

17:20:16    1    Q.    Do you recall who else was in the operating room

17:20:31    2    with you and the student that day?

17:20:34    3    A.    I don't recall who the members of the surgical

17:20:37    4    team were that day.

17:20:38    5    Q.    I'm going to show you what we'll mark as Exhibit

17:20:52    6    Number 36 for your deposition.  We have marked exhibits

17:20:54    7    previously.  That's why we're on Number 36.

            8            (Deposition Exhibit 36 was marked for

            9            identification.)

            10   BY MS. WINDTBERG:

17:20:57    11   Q.    What I'm going to do is go ahead and share it on

17:21:01    12   my screen and hopefully you can see it.  Let me know if

17:21:05    13   you can't.  So let me get that pulled up.

17:21:14    14           Can you see a document on my screen?

17:21:17    15   A.    Yes.

17:21:19    16           MS. WINDTBERG:  And for the record, Exhibit

17:21:21    17   Number 36 is marked as ABOR000557.  And I'm just referring

17:21:31    18   to the numbers in the bottom right corner of the document,

17:21:34    19   Ms. Reaves, so you know what I'm talking about.

17:21:39    20   BY MS. WINDTBERG:

17:21:39    21   Q.    Do you recognize the document that's been marked

17:21:41    22   as Exhibit Number 36?

17:21:42    23   A.    Yes.  Because I've only had to write an email to

17:21:49    24   anybody once about a student not returning to a surgical

17:21:54    25   case.

17:21:54  1      Q.    What is -- what is Exhibit Number 36?

17:21:58  2      A.    So this would be an email I sent to Kim -- Kim

17:22:06  3  Day just to let her know about the student leaving.  Let's

17:22:17  4  see.  Yeah.  So -- Oh, yeah.  I guess I kind of spelled

17:22:20  5  it out when she had left.

17:22:21  6      Q.    And just so that our -- our record is clear, the

17:22:27  7  email is sent from a Valleywise email address,

17:22:37  8  reaia.reaves@valleywisehealth.org.  Do you see that?

17:22:40  9      A.    Yes, that's correct.

17:22:41 10      Q.    Was -- was that your email address when you

17:22:44 11  worked for Valleywise?

17:22:45 12      A.    Yes, that was.

17:22:46 13      Q.    And it's an email to Kimberly Day sent on

17:22:50 14  July 24th of 2021.  Do you see that?

17:22:52 15      A.    Yes, I do.

17:22:53 16      Q.    Is July 24th of 2021 -- do you know, is that the

17:23:02 17  day that the student was in the operating room with you?

17:23:07 18      A.    Yes, I would assume so, because I remember I

17:23:10 19  wrote this email on the same day after the surgical case

17:23:15 20  had finished and I had spoken with Kim.

17:23:19 21      Q.    Did you speak with Kim Day before you sent this

17:23:28 22  email?

17:23:28 23      A.    I spoke with her regarding -- like, just, you

17:23:33 24  know, going to ask her if she had seen the student or if

17:23:37 25  she had spoken to her or --  She said, "No.  You can't

17:23:41   1    find her?"  Like, you know, "Did she get lost or . . ."

17:23:44   2                I was like, "Well, you know, no.  She went

17:23:47   3    to the restroom, and she kind of just never came back, so

17:23:51   4    I just wanted to, you know, know if you were aware," or,

17:23:54   5    you know, like, was this something that she didn't know.

17:23:57   6    And she didn't know that the student had left.  So I told

17:24:00   7    her, "Okay."  And I do remember saying, "Did you want me

17:24:08   8    to put something in writing for you just so you know?"

17:24:10   9                And she said, "Oh, sure.  If you'd write me

17:24:13  10    an email to let me know, you know, what happened, that'd

17:24:15  11    be great."

17:24:16  12                And so I said, "Okay.  Sure."

17:24:20  13        Q.   Did Kim Day tell you what to write in your email?

17:24:24  14        A.   No, she didn't.

17:24:26  15        Q.   But you asked her if she wanted you to send her

17:24:31  16    something in writing about the student?

17:24:33  17        A.   Yes.  Yes.  Because I -- I wasn't sure if that

17:24:38  18    student was coming back.  And I do remember that the staff

17:24:44  19    was, like, kind of questioning me about it.  Like, "Oh,

17:24:48  20    what happened to your student?"

17:24:49  21                You know, I was like, "I don't know.  I

17:24:51  22    think she said she had to go to the restroom or

17:24:54  23    something."  I was like, "I don't know.  Maybe she just,

17:24:55  24    you know, wasn't feeling well and she left."  So yeah, I

17:24:58  25    don't -- yeah.

17:24:59   1        Q.   But you don't recall her telling you that she

17:25:01   2   wasn't feeling well, I believe was your testimony,

17:25:05   3   correct?

17:25:05   4        A.   Yes.  Yeah.  She didn't say anything about not

17:25:08   5   feeling well.

17:25:09   6        Q.   The conversation that you had with Kim about

17:25:15   7   letting her know that the student had left and, you know,

17:25:19   8   asking her if she was aware, was that an in-person

17:25:24   9   conversation?

17:25:25  10        A.   Yes, that was.

17:25:27  11        Q.   And when did that conversation take place?

17:25:34  12        A.   After the surgery was finished and the patient,

17:25:40  13   you know, was out of the room and in recovery.

17:25:42  14        Q.   So I want to go through this exhibit with you a

17:25:53  15   little bit.  If you look at the first sentence in the

17:25:59  16   email, it says, "I just wanted to make the program and you

17:26:04  17   aware that today when the student, Sara, was shadowing in

17:26:08  18   my room today, she abruptly exited the room without

17:26:12  19   warning."  And we've talked about how she left.

17:26:18  20             You say "without warning."  But she did ask

17:26:21  21   if she could go to the restroom.  Is that correct?

17:26:24  22        A.   So reading this email, I don't --  You know, this

17:26:28  23   was two years ago, so I would think she had said she had

17:26:32  24   to go to the restroom.  But in this email, I put that she

17:26:36  25   had left without warning.  I would never have written that

17:26:41  1  if, you know, she hadn't left without warning.  So yeah,

17:26:47  2  I'm guessing that she did leave without warning.  I do

17:26:50  3  remember this whole incident.  I just, you know -- yeah, I

17:26:55  4  would guess that she had left without warning if that's

17:26:57  5  what I had written in the email.

17:26:58  6      Q.    So it's -- it's possible that she didn't ask you

17:27:02  7  if she could go to the restroom?

17:27:04  8      A.    That's correct.

17:27:04  9      Q.    Do you recall anything else about anything she

17:27:11 10  may or may not have said to you before she left the

17:27:13 11  operating room, having looked at this email now?

17:27:16 12      A.    No.  I think it was probably a lot of -- kind of

17:27:24 13  like when I was explaining the surgery and stuff to her,

17:27:27 14  more just like head nodding and just like "uh-hum," but,

17:27:32 15  like, I do remember she wasn't very interactive, and then

17:27:36 16  kind of like I said in the email, like she didn't have

17:27:38 17  very much interest in the operating room, so . . .

17:27:43 18      Q.    And -- and what made you think she didn't have

17:27:45 19  very much interest in the operating room?

17:27:50 20      A.    Because usually people will ask questions and

17:27:52 21  they'll kind of like be interested to stand closer.  Or,

17:27:56 22  you know, the CRNAs, a lot of times they offer, "Do you

17:28:00 23  want to see this patient be intubated?"  So they'll offer

17:28:04 24  people the opportunity to come and stand at the head of

17:28:09 25  the bed.  And so yeah, I'm -- I'm just guessing she

17:28:12   1   probably wasn't interested in any of that, so -- and she

17:28:16   2   probably showed the lack of interest just because, you

17:28:20   3   know, she didn't ask -- ask any questions and she wasn't

17:28:25   4   interested in coming closer to the surgical field and

17:28:28   5   observing.

17:28:29   6        Q.   She -- she didn't step up closer to the surgical

17:28:34   7   field?

17:28:34   8        A.   Yeah.  Like, when asked to come up closer.  Which

17:28:37   9   is fine too, because some people, you know, they're

17:28:40  10   intimidated by surgery and that's okay.  So it's not

17:28:44  11   something that you make somebody do.

17:28:45  12        Q.   Do you recall if somebody asked Ms. Do to step

17:28:49  13   closer to the surgical field to observe?

17:28:51  14        A.   Depending on what doctor it was, usually they do

17:28:57  15   say, "Hey, do you want to come up here and see what we're

17:29:00  16   doing?"

17:29:01  17             And then the CRNAs will typically allow the

17:29:05  18   students to come and stand up at the head of the bed with

17:29:07  19   them.  And I see in my email I had mentioned the CRNAs, so

17:29:13  20   they probably had, you know, asked her at one point to

17:29:16  21   come up and, you know -- or let her know that she was free

17:29:20  22   to come up with them and observe from the top area where

17:29:25  23   she'd be able to observe and see more things.

17:29:28  24        Q.   In the surgical -- in the operating room where

17:29:32  25   the surgery was happening, am I understanding correctly

17:29:35  1  that the CRNA would be located at the head of the bed?

17:29:39  2      A.   That's correct.  Yes.

17:29:39  3      Q.   And then you said you were more towards the foot

17:29:42  4  of the bed in the corner?

17:29:43  5      A.   Yes.  Correct.

17:29:45  6      Q.   And then the student would've been near you, I

17:29:48  7  believe you said.  Is that correct?

17:29:50  8      A.   That's correct.  Yes.

17:29:52  9      Q.   Before the student left the operating room, did

17:29:55 10  you hear her tell anyone else that she was leaving?

17:29:59 11      A.   No.  I mean, yeah, usually --  I guess maybe I

17:30:06 12  thought she asked me to go to the restroom because that's

17:30:08 13  part of my instructions for them, is that "If you have to

17:30:12 14  leave the operating room, please, just come and let me

17:30:18 15  know."  So that's probably why, you know, I would have

17:30:19 16  thought that she would've have asked to go to the

17:30:21 17  restroom.

17:30:22 18           But yes, I don't think she let anybody else

17:30:25 19  know that she was leaving or let anybody know at all, now

17:30:30 20  that I'm reading this email.

17:30:32 21      Q.   Let's -- let's -- let's turn back to the email

17:30:34 22  for a minute.  In the second sentence in the first

17:30:39 23  paragraph of the email, you say, "We came back to the

17:30:43 24  operating room with our patient at around 10 a.m.  Sara

17:30:48 25  stayed for the intubation.  After intubation, Sara walked

17:30:52   1   out of the room leaving behind her lead vest without a

17:30:57   2   word."  Did I read that correctly?

17:30:59   3        A.   That's correct.  Uh-huh.

17:31:02   4        Q.   You mentioned a "lead vest."  Do you have any

17:31:04   5   recollection of why the student would have had a lead vest

17:31:07   6   on?

17:31:07   7        A.   Yes.  So if the case was a surgical case with any

17:31:11   8   x-raying, which -- if it's a trauma and, you know, they're

17:31:16   9   suspecting broken ribs or broken bones or anything like

17:31:19  10   that, we would put on an x-ray vest, and the C-arm or the

17:31:26  11   x-ray team would come in and shoot images.  So everybody

17:31:30  12   in the room has to wear a vest to shield themself from the

17:31:34  13   radiation of x-rays.

17:31:35  14        Q.   Do you know what a fluoroscopy is?

17:31:39  15        A.   Yes.

17:31:39  16        Q.   What is it?

17:31:40  17        A.   Fluoroscopy is when they, you know, put this wire

17:31:46  18   insi- -- well, I guess maybe not a wire, but a catheter

17:31:49  19   inside the patient, and they do a fluoro luminescence.

17:31:53  20   Like, they light up an area with fluorescein, which is

17:31:57  21   the -- that's the, like, medication they inject.  And it's

17:32:00  22   when they're trying to see if there might be a leak or

17:32:03  23   something like that, if there's an issue going on with any

17:32:06  24   of the ureters or vessels or anything like that inside of

17:32:10  25   a patient.

17:32:10   1        Q.   Would -- would the individuals in the operating

17:32:15   2   room, other than the patient, be required to wear a lead

17:32:19   3   vest if fluoroscopy was being done?

17:32:22   4        A.   Yes.   Everyone in the operating room, aside from

17:32:26   5   the patient, would have a lead vest on.

17:32:30   6        Q.   And do you know if the patient in this particular

17:32:34   7   surgery was undergoing a fluoroscopy?

17:32:40   8        A.   I don't recall.

17:32:45   9        Q.   The next sentence of your email says, "I assumed

17:32:48  10   that she . . . left for the restroom.   However, 10 minutes

17:32:51  11   later, the student still had not returned."

17:32:53  12             Does that refresh your recollection at all

17:32:54  13   about whether or not she asked if she could go to the

17:32:57  14   restroom?

17:32:57  15        A.   Yes.   I mean, I -- I guess I just was thinking

17:33:02  16   she left to go to the restroom or something.   Because it's

17:33:07  17   just unusual for somebody to walk out of the room and not

17:33:12  18   say anything.   That would be an unusual situation.

17:33:15  19        Q.   If she had left to go to the restroom, could she

17:33:20  20   have reentered the operating room afterwards?

17:33:23  21        A.   Yes.   And I had let her know, just like I let all

17:33:27  22   of the other students I have know, that, like, you know,

17:33:31  23   "You can come back in.   Just if you get lost" -- because a

17:33:34  24   lot of people get lost in the corridors from the way

17:33:38  25   they're set up.   So I just instruct them, you know, "If

17:33:40   1   you get lost, have somebody help you back in."  And then I

17:33:44   2   explained also not to come through the outer doors into

17:33:46   3   the operating room because that breaks sterility -- or it

17:33:50   4   can.  I just explain, you know, "Come from the inner core

17:33:54   5   and not from the outer core."

17:33:57   6        Q.   And just so that I better understand what that

17:34:02   7   means, if -- if a student -- the student had left to go to

17:34:06   8   the restroom, would she have been able to access those

17:34:10   9   doors to the inner core to return, then?

17:34:12  10        A.   Yes.  So for the operating room, there's, like,

17:34:18  11   one way in, one way out.  They're not blocked out, so

17:34:24  12   technically, you could enter from any of the doors, but

17:34:28  13   just proper protocol, you enter in from the sterile core,

17:34:32  14   and if you're leaving to do anything, go to the restroom,

17:34:34  15   take your breaks, anything like that, you would exit

17:34:37  16   from -- through the -- the outer core, which is the dirty

17:34:40  17   side.  And so, yeah, those are the doors you'd go out of.

17:34:44  18   And then you just go all the way around the operating room

17:34:47  19   and then you can come back in through the locker rooms,

17:34:50  20   which lead into the sterile core.

17:34:52  21        Q.   Your email also mentions that "The CRNA as well

17:35:07  22   as the surgical team questioned where the student had

17:35:10  23   went, as they were trying to inform her about the

17:35:14  24   procedure."  Do you see that?

17:35:15  25        A.   Uh-huh.

17:35:15    1      Q.   Do you specifically recall the CRNA asking about

17:35:19    2   where Ms. Do had gone?

17:35:21    3      A.   Yeah.  I -- I mean, I don't really recall it,

17:35:27    4   but, you know, reading this, I see that, yeah, they would

17:35:33    5   have questioned me as to where she went because everybody

17:35:36    6   else noticed that there wasn't a student in the room

17:35:39    7   anymore.

17:35:39    8      Q.   Do you recall who the CRNA was during that

17:35:44    9   surgery?

17:35:44   10      A.   I do not.

17:35:45   11      Q.   And do you recall anything specifically about

17:35:51   12   what either the CRNA or the surgical team asked about --

17:35:56   13   about the student?

17:35:57   14      A.   I feel like I just remember them being like,

17:36:02   15   "Hey, where did your student go?"  You know.  Like or

17:36:04   16   "Didn't we have a student in the room?"  Something along

17:36:07   17   those lines.  Because it's pretty notable -- you know,

17:36:11   18   it's pretty noticeable when you have a student and then

17:36:14   19   they're gone, because they go into a lot more depth in

17:36:18   20   explaining when there's students, so usually there's a lot

17:36:21   21   more talking and, like, "Oh, do you want to come and see

17:36:24   22   this?"  You know.  So . . .

17:36:27   23      Q.   Your email goes on to say that after ". . . this

17:36:32   24   point, another surgical nurse entered the operating room

17:36:36   25   to inform me that the student's OR scrubs were left on the

Sara Do vs. Arizona Board of Regents                                    CV-22-00190-PHX-JJT
Reaia Reaves                        October 17, 2023                              45

17:36:39   1   locker room bench and her belongings were gone."  Do you

17:36:43   2   see that in the email?

17:36:44   3       A.    Uh-huh.

17:36:44   4       Q.    Do you recall that happening during the surgery?

17:36:46   5       A.    I do remember somebody coming into my room to

17:36:52   6   say, "Hey, I think maybe your student left because her

17:36:56   7   scrubs are on the bench."

17:36:59   8              And I said, "Oh, okay.  Thanks for letting

17:37:03   9   me know."  You know, like, I guess I'll talk to Kim after

17:37:07  10   this is done or when I go on break, you know.

17:37:09  11       Q.    Did you reach out to Kim during the surgery to

17:37:11  12   let her know what that nurse had told you?

17:37:14  13       A.    I probably told that nurse who came and told

17:37:17  14   me -- because I can't just leave the operating room with

17:37:20  15   the patient in there, so I would have most likely told the

17:37:23  16   nurse that informed me to let Kim know.  And then when the

17:37:26  17   surgery was done or if I had a break or something in

17:37:29  18   between, I would have let Kim know personally as well.

17:37:35  19       Q.    Do you recall who the other nurse that's

17:37:39  20   referenced in your email, which is Exhibit 36, was?

17:37:46  21       A.    I don't recall who that nurse was, no.

17:37:49  22       Q.    Do you remember how long after Ms. Do left the

17:37:52  23   operating room it was until that second nurse came in to

17:37:55  24   tell you she found the scrubs?

17:37:58  25       A.    I would say --  No, I -- I don't recall the

| | | |
|---|---|---|
| 17:56:17 | 1 | Q.   Other than this experience with Ms. Do, have you |
| 17:56:22 | 2 | ever had an experience where a nursing student left the |
| 17:56:26 | 3 | facility during a clinical shift without notifying anyone |
| 17:56:29 | 4 | that they were leaving? |
| 17:56:30 | 5 | A.   No, never. |
| 17:56:31 | 6 | Q.   At any point during the time that you spent with |
| 17:56:39 | 7 | Ms. Do, did she mention anything to you about having a |
| 17:56:43 | 8 | medical condition? |
| 17:56:43 | 9 | A.   Not that I recall. |
| 17:56:45 | 10 | Q.   And at any point during the time you spent with |
| 17:56:49 | 11 | Ms. Do, did she mention anything to you about needing to |
| 17:56:53 | 12 | take medication? |
| 17:56:55 | 13 | A.   Not that I recall. |
| 17:56:56 | 14 | Q.   Did she mention anything to you at any time that |
| 17:57:00 | 15 | you were with her about being in arrhythmia? |
| 17:57:05 | 16 | A.   Not that I recall, no. |
| 17:57:06 | 17 | Q.   And I -- I think you told me this, but just in |
| 17:57:16 | 18 | case, I want to ask.  Did you write the email that's |
| 17:57:19 | 19 | Exhibit Number 36 on the same day that Ms. Do shadowed you |
| 17:57:23 | 20 | in the operating room? |
| 17:57:24 | 21 | A.   Yes. |
| 17:57:25 | 22 | Q.   And when you wrote the email, were you attempting |
| 17:57:30 | 23 | to accurately record your interactions with Ms. Do? |
| 17:57:33 | 24 | A.   Yes. |
| 17:57:34 | 25 | Q.   Give me just one minute.  I think I may be just |

```
 1  STATE OF ARIZONA      )

 2  COUNTY OF MARICOPA    )

 3            BE IT KNOWN that the foregoing proceedings

 4  were taken before me; that the witness before testifying

 5  was duly sworn by me to testify to the whole truth; that

 6  the foregoing pages are a full, true, and accurate record

 7  of the proceedings all done to the best of my skill and

 8  ability; that the proceedings were taken down by me in

 9  shorthand and thereafter reduced to print under my

10  direction.

11            I CERTIFY that I am in no way related to any

12  of the parties hereto nor am I in any way interested in

13  the outcome hereof.

14            [ ] Review and signature was requested.

15            [X] Review and signature was waived.

16            [ ] Review and signature was not requested.

17            I CERTIFY that I have complied with the

18  ethical obligations set forth in ACJA 7-206(F)(3) and

19  ACJA 7-206 (J)(1)(g)(1) and (2).  Dated at Phoenix,

20  Arizona, this 29th day of October, 2023.

21

22  _____

23            Meri Coash, RMR, CRR

24            Certified Reporter

25            Arizona CR No. 50327
```

1           I CERTIFY that Coash Court Reporting &

2   Video, LLC, has complied with the ethical obligations set

3   forth in ACJA 7-206 (J)(1)(g)(1) through (6).

4

5

6   _____

7        COASH COURT REPORTING & VIDEO, LLC

8             Registered Reporting Firm

9             Arizona RRF No. R1228

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 15

**Do vs                Videotaped Deposition of Sherry Ann Strotler 30(b)(6) of  Represntative for Maricopa County Arizona Board of Regents**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Sara Do, an individual,                    )
                                           )
                Plaintiff,                 )
vs.                                        )
                                           )
Arizona Board of Regents, an               ) No. 2:22-cv-00190-JJT
Arizona State Entity; Maricopa             )
County Special Health Care                 )
District,                                  )
                                           )
                Defendants,                )
_____)



VIDEOTAPED DEPOSITION OF SHERRY ANN STOTLER

30(b)(6) Representative For Maricopa County

Special Health Care District

August 24, 2023
Phoenix, Arizona
9:00 a.m.




REPORTED STENOGRAPHICALLY BY:
MARY DAVIS, RPR
Certified Reporter
Certificate No. 50271

PREPARED FOR:
ASCII


(Certified Copy)




**Griffin Group International**
**888.529.9990 | 602.264.2230**

Do vs                Videotaped Deposition of Sherry Ann Strotler 30(b)(6) of  Represntative for Maricopa County
Arizona Board of Regents

2

1        VIDEOTAPED DEPOSITION OF SHERRY ANN STOTLER,

2          30(b)(6) Representative for Maricopa County

3                Special Health Care District,

4    was taken on August 24, 2023, commencing at 9:03 a.m.,

5    at GRIFFIN GROUP INTERNATIONAL, 3200 East Camelback

6    Road, Suite 177, Phoenix, Arizona, before MARY DAVIS,

7    RPR, a Certified Reporter in the State of Arizona.

8

9    COUNSEL APPEARING:

10

11   For Plaintiff Sara Do

12        AFFELD GRIVAKES LLP
          By:  Brian R. England, Esq.
13        2049 Century Park East, Suite 2460
          Los Angeles, California 90067
14

15

16   For Defendant Arizona Board of Regents

17        OSBORN MALEDON, P.A.
          By:  Kristin L. Windtberg, Esq.
18        By:  Joshua J. Messer, Esq
          2929 North Central Avenue, 21st Floor
19        Phoenix, Arizona 85012

20

21   For Defendant Maricopa County Special Health Care
     District
22
          COPPERSMITH BROCKELMAN PLC
23        By:  Jill J. Chasson,, Esq.
          By:  Andrew T. Fox, Esq.
24        2800 North Central Avenue, Suite 1900
          Phoenix, Arizona 85004
25



Do vs                    Videotaped Deposition of Sherry Ann Strotler 30(b)(6) of  Represntative for Maricopa County
Arizona Board of Regents

3

1    ALSO PRESENT:

2         Robin Smart, VideoDep Incorporated

3         Sara Trower, Associate General Counsel - ASU

4         Sara Do (via Zoom)

5         Angelina Nye - Valleywise Health (via Zoom)

6         Dale Dschultz - Valleywise (via Zoom)

7         Johanna Hammel - State of Arizona risk management
          department (via Zoom)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Do vs                Videotaped Deposition of Sherry Ann Strotler 30(b)(6) of  Represntative for Maricopa County
Arizona Board of Regents

4

1                        I N D E X

2

3    WITNESS                                    PAGE

4    SHERRY ANN STOTLER

5      Examination by Mr. England                8

6      Examination by Mr. Messer               143

7      Further Examination by Mr. England      162

8      Examination by Ms. Chasson              164

9

10

11

12

13

14

15                     E X H I B I T S

16   EXHIBIT            DESCRIPTION            PAGE

17   No. 36   Third Amended Notice of Videotaped    8
              Deposition of Defendant Maricopa
18            County Special Health Care District
              (4 pages)
19
     No. 37   Master Affiliation Agreement with ASU   15
20            (15 pages) Bates Valleywise-0175-0189

21   No. 38   myClinicalExchange note               43
              (1 page) Bates Valleywise-0451
22
     No. 39   SBAR (2 pages)                         61
23            Bates Valleywise-0445-0446

24   No. 40   SBAR (2 pages)                         66
              Bates Valleywise-0447-0448
25



**Griffin Group International**
**888.529.9990  |  602.264.2230**

Do vs        Videotaped Deposition of Sherry Ann Strotler 30(b)(6) of Represntative for Maricopa County
Arizona Board of Regents

91

1  change this policy or modify the policy?  Was there

2  anybody else present, for example, participating?

3      **A.    Participating.  I can't remember if Nicole was**

4  **present when we had the conversation.**

5      Q.    If you were going to modify that policy --

6  well, first, whose authority would be needed to modify

7  this policy?

8      **A.    I actually could modify the policy.**

9      Q.    You had that power?

10     **A.    (No verbal response.)**

11     Q.    Okay.  Did you need to run that past anyone?

12     **A.    For this, I'm sure I probably had a**

13 **conversation with the chief clinical officer, but I**

14 **don't remember necessarily doing it.  I would not of**

15 **had to have a conversation.**

16     Q.    Do you remember when the policy that's quoted

17 on the first page of Exhibit 41, when that was changed

18 to exclude nursing students from perioperative areas?

19     **A.    I'd have to go back and look at the exact date**

20 **when that was added.**

21     Q.    Was that part of the change because of COVID?

22     **A.    I believe it happened a little before that,**

23 **before COVID, but I'd have to validate.**

24     Q.    And do you know why that change was put in?

25     **A.    I think it was just the -- it had to do with**

Do vs                Videotaped Deposition of Sherry Ann Strotler 30(b)(6) of  Represntative for Maricopa County
Arizona Board of Regents

103

1  explanation for why that is?

2      A.   The only thing I do know, by the time the

3  '21 -- I may not have -- because I may not have put it

4  through is the only thing I can think because I still

5  would have had the ability to okay the student in the

6  environment.  So maybe I didn't just change it and went

7  ahead and made the allowance to be in the OR without

8  changing the policy.

9      Q.   I see.  So you may have created Exhibit 41,

10 but not actually put it into effect?

11     A.   Yeah.

12     Q.   Because you thought you could make an

13 exception?

14     A.   I could make an exception.

15     Q.   Right.  And that exception -- well, if you

16 turn over to page 429 on Exhibit 44.

17     A.   Yeah.

18     Q.   In the redline under the Nursing/Clinical

19 Students.  Do you see that?  There you go.

20     A.   Oh, yeah.  I'm sorry.

21     Q.   And here's where --

22     A.   Yes.

23     Q.   -- consistent with your emails with Marc, you

24 made clear that you can make this exception.

25     A.   Right.



155

1   you -- there's this overall schedule for July 24th,

2   2021.  You also created a separate list that was just

3   the surgeries occurring while Sara Do was in

4   Valleywise; correct?

5       **A.    Correct.**

6       Q.    Okay.  And you might have answered my question

7   somewhere in the middle there, and I apologize if I

8   missed it.

9           Are there surgeries that Sara Do attended on

10  the list that we're looking at?

11      **A.    Yes.**

12      Q.    And can you identify which surgeries those

13  are?

14      **A.    The ones that I remember, that I -- in all the**

15  **conversation was the burn case that she was going to go**

16  **into and the -- I thought it was the plastics case, but**

17  **I'll have to pull -- I'd have to get my notes to**

18  **double-check myself.**

19      Q.    And that plastics case would be the second row

20  on the schedule?

21      **A.    Yes.**

22      Q.    And the burn case would be the --

23      **A.    Towards the bottom.**

24      Q.     -- the last one on the schedule?

25      **A.    Yeah.**

Do vs                    Videotaped Deposition of Sherry Ann Strotler 30(b)(6) of  Represntative for Maricopa County
Arizona Board of Regents

156

1    Q.    And as you sit here today, you don't remember
2  what the third one was?
3    A.    I couldn't remember the third.  I have it
4  written down, but I'm completely -- I'm assuming it was
5  the orthopedics one because of the time.
6    Q.    There's two orthopedics.  Which one are you
7  referring to?
8    A.    The one that was the 09:30 to 11:10.  Because
9  that would have been during that time, the initial.  I
10 would have just looked at the top.
11   Q.    For the burn case, do you know whether that
12 patient was COVID positive or not?
13   A.    COVID negative is what I was informed when I
14 pulled it.
15   Q.    And for the plastics case, do you know whether
16 that patient was COVID negative?
17   A.    COVID negative.
18   Q.    And for the orthopedic case, do you know
19 whether that patient was COVID negative?
20   A.    I was told COVID neglect -- COVID negative.
21   Q.    And would -- because those patients were COVID
22 negative, would those participating in those surgeries
23 be required to wear an N95 mask?
24   A.    Not during the surgical procedure piece of it,
25 no.



Do vs            Videotaped Deposition of Sherry Ann Strotler 30(b)(6) of Represntative for Maricopa County
Arizona Board of Regents

169

1                CERTIFICATE OF CERTIFIED REPORTER

2           BE IT KNOWN that the foregoing proceedings
   were taken before me; that the witness before
3  testifying was duly sworn by me to testify to the whole
   truth; that the foregoing pages are a full, true and
4  accurate record of the proceedings, all done to the
   best of my skill and ability; that the proceedings were
5  taken down by me in shorthand and thereafter reduced to
   print under my direction; that I have complied with the
6  ethical obligations set forth in ACJA 7-206(F)(3) and
   ACJA 7-206 J(1)(g)(1) and (2).

7
           I CERTIFY that I am in no way related to any
8  of the parties hereto, nor am I in any way interested
   in the outcome hereof.

9
        {X}  Review and signature was requested; any
10 changes made by the witness will be attached to the
   original hereof.
11         { }  Review and signature was waived/not
   requested.
12         { }  Review and signature not required.

13
        Dated at Phoenix, Arizona, this 8th day of
14 September, 2023.

15
                        /s/ Mary Davis
16         _____
                     MARY DAVIS, RPR
17                  Certified Reporter
                 Arizona CR No. 50271
18          *        *        *        *        *

19

20      I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has
   complied with the ethical obligations set forth in ACJA
21 7-206 (J)(1)(g)(1) through (6).

22

23                  /s/ Pamela A. Griffin
           _____
24               GRIFFIN GROUP INTERNATIONAL
                 Registered Reporting Firm
25                 Arizona RRF No. R1005



**Griffin Group International**
888.529.9990 | 602.264.2230

# EXHIBIT 16

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ARIZONA

 3                                      )
 4    Sara Do, an individual,          )
                                       )
 5           Plaintiff,                )
                                       )
 6    v.                               )   No.
                                       )   CV-22-00190-PHX-JJT
 7    Arizona Board of Regents, an     )
      Arizona State Entity; et al.,    )
 8                                     )
             Defendants.               )
 9    _____)

10       IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

11            IN AND FOR THE COUNTY OF MARICOPA

12                                     )
      Sara Do, an individual,          )
13                                     )
             Plaintiff,                )   No. CV2022-009424
14                                     )
      v.                               )
15                                     )      VIDEOTAPED
      Arizona Board of Regents, an     )    DEPOSITION OF
16    Arizona State Entity;            )   WARREN BRENT THOMAS
      Dr. Kimberly Day, an unmarried   )
17    person; Dr. Salina Bednarek and  )
      Joshua Bednarek, wife and        )
18    husband; Dr. Margaret Morris     )
      and Phillip Morris, wife and     )   Phoenix, Arizona
19    husband; Candace Keck and        )
      Jonathan Keck, wife and          )   August 22, 2023
20    husband,                         )
                                       )
21           Defendants.               )
      _____)

22

23    Prepared by:

24    Meri Coash, RMR, CRR
      Certified Reporter            CERTIFIED
25    Certification No. 50327        TRANSCRIPT
```

1                          I N D E X
   WITNESS                                                        PAGE
2

3        Examination by Mr. Messer                              6

4        Examination by Mr. England                            49

5        Examination by Mr. Fox                                80

6        Further Examination by Mr. Messer                     84

7        Further Examination by Mr. England                    88

8        Further Examination by Mr. Fox                        89

9        Further Examination by Mr. Messer                     89

10

11

12

13

14                       EXHIBITS MARKED

15   EXHIBITS                 DESCRIPTION                      PAGE

16   Exhibit 35      Email from Brent Thomas to Kimberly        33
                    Day, 7-24-21, Subject:   Student
17                  Nurse at County
                    ABOR000554

18

19

20

21

22

23

24

25

```
 1           VIDEOTAPED DEPOSITION OF WARREN BRENT THOMAS

 2    was taken on August 22, 2023, commencing at 9:06 a.m., at

 3    the law offices of Osborn Maledon, PA, 2929 North Central

 4    Avenue, Phoenix, Arizona, before Meri Coash, a Certified

 5    Reporter in the State of Arizona.

 6

 7                              *    *    *

 8

 9    APPEARANCES:

10          For the Plaintiff:
               AFFELD GRIVAKES, LLP
11             By:  Brian R. England, Esq. (Via Zoom)
                    2049 Century Park East
12                  Suite 2460
                    Los Angeles, California  90067
13                  310-979-8700
                    bre@agzlaw.com
14

15
            For Defendants Arizona Board of Regents, Day,
16          Bednarek, Morris, Keck:
               OSBORN MALEDON, PA
17             By:  Joshua J. Messer, Esq.
                    Kristin L. Windtberg, Esq.
18                  2929 North Central Avenue
                    20th Floor
19                  Phoenix, Arizona  85012
                    602-640-9000
20                  jmesser@omlaw.com
                    kwindtberg@omlaw.com
21

22

23

24

25
```

```
 1   APPEARANCES (CONTINUED):

 2        For Defendant Maricopa County Special Health Care
          District:
 3             COPPERSMITH BROCKELMAN PLC
               By:   Andrew T. Fox, Esq.
 4                   Jill J. Chasson, Esq.   (Via Zoom)
                     2800 North Central Avenue
 5                   Suite 1900
                     Phoenix, Arizona   85004
 6                   602-224-0999
                     afox@cblawyers.com
 7                   jchasson@cblawyers.com

 8
          Also present:   Sara Do (Via Zoom)
 9                        Sara Trower, Esq.
                          Johanna Hammel (Via Zoom)
10                        Daniel Rohan, videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 09:33:19 | 1 | Sara Do? |
| 09:33:20 | 2 | A.   I do. |
| 09:33:20 | 3 | Q.   What do you remember about Sara Do? |
| 09:33:23 | 4 | A.   She was not like any other nursing student I've |
| 09:33:27 | 5 | ever come across.  There was a general sense of -- I don't |
| 09:33:39 | 6 | know how to describe it -- uninterest.  She wasn't |
| 09:33:45 | 7 | interested in seeing anything, really talking about much |
| 09:33:51 | 8 | of anything to do with nursing in the OR.  Tried to engage |
| 09:33:55 | 9 | her, show her some stuff, show her what I do, answer |
| 09:34:01 | 10 | questions, kind of engage.  "What kind of nurse do you |
| 09:34:04 | 11 | want to be?"  "What kind of nursing interests you?"  Just |
| 09:34:07 | 12 | typical stuff to try and get to know them and --  You |
| 09:34:12 | 13 | know, not like counsel them, but help them explore the |
| 09:34:17 | 14 | different aspects of nursing.  There was a general just |
| 09:34:21 | 15 | kind of not -- not interested feel from her, which is -- |
| 09:34:31 | 16 | sorry -- I didn't mean to interrupt.  It's just not -- |
| 09:34:34 | 17 | I've never experienced that before ever. |
| 09:34:35 | 18 | Q.   And what gave you the sense that she wasn't |
| 09:34:38 | 19 | interested?  What gave you that feeling? |
| 09:34:40 | 20 | A.   Well, she kind of sat in a corner, didn't really |
| 09:34:46 | 21 | want to come look at anything, didn't want to see |
| 09:34:49 | 22 | anything.  When I asked -- tried and ask questions, didn't |
| 09:34:51 | 23 | really want to talk about -- about --  Most people look at |
| 09:34:56 | 24 | CRNAs, "Oh, that's amazing.  I want to see what you do." |
| | 25 | You know, no interest.  That's okay.  CRNA's not for |

Sara Do vs. Arizona Board of Regents                                    CV-22-00190-PHX-JJT
Warren Brent Thomas                     August 22, 2023                                    26

| | | |
|---|---|---|
| 09:35:04 | 1 | everybody.  But just felt like just didn't want to be |
| 09:35:05 | 2 | there.  Felt like she wasn't interested in being there in |
| 09:35:08 | 3 | the OR.  Tried to engage her with conversation, and she -- |
| 09:35:13 | 4 | didn't feel like she wanted to even really be a nurse.  I |
| 09:35:17 | 5 | remember at one point she told me that her goal in |
| 09:35:21 | 6 | becoming a nurse was not actually be a nurse but to go |
| 09:35:24 | 7 | into administration.  Her desire was to be a hospital |
| 09:35:28 | 8 | administrator, not ever have any patient care, not ever |
| 09:35:31 | 9 | deal with any of the core nursing -- what we do as nurses. |
| 09:35:40 | 10 | Nursing's all about patient care, and she had no interest |
| 09:35:43 | 11 | in any of that. |
| 09:35:44 | 12 |     Q.   Is that something that she said, that she wasn't |
| 09:35:47 | 13 | interested in patient care? |
| 09:35:47 | 14 |     A.   Yeah, pretty -- through -- I don't know if she |
| 09:35:50 | 15 | said the exact words "I have no interest," but she said |
| 09:35:53 | 16 | she didn't want to be a nurse.  She wanted to be an |
| 09:35:56 | 17 | administrator.  That's what she told me she wanted to be. |
| | 18 | So typically I'll ask, "What kind of a nurse do you want |
| 09:36:00 | 19 | to be?  Do you want to be pediatrics?  Do you want to be |
| 09:36:00 | 20 | obstetrics?  Do you want to be surgical tech?  Want --  A |
| 09:36:03 | 21 | surgical nurse?  What kind of nurse do you want to be?" |
| 09:36:05 | 22 | She said, "I don't want to be that kind of nurse.  I want |
| 09:36:07 | 23 | to be an administrator." |
| 09:36:10 | 24 |     Q.   And you said that she didn't want to come look or |
| 09:36:17 | 25 | see what the -- what you were doing or what the procedure |

09:36:19    1    was, correct?

09:36:20    2        A.    Yeah.   She just kind of sat in a corner.   I

09:36:25    3    remember at --   I think this was on a weekend, on a

09:36:27    4    Saturday, if I'm -- I might be incorrect.   I think it was

09:36:33    5    on a Saturday because it was different --   Weekends at

09:36:37    6    Valleywise are different.   There's -- you're not, like,

09:36:39    7    stuck in one room.   There's -- there's several CRNAs, and

09:36:42    8    we'll kind of alternate who's got the next room.   Kind

09:36:45    9    of --   There's always one person free, so if any traumas

09:36:48   10    come in, they're able to run and handle the trauma that

09:36:50   11    comes in.   We always have to have one OR always ready for

09:36:53   12    traumas, and one CRNA and one anesthesia crew ready to

09:36:58   13    handle any traumas that -- any emergencies that come in.

09:37:01   14    So as we finish a case in this one room, we'll bounce to

09:37:04   15    the next or we'll be the free person until the next case

09:37:04   16    empties and we'll kind of just rotate that way.   Each one

09:37:06   17    takes -- takes a break in between, but were bouncing

09:37:09   18    around, so we're in different rooms at different times.

09:37:15   19    And I've worked, a lot of times on weekends, the same

09:37:18   20    crew, the same nursing staff.   The same core people kind

09:37:21   21    of come in and work a lot of weekends, so we know each

09:37:24   22    other pretty well.

09:37:25   23              And she kind of sat in a corner.   She got up

09:37:31   24    and left a few times.   Just didn't seem interested in

09:37:36   25    being there at all.

09:37:37   1      Q.   Did she say anything about why she didn't want to

09:37:44   2   come any closer to the patient or didn't want to observe

09:37:46   3   more closely?

09:37:47   4      A.   No.

09:37:47   5      Q.   Did she say anything to you before --  You

09:37:52   6   mentioned that she left the operating room a few times,

           7   correct?

09:37:56   8      A.   Yeah.  I figured, you know, some people need to

09:37:58   9   go to the bathroom or whatever.  They just get up and go.

09:38:01  10   It's not like we're in grade school, you've got to ask

09:38:04  11   permission.  Gotta go, go.  So I assumed that she needed

09:38:07  12   to go use the restroom or something like that.  But it was

09:38:10  13   just look over and she's not in the corner anymore.

09:38:14  14            MR. ENGLAND:  Josh, this is Brian, I hate to

09:38:18  15   interrupt.  You're trailing off at the end of your

09:38:20  16   questions.  Could you just speak up a tiny bit?

09:38:22  17            MR. MESSER:  Oh, of course.  Sorry about

09:38:23  18   that, Brian.

09:38:24  19   BY MR. MESSER:

09:38:24  20      Q.   Before she left the room, did she say anything to

09:38:26  21   you?

09:38:26  22      A.   No.

09:38:27  23      Q.   Do you know if she said anything to anyone?

09:38:29  24      A.   I wouldn't know.  Just look up, she's not there.

09:38:35  25   You know, trying to engage, trying to talk with her, and

09:38:37  1   she just sat in the corner, so I would just go on doing

09:38:40  2   my -- you know, doing my thing and monitoring the patient,

09:38:43  3   making sure everything was safe.  Look over and she's not

09:38:45  4   there, and I figured she had to go to the bathroom.  I

09:38:48  5   remember at one point she was just not there anymore.  It

09:38:51  6   wasn't -- I thought maybe it was the end of her clinical

09:38:53  7   experience there, she was done.  Sometimes, you know,

09:38:58  8   students will be -- have meetings to go --  They go down

09:39:00  9   and have their little huddles with all -- with the nursing

09:39:03 10   instructors and they talk about their day.  Maybe she was

09:39:08 11   done and was going to one of those nursing meetings or

09:39:11 12   something, student meetings.  She was there and then she

09:39:14 13   wasn't.

09:39:15 14       Q.   And this -- this last time that she left, when

09:39:18 15   she just didn't come back, did she say anything to you --

09:39:21 16       A.   No.

09:39:21 17       Q.   -- before she left that time?

09:39:23 18       A.   No.

09:39:24 19       Q.   Do you know if she said anything to anyone?

09:39:25 20       A.   I have no idea.

09:39:31 21       Q.   Had anyone told you anything about Ms. Do before

09:39:36 22   she was in the operating room with you?

09:39:37 23       A.   I was told there was going to be a student in

09:39:43 24   there.  The nurse that -- that was there frequently on the

09:39:53 25   weekends who was an instructor, I always called her

| | | |
|---|---|---|
| 09:44:29 | 1 | Exhibit 35. |
| | 2 | (Deposition Exhibit 35 was marked for |
| 09:44:43 | 3 | identification.) |
| 09:44:43 | 4 | BY MR. MESSER: |
| 09:44:56 | 5 | Q.   All right, Mr. Thomas.  The court reporter just |
| 09:45:04 | 6 | handed you Exhibit 35, which is a document with Bates |
| 09:45:07 | 7 | stamp ABOR000554.  Do you recognize this document? |
| 09:45:14 | 8 | A.   I do. |
| 09:45:14 | 9 | Q.   What is this document? |
| 09:45:16 | 10 | A.   This is the review that I wrote to ASU. |
| 09:45:20 | 11 | Q.   And the "From" line, is that your email address? |
| 09:45:25 | 12 | A.   It is. |
| 09:45:26 | 13 | Q.   And did you send this the day of the surgery that |
| 09:45:34 | 14 | we've been talking about? |
| 09:45:35 | 15 | A.   I did. |
| 09:45:35 | 16 | Q.   All right.  So that would be July 24th, 2021? |
| 09:45:39 | 17 | A.   Yes. |
| 09:45:39 | 18 | Q.   So you start this email off by saying, "I have |
| 09:45:51 | 19 | never experienced a student like the one you brought to |
| 09:45:54 | 20 | the OR on Saturday . . . ."  Do you see that? |
| 09:45:56 | 21 | A.   I do. |
| 09:45:57 | 22 | Q.   Is there anything else that we haven't talked |
| 09:45:59 | 23 | about that you meant by that? |
| 09:46:01 | 24 | A.   Just like what I said, students typically are |
| 09:46:07 | 25 | there to soak it all up, experience everything, see |

09:53:55    1        Q.    So does this email accurately capture your

09:53:58    2    impressions of Ms. Do?

09:53:58    3        A.    It was written right, I mean, literally that same

09:54:01    4    day, so it was fresh when I wrote it.

09:54:03    5        Q.    After she left the surgery for the last time,

09:54:13    6    what did you do?

09:54:14    7        A.    As I say, when I -- when I saw Kim again, I asked

09:54:21    8    her about it, like I said before.  And then I still had

09:54:26    9    other surgeries and things to do, so I think I wrote

09:54:29   10    this -- I had a break between the two, between my next

09:54:33   11    case, and I just wrote this real quick and sent it to Kim,

09:54:36   12    that she could then make sure it got passed on to ASU.

09:54:40   13        Q.    Are you aware that Sara Do left a second surgery

09:54:47   14    later in the day?

09:54:49   15        A.    I don't remember that.

09:54:50   16        Q.    We talked about you talking about Sara Do with

09:54:57   17    Kim Day.  Did you talk about Sara Do with anybody else?

09:55:02   18        A.    I wouldn't recall exactly who because, you know,

09:55:10   19    Kim was in charge of the -- of the student.  I know she

09:55:13   20    was the --  I always called her the professor as well

09:55:17   21    because she's -- she taught -- she taught at ASU, and so I

09:55:22   22    always joked with her about that.  So I talked with her

09:55:26   23    about it.  And I remember making comments to some of the

09:55:29   24    other nurses -- circulators in the area, like, "Wow, she

09:55:32   25    just really didn't want to be a nurse, didn't have any

10:16:30   1   don't remember specifically things that I said to her, no.

10:16:35   2   More so it was Kim because she was the -- she was the

10:16:38   3   clinical coordinator.  She was -- she was in charge of

10:16:41   4   Ms. Do.

10:16:42   5        Q.   And do you know whether Kim Day was the charge

10:16:45   6   nurse that day?

10:16:46   7        A.   I can't recall if she was the charge nurse or if

10:16:49   8   she was circulating.  I believe Gabi was in the room.

10:16:53   9   That's why I would have said something to Gabi, because

10:16:56   10  she would have had firsthand experience of seeing what I

10:16:59   11  saw.  But my -- I'm thinking or leaning towards that Kim

10:17:08   12  was not in the room and Gabi was in the room and Kim

10:17:13   13  was -- put her in the room to experience in that room, not

10:17:15   14  with her, you know, with someone else, but that's -- I'm

10:17:20   15  thinking that's the way it was, but I can't remember

10:17:22   16  exactly.

10:17:22   17       Q.   When you were having the conversation with Kim

10:17:26   18  about Ms. Do and Kim asked you to send her an email with

10:17:31   19  your thoughts, did Kim tell you what to say in that email?

10:17:34   20       A.   No.

10:17:53   21            MR. MESSER:  All right.  Mr. Thomas, I think

10:17:55   22  that's not quite all I have.

10:18:03   23            That is all I have for right now.

10:18:05   24  Appreciate your time.  I might have more follow-up after

10:18:08   25  others ask their questions, but for now, that's what I've

1   STATE OF ARIZONA      )

2   COUNTY OF MARICOPA   )

3           BE IT KNOWN that the foregoing proceedings

4   were taken before me; that the witness before testifying

5   was duly sworn by me to testify to the whole truth; that

6   the foregoing pages are a full, true, and accurate record

7   of the proceedings all done to the best of my skill and

8   ability; that the proceedings were taken down by me in

9   shorthand and thereafter reduced to print under my

10  direction.

11          I CERTIFY that I am in no way related to any

12  of the parties hereto nor am I in any way interested in

13  the outcome hereof.

14          [ ] Review and signature was requested.

15          [ ] Review and signature was waived.

16          [X] Review and signature was not requested.

17          I CERTIFY that I have complied with the

18  ethical obligations set forth in ACJA 7-206(F)(3) and

19  ACJA 7-206 (J)(1)(g)(1) and (2).  Dated at Phoenix,

20  Arizona, this 6th day of September, 2021.

21

22          _____

23                  Meri Coash, RMR, CRR

24                  Certified Reporter

25                  Arizona CR No. 50327

1            I CERTIFY that Coash & Coash, Inc., has

2    complied with the ethical obligations set forth in

3    ACJA 7-206 (J)(1)(g)(1) through (6).

4

5

6

7    _____

8              COASH & COASH, INC.

9            Registered Reporting Firm

10            Arizona RRF No. R1036

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 17

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF ARIZONA

 3

 4

 5  Sara Do, an individual,        )
                                   )
 6            Plaintiff,           )
                                   )
 7       v.                        )  No. CV-22-00190-
                                   )      PHX-JJT
 8  Arizona Board of Regents, an   )
    Arizona State Entity; et al.,  )
 9                                 )
              Defendants.          )
10  _____)

11

12

13            Deposition of DIANE J. WEISS, M.D.,

14     Witness, taken on behalf of Defendants at 2049

15     Century Park East, Suite 2460, Los Angeles,

16     California, commencing at 10:15 a.m. on Friday,

17     April 26, 2024, before John M. Taxter, Certified

18     Shorthand Reporter No. 3579 in and for the State

19     of California, a Registered Professional Reporter.

20

21

22

23

24

25
```

1          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4

5   Sara Do, an individual,          )
                                     )
6            Plaintiff,              )
                                     )
7        v.                          )   No. CV2022-009424
                                     )
8   Arizona Board of Regents, an     )
    Arizona state entity; Dr.        )
9   Kimberly Day, an unmarried       )
    person; Dr. Salina Bednarek and  )
10  Joshua Bednarek, wife and        )
    husband; Dr. Margaret Morris and )
11  Phillip Morris, wife and husband;)
    Candace Keck and Jonathan Keck,  )
12  wife and husband,                )
                                     )
13           Defendants.             )
    _____)

14

15

16          Deposition of DIANE J. WEISS, M.D.,

17    Witness, Volume 1, taken on behalf of Defendants

18    at 2049 Century Park East, Suite 2460, Los

19    Angeles, California, commencing at 10:15 a.m. on

20    Friday, April 26, 2024, before John M. Taxter,

21    Certified Shorthand Reporter No. 3579 in and for

22    the State of California, a Registered Professional

23    Reporter.

24

25

```
 1      APPEARANCES:

 2


 3


 4      FOR PLAINTIFF SARA DO AND DEPONENT DIANE WEISS,
        M.D.:
 5
                 AFFELD ENGLAND & JOHNSON LLP
 6               BY:  BRIAN R. ENGLAND, Attorney at Law
                 2049 Century Park East, Suite 2460
 7               Los Angeles, California  90067
                 310.979.8700
 8               bre@aejlaw.com

 9


10


11
        FOR DEFENDANTS ARIZONA BOARD OF REGENTS, AN
12      ARIZONA STATE ENTITY; DR. KIMBERLY DAY, AN
        UNMARRIED PERSON; DR. SALINA BEDNAREK AND JOSHUA
13      BEDNAREK, WIFE AND HUSBAND; DR. MARGARET MORRIS
        AND PHILLIP MORRIS, WIFE AND HUSBAND; AND CANDACE
14      KECK AND JONATHAN KECK, WIFE AND HUSBAND:

15               OSBORN MALEDON, P.A.
                 BY:  KRISTIN L. WINDTBERG,
16                    Attorney at Law
                      kwindtberg@omlaw.com
17
                          -and-
18
                      MARY R. O'GRADY, Attorney at Law
19                    mogrady@omlaw.com
                      (Remote appearance)
20                        -and-

21                    JOSHUA J. MESSER, Attorney at Law
                      jmesser@omlaw.com
22                    (Remote appearance)
                 2929 North Central Avenue, Suite 2000
23               Phoenix, Arizona  85012
                 602.640.9000
24


25
```

```
1    APPEARANCES (CONTINUED):

2


3


4    FOR DEFENDANT MARICOPA COUNTY SPECIAL HEALTH CARE
     DISTRICT:
5
             COPPERSMITH BROCKELMAN PLC
6            BY:  JILL J. CHASSON, Attorney at Law
                  (Remote appearance)
7            2800 North Central Avenue, Suite 1900
             Phoenix, Arizona  85004
8            602.224.0999
             jchasson@cblawyers.com
9


10


11   ALSO PRESENT:
12
             KWAN PIENSOOK, Attorney at Law
13           (Remote appearance)

14


15


16   VIDEOGRAPHER:

17           KEITH MAJOR

18


19


20


21


22


23


24


25
```

```
 1                        I N D E X

 2

 3     DEPONENT:            EXAMINED BY:           PAGE:

 4     DIANE J. WEISS, M.D.  BY MR. WINDTBERG      9,255
                             BY MS. CHASSON         202
 5                           BY MR. ENGLAND         254

 6

 7     EXHIBITS FOR IDENTIFICATION:

 8     67 - Plaintiff's expert report of Diane Weiss in    17
            the state court matter  (61 pages)
 9
       68 - Plaintiff's expert report of Diane Weiss in    19
10          the federal court matter  (61 pages)

11     69 - Handwritten notes by Diane J. Weiss, M.D.      46
            (34 pages)
12
       70 - Handwritten notes by Diane J. Weiss, M.D.      49
13          (6 pages)

14     71 - Handwritten notes by Diane J. Weiss, M.D.      49
            (14 pages)
15
       72 - Handwritten notes by Diane J. Weiss, M.D.      51
16          (50 pages)

17     73 - Handwritten notes by Diane J. Weiss, M.D.      52
            (26 pages)
18
       74 - Psychiatric examination patient information    55
19          (14 pages)

20     75 - Handwritten notes by Diane J. Weiss, M.D.      83
            (12 pages)
21
       76 - Expert report dated 12/20/2023 by Erin M.     129
22          Nelson, Psy.D.  (40 pages)

23     77 - Medical appointment documentation dated       234
            7/1/2021 with Linda Lau, M.D.  (4 pages)
24
       78 - Medical return office visit documentation     236
25          dated 7/14/2021 with Kai Chun Sung, M.D.
            (4 pages)
```

1              I N D E X  (CONTINUED)

2


3       EXHIBITS PREVIOUSLY MARKED:                    PAGE:

4       7 -  Medical appointment documentation dated      69
             10/26/2020 with Mohammad Dardari, M.D.
5            (3 pages)

6       8 -  Return office visit documentation dated      74
             10/28/2020 with Kai Chun Sung, M.D.
7            (4 pages)

8       23 - Medical appointment documentation dated     171
             1/20/2020  (4 pages)
9
        56 - Medical appointment documentation dated     160
10           2/3/2022 with Eddie M. Taylor, Ph.D.
             (29 pages)
11
        64 - Medical appointment documentation dated     238
12           7/20/2022 with Eddie M. Taylor, Ph.D.
             (28 pages)
13


14


15                INFORMATION REQUESTED:

16      (NONE)

17


18


19      QUESTION NOT ANSWERED
        ON ADVICE OF COUNSEL:
20
        (NONE)
21


22


23


24


25

```
 1        Q    Are you aware that Ms. Do is currently      11:54:57

 2   employed?                                             11:54:59

 3        A    Yes.                                        11:54:59

 4        Q    Do you know where she's employed?           11:54:59

 5        A    She told me that she the works for          11:55:00

 6   Banner Health, and what she said was the first or    11:55:03

 7   the second biggest employer; maybe the first in      11:55:07

 8   Arizona.  I -- I don't -- that was interesting to    11:55:09

 9   me.  And she told me what kind of work she does,     11:55:12

10   and she told me that she works from home.  So as     11:55:16

11   far as where, I guess who her official -- what       11:55:20

12   part of Banner Health was her employer I would       11:55:23

13   have no idea.                                         11:55:25

14        Q    Okay.  Did she tell you if she's liking    11:55:26

15   her job?                                             11:55:29

16        A    Yes.                                        11:55:30

17        Q    What did she say?                           11:55:30

18        A    She said she loved the job.                11:55:31

19        Q    Did she tell you any other details about   11:55:35

20   her current employment?                              11:55:37

21        A    Yes, she did.  To be thorough, I would     11:55:40

22   want to look at my notes because that was just       11:55:43

23   this week.                                           11:55:47

24             MS. WINDTBERG:  Well, let's do that        11:55:48

25   then.  I think you have a copy or Mr. England has    11:55:50
```

```
1    STATE OF CALIFORNIA   )
                           ) SS.
2    COUNTY OF VENTURA     )

3         I, John M. Taxter, a California Certified

4    Shorthand Reporter, Certificate No. 3579, a

5    Registered Professional Reporter, do hereby

6    certify:

7         That the foregoing proceedings were taken

8    before me at the time and place therein set forth,

9    at which time the deponent was put under oath by

10   me; that the testimony of the deponent and all

11   objections made at the time of the examination

12   were recorded stenographically by me and were

13   thereafter transcribed; That the foregoing is a

14   true and correct transcript of my shorthand notes

15   so taken.  I further certify that I am neither

16   counsel for nor related to any party to said

17   action.

18        Pursuant to Federal Rule 30(e), transcript

19   review was requested.

20        The dismantling, unsealing, or unbinding of

21   the original transcript will render the Reporter's

22   Certificate null and void.

23   Dated May 7, 2024.

24                         _____
                           JOHN M. TAXTER
                           California Certified Shorthand
25                         Reporter No. 3579, RPR
```

1

2

3

4          , Certified Shorthand Reporter,

5   CSR No.      , hereby certify:

6       The foregoing is a true and correct copy of the

7   original transcript of the proceedings taken by me

8   as thereon stated.

9

10

11

12  Dated: _____

13

14

15

16  _____

17

18

19

20

21

22

23

24

25

# EXHIBIT 18

1          UNITED STATES DISTRICT COURT

2             DISTRICT OF ARIZONA

3    _____

4    Sara Do, an Individual,

5          Plaintiff,

6       v.                              Case No.

7    Arizona State University;          2:22-cv-00190-JJT

8    Arizona Board of Regents, an

9    Arizona State Entity;

10   Valleywise Health; Valleywise

11   Health Medical Center; Dr.

12   Kimberly Day, an unmarried

13   person; Dr. Salina Bednarek

14   and Joshua Bednarek, wife and

15   husband; Dr. Margaret Morris

16   and Phillip Morris, wife and

17   husband; Candace Keck and

18   Jonathan Keck, wife and

19   husband,

20          Defendants.

21   _____

22

23

24                                      **CERTIFIED**
                                        **TRANSCRIPT**
25

1

2

3

4

5

6                  AUDIO-RECORDED INTERVIEW

7                            OF

8                          SARA DO

9       RE: SARA DO VS. ARIZONA STATE UNIVERSITY

10                      July 9, 2021

11

12

13            (File Name:  Do_000324.mp4)

14

15

16

17

18

19

20

21

22   Prepared by:

23   Diane Otto, CER, CET

24   Certified Electronic Transcriber

25   Certification No. 1353

```
 1                    (Commencement of audio file:

 2                    Do_324.mp4)

 3  Counter Start Time:  0:05:17.0

 4                    DR. BEDNAREK:  Hi, everyone.

 5                    MS. DO:  Hi.

 6                    DR. BEDNAREK:  How are you?

 7                    MS. DO:  Okay.  How are you?

 8                    DR. BEDNAREK:  I'm okay.  So I want to

 9  -- you know who I am and you know who Katherine is,

10  right?

11                    MS. DO:  Katherine?

12                    DR. BEDNAREK:  Katherine Benedict.

13                    MS. DO:  Yes.

14                    DR. BEDNAREK:  Okay.  You may not know

15  who Kathy Kenny is, Katherine Kenny, Dr. Katherine

16  Kenny.  She is our Associate Dean at Edson College, so

17  I asked her to be here with us today and so she's

18  joining us.  Just a little bit about her role; she's

19  in charge of all academic operations.  So that means

20  she needs to be involved in all students' -- student

21  conversations that are relevant to their program and

22  what's going on.  So it's not uncommon for her to be

23  looped in to conversations that are important, as the

24  one I know you're anxious to have with me.  Because I

25  know you were trying to reach out to me last night.
```

1           MS. DO:  Yeah.

2           DR. KENNY:  Hi, Sarah.  Thank you.  I'm

3    going to mute myself.  I'm just here, you know, to

4    make sure that I'm aware of our way forward.  So thank

5    you for being here.

6           MS. DO:  Thank you.

7           DR. BEDNAREK:  So you -- you reached

8    out and you wanted to meet, so share with me what's

9    going on?

10           MS. DO:  Yeah, I did.  So I got the

11    e-mail yesterday from Katherine as I was leaving the

12    school.  I went to the school because I had to take an

13    ATI test.  Before I went, I was having arrhythmia

14    problems, and we weren't given the option of doing it

15    online, like we have for the other semesters, which

16    was fine.  I took my medication; I went.  It didn't

17    work.  So I took the test as quickly as I could.  I

18    got through 100 questions in, I think, 31 minutes.  I

19    basically failed the test.  I couldn't concentrate.  I

20    was having to, like, take more medication as I'm

21    sitting there in class trying to take the test, but I

22    knew I needed to leave.

23           As I left, it got worse, and I ended up

24    going to the hospital on the way back toward the East

25    Valley, where I was, basically, for the rest of the

Valleywise-0559

1    night on the IV drips, the medications, the stuff that

2    they have to do when I can't get a hold of it myself.

3                So anyway, I went to the hospital,

4    actually, where we have the clinical for today in case

5    I was able to, you know, somehow just be closer by so

6    I could go to the clinical.  But at the point that I

7    left, I still had arrhythmia.  I was no longer in

8    bigeminy, in ventricular bigeminy, so they let me go

9    home.  And this morning when I got up, I still had

10   arrhythmia and I didn't end up going to the clinical

11   today just because I didn't know -- I didn't want to

12   go and then have to leave, you know, at some point.

13               So anyway, but I got Katherine's e-mail

14   yesterday on my way away from the school, going back

15   home or going toward home and that was when I called

16   you, or when I e-mailed you to see if we could talk.

17               So anyway, I kind of have some notes

18   that I wrote down just so I could try to stay focused

19   and not be all over the place, because I know

20   you're -- we have, like, 23 minutes left.  So I'll

21   just kind of get right into it.

22               So I've seen so far four

23   electrophysiology cardiologists.  I've seen Dr. Kai

24   Sung, Dr. Ziad El Khoury, Dr. John Beshai and Dr. Huy

25   Phan.  They're all medical doctors, electrophysiology

1  cardiologists, and they've all said that my condition

2  aligns with what they have seen in their practice for

3  rare conditions from the vaccine.  They said they are

4  also seeing it in patients who have had the virus.

5  But I've had IgG and IgM tests done.  I don't have

6  IgM.  I have the IgG for the spike protein, not the

7  other one that they look at.  So for sure, what I have

8  is from the vaccine is what they're saying, if that's

9  what it is.

10         And so, the -- the vaccine itself,

11  they're saying that it's likely that I have permanent

12  heart damage at this point.  The other day I had a --

13  you probably couldn't see it.  I can --I can take a

14  picture and send it to you.  I had a 12-lead EKG done

15  a couple of weeks ago.  No, it was about a week ago,

16  at Dr. Huy Phan's office, and it shows that I have an

17  inverted T-wave now and an elevated ST interval, which

18  he said aligns with a myocardial infarction.

19         Two weeks prior to that, I had a normal

20  EKG.  It wasn't normal, but it had normal T-waves and

21  a normal ST elevation or interval.  So sometime within

22  that time span, I think it was 16 days, they think

23  that I had a heart attack and it's also showing that I

24  have anterior ischemia in my heart.  They are saying

25  this is directly attributed to having received the

Valleywise-0561

1    vaccination and it's the effect that it had on my

2    heart.

3              So having said that, I personally would

4    not have chosen to get the vaccine if I hadn't been

5    told that we needed to get it as soon as possible

6    because the future clinical sites may require students

7    to be vaccinated.  I'm very pro-vaccine, but this is

8    not approved through the FDA and I wouldn't have

9    gotten it on my own if it was left up to me.  And so,

10   the fact that I'm now having these problems as a

11   direct result of a vaccine I was told to get from the

12   school on multiple occasions by multiple people, I'm

13   really hoping that somebody can work with me.

14              I don't want to end this program.  I'm

15   a straight A student.  I have been throughout my four

16   years at ASU before this for my undergraduate.  I take

17   my education super seriously and I feel like all of

18   this stuff that is happening to me now with my heart

19   is still COVID related.  So I know, like, in our first

20   semester, we -- we weren't allowed into any clinical

21   sites, no hospitals or anything.  And those

22   accommodations were made for the alternative

23   assignments to cover those required hours because of

24   COVID.  And my condition now is still related directly

25   to COVID, the reaction that I have and the long term

1    effects that I'm having from my heart.  And so, like,

2    in Katherine's e-mail, you know, she said that it's a

3    fundamental alteration of the program.  And, like, on

4    one hand, I can see that, you know, if maybe I had

5    gotten into an accident or something on my own, or if

6    this was my own health problems, but this was, again,

7    directly related to a vaccine I would not have gotten

8    if I hadn't been told by the school that I needed to

9    get it in order to attend future clinicals.  And I've

10   got all these -- these four experts in

11   electrophysiology, cardiologists, who are all saying

12   the same thing: this is from the vaccination.  And so,

13   yeah, that's kind of where I'm at right now.

14                    I'm on multiple medications.  I have

15   them here with me.  They're in my purse at all times.

16   I've got metoprolol.  I have flecanide that I'm taking

17   to try and keep control of my heart.  Three of those

18   four electrophysiology cardiologists recommended that

19   I get an ablation.  The last one, Dr. Phan, said he

20   would highly recommend against it just in case the

21   efficacy of the vaccine wears off and those spike

22   proteins that are in my heart causing this electrical

23   conductivity problem end up basically just dissolving

24   over time.  And, you know, that's why, like, right

25   now, they don't know if we're going to need to get

1  a -- a booster immunization at some point to keep up

2  the immunity against it.  And so he said it's possible

3  that, over time, this problem could resolve itself.

4  So as much as they're saying this appears to be

5  permanent damage, especially after my EKG that showed

6  that I had a heart attack and I've got ischemia now in

7  my heart, it could also resolve itself.  So he doesn't

8  want to jump to ablation.

9            And when they did an echocardiogram,

10  they said, I have valve -- leaky valves in my mitral

11  valve and my tricuspid valve.  So, again, are those

12  permanent?  I hope not.  I pray not.  I don't want

13  open heart surgery.  I don't want to have an ablation.

14  I don't want to deal with any of this, but I have to.

15  I'm kind of, like, thrust into this situation that,

16  you know, it's -- it's terrible, to be honest with

17  you.

18            They ordered a cardiac MRI for me to

19  have, and the doctor gave me a 1 MG tablet of Adavan

20  to take because I've got claustrophobia when it comes

21  to MRIs.  I had thyroid cancer when I was 26.  And so

22  I, just going into the tube, there's a lot of, you

23  know, hardship with that, like, mentally.  It's a two

24  and a half hour scan in the -- the MRI bore.  So they

25  gave me this 1 MG tablet.  I took just a tiny chip of

1   it off.  I mean, I broke it in quarters, and then I

2   broke a quarter into, basically, it was almost like

3   dust.  But I'm really super sensitive to medications.

4   I took it; I went into arrhythmia.  So was it just

5   because that was a random bout of arrhythmia, or was

6   it the actual medication?

7              So the whole circumstance brings about

8   an incredible amount of anxiety and depression that

9   comes along with it, because I feel like I can't leave

10  my house, I can't go anywhere without the possibility

11  of going into arrhythmia.  And then the thought of

12  being dismissed from this program, it just makes me

13  sick.  I've -- I've wanted to do this my whole life.

14  I don't want to take a deferment.  I don't want to

15  take an incomplete.  I am desperately begging you to

16  please work with me for anything so that I can finish

17  my clinicals however I need to.  But I -- I really,

18  like, at this point, I don't know what to do.  But I

19  feel completely desperate.

20             And I know Katherine said that all the

21  alternative assignments have been exhausted.  I did,

22  the first semester, I did 100 percent of my OB

23  rotations in person and then the required pediatric

24  rotations.  I did, like, any of the other excused

25  pediatric clinicals was through the elective class

Valleywise-0565

1   that I was in for the PCH DEU.

2               DR. BEDNAREK:  The PCH thing?

3               MS. DO:  Yeah.  And so, and I remember

4   I had offered at one point to drop that in exchange

5   for what I had already attended to count for any

6   possible missed future pediatric rotations but I was

7   told it was too late to do that.  And so the pediatric

8   rotation, the number of hours through the state

9   requirement, I met that, whether it was through the

10  elective or the core class.

11              But the state looks at the pediatric

12  hours, not, like, what class they came from because

13  they were at the same hospital doing the same

14  activities for both classes.  So the alternative

15  clinical assignments that I was given for pediatrics,

16  it was for the elective.  So I -- I got through all of

17  the pediatric hour requirements.

18              The alternative assignments, from what

19  I understand, are according to that specific topic.

20  So, for example, pediatric replacement assignments

21  pertains to pediatrics, OB would pertain to OB, which

22  I didn't need to do again because I went to those in

23  person.  And then critical care would be that, and

24  then psychiatric would also be on that particular

25  subject.

1              So, for example, like, now I'm being

2      told, you know, that the replacement assignments are

3      exhausted for the overall program, but I've only

4      missed a couple of hours' worth of the scheduled

5      clinicals for critical care, not including today,

6      because I did miss today.  But I'm -- I'm just

7      wondering if we can create more assignments for that

8      or if there's anything that you have as a suggestion

9      that's not inclusive of dropping the program, taking a

10     deferment, taking it incomplete.  Because, again, I

11     wouldn't have this problem if I hadn't gotten

12     vaccinated at the urgency of the school telling us we

13     need to do this.  Otherwise, you may not be allowed to

14     go in to clinicals.  And nobody would have known that

15     I would be somebody that would have a reaction to it.

16     The school wouldn't have known.  I wouldn't have

17     known.  You know, nobody would have known, otherwise,

18     I wouldn't have done it.  I would have just done what

19     I had to do outside of that.  But I thought it'd be

20     fine because, again, I'm pro-vaccine.  I got all of my

21     other required vaccinations before the program

22     started.  And so I'm not, like, pointing the finger at

23     anybody, but it's just a really terrible situation

24     that nobody could have seen coming.  But now that it's

25     here, and it is a direct relation to COVID and having

1   gotten a vaccine that I was told I needed to get on,

2   again, multiple occasions from the school, I'm just

3   hoping that there's something that you guys can do and

4   maybe considering it from a different angle and not

5   just, like, I've got this outside circumstance and I'm

6   asking if you can do something to help me with that.

7   Because, again, this is, like, directly from the

8   vaccine.

9               And so I know that I'm probably beating

10  a dead horse with that, but by keep saying that, but,

11  you know, that's, like -- sorry, I've got to get my

12  charger out -- that's just, like, I -- I just keep

13  coming back to that.  Like, I wouldn't have gotten

14  this vaccine if -- if I wasn't told that I needed to

15  in order to attend clinicals.  I was trying to keep

16  the future patients safe.  I was trying to keep myself

17  safe, you know, knowing we would be going into

18  hospitals and stuff.  And so I don't know.

19              I'm sorry.  I'm talking a mile a

20  minute, and I know that you critiqued me on that, but

21  I'm really cognizant of the time, and I want to

22  respect your 30 minutes that you gave us.  And so I

23  just, like, I had two pages worth of notes and I've

24  got them pulled up and I've got them enlarged so I'm

25  not squinting to see them, but I'm just, like, I'm

1   nervous -- I'm nervous you're going to tell me there's

2   nothing that you can do.  And, I mean, this program

3   means the world to me.  I love taking care of people.

4   I don't know if you -- I mean, you've got so many

5   students.  I don't know how much you, like, look into

6   our other assignments and stuff, but I really put my

7   heart and soul into every assignment that I do because

8   I want to learn from it.  And if I have anything to

9   offer other people, like, I want them to be able to

10  learn from what I've written -- I'm still here.  I'm

11  just plugging in my -- okay.  Sorry.

12                  DR. BEDNAREK:  I appreciate that, Sara.

13  And I, first of all, I want to tell you that I am very

14  sorry for what you are going through.  I know that it

15  has weighed a ton on you.  I know that it has been an

16  incredible journey for you and it hasn't been an easy

17  one, and it's one that's been evolving and we've been

18  right there with you.  And I appreciate that you share

19  this information with us.  I know that you know this,

20  but I feel compelled to tell you that you don't have

21  to share anything with us that you're not comfortable

22  sharing.

23                  MS. DO:  Mm-hmm.

24                  DR. BEDNAREK:  So I know that you feel

25  the -- the need to because it illustrates the

1  situation and the severity.  But you're talking to two

2  nurses and one empathetic individual who understands

3  that this is a serious medical condition.  And we are

4  -- we understand that we -- we empathize with what you

5  are going through.

6                    I want to make two important

7  distinctions about what you said.  So you're not

8  removed from the program.  That is not what

9  Katherine's e-mail said, and nor is it where we sit.

10  So I want to make sure that that is -- that is clear.

11  You are not removed from the program.

12                    If there were to be a situation where

13  any student was removed from the program, there would

14  be -- there would be a series of meetings,

15  communications.  It would be very clear and apparent.

16  We don't -- we don't do that to students.  It's not

17  our -- our -- we're here for students and their

18  success.  We're here to support students and their

19  success.  So that isn't true.

20                    Where we are is we're in a difficult

21  situation because we've -- we've evolved as a society

22  in a pandemic, and we've -- we've shifted from what

23  was acceptable to what is current situation.  And so

24  you referenced a significant amount of time of

25  previous and past.  So I think it's really important

1   to understand that, as far as we're concerned, and as

2   far as Arizona State nursing is concerned, because we

3   are back in clinical placements.  We have the ability

4   to be in clinical facilities that have opened their

5   doors to us.  That we're not in the state that we were

6   in six months ago, twelve months ago, and even sixteen

7   months ago.

8                   MS. DO:  Mm-hmm.

9                   DR. BEDNAREK:  That it has changed.

10  And so when you have evidence and you have data that

11  support a change, then you have to change your

12  practice.

13                  MS. DO:  Mm-hmm.

14                  DR. BEDNAREK:  And so that's what I

15  mean by we've evolved as a school along with the

16  guidance that's given to us, not only from the CDC,

17  but from our State Board of Nursing.  So it's really

18  important that we have that distinction.  And I know

19  that that's confusing for you because you've seen

20  things, you've had experiences that you referenced in

21  the fall and in the spring.  And then where we are

22  right now, it feels different.  And so I want to

23  confirm that it is different.

24                  MS. DO:  Okay.

25                  DR. BEDNAREK:  And the reason that it

Valleywise-0571

1   is different is because we're in a place where we're

2   no longer -- we're no longer bound by the pandemic to

3   provide clinical -- to not be able to provide clinical

4   experiences.  We can provide them.

5                  MS. DO:  Mm-hmm.

6                  DR. BEDNAREK:  And so it's very clear

7   in state statutes that we have to provide experiences

8   for our students.  And even pre-pandemic, before this

9   happened, as much as we liked a student or we

10  empathized with the situation, we wouldn't be able to

11  make exceptions.  What we could do is develop a plan

12  to help a student meet the expectation so that they

13  could progress in the program.  And that's where we

14  find ourselves right now.

15                 MS. DO:  Okay.

16                 DR. BEDNAREK:  We can't make

17  exceptions, but what we can do is develop a plan

18  together for how we meet these outcomes.

19                 MS. DO:  Okay.

20                 DR. BEDNAREK:  Does that make sense

21  that we're in a different space than we were?

22                 MS. DO:  Yeah -- yeah.  I was -- and I

23  was wondering about that when you brought that up.

24  Like, if the delta variant ends up -- because I know

25  that's, like, the primary one right now, and they're

1    saying it's only like 40-something protected with

2    percentage, protected with the vaccine.  If the

3    country ends up basically shutting down again, would

4    they just go back, like, in the fall to -- to what

5    they were doing before to, like, do alternative

6    assignments?

7                    DR. BEDNAREK:  You know, it's really

8    difficult to say.  It's very difficult to say.  The

9    State Board of Nursing, certainly not Edson, were in

10   charge of what happened.

11                   MS. DO:  Mm-hmm.

12                   DR. BEDNAREK:  We were actually

13   reacting to the situation in a community in panic and

14   not having that information.  So I don't know that it

15   would happen the same, but it could.

16                   MS. DO:  Okay.

17                   DR. KENNY:  I can tell you what I know

18   from national and local and state meetings that I

19   attend regularly, like, weekly.  Many organizations in

20   educational, nursing, medical, health related schools

21   think it was a big mistake to keep students away

22   because it was all based on the unknown, and it was

23   panic.

24                   MS. DO:  Yeah.

25                   DR. KENNY:  And there were decisions

1   that were made with no evidence because we had never

2   had a worldwide pandemic.

3                    MS. DO:  Mm-hmm.

4                    DR. KENNY:  Now, in retrospect, they're

5   saying, your know, once we had PPE, once we had all

6   the precautions, once the vaccine came, we should not

7   have kept the future health care providers who are

8   graduating in one, two, and three years, we never

9   should have kept them out.  We should have been

10  smarter to prepare them how to work in this type of

11  situation.  And also, at the time, we -- we didn't

12  know if this was going to last one, two, three months

13  or four.

14                   MS. DO:  Right.

15                   DR. KENNY:  Now, here we are, you know,

16  a year and a half later, and as you mentioned, the

17  variants are coming now.  So we really don't know, and

18  I certainly don't want to predict, but I wanted to

19  just add to what Dr. Bednarek said.  Students may

20  never be prohibited again because we know -- we know

21  that the majority of nurses who worked taking care of

22  COVID patients never got the virus, with or without

23  the vaccine.

24                   MS. DO:  Mm-hmm.

25                   DR. KENNY:  And again, realizing now we

1   have plenty of PPE when we didn't a year ago.

2                 MS. DO:  Right.

3                 DR. KENNY:  So, you know, that's just

4   framing more of the -- the conversation as we think

5   about looking ahead and what can we do?

6                 MS. DO:  Okay.  That makes sense.

7                 DR. BEDNAREK:  So I think so where we

8   where we sit right now, and I think what the crux of

9   your question is in the conversation is, where do we

10  go from here?

11                MS. DO:  Yeah -- yeah.  Pretty much.

12                DR. BEDNAREK:  So we -- yeah -- we need

13  to -- and the answer -- the answer is that we're --

14  we're deeply concerned about you and we want to make

15  sure that you're taken care of and that your health is

16  a priority.  So the interference, the fact that you

17  are unable to attend clinical, it's, as a nurse, it's

18  a little -- it tells me that this is a serious

19  situation.

20                MS. DO:  Mm-hmm.

21                DR. BEDNAREK:  And so we want to

22  support you in whatever you need to do to get the

23  medical care that you need, which it sounds like you

24  are --

25                MS. DO:  Yeah -- yeah.  Like, and

Valleywise-0575

1  yesterday -- yesterday definitely would have been one

2  of those days where I didn't go to the school if it

3  was an option to take that test at home, but I didn't

4  -- I took my medicine like I was supposed to and I was

5  just desperately hoping that it would resolve itself.

6  My doctor has told me I can titrate it up, my dose,

7  according to if it's not resolved or not.  And so I

8  was doing that.  But yesterday definitely would have,

9  you know, because in our e-mail, the last one, you had

10 said -- well, not the last one, but -- you had said

11 previously, well, you know your condition and you know

12 what parameters your doctor has put on you.  Yesterday

13 would have been one of those times where I knew my

14 limit and I shouldn't have gone, but I didn't want to

15 be that student that has to ask again, the teacher,

16 can I take this at a later time?  Can I take it at the

17 testing center by my house?  Can I, you know, take it

18 at home?  Because she's, you know, she's let it be

19 known that she doesn't like doing the Zoom stuff and

20 it's -- she doesn't like how it went, just the whole

21 thing.  She doesn't like it.  And so I didn't want to

22 rock that boat anymore than I already have, and so I

23 went hoping that it would resolve and it got worse.

24 And so that was one of those times where I knew my

25 limitations, I pushed it and I regretted it.  But, I

1  mean, not only did I basically fail the test, but, you

2  know, I ended up in the hospital and I knew I should

3  have just been at home, laying down, trying to sleep,

4  hydrating, taking my medicine, all the things.

5              And so, yeah.  I mean, I do have great

6  doctors, you know, that are trying to also help me

7  through this and figure out what doses of medicine I

8  need and what types of medication, and, you know,

9  they're kind of playing around with all that stuff

10  right now until we can get it figured out.

11             Some days I feel fine.  There's days

12  where I don't have any arrhythmia at all.  I can go

13  two or three days and not have a single heart

14  palpitation at all.  And then -- and then there's

15  moments where I can go from, you know, normal sinus

16  rhythm to ventricular bigeminy within minutes and it's

17  sustained for days.  And that's kind of where I'm at

18  right now.

19             And it's hard, because I don't want to

20  preemptively say, I can't go back to clinicals.

21  Because, again, there are days where I'm fine, and if

22  it happens to coincide with a day that we're supposed

23  to be there, then it works out great.  The 12-hour

24  shifts, or however long they are, they are a lot for

25  me.  Because, again, when I'm at home, I'm usually not

1    doing a whole lot because if I get my heart rate up, I

2    go into arrhythmia.  And it's not only super

3    inconvenient, but it's very scary, especially knowing

4    now that I've got this EKG that shows I had a heart

5    attack recently because I feel like a ticking time

6    bomb, you know?

7                    DR. BEDNAREK:  Yeah.

8                    MS. DO:  But again, I -- I could go and

9    have a 30 second EKG strip done and I'm in normal

10   sinus rhythm, but then as soon as they take it off, it

11   could start again.  So it's, like, so, you know,

12   that's why I was, like, I can go to the doctor and get

13   those letters of release that I can come back to

14   school or clinicals, but there's no guarantee that

15   it's not going to happen again.

16                   DR. BEDNAREK:  Sure.  Understood.

17                   MS. DO:  That's why I'm just hoping for

18   something that I maybe don't have to do the full

19   entire shift and can break them up more or I don't

20   know?  Like, I honestly don't even know what the

21   options are to ask about.  But I know that I want to

22   do it.  I don't -- I don't want to circumvent the

23   system.  I'm just, like, I want to get it done.  But I

24   don't know how at this point.

25                   DR. BEDNAREK:  Sure -- sure.

Valleywise-0578

1          MS. DO:  Because it seems like every

2    time I go and I'm trying to do this, like, to my

3    heart's greatest ability, like, my mental heart and my

4    physical heart, and something happens and then I try

5    to push through it, it, I just, I mean, it just makes

6    it worse.

7          DR. BEDNAREK:  Sure.  And I want to

8    address that.  We are unable to adjust clinical time.

9    We are unable to reduce clinical time because that's

10   the fundamental alteration of the clinical experience

11   that Katherine was mentioning.  And so we're bound by

12   our accrediting body and by the State Board of Nursing

13   to make sure that our students complete all hours.  So

14   that's where we sit.

15          Now, we could work with you to make up

16   the hours missed today to complete the course.  There

17   is no guarantee we would be able to find additional

18   space because we don't have -- we don't have the

19   ability to just say we need 12 hours for one student.

20   The greater Phoenix area is so jam packed with nursing

21   schools and we're all vying for the same spaces.  They

22   really aren't available.  But we would be able to try

23   to get those for you to make up at a later time.  But

24   we could not reduce the amount of hours, if that makes

25   sense?

1          MS. DO:  Yeah.  So I'm not asking for a

2    reduction in hours, but maybe, like, per each shift?

3    I mean, could I just do, like, half of a shift today

4    and half a shift tomorrow for a total of one shift,

5    like six hours today, six hours tomorrow, and that

6    creates my twelve hours needed?  Because it's really,

7    like, these 12-hour shifts are --

8          DR. BEDNAREK:  So there's a couple

9    issues that I wanted to -- so first of all, you need

10   24 hours in two days and so six and six doesn't equal

11   24.  But the other thing is, we're guests in the

12   facility and so we cannot -- it's disruptive to a unit

13   to have somebody step in and step out at specific

14   times that are not coinciding with shift change.  So

15   that's why we model our clinical experience along the

16   nurse's shift.

17         MS. DO:  Mm-hmm.

18         DR. BEDNAREK:  So we -- we can't -- we

19   can't be a partner that does that for our -- for our

20   students.  Because we are only allowed in there with

21   the expectation that we're going to be there the whole

22   time, if that makes sense?

23         MS. DO:  Mm-hmm.

24         DR. BEDNAREK:  There is no agreements

25   that we can make to bend that rule.  They would --

1    what would potentially happen is they wouldn't let us

2    return to that facility and that has happened before.

3                    MS. DO:  Okay.

4                    DR. BEDNAREK:  So what we would need to

5    do is -- is try to find -- seek additional placement

6    for you to make up the hours on an additional day.  We

7    would need to secure a faculty member because you

8    could not be there or alone.  You could not be there

9    alone.  And we would need to try to get this done

10   knowing that we still have five more, or four more

11   shifts.  Correct?  You have three?

12                   MS. DO:  I think there's --

13                   DR. BEDNAREK:  Tomorrow --

14                   MS. DO:  And then the week after --

15                   DR. BEDNAREK:  Tomorrow, Friday and

16   Saturday, right?

17                   MS. DO:  Tomorrow and then, yeah.  So

18   three more.

19                   DR. BEDNAREK:  Four more because you

20   missed today?

21                   MS. DO:  Yeah.  For me.  Yeah.

22                   DR. BEDNAREK:  And them -- and try to

23   get that done by the end of the class.

24                   MS. DO:  Okay.

25                   DR. BEDNAREK:  And again, there's end

Valleywise-0581

1  of the dynamically dated session, which I think is

2  August 10th.  And so we don't know what that would

3  look like or how, but we will try.  And what day that

4  would be or what facility that would be?  We don't

5  have the luxury to say it has to be X, Y or Z because

6  we are literally at the whim of our clinical partners.

7              MS. DO:  Okay.  Do you partner with any

8  of, like, the smaller local hospitals?  Like Abrazo

9  Hospital --

10             DR. BEDNAREK:  Give me an example?

11             MS. DO:  Like, Abrazo Hospital.

12             DR. BEDNAREK:  Mm-hmm.  Yeah.  We send

13 students there.

14             MS. DO:  I mean, it's, like, a single

15 level.  Like, because there's one out here in Gilbert,

16 for example, it's a new one that they just opened.  I

17 don't know if that --

18             DR. BEDNAREK:  Okay.  So Abrazo, we do

19 have a contract with but it is -- so we have to have a

20 contract.  Legally, we have to be able to send

21 students there.  It is for specific facilities.  And

22 my understanding is it's the larger ones within the

23 greater Phoenix area, not in the West Valley.

24             MS. DO:  Oh, okay.

25             DR. BEDNAREK:  But I can look in see if

```
 1   -- if you send me the name of the facility, I can see

 2   if it's covered under that.

 3                    MS. DO:  Okay.

 4                    DR. BEDNAREK:  And getting a contract

 5   would probably take about six months.

 6                    MS. DO:  Oh, gosh.  Okay.

 7                    DR. BEDNAREK:  I know.

 8                    MS. DO:  Okay.

 9                    DR. KENNY:  And then we also have to

10   remember our requirements to have a faculty on site

11   with students so that's another consideration.

12                    MS. DO:  Okay.  I'm so sorry for this.

13   I see, like, I'm obviously causing a huge problem and

14   I'm really sorry and I'm so grateful that you guys are

15   helping me the way that you are because I know it's

16   probably just a huge pain for you as well.

17                    DR. BEDNAREK:  Go ahead.

18                    DR. KENNY:  I would say that I

19   appreciate that sentiment, but you are not a problem

20   for us at all.  So seriously, I know you feel that

21   because we keep talking about requirements.  I mean,

22   there are options.  But and I -- I will just say, I

23   appreciate your very thoughtful suggestions and

24   solutions because they make sense.  They do.  But,

25   like things that happen out of the usual processes,
```

Valleywise-0583

1   there are sometimes legal, sometimes, you know,

2   different reasons why we can't go off script, if you

3   will.

4               MS. DO:  Sure -- sure.  That's why I

5   appreciate you guys talking to me because I don't know

6   that angle at all.  I'm just, like, from what makes

7   sense to me in my mind, I just think, well I can at

8   least present it.  The worst you can do is say no.

9   But I know, like, my biggest thing is that I

10  desperately want to finish this program.  I mean, I've

11  worked for this, like, the prerequisites, the

12  undergraduate.  Like, this has been my goal, you know,

13  to be a nurse and I really -- really want to do it and

14  I want to finish this program so that I can then

15  really focus on getting my heart back to where it

16  needs to be.  And I just -- I fear that if I were to

17  take a deferment or an incomplete, I'm, you know, if I

18  don't end up graduating on time, I'm going to forget

19  so much of the knowledge, and then I risk not passing

20  the NCLEX exam, you know?  If I have to wait an

21  additional six months or a year or whatever to finish

22  a class that I had to take off and then try it again

23  with the next cohort.  I don't even know how that

24  works, but it's still just concerns.

25               DR. BEDNAREK:  Yeah.  Of course.  And

Valleywise-0584

```
 1   those are valid.

 2                   DR. KENNY:  Well, I mean, I will tell

 3   you.  We - we have, I won't say a lot, but enough

 4   students who do have to defer for one year, 18 months.

 5   They come back and we make certain that all of the

 6   learning outcomes are met, all the competencies are

 7   achieved, and that all of our graduates are prepared

 8   to take the NCLEX.  So, you know, that's -- that's,

 9   you know, we don't know what the outcome of this

10   conversation or the solution will be and it really,

11   you know, we'll come up with something together with

12   you.

13                   MS. DO:  Okay.

14                   DR. KENNY:  But that's a worry that I

15   can tell you, we are dedicated to see all of our

16   students who start the program that are eligible to

17   complete, are able to complete.  I would also just

18   give you one thing to think about.  And it's just a

19   thought that came in, is that, you know, you want to

20   be fully immersed and dedicated and learn and maintain

21   and sustain that knowledge and the completion.

22                   MS. DO:  Mm-hmm.

23                   DR. KENNY:  So just a question that

24   only you can answer for yourself is, how distracting

25   is what you're going through right now, physically and
```

Valleywise-0585

1   emotionally, impacting your ability to fully immerse

2   yourself in your learning and your program?  So that's

3   -- it's just a question.  It doesn't need an answer.

4   I don't need an answer, but those are the things

5   that's going through my mind.  But I want to assure

6   you that --

7                    (End of audio file: Do_324.mp4)

8   Counter Stop Time:  00:38:48

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Valleywise-0586

```
 1                   CERTIFICATE OF TRANSCRIBER

 2              I, DIANE OTTO, do hereby certify that this

 3      transcript was prepared from the digital audio

 4      recording of the foregoing proceeding, that said

 5      transcript is a true and accurate record of the

 6      proceedings to the best of my knowledge, skills, and

 7      ability; that I am neither counsel for, related to,

 8      nor employed by any of the parties to the action in

 9      which this was taken; and, further, that I am not a

10      relative or employee of any counsel or attorney

11      employed by the parties hereto, nor financially or

12      otherwise interested in the outcome of this action.

13

14                          _____

15                          DIANE OTTO, CER, CET 1353

16

17

18

19

20

21

22

23

24

25
```

Valleywise-0587

Sara Do vs. Arizona State University
Audio Transcription

07-09-2021
Index: --I..closer

**-**

**--I** 6:13

**0**

**0:05:17.0** 3:3

**1**

**1** 9:19,25
**100** 4:18 10:22
**10th** 27:2
**12** 24:19
**12-hour** 22:23 25:7
**12-lead** 6:14
**16** 6:22

**2**

**23** 5:20
**24** 25:10,11
**26** 9:21

**3**

**30** 13:22 23:9
**31** 4:18

**4**

**40-something** 18:1

**A**

**ability** 16:3 24:3,19
**ablation** 8:19 9:8,13
**Abrazo** 27:8,11,18
**academic** 3:19
**acceptable** 15:23
**accident** 8:5
**accommodations** 7:22

**accrediting** 24:12
**activities** 11:14
**actual** 10:6
**Adavan** 9:19
**add** 19:19
**additional** 24:17 26:5,6 29:21
**address** 24:8
**adjust** 24:8
**agreements** 25:24
**ahead** 20:5 28:17
**aligns** 6:2,18
**allowed** 7:20 12:13 25:20
**alteration** 8:3 24:10
**alternative** 7:22 10:21 11:14,18 18:5
**amount** 10:8 15:24 24:24
**angle** 13:4 29:6
**anterior** 6:24
**anxiety** 10:8
**anxious** 3:24
**anymore** 21:22
**apparent** 15:15
**appears** 9:4
**approved** 7:8
**area** 24:20 27:23
**Arizona** 16:2
**arrhythmia** 4:13 5:7,10 10:4,5,11 22:12 23:2
**assignment** 14:7
**assignments** 7:23 10:21 11:15,18,20 12:2,7 14:6 18:6
**Associate** 3:16
**ASU** 7:16
**ATI** 4:13

**attack** 6:23 9:6 23:5
**attend** 8:9 13:15 18:19 20:17
**attended** 11:5
**attributed** 6:25
**audio** 3:1
**August** 27:2
**aware** 4:4

**B**

**back** 4:24 5:14 13:13 16:3 18:4 22:20 23:13 29:15
**based** 18:22
**basically** 4:19,25 8:23 10:2 18:3 22:1
**beating** 13:9
**Bednarek** 3:4,6,8,12, 14 4:7 11:2 14:12,24 16:9,14,25 17:6,16,20 18:7,12 19:19 20:7,12, 21 23:7,16,25 24:7 25:8,18,24 26:4,13,15, 19,22,25 27:10,12,18, 25 28:4,7,17 29:25
**begging** 10:15
**bend** 25:25
**Benedict** 3:12
**Beshai** 5:24
**big** 18:21
**bigeminy** 5:8 22:16
**biggest** 29:9
**bit** 3:18
**Board** 16:17 18:9 24:12
**boat** 21:22
**body** 24:12
**bomb** 23:6
**booster** 9:1
**bore** 9:24
**bound** 17:2 24:11

**bout** 10:5
**break** 23:19
**brings** 10:7
**broke** 10:1,2
**brought** 17:23

**C**

**called** 5:15
**cancer** 9:21
**cardiac** 9:18
**cardiologists** 5:23 6:1 8:11,18
**care** 11:23 12:5 14:3 19:7,21 20:15,23
**case** 5:4 8:20
**causing** 8:22 28:13
**CDC** 16:16
**center** 21:17
**change** 16:11 25:14
**changed** 16:9
**charge** 3:19 18:10
**charger** 13:12
**chip** 9:25
**chosen** 7:4
**circumstance** 10:7 13:5
**circumvent** 23:22
**class** 4:21 10:25 11:10, 12 26:23 29:22
**classes** 11:14
**claustrophobia** 9:20
**clear** 15:10,15 17:6
**clinical** 5:4,6,10 7:6,20 11:15 16:3,4 17:3 20:17 24:8,9,10 25:15 27:6
**clinicals** 8:9 10:17,25 12:5,14 13:15 22:20 23:14
**closer** 5:5

Sara Do vs. Arizona State University
Audio Transcription

07-09-2021
Index: cognizant..feel

**cognizant** 13:21

**cohort** 29:23

**coincide** 22:22

**coinciding** 25:14

**College** 3:16

**comfortable** 14:21

**commencement** 3:1

**communications** 15:15

**community** 18:13

**compelled** 14:20

**complete** 24:13,16

**completely** 10:19

**concentrate** 4:19

**concerned** 16:1,2 20:14

**concerns** 29:24

**condition** 6:1 7:24 15:3 21:11

**conditions** 6:3

**conductivity** 8:23

**confirm** 16:23

**confusing** 16:19

**consideration** 28:11

**contract** 27:19,20 28:4

**control** 8:17

**conversation** 20:4,9

**conversations** 3:21, 23

**core** 11:10

**Correct** 26:11

**count** 11:5

**Counter** 3:3

**country** 18:3

**couple** 6:15 12:4 25:8

**cover** 7:23

**covered** 28:2

**COVID** 7:19,24,25 12:25 19:22

**create** 12:7

**creates** 25:6

**critical** 11:23 12:5

**critiqued** 13:20

**crux** 20:8

**current** 15:23

**D**

**damage** 6:12 9:5

**data** 16:10

**dated** 27:1

**day** 6:12 22:22 26:6 27:3

**days** 6:22 21:2 22:11, 13,17,21 25:10

**dead** 13:10

**deal** 9:14

**Dean** 3:16

**decisions** 18:25

**deeply** 20:14

**deferment** 10:14 12:10 29:17

**delta** 17:24

**depression** 10:8

**desperate** 10:19

**desperately** 10:15 21:5 29:10

**DEU** 11:1

**develop** 17:11,17

**difficult** 15:20 18:8

**direct** 7:11 12:25

**directly** 6:25 7:24 8:7 13:7

**dismissed** 10:12

**disruptive** 25:12

**dissolving** 8:23

**distinction** 16:18

**distinctions** 15:7

**Do_324.mp4** 3:2

**doctor** 9:19 21:6,12 23:12

**doctors** 5:25 22:6

**doors** 16:5

**dose** 21:6

**doses** 22:7

**drips** 5:1

**drop** 11:4

**dropping** 12:9

**dust** 10:3

**dynamically** 27:1

**E**

**e-mail** 4:11 5:13 8:2 15:9 21:9

**e-mailed** 5:16

**East** 4:24

**easy** 14:16

**echocardiogram** 9:9

**Edson** 3:16 18:9

**education** 7:17

**educational** 18:20

**effect** 7:1

**effects** 8:1

**efficacy** 8:21

**EKG** 6:14,20 9:5 23:4,9

**EI** 5:24

**elective** 10:25 11:10,16

**electrical** 8:22

**electrophysiology** 5:23,25 8:11,18

**elevated** 6:17

**elevation** 6:21

**empathetic** 15:2

**empathize** 15:4

**empathized** 17:10

**end** 5:10 7:14 8:23 26:23,25 29:18

**ended** 4:23 22:2

**ends** 17:24 18:3

**enlarged** 13:24

**entire** 23:19

**equal** 25:10

**evidence** 16:10 19:1

**evolved** 15:21 16:15

**evolving** 14:17

**exam** 29:20

**exceptions** 17:11,17

**exchange** 11:4

**excused** 10:24

**exhausted** 10:21 12:3

**expectation** 17:12 25:21

**experience** 24:10 25:15

**experiences** 16:20 17:4,7

**experts** 8:10

**F**

**facilities** 16:4 27:21

**facility** 25:12 26:2 27:4 28:1

**fact** 7:10 20:16

**faculty** 26:7 28:10

**fail** 22:1

**failed** 4:19

**fall** 16:21 18:4

**FDA** 7:8

**fear** 29:16

**feel** 7:17 10:9,19 14:20, 24 22:11 23:5 28:20

Sara Do vs. Arizona State University
Audio Transcription

07-09-2021
Index: feels..long

feels 16:22

figure 22:7

figured 22:10

file 3:1

find 17:14 24:17 26:5

fine 4:16 12:20 22:11, 21

finger 12:22

finish 10:16 29:10,14, 21

flecanide 8:16

focus 29:15

focused 5:18

forget 29:18

forward 4:4

framing 20:4

Friday 26:15

full 23:18

fundamental 8:3 24:10

future 7:6 8:9 11:6 13:16 19:7

**G**

gave 9:19,25 13:22

Gilbert 27:15

Give 27:10

goal 29:12

gosh 28:6

graduating 19:8 29:18

grateful 28:14

great 22:5,23

greater 24:20 27:23

greatest 24:3

guarantee 23:14 24:17

guests 25:11

guidance 16:16

guys 13:3 28:14 29:5

**H**

half 9:24 19:16 25:3,4

hand 8:4

happen 18:15 23:15 26:1 28:25

happened 17:9 18:10 26:2

happening 7:18

hard 22:19

hardship 9:23

health 8:6 18:20 19:7 20:15

heart 6:12,23,24 7:2,18 8:1,17,22 9:6,7,13 14:7 22:13 23:1,4 24:3,4 29:15

heart's 24:3

helping 28:15

highly 8:20

hold 5:2

home 5:9,15 21:3,18 22:3,25

honest 9:16

honestly 23:20

hope 9:12

hoping 7:13 13:3 21:5, 23 23:17

horse 13:10

hospital 4:24 5:3 11:13 22:2 27:9,11

hospitals 7:21 13:18 27:8

hour 9:24 11:17

hours 7:23 11:8,12 24:13,16,19,24 25:2,5, 6,10 26:6

hours' 12:4

house 10:10 21:17

huge 28:13,16

**Huy** 5:24 6:16

hydrating 22:4

**I**

lgg 6:5,6

lgm 6:5,6

illustrates 14:25

immunity 9:2

immunization 9:1

important 3:23 15:6,25 16:18

including 12:5

inclusive 12:9

incomplete 10:15 12:10 29:17

inconvenient 23:3

incredible 10:8 14:16

individual 15:2

infarction 6:18

information 14:19 18:14

interference 20:16

interval 6:17,21

inverted 6:17

involved 3:20

ischemia 6:24 9:6

issues 25:9

IV 5:1

**J**

jam 24:20

John 5:24

joining 3:18

journey 14:16

jump 9:8

**K**

Kai 5:23

Katherine 3:9,11,12,15 4:11 10:20 24:11

Katherine's 5:13 8:2 15:9

Kathy 3:15

Kenny 3:15,16 4:2 18:17,25 19:4,15,25 20:3 28:9,18

Khoury 5:24

kind 5:17,21 8:13 9:15 22:9,17

knew 4:22 21:13,24 22:2

knowing 13:17 23:3 26:10

knowledge 29:19

**L**

larger 27:22

late 11:7

laying 22:3

leaky 9:10

learn 14:8,10

leave 4:22 5:12 10:9

leaving 4:11

left 4:23 5:7,20 7:9

legal 29:1

Legally 27:20

letters 23:13

level 27:15

life 10:13

limit 21:14

limitations 21:25

literally 27:6

local 18:18 27:8

long 7:25 22:24

Sara Do vs. Arizona State University
Audio Transcription

07-09-2021
Index: longer..priority

**longer** 5:7 17:2

**looped** 3:23

**lot** 9:22 22:24 23:1

**love** 14:3

**luxury** 27:5

**M**

**made** 7:22 19:1

**majority** 19:21

**make** 4:4 15:6,10 17:11,16,20 20:14 24:13,15,23 25:25 26:6 28:24

**makes** 10:12 20:6 24:5, 24 25:22 29:6

**means** 3:19 14:3

**medical** 5:25 15:3 18:20 20:23

**medication** 4:16,20 10:6 22:8

**medications** 5:1 8:14 10:3

**medicine** 21:4 22:4,7

**meet** 4:8 17:12,18

**meetings** 15:14 18:18

**member** 26:7

**mental** 24:3

**mentally** 9:23

**mentioned** 19:16

**mentioning** 24:11

**met** 11:9

**metoprolol** 8:16

**MG** 9:19,25

**mile** 13:19

**mind** 29:7

**minute** 13:20

**minutes** 4:18 5:20 13:22 22:16

**missed** 11:6 12:4 24:16

26:20

**mistake** 18:21

**mitral** 9:10

**Mm-hmm** 14:23 16:8, 13 17:5 18:11 19:3,24 20:20 25:17,23 27:12

**model** 25:15

**moments** 22:15

**months** 16:6,7 19:12 28:5 29:21

**morning** 5:9

**MRI** 9:18,24

**MRIS** 9:21

**multiple** 7:12 8:14 13:2

**mute** 4:3

**myocardial** 6:18

**N**

**national** 18:18

**NCLEX** 29:20

**needed** 4:22 7:5 8:8 13:1,14 25:6

**nervous** 14:1

**night** 3:25 5:1

**normal** 6:19,20,21 22:15 23:9

**notes** 5:17 13:23

**number** 11:8

**nurse** 20:17 29:13

**nurse's** 25:16

**nurses** 15:2 19:21

**nursing** 16:2,17 18:9, 20 24:12,20

**O**

**OB** 10:22 11:21

**occasions** 7:12 13:2

**offer** 14:9

**offered** 11:4

**office** 6:16

**online** 4:15

**open** 9:13

**opened** 16:4 27:16

**operations** 3:19

**option** 4:14 21:3

**options** 23:21 28:22

**order** 8:9 13:15

**ordered** 9:18

**organizations** 18:19

**outcomes** 17:18

**P**

**packed** 24:20

**pages** 13:23

**pain** 28:16

**palpitation** 22:14

**pandemic** 15:22 17:2 19:2

**panic** 18:13,23

**parameters** 21:12

**partner** 25:19 27:7

**partners** 27:6

**passing** 29:19

**past** 15:25

**patients** 6:4 13:16 19:22

**PCH** 11:1,2

**pediatric** 10:23,25 11:6,7,11,17,20

**pediatrics** 11:15,21

**people** 7:12 14:3,9

**percent** 10:22

**percentage** 18:2

**permanent** 6:11 9:5,12

**person** 10:23 11:23

**personally** 7:3

**pertain** 11:21

**pertains** 11:21

**Phan** 5:25 8:19

**Phan's** 6:16

**Phoenix** 24:20 27:23

**physical** 24:4

**picture** 6:14

**place** 5:19 17:1

**placement** 26:5

**placements** 16:3

**plan** 17:11,17

**playing** 22:9

**plenty** 20:1

**plugging** 14:11

**point** 5:6,12 6:12 9:1 10:18 11:4 23:24

**pointing** 12:22

**possibility** 10:10

**potentially** 26:1

**PPE** 19:5 20:1

**practice** 6:2 16:12

**pray** 9:12

**pre-pandemic** 17:8

**precautions** 19:6

**predict** 19:18

**preemptively** 22:20

**prepare** 19:10

**prerequisites** 29:11

**present** 29:8

**Pretty** 20:11

**previous** 15:25

**previously** 21:11

**primary** 17:25

**prior** 6:19

**priority** 20:16

Sara Do vs. Arizona State University
Audio Transcription

07-09-2021
Index: pro-vaccine..state

**pro-vaccine** 7:7 12:20

**problem** 8:23 9:3 12:11 28:13,19

**problems** 4:14 7:10 8:6

**processes** 28:25

**program** 3:21 7:14 8:3 10:12 12:3,9,21 14:2 15:8,11,13 17:13 29:10,14

**progress** 17:13

**prohibited** 19:20

**protected** 18:1,2

**protein** 6:6

**proteins** 8:22

**provide** 17:3,4,7

**providers** 19:7

**psychiatric** 11:24

**pulled** 13:24

**purse** 8:15

**push** 24:5

**pushed** 21:25

**put** 14:6 21:12

**Q**

**quarter** 10:2

**quarters** 10:1

**question** 20:9

**questions** 4:18

**quickly** 4:17

**R**

**random** 10:5

**rare** 6:3

**rate** 23:1

**reach** 3:25

**reached** 4:7

**reacting** 18:13

**reaction** 7:25 12:15

**realizing** 19:25

**reason** 16:25

**reasons** 29:2

**received** 6:25

**recently** 23:5

**recommend** 8:20

**recommended** 8:18

**reduce** 24:9,24

**reduction** 25:2

**referenced** 15:24 16:20

**regretted** 21:25

**regularly** 18:19

**related** 7:19,24 8:7 18:20

**relation** 12:25

**release** 23:13

**relevant** 3:21

**remember** 11:3 28:10

**removed** 15:8,11,13

**replacement** 11:20 12:2

**require** 7:6

**required** 7:23 10:23 12:21

**requirement** 11:9

**requirements** 11:17 28:10,21

**resolve** 9:3,7 21:5,23

**resolved** 21:7

**respect** 13:22

**rest** 4:25

**result** 7:11

**retrospect** 19:4

**return** 26:2

**rhythm** 22:16 23:10

**risk** 29:19

**rock** 21:22

**role** 3:18

**rotation** 11:8

**rotations** 10:23,24 11:6

**rule** 25:25

**S**

**safe** 13:16,17

**Sara** 14:12

**Sarah** 4:2

**Saturday** 26:16

**scan** 9:24

**scary** 23:3

**scheduled** 12:4

**school** 4:12 5:14 7:12 8:8 12:12,16 13:2 16:15 21:2 23:14

**schools** 18:20 24:21

**script** 29:2

**secure** 26:7

**seek** 26:5

**semester** 7:20 10:22

**semesters** 4:15

**send** 6:14 27:12,20 28:1

**sense** 17:20 20:6 24:25 25:22 28:24 29:7

**sensitive** 10:3

**sentiment** 28:19

**series** 15:14

**session** 27:1

**severity** 15:1

**share** 4:8 14:18,21

**sharing** 14:22

**shift** 23:19 25:2,3,4,14, 16

**shifted** 15:22

**shifts** 22:24 25:7 26:11

**showed** 9:5

**showing** 6:23

**shows** 6:16 23:4

**shutting** 18:3

**sick** 10:13

**significant** 15:24

**single** 22:13 27:14

**sinus** 22:15 23:10

**sit** 15:9 20:8 24:14

**site** 28:10

**sites** 7:6,21

**sitting** 4:21

**situation** 9:15 12:23 15:1,12,21,23 17:10 18:13 19:11 20:19

**sixteen** 16:6

**sleep** 22:3

**smaller** 27:8

**smarter** 19:10

**society** 15:21

**solutions** 28:24

**soul** 14:7

**sounds** 20:23

**space** 17:21 24:18

**spaces** 24:21

**span** 6:22

**specific** 11:19 25:13 27:21

**spike** 6:6 8:21

**spring** 16:21

**squinting** 13:25

**ST** 6:17,21

**start** 3:3 23:11

**started** 12:22

**state** 11:8,11 16:2,5,17

Sara Do vs. Arizona State University
Audio Transcription

07-09-2021
Index: statutes..Zoom

17:7 18:9,18 24:12

**statutes** 17:7

**stay** 5:18

**step** 25:13

**straight** 7:15

**strip** 23:9

**student** 3:20 7:15 15:13 17:9,12 21:15 24:19

**students** 7:6 14:5 15:16,17,18 17:8 18:21 19:19 24:13 25:20 27:13,21 28:11

**students'** 3:20

**stuff** 5:1 7:18 13:18 14:6 21:19 22:9

**subject** 11:25

**success** 15:18,19

**suggestion** 12:8

**suggestions** 28:23

**Sung** 5:24

**super** 7:17 10:3 23:2

**support** 15:18 16:11 20:22

**supposed** 21:4 22:22

**surgery** 9:13

**sustained** 22:17

**system** 23:23

**T**

**T-WAVE** 6:17

**T-WAVES** 6:20

**tablet** 9:19,25

**taking** 8:16 12:9,10 14:3 19:21 22:4

**talk** 5:16

**talking** 13:19 15:1 28:21 29:5

**teacher** 21:15

**telling** 12:12

**tells** 20:18

**term** 7:25

**terrible** 9:16 12:23

**test** 4:13,17,19,21 21:3 22:1

**testing** 21:17

**tests** 6:5

**thing** 8:12 11:2 21:21 25:11 29:9

**things** 16:20 22:4 28:25

**thought** 10:11 12:19

**thoughtful** 28:23

**thrust** 9:15

**thyroid** 9:21

**ticking** 23:5

**time** 3:3 6:22 8:24 9:3 13:21 15:24 19:11 21:16 23:5 24:2,8,9,23 25:22 29:18

**times** 8:15 21:13,24 25:14

**tiny** 9:25

**titrate** 21:6

**today** 3:17 5:4,11 12:5,6 24:16 25:3,5 26:20

**told** 7:5,11 8:8 11:7 12:2 13:1,14 21:6

**tomorrow** 25:4,5 26:13,15,17

**ton** 14:15

**topic** 11:19

**total** 25:4

**tricuspid** 9:11

**true** 15:19

**tube** 9:22

**twelve** 16:6 25:6

**type** 19:10

**types** 22:8

**U**

**unable** 20:17 24:8,9

**uncommon** 3:22

**undergraduate** 7:16 29:12

**understand** 11:19 15:4 16:1

**understanding** 27:22

**understands** 15:2

**Understood** 23:16

**unit** 25:12

**unknown** 18:22

**urgency** 12:12

**usual** 28:25

**V**

**vaccinated** 7:7 12:12

**vaccination** 7:1 8:12

**vaccinations** 12:21

**vaccine** 6:3,8,10 7:4,11 8:7,21 13:1,8,14 18:2 19:6,23

**Valley** 4:25 27:23

**valve** 9:10,11

**valves** 9:10

**variant** 17:24

**variants** 19:17

**ventricular** 5:8 22:16

**virus** 6:4 19:22

**vying** 24:21

**W**

**wait** 29:20

**wanted** 4:8 10:13 19:18 25:9

**wears** 8:21

**week** 6:15 26:14

**weekly** 18:19

**weeks** 6:15,19

**weighed** 14:15

**West** 27:23

**whim** 27:6

**wondering** 12:7 17:23

**work** 4:17 7:13 10:16 19:10 24:15

**worked** 19:21 29:11

**works** 22:23 29:24

**world** 14:3

**worldwide** 19:2

**worse** 4:23 21:23 24:6

**worst** 29:8

**worth** 12:4 13:23

**written** 14:10

**wrote** 5:18

**Y**

**year** 19:16 20:1 29:21

**years** 7:16 19:8

**yesterday** 4:11 5:14 21:1,8,12

**Z**

**Ziad** 5:24

**Zoom** 21:19

# EXHIBIT 19

```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF ARIZONA

 3      _____

 4    Sara Do, an Individual,

 5            Plaintiff,

 6        v.                           Case No.

 7    Arizona State University;        2:22-cv-00190-JJT

 8    Arizona Board of Regents, an

 9    Arizona State Entity;

10    Valleywise Health; Valleywise

11    Health Medical Center; Dr.

12    Kimberly Day, an unmarried

13    person; Dr. Salina Bednarek

14    and Joshua Bednarek, wife and

15    husband; Dr. Margaret Morris

16    and Phillip Morris, wife and

17    husband; Candace Keck and

18    Jonathan Keck, wife and

19    husband,

20            Defendants.

21      _____

22

23

24

25
```

**CERTIFIED TRANSCRIPT**

1

2

3

4

5

6                    AUDIO-RECORDED INTERVIEW

7                              OF

8                           SARA DO

9          RE: SARA DO VS. ARIZONA STATE UNIVERSITY

10                        July 9, 2021

11

12

13              (File Name:  Do_000325.mp4)

14

15

16

17

18

19

20

21

22   Prepared by:

23   Diane Otto, CER, CET

24   Certified Electronic Transcriber

25   Certification No. 1353

```
 1                    (Commencement of audio file:

 2                    Do_325.mp4)

 3    Counter Start Time:  0:00:00.0

 4                    MS. KENNY:  -- allow you to meet the

 5    requirements after we've exhausted all options.  Not

 6    being able to complete a semester on time is

 7    disappointing, devastating to you, but we know that

 8    there's a way for you to be successful despite that.

 9                    MS. DO:  Okay.

10                    DR. KENNY:  So it's more of a -- more

11    of I hope I'm -- I'm letting you know that there are

12    options that we will work every which way we can, but

13    I don't want you to feel the pressure of having to

14    stay on track right now when you've got a lot of

15    things about yourself to be concerned about, and we

16    are too.

17                    MS. DO:  Mm-hmm.

18                    DR. KENNY:  I mean, we do not want to

19    add -- I don't -- I can't speak for anybody else, but

20    I kind of can.  I mean, there is no way I or the

21    program would want to put any pressure on you to do

22    something that is -- has consequences for you

23    physically, emotionally, personally related to what's

24    going on right now.

25                    DR. BEDNAREK:  Yeah.
```

Valleywise-0596

```
 1                 MS. DO:  I really appreciate that.  I'm
 2    my harshest critic, and I put a lot of pressure on
 3    myself to -- to, you know, perform like I expect of
 4    myself.  So I don't feel the pressure at all from the
 5    school.  I don't feel anybody saying, you have to do
 6    this, you know?  I do seek clarification sometimes,
 7    like, when I see words like "deferment" or
 8    "incomplete," because that scares me.  You know, it
 9    makes me wonder, like, would I have to repeat the
10    whole class if I don't finish these clinical hours by
11    August 10th, I think you said?  Or would I just have
12    to make them up sometime before graduation?
13                 You know, because my initial thought
14    is, when I hear deferment or incomplete, that means in
15    my mind that I have to retake that whole class.  And
16    I'm, like, when am I going to do it next year with the
17    third Cohort that's doing this program.  And I have to
18    wait till the summer semester before this class comes
19    in again for me to take?  Would the clinicals that I
20    have made it to, would those be erased and I have to
21    start all over, or would those count?  So those are,
22    like, my gut reaction, like, my fears.
23                 DR. BEDNAREK:  Yeah.  Those are --
24    those are really good questions.  Those are really
25    good questions.  And if you withdraw and take a
```

1  deferment and you don't finish this semester and you

2  take the grade that's given to you right now, you

3  would need to repeat that class.

4                    MS. DO:  Okay.

5                    DR. BEDNAREK:  An incomplete, though,

6  stops the clock in time, and then you pick up where

7  you left off and you start where you can when the

8  complete is being --

9                    DR. KENNY:  And you do not pay for the

10  class again.

11                    DR. BEDNAREK:  Yeah.

12                    MS. DO:  Oh, that was a good thing that

13  you said because I would have wondered about that

14  later.

15                    DR. KENNY:  Now, an incomplete means

16  you actually have a year, by university standards.

17  Now, there are some other progression caveats to that,

18  but I mean, you can, you know, like -- like Dr.

19  Bednarek said, stop the clock and finish at a later

20  date.  You don't have to pay for the course again, but

21  you do have to meet the competencies and the outcome.

22                    MS. DO:  Sure.  Okay.

23                    DR. BEDNAREK:  And then, the part of

24  that for the program is that there are prerequisites

25  for, you know, certain courses.

Valleywise-0598

```
 1                    MS. DO:  Mm-hmm.
 2                    DR. BEDNAREK:  So you could, if it
 3   wasn't a requisite for future courses, you could take
 4   the other classes in lieu and then come back to this
 5   one when we offered it again.  So your graduation may
 6   not be in May.  We offer it in the summer, it might be
 7   in August.
 8                    MS. DO:  Okay.
 9                    DR. BEDNAREK:  Something like that.
10   But then, that's with the assumption that everything
11   else goes with planned too.
12                    MS. DO:  Right.
13                    DR. BEDNAREK:  So we could be -- this
14   is a -- this is a situation where it sounds like
15   there's no easy fix.  So whether we're right now or
16   we're later, we're bumping into hours and not able to
17   complete them, it's still an issue we have to contend
18   with.
19                    MS. DO:  Right.  Okay -- okay.  Yeah.
20   That sounds good.
21                    DR. BEDNAREK:  So, Katherine, I'm
22   sorry, I don't know did you want to say something?
23                    MS. BENEDICT:  I was just going to
24   second that.  Like, you're -- when you were talking
25   about, like, being a bother or anything, it's not like
```

Valleywise-0599

```
 1  that at all.  We were just making sure we want to

 2  support you and there -- there are some bounds --

 3  boundaries to what we can do.  And so that's just

 4  we're having conversations around that.  So we want

 5  you to be successful.  You're not a bother or anything

 6  like that.  We -- we want to be able to support you

 7  and do it within what we are, like, legally allowed to

 8  do and everything like that.  So that's all that I had

 9  wanted to add earlier.

10             MS. DO:  I appreciate that.

11             MS. BENEDICT:  And one other thing I

12  wanted to highlight too, as far as accommodations go,

13  you know, I believe I had sent an e-mail a little

14  while ago about accommodation with flexibility for

15  attendance in, like, class.

16             MS. DO:  Mm-hmm.

17             MS. BENEDICT:  And I know you were

18  sharing kind of how you were feeling earlier about you

19  didn't want to be that student that has to ask for

20  something.  Again, this is a really great time, at

21  least for the class aspect, it kind of is different

22  from clinical because there's -- clinical is

23  determined by the board.  There's not as much, like,

24  flexibility with that.  But class, we can work with

25  your professors.  And that could have been a situation
```

Valleywise-0600

```
1   where you could utilize that and say, I can't go to
2   class today.  And loop me in on the e-mail when you
3   let the professor know, and then we can try and
4   reschedule you to have your exam in our testing
5   center, something like that.  Like, what we had done
6   previously.
7                 MS. DO:  Yeah.
8                 MS. BENEDICT:  So that way you don't
9   have to necessarily put yourself in a situation where
10  it might escalate your symptoms or might put you into
11  a worse situation.
12                MS. DO:  Okay.  I appreciate that.
13  That was one of my questions I had, how it would work?
14                MS. BENEDICT:  Yeah.
15                MS. DO:  Because I know next semester
16  they're wanting to do, like, in classes primarily.  I
17  think I saw somewhere that some teachers may still
18  offer the Zoom.  I'm not sure if I misread that or
19  something.  I don't know what I saw.  Maybe it was my
20  pharmacology teacher.  I think he mentioned something,
21  like, that he would still be recording classes because
22  he likes, you know, to be able to go back and --
23                DR. BEDNAREK:  That's actually a
24  university rule.  That's not a -- that's not a MEPN or
25  Edson college rule, that is a university rule.
```

Valleywise-0601

```
1                   MS. DO:  Okay.

2                   DR. BEDNAREK:  And so we won't be

3      offering synchronous sessions anymore.

4                   MS. DO:  Okay.

5                   DR. BEDNAREK:  Students have to go to

6      class if they want the material.

7                   MS. DO:  Okay.

8                   DR. BEDNAREK:  And the part about

9      testing in person, that was a programmatic decision

10     supported by Dr. Kenny that all exams would be in

11     person starting this summer.

12                  MS. DO:  Okay.

13                  DR. BEDNAREK:  Because we have

14     significant concerns about integrity, not related to

15     you or anyone in your class, just in general, that we

16     needed to institute a change immediately.

17                  MS. DO:  Okay.

18                  DR. BEDNAREK:  So we did that.  So that

19     is not progressive tech doing that.  That is actually

20     the program doing that and making a decision that

21     needed to be implemented.  So if, for whatever reason,

22     you need the flexible time, there will not be the

23     option to do it at home.

24                  MS. DO:  Okay.

25                  DR. BEDNAREK:  If you can make a
```

Valleywise-0602

Sara Do vs. Arizona State University                                    07-09-2021
Audio Transcription                                                             10

```
 1   reservation or an appointment to do it at a place that

 2   is more suiting for yourself, sometimes we can be

 3   flexible on the time, but the mode will not be --

 4               MS. DO:  Okay -- okay.

 5               DR. KENNY:  Can I -- I just want to add

 6   one more thing about testing.  Our Arizona State Board

 7   of Nursing actually has an advisory opinion and

 8   advisory group on testing, and they are really -- they

 9   -- they have advised us as much as possible, which

10   means now it is possible to have in person testing.

11   Because, you know, again, not related to you at all,

12   but the incidence of remotely being able to, you know,

13   cheat on the test, basically.

14               MS. DO:  Mm-hmm.

15               DR. KENNY:  So this is a statewide

16   mandate.  It's not, again, it's not even the

17   university.  It's above the university.  So, yeah,

18   there's a lot of behind the scenes things that most of

19   the time can remain invisible, but sometimes they

20   can't.

21               MS. DO:  Yeah.  Right.  Okay.  So,

22   like, next semester, like, if I had an issue where I

23   couldn't attend a class, so the professors, as part of

24   an accommodation, couldn't record the way they do now,

25   so I could see what happened during that class, I
```

Valleywise-0603

1   would just miss it?

2                   MS. BENEDICT:  So it'll depend on the

3   class.  So what I suggest to students is, in the

4   beginning of the semester, meet with your professor to

5   discuss the flexible attendance accommodation.  This

6   is kind of where you can set up guidelines of what

7   that looks like with the professor.

8                   So, like, if you do have to miss on the

9   day of the exam, what's your guys' protocol?  How do

10  you let them know?  Do you text them?  Do you e-mail

11  them?  How far in advance can you let them know if you

12  do need to miss class?  And I know that's kind of

13  variable, depending on how each student is impacted by

14  their symptoms and everything like that.

15                  MS. DO:  Yeah.

16                  MS. BENEDICT:  So that's kind of where

17  that back and forth can happen.

18                  MS. DO:  Okay.

19                  MS. BENEDICT:  And then also, like,

20  discussing how you make up, like, in class visitation

21  or in class experience, will they provide you a

22  recording, or do you need to get with, like, a peer to

23  get notes or kind of what the plan is for that.

24                  MS. DO:  Okay.

25                  MS. BENEDICT:  So it kind of is, like,

Valleywise-0604

1  a back and forth agreement on how that will work,

2  because each class is so unique in the fundamental

3  nature of it and how it's taught and how it's

4  structured but it's not kind of, like, a one size fits

5  all.

6              MS. DO:  Yeah.

7              MS. BENEDICT:  It's kind of an

8  interactive process with the professor.

9              MS. DO:  Okay.  That makes sense.

10  Thank you.

11              MS. BENEDICT:  And that's part of

12  what's important of, like, selecting the

13  accommodations to in your portal.  And let me know if

14  I need to send you the e-mail and the steps on how to

15  do that again or anything like that.  But getting

16  those notifications sent out early so then the

17  professors are aware as well of the accommodations you

18  have in class also.

19              MS. DO:  Okay.  Thank you.

20              MS. BENEDICT:  Mm-hmm.  Any other

21  questions around, like, flexible attendance or

22  accommodations in general?

23              MS. DO:  No, I don't think so.  I can

24  e-mail you if I think of some.

25              MS. BENEDICT:  Definitely.

Valleywise-0605

```
 1                MS. DO:  Thank you.

 2                DR. BEDNAREK:  So I think what the next

 3    steps are -- and correct me if I'm wrong, Sara -- that

 4    I need to try to find clinical placements to make up

 5    12 hours for you this -- this semester.  I'll keep you

 6    in the loop about what that looks like or how that

 7    happens.  And then to meet the objectives of your

 8    course, because I have clinicals, but I don't have

 9    complex care clinicals everywhere.

10                MS. DO:  Okay.

11                DR. BEDNAREK:  And so the -- that --

12    that'll be the thing that I need to work on.  And then

13    we'll need to assess as we get -- as we continue on.

14    So, like, tomorrow.

15                MS. DO:  Mm-hmm.

16                DR. BEDNAREK:  Since you've been in the

17    hospital, though, I think you need a medical clearance

18    for returning class per Edson policy.  Did you happen

19    to get one when you were discharged?

20                MS. DO:  I didn't.  No.  To say that I

21    could go back?

22                DR. BEDNAREK:  Yeah.

23                MS. DO:  No.

24                DR. BEDNAREK:  And it's Friday at five.

25                MS. DO:  Because this is -- Yeah,
```

```
 1   right.
 2                   DR. BEDNAREK:  It's, like, a hard time,
 3   isn't it?
 4                   MS. DO:  Exactly like last time.  Yeah.
 5   Right.  So, and like I told you before, like, I never
 6   know when it's going to happen.  Like, I could be fine
 7   for three days in a row and it's usually about that
 8   three day mark.  That's why I'm saying three days.
 9   It's usually three days or so, give or take, and then
10   it'll just out of nowhere.
11                   And it does, you know, it's worse with
12   any kind of, like, fatigue.  It's worse with stress.
13   If I have, like, a surge of adrenaline, it can get it
14   started, stuff like that, it makes it worse.  So I'm
15   really trying to make sure that I'm well hydrated,
16   that I'm, you know, not fatigued at all.
17                   Stress, I can't really help a whole
18   lot.  You know, I get stressed out really easy about
19   stuff, but I try to alleviate as much of that as
20   possible because I don't like experiencing this.  It's
21   super scary.
22                   I mean, you know, when your heart
23   doesn't work right, it messes with your mind.  You
24   start wondering, like, is this it?  Like, am I going
25   to die at this point?  Because, you know, you feel
```

Valleywise-0607

```
1   like you've got to hold yourself against the wall
2   because you're going to pass out or whatever.
3              But, like I had said before, you know,
4   like, I -- I can go get that letter of clearance to
5   let me go right back and I could be fine for five
6   hours.  And then all of a sudden, out of nowhere, it's
7   just, like, here it is again, so.
8              DR. BEDNAREK:  Yeah.
9              MS. DO:  That's the problem with trying
10  to figure out, like, where is my medication dose, what
11  am I supposed to be taking?  What worked, like, when
12  all this started isn't working anymore so they're
13  adding different things in it.  Started out with just
14  a small amount of metoprolol.  Now they're adding in
15  flecainide.  So I've got two different heart
16  medications trying to work together.
17             And now, with that EKG that showed that
18  I had a heart attack, you know, then they're talking
19  about other things and I don't know, it's kind of a
20  mess.  So, I mean, I'm kind of, I don't know.  I'm at
21  your mercy at this point.  Please be gentle.
22             DR. BEDNAREK:  Well, and I know that
23  all that, you know, in my realm of understanding how
24  things are tells me that your health needs to be the
25  priority.
```

Valleywise-0608

```
 1                    MS. DO:  Yeah.

 2                    DR. BEDNAREK:  Because that's not small

 3    things.

 4                    MS. DO:  Yeah.

 5                    DR. BEDNAREK:  That is not something

 6    you can just bounce to do.

 7                    MS. DO:  Yeah.

 8                    DR. BEDNAREK:  And so you -- you have

 9    people that you have to take care of, that you need to

10    be concerned about, you have to be concerned about

11    you.

12                    MS. DO:  Right.

13                    DR. BEDNAREK:  I'm not sure where

14    school fits in, in this priority list?

15                    MS. DO:  Yeah.  I'm trying to push it

16    up to the very top, and that's why I'm trying to push

17    through this stuff and then I end up paying for it.

18    But, you know, like -- like I said yesterday, if I --

19    if I felt like I had the ability to say I can't go

20    today, I would have said that.  That would have been

21    one of those days where I'm, like, it's going to get

22    worse if I don't take care of it because the medicines

23    aren't working like they should, and like I expect

24    them to.

25                    Any other time, you know, I can tell if
```

Valleywise-0609

 1  | I -- if I have palpitations early in the day, even if
 2  | they're intermittent, it will usually get worse
 3  | throughout the day.  But that's not to say that they
 4  | won't just pop up out of nowhere.
 5  |                 So, I mean, I feel like I could get
 6  | those letters of clearance, but I feel like that's
 7  | more of a technicality, which I understand if the
 8  | school needs it as a technicality, but it's not a
 9  | guarantee that it's not going to happen later.
10  |                 DR. BEDNAREK:  Well, and let me just
11  | explain to you the reason.  If you pass out -- if you
12  | pass out because we knew all this information and
13  | you're really hurt and we didn't have clearance for
14  | you to go back --
15  |                 MS. DO:  Yeah.
16  |                 DR. BEDNAREK:  -- it would be -- it
17  | would be problematic for Edson College.
18  |                 MS. DO:  Yeah.  For sure.
19  |                 DR. BEDNAREK:  That's why.  It's not to
20  | be punitive for you.
21  |                 MS. DO:  Yeah.
22  |                 DR. BEDNAREK:  It's because you sound
23  | like you have a very significant acute myocardial
24  | problem right now.
25  |                 MS. DO:  Mm-hmm.

Valleywise-0610

1                    DR. BEDNAREK:  That-- that is -- is --

2    we don't -- we don't know, just like you don't know,

3    we don't know what's going to happen.  And so we want

4    to make sure that you're safe, the patients you're

5    caring for are safe.

6                    MS. DO:  Yeah.

7                    DR. BEDNAREK:  And without somebody

8    telling us that this is a situation that is in

9    control, we don't really know.  And every student has

10   to have a clearance.  No student is allowed into our

11   program that says that they can't endure long stints,

12   they can't lift certain amount of pounds, they don't

13   have all the health and safety requirements to be in

14   there.  It's because of the conditions that you go

15   into every time that you're in that uniform.

16                   MS. DO:  Right.

17                   DR. BEDNAREK:  And so it's not

18   arbitrary to you.  It's every student has to be

19   cleared medically to be able to perform.

20                   MS. DO:  Yeah.  Sure.

21                   DR. BEDNAREK:  Because we know what

22   it's like to not have water, to not -- to stand for

23   long periods on time -- at a time.

24                   MS. DO:  Yeah.

25                   DR. BEDNAREK:  So when we have

Valleywise-0611

1  something like this that we already know is a problem

2  with that, that makes it really hard to reconcile that

3  it's safe for you to go.

4            MS. DO:  Yeah.  No.  I see where you're

5  coming from.  And -- and, you know, what's -- what's

6  tough about this is that in the beginning, I had that

7  letter of clearance before I started the program, and

8  I was super healthy.  And, you know, it was that -- it

9  was that COVID vaccine that just completely, I mean, I

10 feel like it ruined my life, as much as it may have

11 saved my life at this point, too, because, you know, I

12 was exposed to that nursing assistant at the Shepherd

13 Junior High that day.  She tested positive, like, the

14 next day for COVID, and I was around her all day long,

15 like, within arm's distance from each other, and she

16 kept taking her mask down.

17            And so, I mean, the vaccine may have

18 saved my life at this point, but I feel like it's also

19 cost me my life because I've given so much up now

20 because of what I have to deal with.  So, I mean, it's

21 -- it's, like, a double edged sword, because when I

22 started, I was a picture perfect of health.  I mean,

23 sure, I was a little chubby, but, I mean, aside from

24 that, I was, you know, very healthy and didn't have

25 any of these problems or any concerns about, you know,

Valleywise-0612

```
 1   any of this stuff, whatsoever.

 2                   DR. BEDNAREK:  Sure.

 3                   MS. DO:  And now, it's here because of,

 4   you know, something that I did, trying to protect the

 5   patients and myself and be able to go into the

 6   clinical experiences and stuff.  So it's, yeah, it's

 7   kind of like a shot in the foot.

 8                   DR. BEDNAREK:  Sure -- sure.  Dr.

 9   Kenny, what do you think about that clearance, that we

10   need one for her to return?

11                   DR. KENNY:  Well, when are you supposed

12   to go to clinical?  Tomorrow?

13                   MS. DO:  Yes.

14                   DR. KENNY:  Did you stay overnight in

15   the hospital, or was it an emergency room?

16                   MS. DO:  It was in the emergency

17   department.  Yeah.  It was -- I wasn't admitted, but I

18   was there throughout the night until they let me

19   leave.

20                   DR. KENNY:  It's a hard question.  And

21   this is the same thing, I think, that happened on

22   another Friday night that I knew about.

23                   MS. DO:  Yeah, it was.

24                   DR. KENNY:  So here's what I'm going to

25   suggest to you moving forward.  If you are under
```

Valleywise-0613

1    medical care in the hospital for any reason, you

2    should get a release right then.

3                    MS. DO:  Okay.

4                    DR. KENNY:  So, you know, I understand

5    what you're saying.  You know, how you feel.  You know

6    if you can go or can't go.  I would say, go tomorrow

7    if you feel up to it.  If you don't feel up to it,

8    though, you need to notify your clinical instructor in

9    plenty of time that you won't be there.

10                    MS. DO:  Mm-hmm.

11                    DR. KENNY:  And I would say, if you

12   have any doubt that you're not going to be able to

13   stay the whole shift, then take off the whole day.

14                    MS. DO:  Okay.

15                    DR. KENNY:  And then, I will also say

16   that, from this point forward, anytime you are in a

17   condition that you have to go to the hospital for any

18   reason.

19                    MS. DO:  Mm-hmm.

20                    DR. KENNY:  Because people don't just

21   pop into the hospital just because.

22                    MS. DO:  Right.

23                    DR. KENNY:  So from this point forward,

24   always have in your mind that whoever you say, you

25   need to say, I need the release to return to my

1   clinical nursing program.

2                    MS. DO:  Okay.

3                    DR. KENNY:  Okay?

4                    MS. DO:  Okay.  So about tomorrow, if

5   by chance I go now you said, you know, only go if I

6   feel like I can do the whole shift.  And that will

7   always be my thought.  I wouldn't go if I was feeling

8   bad, thinking I'm just going to put in a few hours.

9   Having said that, if I go and I start to have trouble,

10  any hours that I put in, are they -- are they just --

11  do they not count?

12                   DR. KENNY:  They count.  But I also

13  want you to think of the other side of it.  You're

14  leaving a registered nurse who has agreed to precept

15  you for the whole shift.  They prepare mentally, they

16  prepare academically, and they make patient

17  assignments based on what type of student they're

18  going to have with them.  So it's more than being able

19  to go and not feeling well and having to leave.  So

20  there are -- there's other things to think about from

21  a professional and an academic standpoint.

22                   MS. DO:  Mm-hmm.

23                   DR. KENNY:  So but I do get it that you

24  may feel fine at six o'clock in the morning and at

25  9:30 you feel rotten.  The last thing -- and I want

Valleywise-0615

1    you to hear us -- we do not want you to fight through

2    feeling badly or unsafe because you're afraid that

3    you're doing something against what we want you to do.

4                    MS. DO:  Sure.

5                    DR. KENNY:  That's not what we're

6    saying at all.

7                    MS. DO:  Right.

8                    DR. KENNY:  So, you know, I think if

9    you go tomorrow, see what you can do.  But the other

10   thing that I think realistically you should think

11   about, Sara, if -- if it happens repetitively that you

12   really are not in the physical condition to complete

13   your assigned shift and it's consistently happening,

14   then I think that gives us pause to really think

15   about, should you take an incomplete until your

16   medications are stabilized, until your physicians have

17   a better grasp on, you know, prognosis and probability

18   of, you know, your treatment plan or things like that?

19                   MS. DO:  Mm-hmm.

20                   DR. KENNY:  So, you know, we don't have

21   to decide anything right now.  But some of it, I

22   think, is to look at the pattern of your physical

23   ability.

24                   MS. DO:  Okay.

25                   DR. KENNY:  And what is that doing?

1   Because, as you say, you know, you rushed through a

2   test because you didn't feel good and the consequence

3   was that you failed the test because you were trying

4   to do what you're supposed to, but it really wasn't

5   good for you anyway.

6                    MS. DO:  Right -- right.

7                    DR. KENNY:  I mean, that's one thing.

8   But it's the same thing with going to clinical.  If

9   you're preoccupied with thinking about what's going to

10  happen and how long I can stay, then that patient that

11  you're caring for and applying what you learned in

12  class, that's compromised too, both mostly for

13  yourself, but also for the patient.  You know, what if

14  you were walking someone to the bathroom and you felt

15  weak and lightheaded and they were not able to stand

16  by themselves, they needed assistance?

17                   MS. DO:  Right.

18                   DR. KENNY:  So it's -- it's those types

19  of things --

20                   MS. DO:  Right.

21                   DR. KENNY:  -- that only you -- only

22  you can know.

23                   MS. DO:  Right.

24                   DR. BEDNAREK:  Well, and I think it's

25  really important, this is not a box we're checking.

```
 1                    DR. KENNY:  No.

 2                    DR. BEDNAREK:  This is a -- this is an

 3    active form of learning that you have to be present

 4    for 100 percent.

 5                    MS. DO:  Mm-hmm.

 6                    DR. BEDNAREK:  And it doesn't sound

 7    like you can be because you've got a lot going on, and

 8    you've got a medical condition, so this is -- you have

 9    to take that into account.  It's not just showing up.

10    It's actually physically being present and providing

11    care.

12                    MS. DO:  Right -- right.  And I -- I've

13    done, I mean, I don't know if you guys --

14                    DR. BEDNAREK:  Sorry.

15                    MS. DO:  That's okay.  I don't know if

16    you guys have talked to the preceptors.  I felt like

17    the times that I've been there have gone really well.

18    I was able to interact with a lot of the patients and

19    help them.  At the point where I started to feel bad,

20    I told my professor and also the preceptor, I told

21    them what was going on, because I would never in any

22    way put a patient in harm's way.

23                    And I can tell when palpitations are

24    starting.  Like, they -- they can come on pretty

25    quick, but I can tell, and I would in no way put a
```

Valleywise-0618

1   patient in harm's way if I felt like something was

2   starting to happen with my own health.

3                    DR. BEDNAREK:  I understand.  But what

4   you're describing to us does not necessarily jive with

5   being able to predict it all the time.

6                    MS. DO:  Mm-hmm.

7                    DR. BEDNAREK:  Just from my medical

8   background, that that is something that it sounds like

9   it's out of your control.

10                   MS. DO:  Yeah, for the most part, it is

11  out of my control.  I mean, I can't stop it when it

12  starts, but, you know, I do start to feel palpitations

13  will start, and it -- it, you know, can take a few

14  minutes, and then I can feel like I've got to sit down

15  or I need to take a break or something.  So I have --

16  I have a little bit of a buffer.  Not a whole lot, all

17  the time, and it's not like that every time.

18                   Like I said, sometimes I'll wake up in

19  the morning and I'll start to have intermittent

20  palpitations that slowly progress throughout the day,

21  if I can't get a handle on it with medication.  But

22  there are times where it's, you know, it's fairly

23  quick, but it'll take a few minutes, and then I'll

24  start to feel like I just don't feel good and I need

25  to sit down or take a break.

1                    DR. BEDNAREK:  Well, why don't you let

2    us know as you decide what your thoughts are for

3    tomorrow, and then we'll take it from there.

4                    MS. DO:  Okay.

5                    DR. BEDNAREK:  How does that sound?

6                    MS. DO:  Yeah, that sounds good.  You

7    asked me to give you the name of that other place, so

8    it's Abrazo Hospital on Baseline.  Did you want the

9    address or the phone number?

10                   DR. BEDNAREK:  Just the -- the name.

11                   MS. DO:  Oh, it was just Abrazo Mesa

12   Hospital.  It's 5750 East Baseline.  It's a 24 hour

13   hospital.

14                   DR. BEDNAREK:  Okay, thank you for

15   that.  I'll look into that.

16                   MS. DO:  Okay.  Thank you.

17                   DR. BEDNAREK:  Thank you, Sara, for

18   your time today.  I appreciate you.

19                   MS. DO:  Thank you.  I'm so sorry for

20   going beyond 30 minutes.

21                   DR. BEDNAREK:  No worries.

22                   MS. DO:  I feel bad.  I appreciate your

23   time.

24                   DR. BEDNAREK:  That's okay.

25                   MS. BENEDICT:  Yeah.  I would rather

1  get things figured out.

2              DR. KENNY:  I think this is a really

3  important conversation, and the takeaway is that we

4  will do everything we can to support your success.

5  But I also would ask that you be realistic with what

6  you believe you can accomplish.

7              MS. DO:  Okay.

8              DR. KENNY:  And whatever -- whatever

9  that is, we will work with you to make it happen.  It

10  may not be exactly like you anticipate we could do it,

11  like, a couple of hours here and there.

12              MS. DO:  Uh-huh.

13              DR. KENNY:  But, you know, we have

14  options over time, too.

15              MS. DO:  Okay.  So do I have until the

16  end of the entire program to finish the clinicals for

17  this class?

18              DR. KENNY:  No.

19              MS. DO:  Okay.  So I have between now

20  and August 10th to finish them for this class?

21              DR. BEDNAREK:  Unless we do an

22  incomplete.

23              MS. DO:  Okay.

24              DR. BEDNAREK:  If we do an incomplete

25  that opens options.

Valleywise-0621

Sara Do vs. Arizona State University                                      07-09-2021
Audio Transcription                                                                29

```
 1                    MS. DO:  So if I did the incomplete,
 2      then -- then what would that look like as far as
 3      what --
 4                    DR. BEDNAREK:  I don't know right now,
 5      Sara.  I would need to sit down and map that out.
 6                    MS. DO:  Okay.
 7                    DR. BEDNAREK:  And I would need to see
 8      what's realistically available to push to another
 9      semester, given the circumstances, in that we're going
10      to have to deal with another balance of hours and
11      what's realistic for you.
12                    MS. DO:  Okay.  Sounds good.
13                    DR. KENNY:  And then the other thing to
14      keep in mind, Sara, too, is that next semester you've
15      got just as many hours that, you know, you have to
16      complete too, right?
17                    MS. DO:  Mm-hmm.  Right.  Okay.  So I
18      could still finish the class.  Well, I guess if I take
19      an incomplete, then I don't complete the class then
20      either?
21                    DR. BEDNAREK:  No, you don't.  The last
22      clinical combination course that you complete, is it
23      0545?  Is that what you're in?
24                    MS. DO:  546, I think.  I think 545 is
25      pharmacology.
```

```
 1                    DR. BEDNAREK:  Okay.

 2                    MS. DO:  Yeah.

 3                    DR. BEDNAREK:  You could complete those

 4     two.  Those are independent from this, but it would

 5     just be the clinical lab combo course.

 6                    MS. DO:  Okay.  And so, if I took the

 7     incomplete, would I need to start that all over again

 8     when I picked it back up?

 9                    DR. BEDNAREK:  No.  Remember, an

10     incomplete is stop the clock.

11                    MS. DO:  Oh, right -- right.  Okay --

12     okay -- okay.  Sounds good.  But I would no longer do

13     any, like, of the class work itself either?  So it's

14     stopped from this point for --

15                    DR. BEDNAREK:  Forward.

16                    MS. DO:  -- basically for the next

17     month if I were to do that?

18                    DR. BEDNAREK:  Yes.

19                    MS. DO:  Because it's over in August.

20     Okay -- okay.  I think I have a clear understanding of

21     that.

22                    DR. KENNY:  You know, it sounds like

23     you have a really good relationship with your cardiac

24     team.

25                    MS. DO:  Mm-hmm.
```

Valleywise-0623

1          DR. KENNY:  I would suggest that you

2    really sit down and talk to them about what they think

3    is realistic.

4          MS. DO:  Okay.

5          DR. KENNY:  And it's difficult to get

6    physicians to -- I'm a nurse practitioner, and I'm a

7    cardiology expert --

8          MS. DO:  Nice.

9          DR. KENNY:  So it's sometimes hard to

10   get a confirmed answer because they often don't know.

11         MS. DO:  Right.

12         DR. KENNY:  So sometimes you don't get

13   a precise answer, but it sounds like they understand

14   very well what you're going through.  I mean, you

15   might want to make an appointment and explain the

16   situation and say, tell me, realistically, you know?

17   They may or may not give you a definite answer, but

18   they may help you look at some insight, too.

19         MS. DO:  Yeah.  That's a good idea.

20         DR. KENNY:  They may be able to say,

21   you know, I've had other patients with this before,

22   and here's how they coped with it.  Or, you know, they

23   may.

24         MS. DO:  Yeah.

25         DR. KENNY:  You know?

1    DR. BEDNAREK:  Six months of rest or

2    whatever it is, or, you know, strict attention to it.

3    whatever it is to get you past this hurdle, because

4    we're certainly not helping.

5    MS. DO:  So if I took the incomplete,

6    would I have to wait until next year's cohort takes

7    this exact class, or is this class offered at another

8    time?

9    DR. BEDNAREK:  That's what I told you

10   that I needed to sit down and map out.

11   MS. DO:  Okay.

12   DR. BEDNAREK:  I can't give you an

13   answer like that right now.

14   MS. DO:  Okay -- okay.

15   DR. BEDNAREK:  So I would need to sit

16   down and understand where we were at the end of the

17   course.  I could not predict that for you right now.

18   MS. DO:  Okay.  I didn't know if this

19   particular class or each class was only offered once a

20   year through the Edson College of Nursing.

21   DR. BEDNAREK:  It is.  But we have

22   other classes that we could do.  We could use and/or

23   we have other ways that we could complete an

24   incomplete, if that makes sense?

25   MS. DO:  Oh, okay.

1          DR. BEDNAREK:  We can't offer you the

2    same class, because you don't need it.  You've taken

3    three quarters of it.  We would need a way to get you

4    through it.

5          MS. DO:  Okay -- okay.  I understand

6    now.  Okay.  I didn't understand that before all the

7    way.  Thank you.

8          DR. KENNY:  It's a little confusing,

9    but we'll, you know, Dr. Bednarek and I will really

10   take a really hard look and see if we can come up with

11   a plan for you that maybe can give you some sense of

12   security and peace that this is possible.

13          MS. DO:  Okay.

14          DR. KENNY:  In a way that is

15   acceptable, both for you and for the college and for

16   our accreditors and the board and all those things.

17          MS. DO:  Okay.  I really appreciate

18   that.

19          DR. KENNY:  And our clinical partners.

20   So, yeah.  So I think from this conversation, one

21   thing it's shown you is that it's not easy just to

22   say, sure, go in for three hours and we'll just have

23   you go somewhere else.  It's not like that.

24          MS. DO:  Yeah.

25          DR. KENNY:  It's not like that when

Valleywise-0626

```
 1   you're a nurse either.
 2                  MS. DO:  Right.
 3                  DR. KENNY:  You know, when you go to
 4   work, you, you know, you're there for 12 hours.
 5   They're counting on you for 12 hours.  So, I mean --
 6                  MS. DO:  Right.
 7                  DR. KENNY:  You know, it's -- it's
 8   really, we emulate what the profession expects.
 9                  MS. DO:  Okay.  Sounds good.  Well,
10   thank you so much for meeting with me.
11                  DR. KENNY:  You're welcome.
12                  MS. DO:  And again, I'm sorry for going
13   over time for so long.
14                  DR. KENNY:  It's okay.
15                  MS. DO:  Thank you for giving me your
16   time.
17                  DR. KENNY:  I'm really glad to meet you
18   and be able to have the conversation.  So I will be in
19   the background and aware of things that are happening,
20   but we work very closely together, so.
21                  MS. DO:  Okay.
22                  DR. KENNY:  And Katherine, thank you so
23   much for your support and advice, too.
24                  MS. DO:  Thank you.
25                  DR. BEDNAREK:  Take care, Sara.
```

1                    MS. DO:  Thank you.  You too.  I'll see

2   you later.

3                    DR. BEDNAREK:  Bye -- bye.

4                    MS. DO:  Bye.

5                    (End of audio file: Do_325.mp4)

6   Counter Stop Time:  00:30:41

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Valleywise-0628

Case 2:22-cv-00190-JJT    Document 125-8    Filed 06/28/24    Page 313 of 412

Sara Do vs. Arizona State University                          07-09-2021
Audio Transcription                                                   36

```
 1                   CERTIFICATE OF TRANSCRIBER

 2            I, DIANE OTTO, do hereby certify that this

 3    transcript was prepared from the digital audio

 4    recording of the foregoing proceeding, that said

 5    transcript is a true and accurate record of the

 6    proceedings to the best of my knowledge, skills, and

 7    ability; that I am neither counsel for, related to,

 8    nor employed by any of the parties to the action in

 9    which this was taken; and, further, that I am not a

10    relative or employee of any counsel or attorney

11    employed by the parties hereto, nor financially or

12    otherwise interested in the outcome of this action.

13

14                                _____

15                                DIANE OTTO, CER, CET 1353

16

17

18

19

20

21

22

23

24

25
```

Sara Do vs. Arizona State University
Audio Transcription

07-09-2021
Index: 0545..conditions

**0**

**0545** 29:23
**0:00:00.0** 3:3

**1**

**100** 25:4
**10th** 4:11 28:20
**12** 13:5

**2**

**24** 27:12

**3**

**30** 27:20

**5**

**545** 29:24
**546** 29:24
**5750** 27:12

**9**

**9:30** 22:25

**A**

**ability** 16:19 23:23
**Abrazo** 27:8,11
**academic** 22:21
**academically** 22:16
**accommodation** 7:14 10:24 11:5
**accommodations** 7:12 12:13,17,22
**accomplish** 28:6
**account** 25:9
**active** 25:3
**acute** 17:23
**add** 3:19 7:9 10:5

**adding** 15:13,14
**address** 27:9
**admitted** 20:17
**adrenaline** 14:13
**advance** 11:11
**advised** 10:9
**advisory** 10:7,8
**afraid** 23:2
**agreed** 22:14
**agreement** 12:1
**alleviate** 14:19
**allowed** 7:7 18:10
**amount** 15:14 18:12
**anticipate** 28:10
**anymore** 9:3 15:12
**anytime** 21:16
**applying** 24:11
**appointment** 10:1
**arbitrary** 18:18
**Arizona** 10:6
**arm's** 19:15
**aspect** 7:21
**assess** 13:13
**assigned** 23:13
**assignments** 22:17
**assistance** 24:16
**assistant** 19:12
**assumption** 6:10
**attack** 15:18
**attend** 10:23
**attendance** 7:15 11:5 12:21
**audio** 3:1
**August** 4:11 6:7 28:20
**aware** 12:17

**B**

**back** 6:4 8:22 11:17 12:1 13:21 15:5 17:14
**background** 26:8
**bad** 22:8 25:19 27:22
**badly** 23:2
**balance** 29:10
**based** 22:17
**Baseline** 27:8,12
**basically** 10:13
**bathroom** 24:14
**Bednarek** 3:25 4:23 5:5,11,19,23 6:2,9,13, 21 8:23 9:2,5,8,13,18, 25 13:2,11,16,22,24 14:2 15:8,22 16:2,5,8, 13 17:10,16,19,22 18:1, 7,17,21,25 20:2,8 24:24 25:2,6,14 26:3,7 27:1,5, 10,14,17,21,24 28:21, 24 29:4,7,21
**beginning** 11:4 19:6
**BENEDICT** 6:23 7:11, 17 8:8,14 11:2,16,19,25 12:7,11,20,25 27:25
**bit** 26:16
**board** 7:23 10:6
**bother** 6:25 7:5
**bounce** 16:6
**boundaries** 7:3
**bounds** 7:2
**box** 24:25
**break** 26:15,25
**buffer** 26:16
**bumping** 6:16

**C**

**care** 13:9 16:9,22 21:1 25:11
**caring** 18:5 24:11

**caveats** 5:17
**center** 8:5
**chance** 22:5
**change** 9:16
**cheat** 10:13
**checking** 24:25
**chubby** 19:23
**circumstances** 29:9
**clarification** 4:6
**class** 4:10,15,18 5:3,10 7:15,21,24 8:2 9:6,15 10:23,25 11:3,12,20,21 12:2,18 13:18 24:12 28:17,20 29:18,19
**classes** 6:4 8:16,21
**clearance** 13:17 15:4 17:6,13 18:10 19:7 20:9
**cleared** 18:19
**clinical** 4:10 7:22 13:4 20:6,12 21:8 22:1 24:8 29:22
**clinicals** 4:19 13:8,9 28:16
**clock** 5:6,19
**Cohort** 4:17
**college** 8:25 17:17
**combination** 29:22
**commencement** 3:1
**competencies** 5:21
**complete** 3:6 5:8 6:17 23:12 29:16,19,22
**completely** 19:9
**complex** 13:9
**compromised** 24:12
**concerned** 3:15 16:10
**concerns** 9:14 19:25
**condition** 21:17 23:12 25:8
**conditions** 18:14

Sara Do vs. Arizona State University
Audio Transcription

07-09-2021

consequence 24:2

consequences 3:22

consistently 23:13

contend 6:17

continue 13:13

control 18:9 26:9,11

conversation 28:3

conversations 7:4

correct 13:3

cost 19:19

count 4:21 22:11,12

Counter 3:3

couple 28:11

courses 5:25 6:3

COVID 19:9,14

critic 4:2

**D**

date 5:20

day 11:9 14:8 17:1,3 19:13,14 21:13 26:20

days 14:7,8,9 16:21

deal 19:20 29:10

decide 23:21 27:2

decision 9:9,20

deferment 4:7,14 5:1

department 20:17

depend 11:2

depending 11:13

describing 26:4

determined 7:23

devastating 3:7

die 14:25

disappointing 3:7

discharged 13:19

discuss 11:5

discussing 11:20

distance 19:15

Do_325.mp4 3:2

dose 15:10

double 19:21

doubt 21:12

**E**

e-mail 7:13 8:2 11:10 12:14,24

earlier 7:9,18

early 12:16 17:1

East 27:12

easy 6:15 14:18

edged 19:21

Edson 8:25 13:18 17:17

EKG 15:17

emergency 20:15,16

emotionally 3:23

end 16:17 28:16

endure 18:11

entire 28:16

erased 4:20

escalate 8:10

exam 8:4 11:9

exams 9:10

exhausted 3:5

expect 4:3 16:23

experience 11:21

experiences 20:6

experiencing 14:20

explain 17:11

exposed 19:12

**F**

failed 24:3

fairly 26:22

fatigue 14:12

fatigued 14:16

fears 4:22

feel 3:13 4:4,5 14:25 17:5,6 19:10,18 21:5,7 22:6,24,25 24:2 25:19 26:12,14,24 27:22

feeling 7:18 22:7,19 23:2

felt 16:19 24:14 25:16 26:1

fight 23:1

figure 15:10

figured 28:1

file 3:1

find 13:4

fine 14:6 15:5 22:24

finish 4:10 5:1,19 28:16,20 29:18

fits 12:4 16:14

fix 6:15

flecainide 15:15

flexibility 7:14,24

flexible 9:22 10:3 11:5 12:21

foot 20:7

form 25:3

forward 20:25 21:16,23

Friday 13:24 20:22

fundamental 12:2

future 6:3

**G**

general 9:15 12:22

gentle 15:21

give 14:9 27:7

good 4:24,25 5:12 6:20 24:2,5 26:24 27:6 29:12

grade 5:2

graduation 4:12 6:5

grasp 23:17

great 7:20

group 10:8

guarantee 17:9

guess 29:18

guidelines 11:6

gut 4:22

guys 25:13,16

guys' 11:9

**H**

handle 26:21

happen 11:17 13:18 14:6 17:9 18:3 24:10 26:2 28:9

happened 10:25 20:21

happening 23:13

hard 14:2 19:2 20:20

harm's 25:22 26:1

harshest 4:2

health 15:24 18:13 19:22 26:2

healthy 19:8,24

hear 4:14 23:1

heart 14:22 15:15,18

High 19:13

highlight 7:12

hold 15:1

home 9:23

hope 3:11

hospital 13:17 20:15 21:1,17,21 27:8,12,13

hour 27:12

hours 4:10 6:16 13:5 15:6 22:8,10 28:11 29:10,15

Sara Do vs. Arizona State University
Audio Transcription

07-09-2021
Index: hurt..periods

hurt 17:13

hydrated 14:15

**I**

immediately 9:16

impacted 11:13

implemented 9:21

important 12:12 24:25 28:3

incidence 10:12

incomplete 4:8,14 5:5, 15 23:15 28:22,24 29:1, 19

information 17:12

initial 4:13

institute 9:16

instructor 21:8

integrity 9:14

interact 25:18

interactive 12:8

intermittent 17:2 26:19

invisible 10:19

issue 6:17 10:22

**J**

jive 26:4

Junior 19:13

**K**

Katherine 6:21

Kenny 3:4,10,18 5:9,15 9:10 10:5,15 20:9,11, 14,20,24 21:4,11,15,20, 23 22:3,12,23 23:5,8, 20,25 24:7,18,21 25:1 28:2,8,13,18 29:13

kind 3:20 7:18,21 11:6, 12,16,23,25 12:4,7 14:12 15:19,20 20:7

knew 17:12 20:22

**L**

learned 24:11

learning 25:3

leave 20:19 22:19

leaving 22:14

left 5:7

legally 7:7

letter 15:4 19:7

letters 17:6

letting 3:11

lieu 6:4

life 19:10,11,18,19

lift 18:12

lighthearted 24:15

likes 8:22

list 16:14

long 18:11,23 19:14 24:10

loop 8:2 13:6

lot 3:14 4:2 10:18 14:18 25:7,18 26:16

**M**

made 4:20

make 4:12 9:25 11:20 13:4 14:15 18:4 22:16 28:9

makes 4:9 12:9 14:14 19:2

making 7:1 9:20

mandate 10:16

map 29:5

mark 14:8

mask 19:16

material 9:6

means 4:14 5:15 10:10

medical 13:17 21:1 25:8 26:7

medically 18:19

medication 15:10 26:21

medications 15:16 23:16

medicines 16:22

meet 3:4 5:21 11:4 13:7

mentally 22:15

mentioned 8:20

MEPN 8:24

mercy 15:21

Mesa 27:11

mess 15:20

messes 14:23

metoprolol 15:14

mind 4:15 14:23 21:24 29:14

minutes 26:14,23 27:20

misread 8:18

Mm-hmm 3:17 6:1 7:16 10:14 12:20 13:15 17:25 21:10,19 22:22 23:19 25:5 26:6 29:17

mode 10:3

morning 22:24 26:19

moving 20:25

myocardial 17:23

**N**

nature 12:3

necessarily 8:9 26:4

needed 9:16,21 24:16

night 20:18,22

notes 11:23

notifications 12:16

notify 21:8

number 27:9

nurse 22:14

nursing 10:7 19:12 22:1

**O**

objectives 13:7

offer 6:6 8:18

offered 6:5

offering 9:3

opens 28:25

opinion 10:7

option 9:23

options 3:5,12 28:14, 25

outcome 5:21

overnight 20:14

**P**

palpitations 17:1 25:23 26:12,20

part 5:23 9:8 10:23 12:11 26:10

pass 15:2 17:11,12

patient 22:16 24:10,13 25:22 26:1

patients 18:4 20:5 25:18

pattern 23:22

pause 23:14

pay 5:9,20

paying 16:17

peer 11:22

people 16:9 21:20

percent 25:4

perfect 19:22

perform 4:3 18:19

periods 18:23

Sara Do vs. Arizona State University
Audio Transcription

07-09-2021
Index: person..State

**person** 9:9,11 10:10

**personally** 3:23

**pharmacology** 8:20 29:25

**phone** 27:9

**physical** 23:12,22

**physically** 3:23 25:10

**physicians** 23:16

**pick** 5:6

**picture** 19:22

**place** 10:1 27:7

**placements** 13:4

**plan** 11:23 23:18

**planned** 6:11

**plenty** 21:9

**point** 14:25 15:21 19:11,18 21:16,23 25:19

**policy** 13:18

**pop** 17:4 21:21

**portal** 12:13

**positive** 19:13

**pounds** 18:12

**precept** 22:14

**preceptor** 25:20

**preceptors** 25:16

**predict** 26:5

**preoccupied** 24:9

**prepare** 22:15,16

**prerequisites** 5:24

**present** 25:3,10

**pressure** 3:13,21 4:2,4

**pretty** 25:24

**previously** 8:6

**primarily** 8:16

**priority** 15:25 16:14

**probability** 23:17

**problem** 15:9 17:24 19:1

**problematic** 17:17

**problems** 19:25

**process** 12:8

**professional** 22:21

**professor** 8:3 11:4,7 12:8 25:20

**professors** 7:25 10:23 12:17

**prognosis** 23:17

**program** 3:21 4:17 5:24 9:20 18:11 19:7 22:1 28:16

**programmatic** 9:9

**progress** 26:20

**progression** 5:17

**progressive** 9:19

**protect** 20:4

**protocol** 11:9

**provide** 11:21

**providing** 25:10

**punitive** 17:20

**push** 16:15,16 29:8

**put** 3:21 4:2 8:9,10 22:8,10 25:22,25

**Q**

**question** 20:20

**questions** 4:24,25 8:13 12:21

**quick** 25:25 26:23

**R**

**reaction** 4:22

**realistic** 28:5 29:11

**realistically** 23:10 29:8

**realm** 15:23

**reason** 9:21 17:11

21:1,18

**reconcile** 19:2

**record** 10:24

**recording** 8:21 11:22

**registered** 22:14

**related** 3:23 9:14 10:11

**release** 21:2,25

**remain** 10:19

**remotely** 10:12

**repeat** 4:9 5:3

**repetitively** 23:11

**requirements** 3:5 18:13

**requisite** 6:3

**reschedule** 8:4

**reservation** 10:1

**retake** 4:15

**return** 20:10 21:25

**returning** 13:18

**room** 20:15

**rotten** 22:25

**row** 14:7

**ruined** 19:10

**rule** 8:24,25

**rushed** 24:1

**S**

**safe** 18:4,5 19:3

**safety** 18:13

**Sara** 13:3 23:11 27:17 29:5,14

**saved** 19:11,18

**scares** 4:8

**scary** 14:21

**scenes** 10:18

**school** 4:5 16:14 17:8

**seek** 4:6

**selecting** 12:12

**semester** 3:6 4:18 5:1 8:15 10:22 11:4 13:5 29:9,14

**send** 12:14

**sense** 12:9

**sessions** 9:3

**set** 11:6

**sharing** 7:18

**Shepherd** 19:12

**shift** 21:13 22:6,15 23:13

**shot** 20:7

**showed** 15:17

**showing** 25:9

**side** 22:13

**significant** 9:14 17:23

**sit** 26:14,25 29:5

**situation** 6:14 7:25 8:9, 11 18:8

**size** 12:4

**slowly** 26:20

**small** 15:14 16:2

**sound** 17:22 25:6 27:5

**sounds** 6:14,20 26:8 27:6 29:12

**speak** 3:19

**stabilized** 23:16

**stand** 18:22 24:15

**standards** 5:16

**standpoint** 22:21

**start** 3:3 4:21 5:7 14:24 22:9 26:12,13,19,24

**started** 14:14 15:12,13 19:7,22 25:19

**starting** 9:11 25:24 26:2

**starts** 26:12

**State** 10:6

Sara Do vs. Arizona State University
Audio Transcription

07-09-2021
Index: statewide..Zoom

statewide 10:15

stay 3:14 20:14 21:13 24:10

steps 12:14 13:3

stints 18:11

stop 5:19 26:11

stops 5:6

stress 14:12,17

stressed 14:18

structured 12:4

student 7:19 11:13 18:9,10,18 22:17

students 9:5 11:3

stuff 14:14,19 16:17 20:1,6

success 28:4

successful 3:8 7:5

sudden 15:6

suggest 11:3 20:25

suiting 10:2

summer 4:18 6:6 9:11

super 14:21 19:8

support 7:2,6 28:4

supported 9:10

supposed 15:11 20:11 24:4

surge 14:13

sword 19:21

symptoms 8:10 11:14

synchronous 9:3

**T**

takeaway 28:3

taking 15:11 19:16

talked 25:16

talking 6:24 15:18

taught 12:3

teacher 8:20

teachers 8:17

tech 9:19

technicality 17:7,8

telling 18:8

tells 15:24

test 10:13 24:2,3

tested 19:13

testing 8:4 9:9 10:6,8, 10

text 11:10

that'll 13:12

That-- 18:1

thing 5:12 7:11 10:6 13:12 20:21 22:25 23:10 24:7,8 29:13

things 3:15 10:18 15:13,19,24 16:3 22:20 23:18 24:19 28:1

thinking 22:8 24:9

thought 4:13 22:7

thoughts 27:2

till 4:18

time 3:3,6 5:6 7:20 9:22 10:3,19 14:2,4 16:25 18:15,23 21:9 26:5,17 27:18,23 28:14

times 25:17 26:22

today 8:2 16:20 27:18

told 14:5 25:20

tomorrow 13:14 20:12 21:6 22:4 23:9 27:3

top 16:16

tough 19:6

track 3:14

treatment 23:18

trouble 22:9

type 22:17

types 24:18

**U**

Uh-huh 28:12

understand 17:7 21:4 26:3

understanding 15:23

uniform 18:15

unique 12:2

university 5:16 8:24,25 10:17

unsafe 23:2

utilize 8:1

**V**

vaccine 19:9,17

variable 11:13

visitation 11:20

**W**

wait 4:18

wake 26:18

walking 24:14

wall 15:1

wanted 7:9,12

wanting 8:16

water 18:22

weak 24:15

whatsoever 20:1

withdraw 4:25

wondered 5:13

wondering 14:24

words 4:7

work 3:12 7:24 8:13 12:1 13:12 14:23 15:16 28:9

worked 15:11

working 15:12 16:23

worries 27:21

worse 8:11 14:11,12,14 16:22 17:2

wrong 13:3

**Y**

year 4:16 5:16

yesterday 16:18

**Z**

Zoom 8:18

# EXHIBIT 20

```
1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF ARIZONA

3    _____

4    Sara Do, an Individual,

5           Plaintiff,

6       v.                            Case No.

7    Arizona State University;        2:22-cv-00190-JJT

8    Arizona Board of Regents, an

9    Arizona State Entity;

10   Valleywise Health; Valleywise

11   Health Medical Center; Dr.

12   Kimberly Day, an unmarried

13   person; Dr. Salina Bednarek

14   and Joshua Bednarek, wife and

15   husband; Dr. Margaret Morris

16   and Phillip Morris, wife and

17   husband; Candace Keck and

18   Jonathan Keck, wife and

19   husband,

20           Defendants.

21   _____

22

23

24                                        CERTIFIED
                                          TRANSCRIPT
25
```

```
 1

 2

 3

 4

 5

 6                AUDIO-RECORDED INTERVIEW

 7                          OF

 8                       SARA DO

 9        RE: SARA DO VS. ARIZONA STATE UNIVERSITY

10                    July 28, 2021

11

12

13            (File Name:  Do_000326.mp4)

14

15

16

17

18

19

20

21

22   Prepared by:

23   Diane Otto, CER, CET

24   Certified Electronic Transcriber

25   Certification No. 1353
```

Valleywise-0636

```
 1                    (Commencement of audio file:

 2                    Do_326.mp4)

 3   Counter Start Time:  0:02:53.3

 4                    DR. BEDNAREK:  It's been kind of one of

 5   those days.  Hi, Sara.  How are you?

 6                    MS. DO:  Hey.  Okay.  How are you?

 7                    DR. BEDNAREK:  Okay.  Thank you.

 8                    MS. DO:  Good.

 9                    DR. BEDNAREK:  First of all, how are

10   you feeling?

11                    MS. DO:  A little rough.

12                    DR. BEDNAREK:  Yeah?

13                    MS. DO:  I got, like, a really bad

14   headache the other day and a fever, so I'm just not

15   usually one to get fevers, so I just kind of feel

16   gross.

17                    DR. BEDNAREK:  Yeah.  And you said

18   you're going to the doctor later, right?

19                    MS. DO:  I already went.  Yeah.

20                    DR. BEDNAREK:  Okay, so you know

21   everybody in this room.

22                    MS. DO:  Okay.

23                    DR. BEDNAREK:  So And I just want to

24   make sure you know the roles.

25                    MS. DO:  Okay.
```

1          DR. BEDNAREK:  So I'm the director of

2    the prelicensure program, which I believe you know,

3    but I just wanted to make sure.

4          MS. DO:  Uh-huh.

5          DR. BEDNAREK:  Maggie is the

6    coordinator of the MEPN program, and Candace is the

7    coordinator of NUR478.

8          MS. DO:  Okay.

9          DR. BEDNAREK:  And then she's also

10   faculty for a different course, but her role here

11   today is coordinator for 478.

12         MS. DO:  Okay.

13         DR. BEDNAREK:  So you e-mailed me over

14   the weekend after, I -- I have to tell you, received a

15   very panicked call on Saturday morning when no one in

16   the OR staff knew where you were, nor the faculty

17   member.  And so that was a very anxiety ridden

18   experience, I'm sure, for you, but definitely for the

19   staff in which we were a guest at.  And so that is why

20   I e-mailed you as I did on Sunday morning.  And your

21   response to me was that the experience itself wasn't

22   great.

23         MS. DO:  Yeah.  That was part of it.

24   The other part was that I had arrhythmia pretty bad.

25   I did e-mail the professor.  I did not have her phone

1    number.  I looked through the different e-mails that I

2    had received from her, and I was never given her phone

3    number.  Otherwise, I would have called.

4                 I called your number, thinking you

5    might have it forwarded to your cell phone or that you

6    might be working on the weekend.  But I also got

7    voicemail when I called.  I was trying to find her

8    phone number so I could let her know.

9                 There were no staff members from the

10   hospital.  When I was packing up to leave, there

11   was -- the hallways were empty.  The desk, like, on

12   the way out, that was also empty.  Nobody was there.

13   So that's why I had called.  And I e-mailed her twice

14   trying to get a hold of her, because I figured it

15   would probably go to her watch or her cell phone or

16   something, and she would get it.

17                 DR. BEDNAREK:  Okay.  So that didn't

18   happen.  But I see -- I thank you for explaining that.

19   Question; did you -- you obviously left a place, you

20   left a space where you were with a registered nurse.

21   Did you let that registered nurse know?

22                 MS. DO:  She was doing stuff in the OR

23   when the -- when my arrhythmia got really bad, and I

24   did ask the cRNA that had been talking to me right

25   next to the registered nurse before she walked to the

1  other end of the OR to help the doctor tape up the

2  patient's leg to a -- I don't even know what it's

3  called -- but it was to stretch it so they could do

4  the surgery.  And so I asked her if it was okay if I

5  took a short break, and she said, yeah, go ahead.  And

6  I told her I would be going to the locker room and

7  that's where I went.

8            And that's when I took some more of my

9  medication and I got a drink, went to the restroom and

10  was still feeling pretty bad.  And I didn't want to

11  break the -- I didn't want to open up the OR room

12  again just to go in there to tell them that I wasn't

13  feeling well and I was going to leave because, I mean,

14  it's a clean environment in there.  They had already

15  scrubbed down the patient and I didn't want to

16  interrupt a whole operating room to just say, guys, I

17  got to go.  So I did tell the cRNA that I was going to

18  go take a break and I wasn't feeling great.

19            DR. BEDNAREK:  I appreciate that.

20  Thank you for sharing that to me.  I want to just

21  share with you though, that it created mass -- for the

22  OR -- concern.  Every person in that or was looking

23  for you and it was -- cases were interrupted but for a

24  different reason.

25            MS. DO:  Okay.

1          DR. BEDNAREK:  And it created a

2    problem, interrupted patient care.  It -- it was -- it

3    was very -- it's a very unfortunate thing that

4    happened for the patients who were being cared for.

5    And I realize that you were not intending to do this,

6    but I want to share with you, your actions, although

7    you have an understanding of what you were intending

8    to do, I need to share with you the outcomes of that

9    because I think it has mass implications for -- I know

10   it has mass implications for our school, and it has

11   implications for your ability to complete your

12   clinical hours there because it can't happen there.

13          MS. DO:  Okay.

14          MS. KECK:  And, you know, when you tell

15   someone that you're not feeling well and then you

16   leave and they can't find you --

17          DR. BEDNAREK:  Yeah.  They thought

18   something really bad had happened.

19          MS. KECK:  Yeah.  They thought

20   something really bad had happened so they all had to

21   stop what they were doing and look for you.

22          MS. DO:  Okay.  Well, like I said, I

23   didn't know what else to do.  I tried calling you.  I

24   e-mailed the professor --

25          MS. KECK:  Well, in retrospect -- in

Valleywise-0641

1    retrospect -- you -- in retrospect, you can certainly

2    put your head in, you know, go back in and say, "I'm

3    not feeling well, I have to leave."  That way, they at

4    least will not have to stop and look for you.

5                    MS. DO:  Okay.  Yeah.  That's why, I

6    mean, I thought about that and I just thought that

7    would probably get me in more trouble.  That's why I

8    e-mailed my professor twice.

9                    MS. KECK:  Well, it got you -- no that

10   -- your decision got you in more trouble --

11                   MS. DO:  Okay.

12                   MS. KECK:  -- than having -- going back

13   in and explaining to people that you had to leave.

14                   MS. DO:  Okay.

15                   MS. KECK:  Because nobody knew where

16   you were.

17                   MS. DO:  Okay.  Well, I'm sorry.  Like,

18   I e-mailed her.  She didn't check her e-mail, I guess?

19   She said she didn't check it from the night before

20   either.  So I wasn't trying to abandon anybody --

21                   DR. BEDNAREK:  So let's -- let's talk

22   about that.

23                   MS. DO:  I e-mailed her twice -- twice

24   before I left.  I e-mailed her twice.

25                   DR. BEDNAREK:  So can I talk to you for

```
1   a second --
2                   MS. DO:  Yeah.  Absolutely.
3                   DR. BEDNAREK:  -- about that?  So she
4   is in a -- she was in a charge nurse role.  She is a
5   registered nurse for an organization for which she had
6   responsibility.
7                   MS. DO:  Mm-hmm.
8                   DR. BEDNAREK:  And she is -- that is
9   her primary responsibility.  So in the scope of the RN
10  and being the bedside nurse and being the charge
11  nurse, particularly in that day of the OR, it is not
12  appropriate for her to be checking her e-mail.
13                  MS. DO:  Okay.  That's fair.
14                  DR. BEDNAREK:  And so I understand that
15  you feel like that should have been received
16  immediately, but I think maybe a realistic
17  understanding of the role of Dr. Day is important.
18  But I also think the immediacy of communication.
19  E-mail is not an immediate mode of communication.
20                  MS. DO:  Sure.
21                  DR. BEDNAREK:  They don't get read
22  immediately.
23                  MS. DO:  Okay.
24                  DR. BEDNAREK:  And that's true for any
25  program.
```

```
 1                    MS. DO:  Right.
 2                    DR. BEDNAREK:  I think that any program
 3     in any space, any academic setting, I think that --
 4     because if we had nurses e-mailing, they wouldn't be
 5     taking care of patients.
 6                    MS. DO:  Right.
 7                    DR. BEDNAREK:  So I just want to say
 8     that.  Third and finally, we are in a position
 9     where -- where we don't have a clinical placement for
10     you for the remainder of the time that you are needing
11     to make up.  But you did four hours, so we're at an
12     18.5 hour deficit.
13                    So furthermore, I'll just stop there
14     with that.  The other part of it is based on your
15     experience by which the nurses at Valleywise had a
16     significant amount of input on, they -- they reported
17     to Dr. Day your behaviors, conversations that were not
18     consistent with the values of Edson and then also with
19     Valleywise, that you don't meet competency for the
20     completion of NUR478.
21                    MS. DO:  Okay.
22                    DR. BEDNAREK:  Your evaluation right
23     now has zeros and ones, and in order for a student to
24     progress, it needs to be threes.
25                    MS. DO:  Okay.
```

```
 1                  DR. BEDNAREK:  So that was not
 2   demonstrated on your last day of clinical and not
 3   having any clinical availability for the remainder of
 4   the term, that means that you will not successfully
 5   pass NUR478.
 6                  MS. DO:  Okay.
 7                  DR. BEDNAREK:  So we would need to
 8   submit -- we'll just finish the semester and submit
 9   that grade and then we'll need to identify an
10   alternate plan of study for you.
11                  MS. DO:  Okay.
12                  DR. BEDNAREK:  I don't know what your
13   thoughts are on previous conversations that we've had
14   about when the right time for that discussion would
15   be.  It certainly doesn't need to be now, but we
16   should talk definitely with Dr. Morris and, I separate
17   from this conversation, about what that looks like for
18   you returning to the program.
19                  MS. DO:  Okay.
20                  DR. BEDNAREK:  Do you have any
21   questions for me or for Professor Keck?
22                  MS. DO:  So that's just regarding that
23   one class, right?
24                  DR. BEDNAREK:  478.  Yes.
25                  MS. DO:  Okay.  So I can keep going
```

1  forward in the other classes?

2                    DR. BEDNAREK:  The classes you're

3  currently enrolled in?  Yes.

4                    MS. DO:  Okay.

5                    MS. KECK:  But you will not be able to

6  complete the other clinicals next semester since you

7  failed this clinical.

8                    MS. DO:  Okay.

9                    DR. BEDNAREK:  That's what I meant --

10  was referring to when I said an alternate plan of

11  study.

12                    MS. DO:  Okay.  What does that mean?

13                    DR. BEDNAREK:  So you're admitted into

14  a graduate program with a set program of study, which

15  means that you will do this course at this time and

16  it's -- each of the courses has prerequisites, which

17  means you have to pass those in order to move on to

18  the next.

19                    MS. DO:  Mm-hmm.

20                    DR. BEDNAREK:  And so your -- your plan

21  of study needs to be looked at and individualized

22  because we can't alter a plan of study that other

23  students are in, if that makes sense?

24                    MS. DO:  Mm-hmm.

25                    DR. BEDNAREK:  So we would need to

Valleywise-0646

1    identify what your plan of study looks like.

2                    MS. DO:  Okay.

3                    DR. BEDNAREK:  And so that's what I'm

4    referring to is, we would need to meet and that --

5    well, first of all, we would need to dialogue, Dr.

6    Morris and I, with the graduate college and our

7    leadership to understand what we could do.  And then

8    we'd put together a package, and then we would present

9    it to you.

10                    MS. DO:  Okay.  So is that different

11   than the incomplete that you talked about before?

12                    DR. BEDNAREK:  Yes.  Because in order

13   to do an incomplete, you have to be passing the

14   course.

15                    MS. DO:  Okay.  So what about all the

16   other clinicals that I had taken, though, for that, I

17   mean, failing that --

18                    MS. KECK:  No, you'll have to totally

19   repeat --

20                    DR. BEDNAREK:  The whole course.

21                    MS. KECK:  -- the whole course.  You

22   were at one -- you were at zeros and ones, so that

23   indicates failing.  So you will have to repeat complex

24   care.

25                    DR. BEDNAREK:  Clinical.

Valleywise-0647

```
 1                    MS. KECK:  Clinical.

 2                    MS. DO:  Okay.  So the clinicals that I

 3    did attend where I was working bedside and I was doing

 4    what I was supposed to do and I didn't make any

 5    mistakes whatsoever, those didn't count?

 6                    MS. KECK:  Not according to your

 7    evaluations.

 8                    DR. BEDNAREK:  Now, you're talking

 9    about the course holistically.

10                    DR. KENNY:  Yeah.

11                    MS. DO:  Okay.  I'm not really sure.  I

12    mean, I did everything, she marked everything that I

13    did as well.  The verbal feedback was that I was doing

14    great.

15                    DR. BEDNAREK:  Understood.

16                    MS. KECK:  You know, you can't take one

17    -- when you fail a course, you can't just take a

18    portion of the course again.  That's not our rules.

19    That's the graduate school of ASU.

20                    MS. DO:  No, I understand that.

21                    MS. KECK:  So you have to retake the

22    whole course.

23                    MS. DO:  But what -- the things that

24    were left over were just the last couple of clinicals

25    right?
```

```
 1              MS. KECK:  It doesn't matter.  You
 2   failed the entire course.  You would take the entire
 3   course over again.
 4              DR. BEDNAREK:  Yes.  I think that's an
 5   important distinction.  You didn't fail a day.  It's
 6   the whole course.
 7              MS. DO:  That's what I'm understanding,
 8   too.  But what I'm saying is that, like, all of the
 9   clinicals that I did successfully attend, with the
10   exception of this last one, they said I did
11   everything --
12              MS. KECK:  You know, every single
13   student -- every single student who fails a course,
14   whether it's clinical or whatever, they might have
15   gotten A's and B's on their first exams, which will
16   actually make it easier for them when they retake the
17   course, but we don't give them partial credit for the
18   course.  The same way for you is we don't give you
19   partial credit for a course that you failed.  You
20   failed the entire course.
21              MS. DO:  What's that based on, though?
22              MS. KECK:  It's based on the fact that
23   your evaluation has zeros and ones and that you still
24   have clinical to finish.  So you did not finish the
25   entire course.
```

Valleywise-0649

1              MS. DO:  Okay.  But --

2              MS. KECK:  And you have made a

3    series -- a series of serious judgment issues that if

4    we looked at that in terms of critical incidents, that

5    would give us pause.

6              MS. DO:  Okay.  What are the series of

7    decisions that I've made, besides leaving --

8              MS. KECK:  Well, the fact that the

9    institutions, some of the institutions that you've

10   been in do not want you back.  They feel that you are

11   a danger to their patients.

12             MS. DO:  A danger to their patients

13   how?

14             MS. KECK:  Yes.  When you --

15             MS. DO:  I didn't make any mistakes.

16             MS. KECK:  Because when you left, you

17   left your patients.  You left without telling anybody

18   where you were and you caused  the patient to have --

19             MS. DO:  I did tell somebody where I

20   was.

21             MS. KECK:  No, you told them you were

22   leaving for a moment.  You didn't tell that you were

23   leaving.  That's why they had to stop the case with a

24   patient and go look for you.

25             MS. DO:  Okay.  So instead of saying

1   there was miscommunication, we're going to say I

2   failed the whole class?  That doesn't make sense.  I

3   did well -- I did well in my other clinicals that I

4   did at Banner.  Professor Cohen --

5              DR. BEDNAREK:  So the first day -- I'll

6   stop you.  The first day of your evaluations, you have

7   zeros and ones or twos -- twos.  Excuse me.  And the

8   second set of days, you have zeros and ones.

9              MS. DO:  The second and third day, I

10  wasn't there.

11             DR. BEDNAREK:  And that's why.

12             MS. DO:  Right.  And those were the

13  classes -- those were the days I needed to make up.

14             DR. BEDNAREK:  Mm-hmm.  You were there

15  for a couple of hours on that Friday.

16             MS. DO:  I was there except for two

17  hours at the end.  I did the whole day but that.

18             DR. BEDNAREK:  Exactly.  So those days

19  you had a zero and one, zeros and ones.

20             MS. DO:  But, like, I did the whole day

21  except for two hours worth.

22             MS. KECK:  You apparently --

23  whatever -- you're talking about time.  We're talking

24  about outcomes.

25             DR. BEDNAREK:  Competencies.

Valleywise-0651

1          MS. KECK:  So you have not shown us the

2    outcomes that you need to pass the course.

3          MS. DO:  Why did my professor give me

4    good feedback then?

5          MS. KECK:  You can continue to argue

6    with us, Sara, but these aren't our rules.  These are

7    the -- these are the graduate school rules.

8          MS. DO:  I'm not arguing.  I'm trying

9    to understand.  Please understand that I'm not arguing

10   with you.  I'm having a conversation where we may

11   disagree or not see eye-to-eye, but I am trying to

12   understand.  I'm not trying to be belligerent in any

13   means, whatsoever.  My feedback that I got verbally

14   from my professor was very positive every time.  I was

15   very --

16          MS. KECK:  Well, the feedback that you

17   got on your evaluation, then, there's a

18   miscommunication between you and faculty, now.

19          MS. DO:  Okay.

20          MS. KECK:  Because the feedback that we

21   got, and it is in writing, is subpar and failing.

22          MS. DO:  Okay.  So I guess I'll talk to

23   her then, because she gave me very positive feedback

24   every time we talked when she would come up to the

25   floor --

Valleywise-0652

1            DR. BEDNAREK:  This is not something

2   that can be changed.  This is an evaluation based

3   on -- she didn't do the evaluation today.  She did it

4   at the time in which you completed those hours.

5            MS. DO:  Okay.

6            DR. BEDNAREK:  And so the -- the

7   important part, I think, to understand about meeting

8   course outcomes is that you have to demonstrate this

9   consistently over the course of multiple days and

10  interactions with patients, not just one single

11  isolated incident.

12           MS. DO:  Okay.

13           DR. BEDNAREK:  I know you're not saying

14  that, it's we can't do good on one day and then not do

15  good on other days and pass the course.  Does that

16  make sense?

17           MS. DO:  Yeah.  When did she turn in

18  that evaluation that you said she did it that day, day

19  one and two?  So we knew, like, back on day one or two

20  that I was going to fail the class and yet I kept told

21  to show up?

22           DR. BEDNAREK:  No -- no.  Because you

23  had more days -- you had more days in the rotation to

24  bring that back up to an accomplished learner, which

25  is ultimately your goal on that form that is

1    submitted.  Nobody does great on the first day.  I

2    shouldn't say nobody.  Students generally are

3    developing still on those first few days because

4    they're new to an environment and they're getting

5    situated and they're learning and they're learning how

6    to behave as a registered nurse in this environment.

7                    MS. DO:  Okay.

8                    DR. BEDNAREK:  So it's not -- it's not

9    uncommon for students to "meets" and "developing"

10   those first few days.  The goal is, by the end of the

11   sixth day, that you're functioning at an accomplished

12   level and it says that in your evaluation at the top

13   that that's the goal.  You have to get to that by the

14   end of your rotation.

15                   MS. DO:  Mm-hmm.

16                   DR. BEDNAREK:  So it's a measurement

17   over the course of time, not individualized days.

18   Does that make sense?

19                   MS. DO:  Okay.  So previously, when I

20   was told that I could take an incomplete that was

21   based on whatever I had left, right?

22                   DR. BEDNAREK:  Mm-hmm.

23                   MS. DO:  And so I still have that stuff

24   left.  I haven't done it and then failed.  I just

25   haven't done it yet.  So I'm not --

1              DR. BEDNAREK:  There's no place for you

2    to go to do it.

3              MS. DO:  Okay.  So that's why I'm

4    saying, can I take the incomplete now and then wait

5    until next semester when there is somewhere for me to

6    go to make up those additional --

7              DR. BEDNAREK:  No, you cannot.  No.

8    The difference would be, when we had those

9    conversations, your evaluation for those days that you

10   had gone, you were doing okay in the course.  You were

11   actually -- I think you had threes.

12             MS. DO:  So this last four or five

13   hours that I was at this place and I thought that I

14   was making the right decision, that's what failed me

15   for the whole class then?  Because, according to what

16   you just said, I was doing fine up until that point

17   when I needed to do the rest of it.  So I'm being

18   failed over a misunderstanding and over a professor

19   that I didn't have her phone number.  I didn't want to

20   walk back into the operating room and then have a

21   problem with my heart fall on the floor.  Then they

22   would have really had to stop everything.

23             There was nobody there for me to leave

24   a note with.  I looked for somebody.  I mean, I'm sure

25   you can go back and look at surveillance.  You see me

1    looking for people.  There was nobody around.  And,

2    you know, I mean, I just feel like we obviously know

3    that I've had trouble with my heart throughout all of

4    this and I've had to leave other places early.  And I

5    think it's fair to say it was an oversight on maybe

6    her part and my part for me not to ask for her phone

7    number and for her to not voluntarily give it to me,

8    but --

9                    DR. BEDNAREK:  I will just clarify that

10   she did not know anything about your medical

11   condition.  She did not know anything about your

12   situation.  That would not be appropriate to share

13   with her, and she had no need to know that so that

14   assumption needs to be corrected.

15                   MS. DO:  Okay.  Even my other

16   professors, though, throughout every other clinical

17   that I've done, they've given us their cell phone

18   number in case we've needed them, like, right away for

19   something and this would have been one of those times.

20   I don't know if you have --

21                   DR. BEDNAREK:  Did you ask her for it?

22                   MS. DO:  I didn't.  And that's what I'm

23   saying.  It's an oversight on my part for not asking

24   for it.  But I don't know why she wouldn't have given

25   it to me, you know, either way, because I've had all

```
1    the other professors have given us their cell phone

2    numbers and said, if you're sick, if you can't make

3    it, if something came up, please call us or text us

4    and let us know.  And so I just, like, I hear you

5    saying that I was doing okay up until the last five

6    hours and I failed the whole class because I'm having

7    a medical condition and, I mean, that is why I left.

8    I didn't just decide, well, she treated me

9    disrespectfully.  I'm leaving.  I'm saying that's

10   probably what tripped it.  Like, a whole cascade of

11   events after that with my heart.

12                  DR. BEDNAREK:  Sure.

13                  MS. DO:  But I wouldn't have left

14   because of that.  I've got thicker skin than that.

15   But I do think that's --

16                  MS. KECK:  Can I say something?

17                  MS. DO:  Mm-hmm.

18                  MS. KECK:  Can I say something?  So,

19   Sara, I understand what you're saying and we're kind

20   of -- we're on this hamster wheel right now, but

21   basically what you did and how the State of Arizona

22   will look at it is patient abandonment.  Doesn't

23   matter what you're saying, what you're justifying, it

24   was patient abandonment.  And that is a huge offense

25   in nursing.
```

```
 1                    MS. DO:  Okay?

 2                    MS. KECK:  And that, when the state

 3    goes through and reviews our records, that's what they

 4    will see.

 5                    MS. DO:  Okay.  Well, I guess if you

 6    guys have made up your mind, then it doesn't matter

 7    what I have to say on it, so.

 8                    DR. BEDNAREK:  So I think next steps

 9    would be, we'll get you your formative summative

10    evaluation to you so that you can take a look at it

11    and you have it for your records.  I understand

12    they're being posted in Canvas, so I'll have somebody

13    posted in Canvas for you.

14                    MS. DO:  Okay.

15                    DR. BEDNAREK:  I also will confer with

16    Dr. Morris and our leadership to figure out what your

17    plan of study could be and then we will communicate

18    that to you.  As far as your other courses are

19    concerned, you would continue in them as scheduled.

20                    MS. DO:  Except for psychology or

21    psychiatry?

22                    DR. BEDNAREK:  No, I mean this term.  I

23    mean this term.

24                    MS. DO:  Okay.

25                    DR. BEDNAREK:  The remainder of the
```

1   summer, we would give you that information before the

2   fall semester starts, and your registration may need

3   to be changed based on the plan of study.

4                    MS. DO:  What do you mean registration?

5                    DR. BEDNAREK:  Registration for fall

6   term.

7                    MS. DO:  Okay -- okay.

8                    DR. BEDNAREK:  Yeah.  You know how to

9   reach me.  You know where my e-mail and so if you have

10  questions that come up, I know that they may come up

11  as you're thinking, I encourage you to e-mail them to

12  me.  It would be beneficial if you e-mailed them to

13  both Dr. Morris and I because we both have

14  responsibility for this program and to keep us all in

15  the loop.  And we will get you the answers as quickly

16  as we possibly can.

17                   MS. DO:  Okay.

18                   DR. BEDNAREK:  I know that you have a

19  lot going on.  And I know that this is not going to be

20  easy on you.  I want you to hear me when I say that we

21  will figure out a way through this with you.  We're

22  not -- we're not abandoning you.  We are going to

23  figure out a way with this -- with you through this.

24  Okay?

25                   MS. DO:  Okay.

1              DR. BEDNAREK:  Take care of yourself.

2              MS. DO:  Thanks.  You too.

3              (End of audio file: Do_326.mp4)

4    Counter Stop Time:  00:26:07.4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Valleywise-0660

```
 1                  CERTIFICATE OF TRANSCRIBER

 2              I, DIANE OTTO, do hereby certify that this

 3    transcript was prepared from the digital audio

 4    recording of the foregoing proceeding, that said

 5    transcript is a true and accurate record of the

 6    proceedings to the best of my knowledge, skills, and

 7    ability; that I am neither counsel for, related to,

 8    nor employed by any of the parties to the action in

 9    which this was taken; and, further, that I am not a

10    relative or employee of any counsel or attorney

11    employed by the parties hereto, nor financially or

12    otherwise interested in the outcome of this action.

13

14                               _____

15                               DIANE OTTO, CER, CET 1353

16

17

18

19

20

21

22

23

24

25
```

Valleywise-0661

Sara Do vs. Arizona State University
Audio Transcription

07-28-2021
Index: 0:02:53.3..exception

**0**

**0:02:53.3** 3:3

**1**

**18.5** 10:12

**4**

**478** 4:11 11:24

**A**

**A's** 15:15
**abandon** 8:20
**ability** 7:11
**Absolutely** 9:2
**academic** 10:3
**accomplished** 19:24 20:11
**actions** 7:6
**admitted** 12:13
**ahead** 6:5
**alter** 12:22
**alternate** 11:10 12:10
**amount** 10:16
**anxiety** 4:17
**apparently** 17:22
**argue** 18:5
**arguing** 18:8,9
**arrhythmia** 4:24 5:23
**ASU** 14:19
**attend** 14:3 15:9
**audio** 3:1
**availability** 11:3

**B**

**B's** 15:15
**back** 8:2,12 16:10 19:19,24

**bad** 3:13 4:24 5:23 6:10 7:18,20
**Banner** 17:4
**based** 10:14 15:21,22 19:2 20:21
**BEDNAREK** 3:4,7,9, 12,17,20,23 4:1,5,9,13 5:17 6:19 7:1,17 8:21, 25 9:3,8,14,21,24 10:2, 7,22 11:1,7,12,20,24 12:2,9,13,20,25 13:3, 12,20,25 14:8,15 15:4 17:5,11,14,18,25 19:1, 6,13,22 20:8,16,22
**bedside** 9:10 14:3
**behave** 20:6
**behaviors** 10:17
**belligerent** 18:12
**break** 6:5,11,18
**bring** 19:24

**C**

**call** 4:15
**called** 5:3,4,7,13 6:3
**calling** 7:23
**Candace** 4:6
**care** 7:2 10:5 13:24
**cared** 7:4
**case** 16:23
**cases** 6:23
**caused** 16:18
**cell** 5:5,15
**changed** 19:2
**charge** 9:4,10
**check** 8:18,19
**checking** 9:12
**class** 11:23 17:2 19:20
**classes** 12:1,2 17:13
**clean** 6:14

**clinical** 7:12 10:9 11:2, 3 12:7 13:25 14:1 15:14,24
**clinicals** 12:6 13:16 14:2,24 15:9 17:3
**Cohen** 17:4
**college** 13:6
**commencement** 3:1
**communication** 9:18, 19
**Competencies** 17:25
**competency** 10:19
**complete** 7:11 12:6
**completed** 19:4
**completion** 10:20
**complex** 13:23
**concern** 6:22
**consistent** 10:18
**consistently** 19:9
**continue** 18:5
**conversation** 11:17 18:10
**conversations** 10:17 11:13
**coordinator** 4:6,7,11
**count** 14:5
**Counter** 3:3
**couple** 14:24 17:15
**courses** 12:16
**created** 6:21 7:1
**credit** 15:17,19
**critical** 16:4
**crna** 5:24 6:17

**D**

**danger** 16:11,12
**day** 3:14 9:11,17 10:17 11:2 15:5 17:5,6,9,17, 20 19:14,18,19 20:1,11

**days** 3:5 17:8,13,18 19:9,15,23 20:3,10,17
**decision** 8:10
**decisions** 16:7
**deficit** 10:12
**demonstrate** 19:8
**demonstrated** 11:2
**desk** 5:11
**developing** 20:3,9
**dialogue** 13:5
**director** 4:1
**disagree** 18:11
**discussion** 11:14
**distinction** 15:5
**Do_326.mp4** 3:2
**doctor** 3:18 6:1
**drink** 6:9

**E**

**e-mail** 4:25 8:18 9:12, 19
**e-mailed** 4:13,20 5:13 7:24 8:8,18,23,24
**e-mailing** 10:4
**e-mails** 5:1
**easier** 15:16
**Edson** 10:18
**empty** 5:11,12
**end** 6:1 17:17 20:10,14
**enrolled** 12:3
**entire** 15:2,20,25
**environment** 6:14 20:4,6
**evaluation** 10:22 15:23 18:17 19:2,3,18 20:12
**evaluations** 14:7 17:6
**exams** 15:15
**exception** 15:10

Sara Do vs. Arizona State University
Audio Transcription

07-28-2021
Index: Excuse..night

**Excuse** 17:7

**experience** 4:18,21 10:15

**explaining** 5:18 8:13

**eye-to-eye** 18:11

**F**

**fact** 15:22 16:8

**faculty** 4:10,16 18:18

**fail** 14:17 15:5 19:20

**failed** 12:7 15:2,19,20 17:2 20:24

**failing** 13:17,23 18:21

**fails** 15:13

**fair** 9:13

**feedback** 14:13 18:4, 13,16,20,23

**feel** 3:15 9:15 16:10

**feeling** 3:10 6:10,13,18 7:15 8:3

**fever** 3:14

**fevers** 3:15

**figured** 5:14

**file** 3:1

**finally** 10:8

**find** 5:7 7:16

**finish** 11:8 15:24

**floor** 18:25

**form** 19:25

**forward** 12:1

**forwarded** 5:5

**Friday** 17:15

**functioning** 20:11

**G**

**gave** 18:23

**generally** 20:2

**give** 15:17,18 16:5 18:3

**goal** 19:25 20:10,13

**good** 3:8 18:4 19:14,15

**grade** 11:9

**graduate** 12:14 13:6 14:19 18:7

**great** 4:22 6:18 14:14 20:1

**gross** 3:16

**guess** 8:18 18:22

**guest** 4:19

**guys** 6:16

**H**

**hallways** 5:11

**happen** 5:18 7:12

**happened** 7:4,18,20

**head** 8:2

**headache** 3:14

**Hey** 3:6

**hold** 5:14

**holistically** 14:9

**hospital** 5:10

**hour** 10:12

**hours** 7:12 10:11 17:15,17,21 19:4

**I**

**identify** 11:9 13:1

**immediacy** 9:18

**immediately** 9:16,22

**implications** 7:9,10,11

**important** 9:17 15:5 19:7

**incident** 19:11

**incidents** 16:4

**incomplete** 13:11,13 20:20

**individualized** 12:21 20:17

**input** 10:16

**institutions** 16:9

**intending** 7:5,7

**interactions** 19:10

**interrupt** 6:16

**interrupted** 6:23 7:2

**isolated** 19:11

**issues** 16:3

**J**

**judgment** 16:3

**K**

**Keck** 7:14,19,25 8:9,12, 15 11:21 12:5 13:18,21 14:1,6,16,21 15:1,12,22 16:2,8,14,16,21 17:22 18:1,5,16,20

**KENNY** 14:10

**kind** 3:4,15

**knew** 4:16 8:15 19:19

**L**

**leadership** 13:7

**learner** 19:24

**learning** 20:5

**leave** 5:10 6:13 7:16 8:3,13

**leaving** 16:7,22,23

**left** 5:19,20 8:24 14:24 16:16,17 20:21,24

**leg** 6:2

**level** 20:12

**locker** 6:6

**looked** 5:1 12:21 16:4

**M**

**made** 16:2,7

**Maggie** 4:5

**make** 3:24 4:3 10:11 14:4 15:16 16:15 17:2, 13 19:16 20:18

**makes** 12:23

**marked** 14:12

**mass** 6:21 7:9,10

**matter** 15:1

**means** 11:4 12:15,17 18:13

**meant** 12:9

**measurement** 20:16

**medication** 6:9

**meet** 10:19 13:4

**meeting** 19:7

**meets** 20:9

**member** 4:17

**members** 5:9

**MEPN** 4:6

**miscommunication** 17:1 18:18

**mistakes** 14:5 16:15

**Mm-hmm** 9:7 12:19,24 17:14 20:15,22

**mode** 9:19

**moment** 16:22

**morning** 4:15,20

**Morris** 11:16 13:6

**move** 12:17

**multiple** 19:9

**N**

**needed** 17:13

**needing** 10:10

**night** 8:19

Sara Do vs. Arizona State University
Audio Transcription

07-28-2021
Index: number..totally

**number** 5:1,3,4,8

**NUR478** 4:7 10:20 11:5

**nurse** 5:20,21,25 9:4,5, 10,11 20:6

**nurses** 10:4,15

---

**O**

**open** 6:11

**operating** 6:16

**order** 10:23 12:17 13:12

**organization** 9:5

**outcomes** 7:8 17:24 18:2 19:8

---

**P**

**package** 13:8

**packing** 5:10

**panicked** 4:15

**part** 4:23,24 10:14 19:7

**partial** 15:17,19

**pass** 11:5 12:17 18:2 19:15

**passing** 13:13

**patient** 6:15 7:2 16:18, 24

**patient's** 6:2

**patients** 7:4 10:5 16:11,12,17 19:10

**pause** 16:5

**people** 8:13

**person** 6:22

**phone** 4:25 5:2,5,8,15

**place** 5:19

**placement** 10:9

**plan** 11:10 12:10,20,22 13:1

**portion** 14:18

**position** 10:8

**positive** 18:14,23

**prelicensure** 4:2

**prerequisites** 12:16

**present** 13:8

**pretty** 4:24 6:10

**previous** 11:13

**previously** 20:19

**primary** 9:9

**problem** 7:2

**professor** 4:25 7:24 8:8 11:21 17:4 18:3,14

**program** 4:2,6 9:25 10:2 11:18 12:14

**progress** 10:24

**put** 8:2 13:8

---

**Q**

**Question** 5:19

**questions** 11:21

---

**R**

**read** 9:21

**realistic** 9:16

**realize** 7:5

**reason** 6:24

**received** 4:14 5:2 9:15

**referring** 12:10 13:4

**registered** 5:20,21,25 9:5 20:6

**remainder** 10:10 11:3

**repeat** 13:19,23

**reported** 10:16

**response** 4:21

**responsibility** 9:6,9

**restroom** 6:9

**retake** 14:21 15:16

**retrospect** 7:25 8:1

**returning** 11:18

**ridden** 4:17

**RN** 9:9

**role** 4:10 9:4,17

**roles** 3:24

**room** 3:21 6:6,11,16

**rotation** 19:23 20:14

**rough** 3:11

**rules** 14:18 18:6,7

---

**S**

**Sara** 3:5 18:6

**Saturday** 4:15

**school** 7:10 14:19 18:7

**scope** 9:9

**scrubbed** 6:15

**semester** 11:8 12:6

**sense** 12:23 17:2 19:16 20:18

**separate** 11:16

**series** 16:3,6

**set** 12:14 17:8

**setting** 10:3

**share** 6:21 7:6,8

**sharing** 6:20

**short** 6:5

**show** 19:21

**shown** 18:1

**significant** 10:16

**single** 15:12,13 19:10

**situated** 20:5

**sixth** 20:11

**space** 5:20 10:3

**staff** 4:16,19 5:9

**Start** 3:3

**stop** 7:21 8:4 10:13 16:23 17:6

**stretch** 6:3

**student** 10:23 15:13

**students** 12:23 20:2,9

**study** 11:10 12:11,14, 21,22 13:1

**stuff** 5:22 20:23

**submit** 11:8

**submitted** 20:1

**subpar** 18:21

**successfully** 11:4 15:9

**Sunday** 4:20

**supposed** 14:4

**surgery** 6:4

---

**T**

**taking** 10:5

**talk** 8:21,25 11:16 18:22

**talked** 13:11 18:24

**talking** 5:24 14:8 17:23

**tape** 6:1

**telling** 16:17

**term** 11:4

**terms** 16:4

**thing** 7:3

**things** 14:23

**thinking** 5:4

**thought** 7:17,19 8:6

**thoughts** 11:13

**threes** 10:24

**time** 3:3 10:10 11:14 12:15 17:23 18:14,24 19:4 20:17

**today** 4:11 19:3

**told** 6:6 16:21 19:20 20:20

**top** 20:12

**totally** 13:18

Sara Do vs. Arizona State University
Audio Transcription

07-28-2021
Index: trouble..zeros

**trouble**  8:7,10

**true**  9:24

**turn**  19:17

**twos**  17:7

---

### U

**Uh-huh**  4:4

**ultimately**  19:25

**uncommon**  20:9

**understand**  9:14 13:7
 14:20 18:9,12 19:7

**understanding**  7:7
 9:17 15:7

**Understood**  14:15

**unfortunate**  7:3

---

### V

**Valleywise**  10:15,19

**values**  10:18

**verbal**  14:13

**verbally**  18:13

**voicemail**  5:7

---

### W

**walked**  5:25

**wanted**  4:3

**watch**  5:15

**weekend**  4:14 5:6

**whatsoever**  14:5
 18:13

**working**  5:6 14:3

**worth**  17:21

**writing**  18:21

---

### Z

**zeros**  10:23 13:22
 15:23 17:7,8,19

# Exhibit 21
## to ABOR's Separate Statement of Facts in Support of its Motion for Summary Judgment

# Filed Separately on Flash Drive

**Exhibit 22**
**to ABOR's Separate Statement of  Facts in**
**Support of its Motion for Summary**
**Judgment**

**Filed Separately on Flash**
**Drive**

# Exhibit 23
## to ABOR's Separate Statement of Facts in Support of its Motion for Summary Judgment

# Filed Separated on Flash Drive

# Exhibit 24
## to ABOR's Separate Statement of  Facts in Support of its Motion for Summary Judgment

# Lodged Under Seal

# EXHIBIT 25

**From:**     Sara Do <sabedro@asu.edu> on behalf of Sara Do <sabedro@asu.edu>
**To:**       Paul More
**Sent:**     6/9/2021 2:32:02 PM
**Subject:**  Re: Test

Hi Paul,

It was nice talking with you as well! You are such a caring professor and person. I really appreciate it. I'm sure you've had that one professor that stands out in your mind from all the years of school and without a doubt, I know you're that person for me, as well as a large number of my classmates that I've spoken to. You give us hope that we might be able to actually get through this class (left to our own devices, we're all lacking confidence) and the reassurance that you're not trying to trip us up or test us on memorization of things. Hearing you say that really went a long way to give us a morale boost. It helps that you've been where we are and understand from a perspective many can't empathize with on a "been there, done that" basis.

I will definitely do my best and thank you for doing all you can to help me with the test. I don't think it's the time that I'm worried about inasmuch as I'm worried about the material and where I should focus my studying. It all seems so foreign. I take notes during class, but I'm usually writing what I hear you saying and not what I'm understanding.

Thank you again!
Sara

On Wed, Jun 9, 2021 at 2:25 PM Paul More <Paul.More@asu.edu> wrote:
Hi Sara. It was nice talking to you today. I don't know that I can extend the test for longer than 6 1/2 hours. That is more than one and a half times that the ASU center requires me to extend the test. My only suggestion is to do the best that you can and let me know if anything happens while you were taking the exam after the fact. Good luck. Take care. Paul.

Get Outlook for iOS

---

**From:** Sara Do <sabedro@asu.edu>
**Sent:** Wednesday, June 9, 2021 9:03:56 AM
**To:** Paul More <Paul.More@asu.edu>
**Subject:** Re: Test

Thank you so much! My phone number is 281-323-0844.

I greatly appreciate it and am looking forward to hearing from you.

Sara Do

On Wed, Jun 9, 2021, 9:02 AM Paul More <Paul.More@asu.edu> wrote:
Sara. I will call you after work. Send me your number. Paul

Get Outlook for iOS

---

**From:** Sara Do <sabedro@asu.edu>
**Sent:** Wednesday, June 9, 2021 8:36:03 AM
**To:** Paul More <Paul.More@asu.edu>
**Subject:** Test

Paul,

I hope it's okay to ask this, but if not, please disregard. I'm extremely anxious about this test (all 3 for that

ABOR002598

matter) and I'm terrified to fail. Especially because one bad grade on any of the 3 tests and it's over since that's our whole grade.

I'm wondering if you pulled your test questions primarily from the notes of your lectures? I'm struggling to retain this information and really need to focus my studying if possible.

Some of what is covered in class (like you mention from 8th grade biology or 6th grade science) is so far back in my memory, I struggle to recall it and then I get sidetracked trying to refresh my knowledge. (I'm 41, so middle school stuff was forever ago).

I'm grateful for the 4-hours we have to complete the test, but I'm still so worried about it. As I said before, I have severe heart problems right now that my team of 3 electrophysiology cardiologists are trying to figure out and oftentimes I need to take prn medication when I randomly go into arrhythmia that makes me feel really loopy and exhausted. I'm just hoping for some guidance on where to focus my studies before trying to take the test to ease some of my anxiety.

I greatly appreciate you and any help you can offer.

Thanks so much!


Take care,
Sara Do

ABOR002599

# EXHIBIT 26

# Kardia

**EKG Recording**

## Sara Do

DOB: ███████████
Sex: **Female**

---

## EKG Recording Overview

### Kardia Determination

Normal Sinus Rhythm

\* Kardia Determination is done on Lead I.

| | |
|---|---|
| **Recorded:** | Saturday, Jul 24, 2021, 11:39:46 AM |
| **Heart Rate:** | 97 BPM |
| **Duration:** | 30s |

---

## Additional Information

No additional information to display

Kardia does not check for heart attack. If you believe you are having a medical emergency, call emergency services. AliveCor does not provide medical advice or services, and any information from AliveCor is provided to assist you and your doctor with your medical care and not as a replacement for consulting with your doctor.

2022 AliveCor, Inc.
Confidential patient information

CONFIDENTIAL
**AliveCor**®

Do_010498

1 of 5

# Kardia

**Patient:** Sara Do
**Recorded:** 07/24/2021, 11:39 AM
**Heart Rate:** 97 bpm
**Duration:** 30s

**Kardia Determination** Normal Sinus Rhythm
* Kardia Determination is done on Lead I.

Enhanced Filter, Mains Filter: 60 Hz    Scale: 25mm/s, 10mm/mV



# Kardia

**Patient:** Sara Do
**Recorded:** 07/24/2021, 11:39 AM
**Heart Rate:** 97 bpm
**Duration:** 30s

**Kardia Determination** Normal Sinus Rhythm
* Kardia Determination is done on Lead I.

Enhanced Filter, Mains Filter: 60 Hz    Scale: 25mm/s, 10mm/mV



CONFIDENTIAL

(c) Copyright 2022, AliveCor Inc. alivecor 5.17.3-01be14300, UUID: 2a6e111b-d48e-4caa-83c9-08b98c03a66b

Do_010500

# Kardia

**Patient:** Sara Do
**Recorded:** 07/24/2021, 11:39 AM
**Heart Rate:** 97 bpm
**Duration:** 30s

**Kardia Determination** Normal Sinus Rhythm
* Kardia Determination is done on Lead I.

Enhanced Filter, Mains Filter: 60 Hz    Scale: 25mm/s, 10mm/mV



CONFIDENTIAL
(c) Copyright 2022, AliveCor Inc. alivecor 5.17.3-01be14300, UUID: 2a6e111b-d48e-4caa-83c9-08b98c03a66b

# Kardia

**Patient:** Sara Do
**Recorded:** 07/24/2021, 11:39 AM
**Heart Rate:** 97 bpm
**Duration:** 30s

**Kardia Determination** Normal Sinus Rhythm

* Kardia Determination is done on Lead I.

Enhanced Filter, Mains Filter: 60 Hz    Scale: 25mm/s, 10mm/mV



CONFIDENTIAL

(c) Copyright 2022, AliveCor Inc. alivecor 5.17.3-01be14300, UUID: 2a6e111b-d48e-4caa-83c9-08b98c03a66b

Do_010502

# Kardia

## EKG Recording

## Sara Do

DOB: ████████████
Sex: **Female**

## EKG Recording Overview

### Kardia Determination

Normal Sinus Rhythm

* Kardia Determination is done on Lead I.

| | |
|---|---|
| **Recorded:** | Saturday, Jul 24, 2021, 11:41:21 AM |
| **Heart Rate:** | 93 BPM |
| **Duration:** | 30s |

## Additional Information

No additional information to display

Kardia does not check for heart attack. If you believe you are having a medical emergency, call emergency services. AliveCor does not provide medical advice or services, and any information from AliveCor is provided to assist you and your doctor with your medical care and not as a replacement for consulting with your doctor.

2022 AliveCor, Inc.
Confidential patient information

CONFIDENTIAL
**AliveCor**®

# Kardia

**Patient:** Sara Do
**Recorded:** 07/24/2021, 11:41 AM
**Heart Rate:** 93 bpm
**Duration:** 30s

**Kardia Determination** Normal Sinus Rhythm
* Kardia Determination is done on Lead I.

Enhanced Filter, Mains Filter: 60 Hz    Scale: 25mm/s, 10mm/mV



# Kardia

**Patient:** Sara Do
**Recorded:** 07/24/2021, 11:41 AM
**Heart Rate:** 93 bpm
**Duration:** 30s

**Kardia Determination** Normal Sinus Rhythm
* Kardia Determination is done on Lead I.

Enhanced Filter, Mains Filter: 60 Hz    Scale: 25mm/s, 10mm/mV



(c) Copyright 2022, AliveCor Inc. alivecor 5.17.3-01be14300, UUID: 28a5e7b9-dd43-47c3-88d9-84dd77daed90                                3 of 5

**Kardia**

**Patient:** Sara Do
**Recorded:** 07/24/2021, 11:41 AM
**Heart Rate:** 93 bpm
**Duration:** 30s

**Kardia Determination** Normal Sinus Rhythm
* Kardia Determination is done on Lead I.

Enhanced Filter, Mains Filter: 60 Hz    Scale: 25mm/s, 10mm/mV



CONFIDENTIAL

(c) Copyright 2022, AliveCor Inc. alivecor 5.17.3-01be14300, UUID: 28a5e7b9-dd43-47c3-88d9-84dd77daed90

Do_010506

# Kardia

**Patient:** Sara Do
**Recorded:** 07/24/2021, 11:41 AM
**Heart Rate:** 93 bpm
**Duration:** 30s

**Kardia Determination** Normal Sinus Rhythm
* Kardia Determination is done on Lead I.

Enhanced Filter, Mains Filter: 60 Hz    Scale: 25mm/s, 10mm/mV



(c) Copyright 2022, AliveCor Inc. alivecor 5.17.3-01be14300, UUID: 28a5e7b9-dd43-47c3-88d9-84dd77daed90                    5 of 5

# Kardia

# EKG Recording

## Sara Do

DOB: ████████████
Sex: **Female**

---

## EKG Recording Overview

### Kardia Determination

Normal Sinus Rhythm

* Kardia Determination is done on Lead I.

| | |
|---|---|
| **Recorded:** | Saturday, Jul 24, 2021, 4:53:21 PM |
| **Heart Rate:** | 78 BPM |
| **Duration:** | 30s |

---

## Additional Information

No additional information to display

Kardia does not check for heart attack. If you believe you are having a medical emergency, call emergency services. AliveCor does not provide medical advice or services, and any information from AliveCor is provided to assist you and your doctor with your medical care and not as a replacement for consulting with your doctor.



# Kardia

**Patient:** Sara Do
**Recorded:** 07/24/2021, 4:53 PM
**Heart Rate:** 78 bpm
**Duration:** 30s

**Kardia Determination** Normal Sinus Rhythm
* Kardia Determination is done on Lead I.

Enhanced Filter, Mains Filter: 60 Hz    Scale: 25mm/s, 10mm/mV



(c) Copyright 2022, AliveCor Inc. alivecor 5.17.3-01be14300, UUID: 08f99bdc-adfc-4dd2-9aa9-362bbb989a48

# Kardia

**Patient:** Sara Do
**Recorded:** 07/24/2021, 4:53 PM
**Heart Rate:** 78 bpm
**Duration:** 30s

**Kardia Determination** Normal Sinus Rhythm
* Kardia Determination is done on Lead I.

Enhanced Filter, Mains Filter: 60 Hz    Scale: 25mm/s, 10mm/mV



(c) Copyright 2022, AliveCor Inc. alivecor 5.17.3-01be14300, UUID: 08f99bdc-adfc-4dd2-9aa9-362bbb989a48

# Kardia

**Patient:** Sara Do
**Recorded:** 07/24/2021, 4:53 PM
**Heart Rate:** 78 bpm
**Duration:** 30s

**Kardia Determination** Normal Sinus Rhythm
* Kardia Determination is done on Lead I.

Enhanced Filter, Mains Filter: 60 Hz    Scale: 25mm/s, 10mm/mV



(c) Copyright 2022, AliveCor Inc. alivecor 5.17.3-01be14300, UUID: 08f99bdc-adfc-4dd2-9aa9-362bbb989a48

# Kardia

**Patient:** Sara Do
**Recorded:** 07/24/2021, 4:53 PM
**Heart Rate:** 78 bpm
**Duration:** 30s

**Kardia Determination** Normal Sinus Rhythm
* Kardia Determination is done on Lead I.

Enhanced Filter, Mains Filter: 60 Hz    Scale: 25mm/s, 10mm/mV



# Exhibit 27
## to ABOR's Separate Statement of Facts in Support of its Motion for Summary Judgment

# Lodged Under Seal

# Exhibit 28
## to ABOR's Separate Statement of Facts in Support of its Motion for Summary Judgment

# Lodged Under Seal

**Exhibit 29**
**to ABOR's Separate Statement of Facts in Support of its Motion for Summary Judgment**

**Lodged Under Seal**

# EXHIBIT 30

**From:**         Janine Carrasco <janine.carrasco@gmail.com>
**To:**           Kimberly Day
**Sent:**         7/24/2021 12:31:54 PM
**Subject:**      "Nursing Student"
**Attachments:**  20210724_120237.jpg


The "Nursing student" Sarah, needs to choose another path. She announce she wants to do administration. We all attempted to engage her in general conversation and encourage participation. She showed no interest in the patient or procedure we were doing. She sat in the corner, asked no questions, and was outside of the OR more than in. It is unfortunate that she did not take advantage of this opportunity. Furthermore, I would not want a "Nursing" administrator who has no clinical experience with patients and clinical staff. On the plus side, she did leave her disposable paper scrubs nicely folded on the bench.

ABOR000555

# EXHIBIT 31

**From:**     Gabriela Novakova <Gabriela.Novakova@valleywisehealth.org>
**To:**        Kimberly Day
**Sent:**      7/25/2021 7:53:00 AM
**Subject:**   FW: from Gabi - plastic OR case

**From:** Gabriela Novakova
**Sent:** Saturday, July 24, 2021 12:12 PM
**To:** kim.day@esu.edu
**Subject:** from Gabi - plastic OR case



Hi Kim

I would like to let you know about my experience with your nursing student Sara Do that was assigned to me for one of my OR cases on Saturday 7/24/21 . I have been RN for 17 years and I have to be honest to you , in my whole career I have never met a student like Sara. I like having students with me and always wanna make sure they have a good day and learn things as I remember how it was to be in nursing school. This student was totally disintrested in learning anything at all, not interested in the periperative process, not interested in the patient or his history or the type of surgery he was having. I was trying to involve her in the room and encouraged her to come see the intubation or ask questions. She told me she wasn't interested in any of this because she wants to do administrative type of job and that she is just here because she needs some hours. I completely understand that we are all different, some of us like the patient care, some of us don't and that's OK. But clinicals are part of nursing program and we all had to participate to earn the grade and the degree.  I was completely shock with her behavior, not interested in anything and she made it obvious that she was very bothered to be here. She left the room without saying anything, didn't ask single question and stated she had no interest in this. I just wanna give you some feed back as this was just very surprising to me.
Thank you for reading this.

Gabi

**Gabriela Novakova**
Advanced Clinical Nurse

**Valleywise Health**

Phone: 602-344-5760

Valleywisehealth.org

ABOR000560

# EXHIBIT 32

**From:**      Brent Thomas <wbthomas@gmail.com>
**To:**        Kimberly Day
**Sent:**      7/24/2021 12:00:48 PM
**Subject:**   Student Nurse at County

Kim,

I have never experienced a student like the one you brought to the OR on Saturday (7-24-21). Her name is Sarah. She was disinterested in being there or learning about anything. She sat in the corner and basically looked away. I can understand that seeing wounds for the first time can be overwhelming so we asked her questions to make sure she was ok. She said she was fine and that she had no interest in direct patient care and "just needed to get through this" so she can become an administrator. During the case, she abruptly got up and left for a good amount of time.

It is my opinion that if she wants to be an administrator, she needs to get an administration degree, not a nursing degree. Having the title RN means something. No one should use it as a pass through into administration because everyone who sees your title will make assumptions about your knowledge, experience, and capacity as a nurse first… and then as an administrator. If she were to skip nursing and go directly into administration she would not adequately represent our profession. Please move her into the appropriate degree program for her desired career.

Respectfully,

W. Brent Thomas CRNA
480-834-7500

# EXHIBIT 33

**From:**  Reaia Reaves <Reaia.Reaves@valleywisehealth.org>
**To:**  Kimberly Day
**Sent:**  7/24/2021 1:02:20 PM
**Subject:**  Clinical Student Concern

Hello Kim,

I just wanted to make the program and you aware that today when the student, Sarah, was shadowing in my room today she abruptly exited the room without warning. We came back to the operating room with our patient at around 10 am, Sarah stayed for the intubation, after intubation Sarah walked out of the room leaving behind her lead vest without word. I assumed that she had left for the restroom, however 10 minutes later the student had still not returned. The CRNA as well as the surgical team questioned where the student had went, as they were trying to inform her about the procedure. From this point another surgical nurse entered the operating room to inform me that the student's OR scrubs were left on the locker room bench and her belongings were gone. We did not hear back from the student, there was no forewarning that she was leaving the operating room or the Valleywise Health facility.

Other than leaving early, the student was also disinterested, showed lack of interest in the program, and lack of interest in patient care as well. Due to these concerns, I believe that it is imperative for future patient safety that your education facility review this student. She did mention that she only wants to do administrative work and has no interest in direct patient care as well. These things need correcting before the student be allowed on anymore clinical assignments in my professional nursing opinion.

Best Regards,
Reaia Reaves, BSN-RN

ABOR000557

# EXHIBIT 34

**From:** Sara Do <sabedro@asu.edu> on behalf of Sara Do <sabedro@asu.edu>
**To:** Nancy Kiernan
**CC:** Sara Do (Student)
**Sent:** 11/1/2022 6:11:21 PM
**Subject:** Re: next steps: spring 2023

Ms. Kiernan,

Thank you for the follow up conversation. Relying on the information you shared with me, I will take option 1A. I will submit the SAILS application and quickly begin the process of gathering the requested information so we can reach the reasonable accommodations. In light of the late hour, I cannot submit the SAILS form today, but I will get it submitted tomorrow.

Thank you,
Sara Do

On Tue, Nov 1, 2022 at 4:11 PM Nancy Kiernan <nkiernan@asu.edu> wrote:

Hi Sara,


As a follow up to our conversation earlier today, please confirm your intent to enroll for the spring 2023 semester by today (November 1, 2023). Once you confirm your intent to enroll, you should immediately begin the intake process with the Student Accessibility and Inclusive Learning Services (SAILS) team. Here is the link to begin the process: https://eoss.asu.edu/accessibility (scroll down, select "new registration form").


I understand that you have questions related to accommodations. Once you being the process with SAILS, and provide supporting documentation, we can review the accommodation items and discuss options, if any, for the spring 2023 semester. Please submit the SAILS request today.


Next steps:

1. Respond to this email confirming your intent to enroll and your intention to select option 1A.
2. Submit the new registration form for SAILS (link provided above).
3. Notify Nancy Kiernan once the SAILS registration form has been submitted.


Once you submit the form, SAILS will reach out to you to begin the process. You will need to submit supporting documentation for SAILS.


Once you respond with your intent to enroll, we will follow up with you on next steps for items related to your spring 2023 courses and clinical placement. This process is separate from the SAILS process.


Thank you!



Exhibit 39
Name: Do
Meri Coash 3-16-24

ABOR010732

Nancy Kiernan

Senior Director, Recruitment & Student Services

Edson College of Nursing and Health Innovation

Arizona State University

nkiernan@asu.edu

ABOR010733

# EXHIBIT 35

2:00 💬 📷 🔘 ⬛ 🔘 ▶ •                                         📶 47% 🔋

‹   Ⓟ   **Professor Serna TTP F...**   ⌄          ⋮

Friday, August 4, 2023

Hello! Just confirming your last shift is
tomorrow...                                              9:41 AM

Hi! Yes that's correct. I **fell** yesterday
and hurt my foot and ankle pretty bad
9:42 AM      but I'll be there.

Hi, I just totaled up all of my hours
that I have spent at St. Joseph's, and
according to my documentation (as
well as the text messages that you
have asked me to send you when I
arrive and when I leave each shift that
can serve as time stamps), I have
spent 79 hours and 45 minutes on TTP
clinicals

7:07 PM      **View all**                              ›

Hi Sara, it was previously
communicated that the requirement
for TTP is completing 7 full shifts,
including report at the beginning and
end of each shift.                                      7:56 PM

Okay so I'll end up putting in 94 hours?

Any exception to this?
7:57 PM

You will need to complete the full shift.   7:57 PM

There is no exception, this is the
requirement for the course.                 8:03 PM      ⌄



Exhibit H8
Name: Do
Meri Coash   3-16-24

🖼  📷  ＋  |                              😊  ⌇

|||      ▢      ‹

Do_105023

< **Me**
7:07 PM, Aug 4

Hi, I just totaled up all of my hours that I have spent at St. Joseph's, and according to my documentation (as well as the text messages that you have asked me to send you when I arrive and when I leave each shift that can serve as time stamps), I have spent 79 hours and 45 minutes on TTP clinicals at St. Joseph.

As you know, we have an 84 hour clinical requirement. Between my foot/ankle/lower leg being injured, and my arrhythmia that's gotten out of control, would it be okay to put in my remaining 4 hours and 15 minutes (to total the required hours for the class) and be done?

I have given report for multiple patients at the end of each shift, and my preceptor has communicated that I'm fluent in giving and taking report using the SBAR format. I've been independently caring for multiple patients also at each shift.

I'm not asking to cut short the 84-hour class requirement, but I don't feel well and, with my injury from falling last night and my arrhythmia that's not been responding to my antiarrhythmic medication, I'm hoping you'll be okay for me to finish the remaining time I have left so I can finish out this class and be done.

Please let me know when you can so I can plan either way. Thank you!



Copy text        Share        More

# EXHIBIT 36

Michael J. Farrell, AZ Bar No. 015056
mfarrell@bfazlaw.com
**Beyers Farrell PLLC**
99 East Virginia Ave., Ste. 220
Phoenix, AZ 85004-1195
Tel. (602) 738-3022

Brian R. England, AZ Bar No. 024888
bre@agzlaw.com
**Affeld Grivakes LLP**
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Tel. (310) 979-8700

*Attorneys for Plaintiff, Sara Do*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Sara Do, an individual,<br><br>                    Plaintiff,<br><br>          vs.<br><br>Arizona Board of Regents, an Arizona State Entity; Maricopa County Special Health Care District,<br><br>                    Defendant. | **Case No.: 2:21-cv-00190-JJT**<br><br>*Assigned to: Honorable John J. Tuchi*<br><br>**PLAINTIFF SARA DO'S SUPPLEMENTAL RESPONSES TO DEFENDANT ARIZONA BOARD OF REGENTS' FIRST SET OF SPECIAL INTERROGATORIES**<br><br>Action Filed: February 3, 2022 |

PROPOUNDING PARTY:     DEFENDANT ARIZONA BOARD OF REGENTS

RESPONDING PARTY:     PLAINTIFF SARA DO

SET NUMBER:     ONE

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Sara Do ("Plaintiff") hereby responds to Defendant Arizona Board of Regents' ("ABOR") First Set of Special Interrogatories as follows:

## **PRELIMINARY STATEMENT**

Plaintiff objects to the Special Interrogatories, Set One, and each individual request therein (collectively, the "Interrogatories"; each an "Interrogatory") to the extent that the Interrogatories, including any instructions and definitions, seek to impose obligations beyond those contemplated by the Federal Rules of Civil Procedure. Plaintiff does not agree to undertake any obligations beyond those required by the Federal Rules of Civil Procedure.

Discovery and investigation are ongoing. Plaintiff responds to the Interrogatories to the best of his ability based on the information currently available to her. Plaintiff reserves the right to amend or supplement her responses to correct inadvertent errors or omissions, or as additional information comes to light.

Plaintiff objects generally to the extent that the Interrogatories, or any of them, are vague, ambiguous, or unintelligible. To the extent any of the Interrogatories are ambiguous, Plaintiff has interpreted them in good faith and has responded based upon her good faith interpretation.

Plaintiff objects to the extent any of the Interrogatories call for disclosure of information protected by the attorney-client privilege, the work-product doctrine, the spousal privilege, or other applicable privileges and legal protections from disclosure. By responding to any given request or interrogatory, Plaintiff does not intend to waive any applicable privileges or protections. Each response should be interpreted as incorporating an objection on the grounds of all applicable privileges or protections.

By responding to the following Interrogatories, Plaintiff does not concede the relevance or the admissibility of any Interrogatory or response, or any documents produced pursuant to the Interrogatories. Plaintiff reserves all objections to admissibility, including, but not limited to, foundation, personal knowledge, hearsay, authentication, relevance, and undue prejudice.

# # #

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO

DEFENDANT'S FIRST SET OF INTERROGATORIES

## RESPONSES TO SPECIAL INTERROGATORIES

**INTERROGATORY NO. 1.:**

Identify all Medical Providers who examined or treated You for any physical or psychological ailment, injury, or illness within the last 10 years, including for each Medical Provider, their name, address, and phone number, and the diagnosis/diagnoses and/or treatment(s) You received.

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff objects on the ground that this Interrogatory is overly broad and burdensome, and that it is not reasonably tailored to seek relevant information. Plaintiff also objects that this information is equally available to the requesting party which has been provided all of Plaintiff's medical records pursuant to its subpoenas.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

1. Dr. Wilber Su, provider at Banner-University Medicine Heart Institute

   Address: 755 E. McDowell Road, Floor 4, Phoenix, AZ 85006

   Phone: 602-521-3090

   Diagnoses:    Diffuse myocardial fibrosis,

   Multifocal Premature Ventricular Complexes

   Treatments: Antiarrhythmic Medication

2. Dr. Jonathan Weiss, provider at Banner-University Medicine Heart Institute

   Address: 755 McDowell Road, Floor 4, Phoenix, AZ 85006

   Phone: 602-521-3090

   Diagnoses:    Diffuse myocardial fibrosis,

   Multifocal Premature Ventricular Complexes

   Treatments: Antiarrhythmic Medication

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

3.  Dr. Kai-Chun Sung, provider at Tri-City Cardiology

      Address: 6750 E. Baywood Ave. #301, Mesa, AZ 85206

      Phone: 480-835-6100

      Diagnoses: Premature Ventricular Complexes

      Treatments: Antiarrhythmic Medication

4.  Dr. Huy Phan, provider at Valley Heart Rhythm Specialists

      Address: 595 N. Dobson Road, # A-5, Chandler, AZ 85224

      Phone: 480-534-7308

      Diagnoses: Premature Ventricular Complexes

      Treatments: Antiarrhythmic Medication

5.  Dr. Ziad El Khoury, provider at Premier Cardiovascular Center

      Address: 77 S. Dobson Road, Chandler, AZ 85224

      Phone: 480-814-0266

      Diagnoses: Premature Ventricular Complexes

      Treatments: Antiarrhythmic Medication

6.  Dr. John Beshai, provider at The Heart Rhythm Institute of Arizona

      Address: 7221 E. Princess Blvd. #102, Scottsdale, AZ 85255

      Phone: 480-634-4449

      Diagnoses: Premature Ventricular Complexes

      Treatments: Antiarrhythmic Medication

7.  Dr. Linda Lau, provider at Desert Grove Family Medical

      Address: 5656 S. Power Road # 126, Gilbert, AZ 85295

      Phone: 480-545-9686

      Diagnoses: Cardiac Arrhythmia - Referral to Cardiologist

      Treatments: Referral to Cardiologist

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

**SUPPLEMENTAL RESPONSE:**

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

8. Thong Do.

Address:  4242 E. Bethena St., Gilbert, AZ 85295

Phone:     (281) 210-8187

Dr. Do is Plaintiff's ex-husband and has been an informal resource of medical information and support for many years on unrelated issues.   With respect to the disability caused by the COVID-19 vaccine, Dr. Do has provided information and assistance to Plaintiff on an informal basis.  He did not see her as an active patient, did not bill Plaintiff or her insurance for any consultation or treatment, and is not included in her group of active, treating physicians.  Dr. Do is retired from active practice and has been for over two years.

**INTERROGATORY NO. 2.:**

Identify all medications You have been prescribed in the last 10 years.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff objects on the ground that this Interrogatory is overly broad and burdensome. Plaintiff further objects that this Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information.  Plaintiff objects that this Interrogatory unreasonably invades Plaintiff's privacy.  Plaintiff also objects that this information is equally available to the requesting party which has been provided all of Plaintiff's medical records pursuant to its subpoenas.

**INTERROGATORY NO. 3.:**

Identify all Accommodations You allege You requested from ABOR, including for each, the specific Accommodation requested, whether You contend ABOR granted or denied the Accommodation, and whether You contend ABOR changed or modified the Accommodation after it was granted.

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO

DEFENDANT'S FIRST SET OF INTERROGATORIES

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff objects that this Interrogatory is vague and ambiguous as it limits responses to binary options which do not accurately cover all situations.   It is also vague and ambiguous as to time.  Plaintiff further objects on the ground that the Interrogatory is compound.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

The following is a list of accommodations requested and/or provided prior to the commencement of this litigation:

1.  Ability to attend classes remotely; granted; changed.

2.  Ability to take an incomplete for NUR-478; offered; changed.

3.  Ability to complete assignments at an ASU testing center; granted; changed.

4.  Shorter sessions/broken up clinical hour requirements; offered by school in written materials, including student handbook; changed.

5.  Written assignments to replace clinical hour requirements; given without specific request; changed.

**SUPPLEMENTAL RESPONSE:**

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Plaintiff has repeatedly requested that ABOR allow her to complete the required number of clinical hours in blocks or shifts that are shorter than 12-14 hours.  Plaintiff's repeated requests were supported by specific information from multiple treating physicians, each of whom made clear that it was unsafe and against medical advice for Plaintiff to try and complete the shifts as demanded by ABOR.  Abor refused that accommodation request, even though printed materials from ABOR make clear that accommodations to the length of shifts is expressly allowed and contemplated by ABOR.  For example, ABOR's NUR 519 Student Expectations for TTP Clinical description states "If your unit has shifts that are less than 12 hours then you will need to schedule more than 7 shifts to ensure you complete 84 clinical hours."  ABOR's Master of Science in Nursing (Entry to Nursing Practice) Information Packet

1  also expressly states that "modifications to the physical environment or clinical hours" are some

2  of the accommodations that are available to students with recognized disabilities.

3      ABOR has offered a shifting set of explanations for why it has refused this reasonable

4  accommodation, each and all of which lack a reasonable basis and violate the Americans with

5  Disabilities Act, the Rehabilitation Act, and their Arizona equivalents.

6      *First*, on multiple occasions, ABOR has ignored the information submitted from

7  Plaintiff's treating physicians and has demanded additional information from Plaintiff's doctors

8  to support her requests.  Both Dr. Allison Kaplan and Dr. Jonathan Weiss submitted written

9  documentation to ABOR supporting Plaintiff's request for a reasonable accommodation,

10  emphasizing risks of "significant exertion as well as working very long hours without adequate

11  breaks."  ABOR's reckless and bad faith decision to disregard the information submitted by

12  trained healthcare professions overseeing Plaintiff's condition violates the law.  Significantly,

13  for an institution that is supposed to be training healthcare providers and professionals, ABOR's

14  conduct violates well-established medical concepts of "nonmaleficience" (the ethical principle

15  under which physicians and nurses do not to harm the patient), "beneficience" (the ethical

16  principle under which physicians and nurses act for the benefit of the patient), and not

17  encouraging patients to act "AMA" or against medical advice.

18      *Second*, ABOR and its authorized representatives have repeatedly misrepresented that the

19  clinical shifts must be completed in 13–14-hour shifts.  Going further, these same representatives

20  have repeatedly asserted that anything less than 13-14-hour shifts would amount to a

21  "fundamental alteration" of the nursing program.  For example, on June 6, 2023, Dr. Victoria

22  Scheer, ABOR's Director of Masters Entry and Accelerated Nursing Programs, emailed Plaintiff

23  and denied her request to schedule her clinical assignments in less than 13-14-hour shifts.  Dr.

24  Scheer stated "You are required too complete 7 full shifts, at approximately 13-14 hours each,

25  including report at the beginning and end of each shift."  That statement by Dr. Scheer, on

26  ABOR's behalf, is false and demonstrably so.  There is no requirement by the Arizona Nursing

27  Board that the shifts be at least 13-14 hours long and the clinical shifts approved by ABOR

28  faculty routinely last less than 13-14 hours.

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

Nor is Dr. Scheer the only ABOR representative who has repeated this falsehood.  In an email to Plaintiff on January 6, 2023, Alicia Wackerly-Painter. ABOR's Director-Access and Student Support in ABOR's SAILS office, falsely stated that accommodating Plaintiff's request for clinical shifts of less than 13-14-hours would be a "fundamental alteration of the program".  Ms. Wackerly-Painter, in a legalese-filled email, stated in part:

> The required clinical hours are determined by the learning objectives of the program. While the program does allow students to make up a small number of missed clinical hours in alternative manners, we want to clarify that, as per the nursing program handbook, in order to ensure the student's acquisition of the skills/knowledge for the particular clinical course's intended learning outcomes, attendance at all clinical learning experiences is the general expectation. The number of hours required in the SIM and Clinical environments have been determined by the faculty teaching the courses as essential elements of the course."

As will be shown below, the ABOR nursing program handbook expressly contemplates clinical shifts of 8-12 hours and nowhere states that 13-14 hour shifts are required.  Ms. Wackerly-Painter's statement is thus false and part of a pattern of ABOR refusing reasonable accommodations to Plaintiff in direct violation of the law.

On May 17, 2023, during a class with Professor Candace Keck (a defendant in the companion case in Arizona State Court), Plaintiff asked Professor Keck if clinical shifts could be less than 13-14 hours in length.  Professor Keck responded that this specific clinical experience required a total of 52 hours, but that the facilities being used for the clinical experiences did not want the ABOR students there in "full shifts" and that it would be at the discretion of the ABOR faculty present to dismiss students early based on what the facility determines is best on any given day.  Professor Keck also stated that the remaining required hours would be completed via zoom or online discussion from any remote location as the students and faculty discussed the clinical experience.  These statements by Professor demonstrate that granting Plaintiff's request for this reasonable accommodation would not amount to a "fundamental alteration" of the program.  Numerous other nursing students were present during this conversation and can corroborate that clinical shifts often are stopped well short of 13-14 hours.

As but one example, for a clinical shift on June 10, 2023, ABOR Professor Bryan

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

Reddick for the class NUR 516 Summer 23, allowed the nursing students to receive 12 hours of clinical credit for NUR 516 even though the students spent far less than 12 hours in the virtual clinical.  In an email to the students in advance of that clinical, Professor Reddick stated that "I set the meeting from 0900 until 1600, but I am sure we will not be going this long."  At the start of the clinical, Professor Reddick stated that he had to schedule the day for that long in case any of the course coordinators were looking at his Zoom schedule for this virtual clinical.  The session actually went from 9:00 a.m. to 1:00 p.m.  At the end of the virtual clinical day, Professor Reddick stated that "So our group was different for our virtual clinical day, so don't go telling other students that we finished early just because we did our psychopharmacology commercial at a shorter time."  The students responded "Your secret is safe with us," to which Professor Reddick responded "Thank you, have a good day."[1]

When Plaintiff originally completed her NUR 516 Summer 23 Clinical Performance Evaluation and accurately reported the number of hours actually spent on the June 10, 2023 clinical, Professor Reddick changed her evaluation and increased the number of hours to "12". By so doing, Professor Reddick, an ABOR professor and representative, created a false record of the hours spent and submitted it to the University.  Thus, not only does this example prove that there is no actual requirement that the clinical shifts be 13-14 hours long, but also that ABOR and its representatives have no issue with creating false records concerning these clinical experiences, which are then used to show completion of the program requirements and certify to the Arizona Board of Nursing that the requirements have been met.

Further, the Edson College of Nursing and Health Innovation BSN Nursing Handbook expressly contradicts ABOR, Dr. Scheer, Professor Keck, and Ms. Wackerly-Painter's false statements.  In that Handbook's "General Description of Required Nursing Practice for

---

[1] The point of quoting Professor Reddick is not single him out or cause him issues with ABOR.  Rather, it is just one of many examples of instances where ABOR professors approve clinical shifts and experiences of less than 13-14 hours, many of which can be easily corroborated with the records of the virtual clinicals and the records of when ABOR students are physically present for the clinical sessions.  For example, for a Critical Care clinical shift, ABOR Professor Katelyn Keown dismissed the ASU students at 3 pm because Professor Keown had a night shift that day at another facility and needed time to rest before her other shift. There are numerous examples of ABOR professors approving clinical shifts of less than 13 or 14 hours. ABOR cannot credibly claim that granting Plaintiff's request to complete her clinicals in less than 13–14-hour shifts would "fundamentally alter" the program.

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

Students" (pg. 39), it states that "Students usually complete nursing practice in 8- or 12-hour blocks of time."  ABOR has not, and cannot, reasonably explain how granting Plaintiff's request to complete her clinical hours in 8-hour shifts would constitute a "fundamental alteration" of the program when the program materials expressly contemplate doing them in 8-hour shifts.

*Third*, ABOR pretended to make an accommodation to the 13-14 hour clinical "requirement" by allowing Plaintiff to take a 1-2 hour break during the clinical session if needed to address her disability.  In numerous communications, however, ABOR specifically required Plaintiff to pre-schedule these breaks before the clinical started.  The express purpose for the accommodation was to allow Plaintiff to address an acute episode of her cardiac condition, something that is impossible to predict and schedule around.  In essence, ABOR told Plaintiff that she could have a 1-2 hour break to address a heart attack as long as she told ABOR in advance when that heart attack would happen during the day.  ABOR's position is absurd and in flagrant violation of, *inter alia*, the ADA.

**INTERROGATORY NO. 4.:**

Describe with particularity the factual basis for the allegations in Paragraph 29 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff objects to this Interrogatory on the ground that it is a contention interrogatory seeking all facts in support of her allegations, even though discovery has only recently commenced.  Plaintiff expressly reserves the right to supplement this Response as additional facts and evidence are discovered.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Do and her fellow students were expressly told that they would have to be fully vaccinated in order to complete their required clinicals and, subsequently, graduate from the Master's of Nursing program.  This was conveyed to them orally on numerous occasions.

On websites maintained by ABOR, including MyClinicalExchange, COVID-19 vaccinations and boosters are listed amongst the medical requirements students must satisfy in

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

order to be considered in compliance with school rules and in order to be assigned to hospitals to fulfill clinical hour requirements. Students who have not been vaccinated/boosted and provided this information are given a red thumbs-down icon, signifying their inability to enroll in courses. Students may only be exempted from these requirements upon a showing of medical proof, such as a doctor's note why they cannot or should not be required to get the COVID-19 vaccine, and this showing is still subject to ABOR's final approval. Students cannot simply decline to receive this vaccine or not provide vaccination history information. Though there is a process for opting out, the fact that COVID-19 vaccination is the default expected by the school, rather than something that can be freely opted in to, shows vaccination was not voluntary.

Further, ABOR, by and through the Edson College of Nursing, schedules mandatory clinical shifts at various medical institutions which have their own requirements for COVID-19 vaccinations. Students participating in mandatory clinicals are required by these hospitals to be vaccinated. Since these clinicals must be completed to satisfy graduation requirements, ABOR requires compliance with vaccinations requirements through regulations imposed by these hospitals as well.

When Plaintiff received her COVID-19 vaccine in December of 2020, it had just been released earlier that month for mass distribution among healthcare workers with an "emergency use authorization" (EUA) label to bypass the typical years-long safety measures of standard vaccination approvals. ABOR, by and through its administrators of its nursing programs, including at Edson, would have or should have been aware of the possibility of severe reactions.

**INTERROGATORY NO. 5.:**

Describe with particularity the factual basis for the allegations in Paragraph 65 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff objects to this Interrogatory on the ground that it is a contention interrogatory seeking all facts in support of her allegations, even though discovery has only recently commenced. Plaintiff expressly reserves the right to supplement this Response as additional facts and evidence are discovered. Plaintiff also objects on the ground that this Interrogatory is

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

1  overly broad and burdensome.  Plaintiff further objects to this Interrogatory to the extent that it

2  seeks the premature disclosure of expert opinion and evidence.

3      Subject to and without waiving the foregoing general and specific objections, Plaintiff

4  responds as follows:

5      Do received her COVID-19 vaccination in December 2020.  She was required to be

6  vaccinated by ASU and by hospital partners of the school at whose facilities she would be

7  required to conduct her clinical classes.  She had a severe negative reaction to the shot, and

8  developed a potentially permanent and disabling heart condition as a result.

9      At numerous times following the onset of Do's disability because of complications from

10  the COVID-19 vaccine, Plaintiff requested reasonable accommodations from ABOR.  These

11  accommodations included the ability to attend class remotely, the ability to complete

12  assignments and exams at ASU's testing centers closer to Plaintiff's home, and the ability to

13  break up clinical hour requirements into shorter shifts while still fulfilling the overall required

14  hours.  Do provided supporting materials from her physicians when making these requests.  Each

15  time Plaintiff received an accommodation from ABOR, or in some cases requested

16  accommodations that ABOR publicly stated it offered, these accommodations were either

17  granted and later modified or denied outright.

18      Plaintiff requested the ability to attend classes remotely, as had been standard practice

19  during the COVID-19 pandemic and in light of the fact that she is unable to drive due to her

20  arrythmias.  ABOR allowed her to do so at first, and then began requiring in person attendance.

21      Plaintiff requested to be able to complete exams and other assignments that must be

22  conducted in person at an ASU testing center 3 miles from her home.  ABOR initially allowed

23  this, and again changed its mind and began requiring Do to come all the way to campus, 27

24  miles from her home.

25      When Do missed her clinical shifts in NUR-478, written assignments were placed in her

26  student portal for the purpose of making up her clinical hours.  As Do was completing this work,

27  which had been affirmatively placed there by ABOR by and through its faculty agents, Do was

28  instead informed that the work she had largely finished would not qualify and she would still

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

1   need to make up in person clinical hours.

2       Despite specifically stating in its student handbook and other materials that modifications

3   could be made to break up clinical hours into shorter sessions for students, an assurance on

4   which Do relied, ABOR refused to break Do's clinical sessions up in such a way.  They instead

5   assigned her to full, 12+ hour shifts, required to be performed back-to-back, two at a time,

6   despite knowing that this seriously risked triggering her arrythmias.

7       On July 24, 2021, when Do arrived to make up the clinical shifts her written work had

8   not counted towards fulfilling, she was assigned to two trauma surgeries handling horrifying

9   injuries.  When she expressed concern about these environments, in particular the burn surgery

10   to which she had originally been assigned, and the fact that her arrythmias are triggered by

11   stressful situations such as the ones these surgeries presented, Plaintiff's concerns were

12   dismissed.  She attempted to complete her clinicals in these surgeries, even though (i) her

13   classmate was assigned to far less strenuous ACLS classroom learning that same day for her

14   makeup clinicals, and (ii) the clinicals Do had missed were bedside shifts.  Do eventually went

15   into arrythmia despite her best efforts, and had to leave the facility to get her symptoms under

16   control.

17       Though she tried her best, performed her work while present, and did try to contact her

18   advisor multiple times before leaving, ABOR, by and through its agents, gave Do a scathing

19   performance review alleging that she had not done any of those things.  It stated she was

20   unprofessional, had complained that the room was going to be "too warm" for her to attend the

21   originally assigned burn surgery, had left without telling anyone, and multiple other defamatory

22   and false statements. The evaluation mocked Do for her disability and the disruption it caused to

23   her clinical performance because ABOR had placed her in stressful environments when they did

24   not need to and when they knew that arrythmias would result.  As a result of that evaluation, Do

25   was given a failing grade in the class.  This undeserved grade's harm to her GPA and reputation,

26   combined with ABOR's unwillingness to provide her promised reasonable accommodations to

27   help her safely complete work despite her arrythmias, made it impossible for Do to continue in

28   her program.  This also meant that she would be unable to earn her Master's as intended, or

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

provide for herself and her family once she had acquired it.

**INTERROGATORY NO. 6.:**

Describe with particularity the factual basis for the allegations in Paragraph 79 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff objects to this Interrogatory on the ground that it is a contention interrogatory seeking all facts in support of her allegations, even though discovery has only recently commenced.  Plaintiff expressly reserves the right to supplement this Response as additional facts and evidence are discovered. Plaintiff objects on the ground that this Interrogatory is overly broad and burdensome.  Plaintiff further objects to the extent that this Interrogatory seeks the premature disclosure of expert testimony and facts.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

While performing her clinical shifts at Valleywise on July 24, 2021, Do was assigned to two separate trauma surgeries.  Each was a high-stress environment with clear signs of being particularly agitating—even for a hospital environment.  Each also was a zone she was not allowed to be in, pursuant to Valleywise policy.

Valleywise documentation, such as the "Limitations Applied to All Nursing & Allied Health Student Experiences" document, which Do provided to Dr. Day ahead of the start of her clinical shift, clearly states that students are not permitted in rooms requiring a N95 respirator. In one of Dr. Day's prior emails, she told Do to make sure she brought an N95 mask for each clinical shift, since there is not time to test emergency/trauma patients first to determine their COVID status.  Do, who only received one shot of COVID-19 vaccine, is already more susceptible to contracting COVID with more serious symptoms than individuals who are fully vaccinated.  Dr. Day informed Do that, despite its unequivocal language, the Valleywise rule did not apply to Do personally, said she was exempt from that rule in the operating room, and that if she refused to attend any surgery requiring N95 masks, she would not be able to make up as many clinical hours that day as she needed.  Do was knowingly forced to enter surgeries that

- 14 -

1  posed her specific risk of COVID-19 in violation of policies meant to protect her.

2  The first surgery to which Do was assigned was a burn victim, where the operating room

3  would need to be kept at a high temperature for patient safety.  This meant that Do was going to

4  be placed in an area kept at 100+ degrees for an anticipated 3-hour surgery.  Such temperature is

5  uncomfortable for most people, and a clear risk for aggravating Do's heart condition by placing

6  extra strain on her body necessary to cope with the heat.  The conditions of this surgery also

7  caused Do concern that she would not have easy access to her medications to help control her

8  arrythmias, should one arise, and how her condition might affect treatment of the patient.

9  Do foresaw these problems and expressed concern to Dr. Day, but also made clear her

10  willingness to participate in the burn surgery if necessary to complete her assignment.  Instead,

11  Dr. Day reassigned Do to another trauma surgery.  Here, Do's cases involved severe accident

12  victims, including one patient who had been degloved—*i.e.*, the skin and muscle from his palm

13  up to his deltoid had been completely ripped off in a motor vehicle accident, and was spurting

14  blood and surgical fluids in the operating room.  Do at one point was told to stand clear and

15  attempt to avoid said fluids being sprayed on her.  Another patient had been crushed by a

16  forklift, was nonresponsive when brought in.  These cases were extreme and upsetting, and like

17  the burn assignment, it was obvious that this environment and exposure to such grievous injuries

18  would be upsetting and heighten anxieties for anyone present.  This was even more so the case

19  for Do, who was known to have arrythmias triggered by stressful environments.  Again,

20  foreseeably and unsurprisingly, Do began experiencing arrythmias.

21  Do's disability was known to Day, and the uniquely stressful environments that these

22  particular assignments posed was or should have been obvious to someone with Dr. Day's years

23  of education and experience, and based on her work with other nursing students like Do.  Do did

24  her best to complete the assignment, but eventually began experiencing arrhythmias due to these

25  horrific scenes. The traumatic clinical shift sent Do into tachycardiac ventricular bigeminy. At

26  11:01 a.m., Do emailed Dr. Day to let her know that she was not feeling well and specified she

27  was having heart arrhythmia. At 11:07 a.m., she called Dr. Bednarek to try to let her know about

28  the situation, but Dr. Bednarek did not answer. At 11:30 a.m., she emailed Dr. Day again to let

- 15 -

1   her know that she needed to leave due to aggravation of her heart condition and disability.

2        Do is aware that while she was assigned to these surgeries to perform her clinical

3   requirements, more suitable alternatives were available at Valleywise.  For instance, ASU

4   program directors and professors assigned one of her fellow students, Theresa Lobato, to a

5   classroom Advanced Cardiovascular Life Support (ACLS) training to make up for also having

6   missed clinicals.  Such classes generally involve training in advanced life support skills, such as

7   chest compressions and using Automated External Defibrillators (AEDs).  These techniques are

8   practiced on mannequins, not live patients, and are highly sought after certifications for nurses

9   who are given priority selection for future job offers when ACLS certified.

10        Following Do's clinical shift, ABOR, by and through its agents, gave Do a scathing

11   performance review alleging that she had not made any attempt to inform anyone she needed to

12   leave due to her emergent health situation, was unprofessional, and had complained that the

13   room was going to be too warm for her to attend the originally assigned burn surgery, amongst

14   other defamatory and false statements. The evaluation mocked Do for her disability and the

15   disruption it caused to her clinical performance because ABOR had placed her in stressful

16   environments when they did not need to and when they knew that arrythmias would result.  As a

17   result of that evaluation, Do was given a failing grade in the class.  This undeserved grade's

18   harm to her GPA and reputation, combined with ABOR's unwillingness to provide her promised

19   reasonable accommodations to help her safely complete work despite her arrythmias, made it

20   impossible for Do to continue in her program.  This also meant that she would be unable to earn

21   her Master's as intended, or provide for herself and her family once she had acquired it.

22   **INTERROGATORY NO. 7.:**

23        Describe with particularity the factual basis for the allegations in Paragraph 99 of the

24   Complaint.

25   **RESPONSE TO INTERROGATORY NO. 7:**

26        Plaintiff objects on the ground that this Interrogatory is overly broad and burdensome.

27   Plaintiff objects to this Interrogatory on the ground that it is a contention interrogatory seeking

28   all facts in support of her allegations, even though discovery has only recently commenced.

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff expressly reserves the right to supplement this Response as additional facts and evidence are discovered. Plaintiff objects on the ground that this Interrogatory is overly broad and burdensome.  Plaintiff further objects to the extent that this Interrogatory seeks the premature disclosure of expert testimony and facts.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

While performing her clinical shifts at Valleywise on July 24, 2021, Do was assigned to two separate trauma surgeries.  Each was a high-stress environment with clear signs of being particularly agitating—even for a hospital environment.  Each also was a zone she was not allowed to be in, pursuant to Valleywise policy.

Valleywise documentation, such as the "Limitations Applied to All Nursing & Allied Health Student Experiences" document, which Do provided to Dr. Day ahead of the start of her clinical shift, clearly states that students are not permitted in rooms requiring a N95 respirator. In one of Dr. Day's prior emails, she told Do to make sure she brought an N95 mask for each clinical shift, since there is not time to test emergency/trauma patients first to determine their COVID status.  Do, who only received one shot of COVID-19 vaccine, is already more susceptible to contracting COVID with more serious symptoms than individuals who are fully vaccinated.  Dr. Day informed Do that, despite its unequivocal language, the Valleywise rule did not apply to Do personally, said she was exempt from that rule in the operating room, and that if she refused to attend any surgery requiring N95 masks, she would not be able to make up as many clinical hours that day as she needed.  Do was knowingly forced to enter surgeries that posed her specific risk of COVID-19 in violation of policies meant to protect her.

Further, Do's disability was known to Day, and the uniquely stressful environments that Do's assignments posed was or should have been obvious to someone with Dr. Day's years of education and experience, and based on her work with other nursing students like Do.  Do did her best to complete the assignment, but eventually began experiencing arrhythmias due to these horrific scenes. The traumatic clinical shift sent Do into tachycardiac ventricular bigeminy. At 11:01 a.m., Do emailed Dr. Day to let her know that she was not feeling well and specified she

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

1 was having heart arrhythmia. At 11:07 a.m., she called Dr. Bednarek to try to let her know about

2 the situation, but Dr. Bednarek did not answer. At 11:30 a.m., she emailed Dr. Day again to let

3 her know that she needed to leave due to aggravation of her heart condition and disability.

4      Do is aware that while she was assigned to these surgeries to perform her clinical

5 requirements, more suitable alternatives were available at Valleywise.  For instance, ASU

6 program directors and professors assigned one of her fellow students, Theresa Lobato, to a

7 classroom Advanced Cardiovascular Life Support (ACLS) training to make up for also having

8 missed clinicals.  Such classes generally involve training in advanced life support skills, such as

9 chest compressions and using Automated External Defibrillators (AEDs).  These techniques are

10 practiced on mannequins, not live patients, and are highly sought after certifications for nurses

11 who are given priority selection for future job offers when ACLS certified.

12      During Do's performance of clinicals, she was not provided with reasonable

13 accommodations.  Instead of acknowledging her disability and working to help her complete her

14 assignment, Defendants actively placed her in stressful situations when they did not need to, did

15 not make Valleywise personnel (other than Dr. Day) aware of her disability when she came to

16 perform her clinical, and constructively forced Do out of the program when she unsurprisingly

17 experienced medical episodes due to these actions.

18 **INTERROGATORY NO. 8.:**

19      Describe with particularity all damages You claim to have suffered as alleged in the

20 Prayer for Relief of the Complaint.

21 **RESPONSE TO INTERROGATORY NO. 8:**

22      Plaintiff objects that this Interrogatory calls for the premature disclosure of expert

23 testimony, opinions, and work product.

24      Subject to and without waiving the foregoing general and specific objections, Plaintiff

25 responds as follows:

26      Plaintiff seeks damages according to proof, related to the harm she suffered because of

27 Defendants' failure to accommodate her disability and her resulting emotional distress.  In order

28 to properly calculate Plaintiff's damages, she will require expert testimony to evaluate various

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

1  factors including the harm done to her reputation and her earning potential.  Do is presently back

2  in ASU's Master's of Nursing program, trying to complete her degree.  She is also still

3  considering surgical options which may alleviate her disability, though new MRI imaging results

4  suggest she may not be a candidate for an ablation as previously hoped.  These developments

5  may impact Do's damages as well.  Plaintiff will provide an updated calculation of her damages

6  at such time that a calculation is possible once she has retained an expert and once potentially

7  mitigating factors have played out.

8

9  Dated:  July 6, 2023                          Respectfully submitted,

10                                                      By: /s/ Brian R. England
                                                            Brian R. England
11                                                        Affeld Grivakes LLP

12                                                        Attorney for Plaintiff
                                                            Sara Do
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

1

**VERIFICATION**

2    I, Sara Do, have reviewed PLAINTIFF SARA DO'S SUPPLEMENTAL RESPONSES

3    TO DEFENDANT ARIZONA BOARD OF REGENTS' FIRST SET OF SPECIAL

4    INTERROGATORIES, know their contents, and declare under penalty of perjury under the

5    laws of the United States that the responses are true and correct based on my personal

6    knowledge at this time.

7

8    Executed on July 6, 2023 in Gilbert, Arizona,

9

10    _____

11    Sara Do

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

## PROOF OF SERVICE

I, the undersigned, certify and declare:

I am over the age of 18 years and am employed in the County of Los Angeles, State of California.  I am not a party to this action.  My business address is 2049 Century Park East, Suite 2460, Los Angeles, CA 90067.

On July 6, 2023, I served a true copy of the following documents as described herein:

**PLAINTIFF SARA DO'S SUPPLEMENTAL RESPONSES TO DEFENDANT ARIZONA BOARD OF REGENTS' FIRST SET OF SPECIAL INTERROGATORIES**

I served true copies of the foregoing on the interested parties as follows:

| Party(ies) | Address(es) for Service |
|---|---|
| Attorneys for Defendant Arizona Board of Regents | Mary R. O'Grady, 011434<br>Kristin L. Windtberg, 024804<br>Joshua J. Messer, 035101<br>OSBORN MALEDON, P.A.<br>2929 North Central Avenue, 21st Floor<br>Phoenix, Arizona 85012-2793<br>(602) 640-9000<br>mogrady@omlaw.com<br>kwindtberg@omlaw.com<br>jmesser@omlaw.com |
| Attorneys for Defendant Maricopa County Special Health Care District | Jill J. Chasson, 019424<br>Andrew T. Fox, 034581<br>2800 North Central Ave., Suite 1900<br>Phoenix, AZ  85004<br>afox@cblawyers.com<br>JChasson@cblawyers.com |

**ONLY BY ELECTRONIC TRANSMISSION**: Only by emailing the document(s) to the persons at the e-mail address(es). Pursuant to stipulation of the parties, court order, or consent to electronic service, I caused the foregoing to be served on the interested parties via email or electronic delivery through an electronic delivery service.  No electronic message or other indication that the transmission was unsuccessful was received within a reasonable time after the transmission.

I hereby certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  July 6, 2023                    /s/ Brian R. England
                                        Brian R. England

- 21 -

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES